**DYKEMA GOSSETT LLP**
JOHN M. THOMAS, SBN: 266842
TAMARA A. BUSH, SBN: 197153
FRED J. FRESARD (*Pro Hac Vice*)
KRISTA L. LENART (*Pro Hac Vice*)
JANET CONIGLIARO (*Pro Hac Vice*)
333 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Telephone:     (213) 457-1800
Facsimile:      (213) 457-1850

**ORRICK**
NORMAN HILE, SBN: 57299
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497

Attorneys for Defendant
FORD MOTOR CO.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals<br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY, a Delaware corporation,<br><br>Defendant. | Case No. 2:11-cv-02890-WBS -EFB<br><br>**FORD MOTOR COMPANY'S   NOTICE OF   MOTION   AND   MOTION   TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER**<br><br>Date:          May 6, 2013<br>Time:          2:00 p.m.<br>Courtroom:    5<br><br>Honorable William B. Shubb |

*Sidebar (vertical text):* DYKEMA GOSSETT LLP 333 SOUTH GRAND AVENUE, SUITE 2100 LOS ANGELES, CALIFORNIA 90071

1    TO THE COURT, TO ALL PARTIES, AND THEIR ATTORNEYS:

2    PLEASE TAKE NOTICE that Defendant FORD MOTOR COMPANY ("Ford"), through its

3    attorneys, Dykema Gossett LLP, in the courtroom of the Honorable Judge William B. Shubb

4    located at 501 I Street, Suite 4-200, Courtroom 6, Sacramento, California on May 6, 2013, at 2:00

5    pm, will move for an order excluding the testimony of Plaintiffs' expert Thomas J. Lepper.

6

7    This Motion is made pursuant to Federal Rules of Evidence 402 and 702, and *Daubert v.*

8    *Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Ford's Motion is based on this Notice of

9    Motion and Motion, and the attached Brief in Support, the pleadings, papers and records on file in

10   this action, and upon such other and further evidence and argument as may be presented at the time

11   of the hearing on the Motion.

12   WHEREFORE, Ford respectfully requests that this Court enter an Order excluding the

13   testimony of Plaintiffs' expert Thomas J. Lepper.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DYKEMA GOSSETT LLP**
**333 SOUTH GRAND AVENUE, SUITE 2100**
**LOS ANGELES, CALIFORNIA 90071**

1

2    Dated: March 15, 2013

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DYKEMA GOSSETT LLP

By: /s/ Fred J. Fresard

Fred J. Fresard (admitted *pro hac vice*)
*ffresard@dykema.com*
39577 Woodward Ave., Suite 300
Bloomfield Hills, MI 48304

John M. Thomas (SBN 266842)
*jthomas@dykema.com*
Krista L. Lenart (admitted *pro hac vice*)
*klenart@dykema.com*
Janet Conigliaro (admitted *pro hac vice*)
*jconigliaro@dykema.com*
2723 South State Street, Suite 400
Ann Arbor, MI  48104

Tamara A. Bush (SBN 197153)
*tbush@dykema.com*
333 South Grand Avenue, Suite 2100
Los Angeles, California 90071

Norman Hile (SBN 57299)
ORRICK
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497

Attorneys for Defendant  FORD MOTOR CO.

FORD MOTOR COMPANY'S  MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

**DYKEMA GOSSETT LLP**
JOHN M. THOMAS, SBN: 266842
TAMARA A. BUSH, SBN: 197153
FRED J. FRESARD (*Pro Hac Vice*)
KRISTA L. LENART (*Pro Hac Vice*)
JANET CONIGLIARO (*Pro Hac Vice*)
333 South Grand Avenue, Suite 2100
Los Angeles, California 90071
Telephone:      (213) 457-1800
Facsimile:      (213) 457-1850

**ORRICK**
NORMAN HILE, SBN: 57299
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497

Attorneys for Defendant
FORD MOTOR CO.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals | Case No. 2:11-cv-02890-WBS -EFB |
| Plaintiffs, | **FORD MOTOR COMPANY'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER** |
| vs. | Date:          May 6, 2013 |
| FORD MOTOR COMPANY, a Delaware corporation, | Time:          2:00 p.m. Courtroom:    5 |
| Defendant. | Honorable William B. Shubb |

*DYKEMA GOSSETT LLP*
*333 SOUTH GRAND AVENUE, SUITE 2100*
*LOS ANGELES, CALIFORNIA 90071*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION & FACTUAL BACKGROUND ..................................................... 1

ARGUMENT ....................................................................................................................... 3

I.      APPLICABLE LEGAL STANDARD ................................................... 3

II.     LEPPER IS NOT QUALIFIED TO GIVE AUTOMOTIVE DESIGN DEFECT OPINIONS ................................................................. 5

III.    LEPPER'S OPINIONS ARE NOT RELIABLE AND ARE BASED ON PURE SPECULATION ..................................................... 8

      A.      Lepper's Premature Tire Wear Opinions Should Be Excluded .................................. 8

           1.      Lepper's Tire Wear Opinions Have Not Been Tested ................................... 9

           2.      Lepper's Tire Wear Opinions Are Not Based on Reliable Data ................... 10

           3.      Lepper Failed to Quantify Any Actual Tire Wear ........................................ 12

      B.      Lepper's Vehicle Handling Testing and Opinions Should Be Excluded ................. 15

      C.      Lepper's Repair Cost Estimates Should Be Excluded ............................................. 19

CONCLUSION ............................................................................................................... 21

**DYKEMA GOSSETT LLP**
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

FORD MOTOR COMPANY'S BRIEF IN  IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

1

2

## **<u>TABLE OF AUTHORITIES</u>**

3

**Page(s)**

4

**CASES**

5

*Am. Honda Motor Co. v. Allen*,

6

    600 F.3d 813 (7th Cir. 2010) ...............................................................................5, 11, 12

7

*Avila v. Willits Env't Remediation Trust*,

    No. C99-3941, 2008 WL 360858 (N.D. Cal. Feb. 6, 2008) ......................................9

8

*Bourelle v. Crown Equip. Corp.*,

9

    220 F.3d 532 (7th Cir. 200) .....................................................................................9

*Cabrera v. Cordis Corp.*,

    134 F.3d 1418 (9th Cir. 1998) ...........................................................................14, 17

*Cummings v. Lyle Indus.*,

    93 F.3d 362 (7th Cir. 1996) .....................................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

    43 F.3d 1311 (9th Cir. 1995) ("*Daubert II*") .........................................................15

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,

    509 U.S. 579 (1993) ("*Daubert*") ....................................................................*passim*

*Domingo ex rel. Domingo v. T.K.*,

    289 F.3d 600 (9th Cir. 2002) ...................................................................................5

*Gen. Tel Co. of Sw. v. Falcon*,

    457 U.S. 147 (1982)..................................................................................................5

*Guidroz-Brault v. Missouri. Pac. Railroad Co.*,

    254 F.3d 825 (9th Cir. 2001) ...........................................................................4, 8, 15

*Heisler v. Maxtor Corp.*,

    No. 5:06-cv-06634, 2001 WL 1496114 (N.D. Cal. Apr. 20, 2011) ...................7, 14

*In re Oracle Corp. Sec. Litig.*,

    627 F.3d 376 (9th Cir. 2010) ...................................................................................4

*In re Paoli R.R. Yard v. PCB Litig.*,

    35 F.3d 717 (3rd Cir. 1994) ...............................................................................12, 17

*Keegan v. Am. Honda Motor Co., Inc.*,

    284 F.R.D. 504 (C.D. Cal. 2012)......................................................................8, 11

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

iii

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999).................................................................................3, 4, 5

*Lust v. Merrell Dow Pharm.,*
    89 F.3d 594 (9th Cir. 1996) ....................................................................4, 12

*Samuels v. Holland American Line-USA Inc.,*
    656 F.3d 948 (9th Cir. 2011) ........................................................................8

*Shalaby v. Irwin Indus. Toll Co.,*
    No. 07CV2107, 2009 WL 7452756 (S.D. Cal. July 28, 2009) aff'd ..........9

*Shalaby v. Newell Rubbermaid, Inc.,*
    379 Fed. Appx. 620 (9th Cir. 2010)............................................................9

*Trumps v. Toastmaster, Inc.,*
    969 F. Supp. 247 (S.D.N.Y. 1997) .............................................................9

*Unger v. Amedisys Inc.,*
    401 F.3d 316 (5th Cir. 2005) .......................................................................5

*United States v. Hermanek,*
    289 F.3d 1076 (9th Cir. 2002) ..............................................................4, 17

*Wal-Mart Stores, Inc. v. Dukes, et al.,*
    U.S., 131 S. Ct. 2541 (2011)........................................................................5

**RULES**

Federal Rule of Civil Procedure 23 ......................................................................5

Federal Rules of Evidence 402 and 702 ...........................................1, 3, 4, 5, 7, 12, 17

**DYKEMA GOSSETT LLP**
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

FORD MOTOR COMPANY'S BRIEF IN  IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

Defendant Ford Motor Company ("Ford") respectfully submits the following Memorandum of Points and Authorities in support of its Motion to Exclude Testimony of Thomas J. Lepper, pursuant to Federal Rules of Evidence 402 and 702, and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").

## INTRODUCTION & FACTUAL BACKGROUND

Plaintiffs allege that all 2005-2011 model year Ford Focus vehicles are defective because the geometry of the rear suspension system causes premature tire wear on the inboard tread of the vehicle's rear tires.  (See Complaint, *generally*.)  In support of their Complaint and Motion for Class Certification, Plaintiffs offer the opinions of Thomas Lepper.  Mr. Lepper was hired as one of three automobile suspension/tire wear experts whom Plaintiffs intend to call at trial.  Mr. Lepper plans to provide an expert opinion that the Focus vehicles "have a rear suspension problem that causes premature wear to the rear tires."  (Lepper Report, Ex. A, p. 2.)[1]  As set forth in Lepper's expert report, his opinions with respect to this case are generally as follows:

The rear suspensions of the five named Plaintiffs' Ford Focuses "have a geometry problem that manifests itself as accelerated wear on the inner tread row of the rear tires." (*Id.*, p. 3)

This suspension geometry "produces undesired movement and substantial loads on the inner edge of the rear tires, leading to premature wear on the inner tread rows of the rear tires." (*Id.*)

"The rear suspension geometry exists in all class vehicles inspected" and thus "accelerated wear to the rear tires is characteristic of the design of the rear suspension of the vehicle." (*Id.*, p. 4.)

"All five of the named Plaintiffs' vehicles exhibited accelerated wear problems of the rear tires" despite varying driving habits, maintenance history, and vehicle usage. (*Id.*)

Plaintiffs' experts' modifications to the rear suspension "did not affect the handling characteristics of the vehicle." (*Id.*)

The cost to remediate the rear suspension varies, but is "reasonable and consistent with industry standards." (*Id.*)

---

[1] Ford has also contemporaneously moved to exclude the opinions of Plaintiffs' other two suspension/tire wear experts, Peter Tkacik and Andrew Webb, for many of the same reasons.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

Mr. Lepper's opinions, however, are inadmissible for several reasons.

*First*, he is not qualified to offer these opinions.  Although Lepper identifies a supposed "problem" with the design of the rear suspension on the Ford Focus, he is not an engineer, he has not designed a suspension or any other component parts for production automobiles, he has never written any articles concerning suspensions, wheel alignment, vehicle dynamics or tire wear, and he has not relied on any treatise or publication to formulate his opinions.  His career as a fire cause and origin expert, accident reconstructionist and amateur stock car driver is not enough to qualify him as an expert in automotive suspension design and its effect on tire wear.

*Second*, Mr. Lepper's opinions are also inadmissible because they were never tested.  He never tested Plaintiffs' alternative design to see if it has any effect on tire wear.  This alone is fatal; mere conjecture and untested theories are inadmissible.  To compound the problem, Lepper has ignored all empirical data concerning the rate of Ford Focus' tire wear in the field.  He did not research the average tire life for the 2005–2011 Ford Focus.  He has no knowledge of the percentage of customers who complained about accelerated tire wear, and how that compares to other vehicles.  He did not compare the Focus' rate of tire wear to competitor vehicles or other Ford vehicles.  The only tire measurements that Lepper did collect—the tire tread depths of the five named Plaintiffs' vehicles—revealed no inboard edge tread wear.  Lepper nonetheless points to supposed discoloration on the extreme edge of the rear tires as evidence of a suspension defect.  He, again, provides no basis or reliable technical authority for this opinion, and admits that he cannot quantify this supposed tire wear.  His opinion lacks credibility and support, and should be excluded.

*Finally*, Mr. Lepper also has no scientific basis for his opinion that Plaintiffs' proposed alternative design does not negatively impact the handling characteristics of the Ford Focus.  To assess the impact of his proposed alternative design on the Focus' handling characteristics, Lepper conducted one subjective test—the ISO 3888-2 Lane Change Maneuver—which is designed to

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

2

evaluate vehicle rollover resistance.  The vehicle was not instrumented in any way for this testing.

Moreover, Lepper unilaterally modified the test procedure, and conducted it in a manner that is not

repeatable.  Perhaps most remarkably, the test results established that Plaintiffs' alternative design

suspension performed far worse than the Focus with the original suspension.  Thus, Lepper's

opinions regarding the handling characteristics of the modified Focus are inadmissible because his

testing procedure was flawed, unreliable, not repeatable, and he ignored the actual results of his

testing.

Lepper is not qualified to provide opinion testimony on suspension system design.  He has

conducted no data analysis or objective, reliable testing to provide a scientific basis for any of these

opinions.  They are based on speculation, and thus they should be excluded.

## ARGUMENT

## I.     APPLICABLE LEGAL STANDARD

With respect to the screening of expert testimony, the Court functions as a "gatekeep[er]."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589).  The

primary objective of this gatekeeping function is to ensure that an expert "employs in the courtroom

the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Kumho Tire Co*., 526 U.S. at 152.

Rule 702 codifies *Daubert* and "imposes a special obligation upon a trial judge to 'ensure

that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co*., 526

U.S. at 147 (quoting *Daubert*, 509 U.S. at 589).  In determining whether an expert opinion is

admissible under Rule 702, a court must engage in a three-step analysis.  First, it must ensure that

the expert is "qualified."  Fed. R. Evid. 702.  Second, it must determine whether the expert's

analysis is based on scientifically reliable methodology—that is, whether the proffered testimony

"relates to scientific, technical or other specialized knowledge *which does not include unsupported*

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

*speculation and subjective beliefs.*"  *Guidroz-Brault v. Missouri. Pac. Railroad Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (emphasis added).  Third, the court must decide whether the testimony will assist the trier of fact in understanding the evidence or in determining a fact at issue.  *Daubert*, 509 U.S. at 591.

With regard to the requirement that expert opinions be scientifically reliable, *Daubert* sets forth the following non-exhaustive list of "guideposts:"

(1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community.

*Daubert*, 509 U.S. at 593-94.

In addition to these factors, the 2000 Advisory Committee's Notes to Rule 702 suggest six other benchmarks for gauging expert reliability:

(5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying;" (7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;" (8) "[w]hether the expert has adequately accounted for obvious alternative explanations;" (9) "[w]hether the expert is being as careful as he would in his regular professional work outside his paid litigation consulting;" and (10) "[w]hether the field of expertise claim by the expert is known to reach reliable results for the type of opinion the expert would give."

Fed. R. Evid. 702 Advisory Committee's Notes (2000 amends.); *see also Lust v. Merrell Dow Pharm.*, 89 F.3d 594, 597 (9th Cir. 1996) (stating the "[o]ne significant fact" is whether the expert "developed his opinions expressly for the purpose of testifying"; if these guarantees are not satisfied, the expert "must explain precisely how he went about reaching his conclusions and point to some objective source . . . to show that he has followed the scientific method . . . .")

Although the inquiry is flexible (*Kumho Tire*, 526 U.S. at 150), there is no presumption of admissibility.  To the contrary, the burden is on the proponent of the evidence to show that the material is admissible as presented.  *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010); *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) ("Under Rule 702, the

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

4

1    proffered expert must establish that reliable principles and  methods underlie the particular

2    conclusions offered"); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002).[2]

3        Plaintiffs cannot meet their burden and establish that Mr. Lepper is qualified *and* that his

4    opinions are sufficiently reliable.  To the contrary, Lepper's own testimony demonstrates that he is

5    not qualified to provide automotive design opinions and his conclusions are based on nothing more

6    than untested, unsupported speculation.

7

8    **II.   LEPPER IS NOT QUALIFIED TO GIVE AUTOMOTIVE DESIGN DEFECT
         OPINIONS**

9        An expert witness must be "qualified as an expert by knowledge, skill, experience, training,

10   or education."  Fed. R. Evid. 702.  This means that the party proffering the expert's testimony must

11   prove that he has the requisite "knowledge, skill, experience, training, or education" to render the

12   opinions offered.  *Daubert*, 509 U.S. at 590; *Kumho*, 526 U.S. at 149 (stating that an expert must

13   have "a reliable basis in the knowledge and experience of the *relevant* discipline") (emphasis

14   added).

15

16       Lepper is not an engineer and does not have a college degree.  (Lepper Deposition, Ex. B,

17   pp. 23, 91.)  The vast majority of Mr. Lepper's experience is in stock car racing and working as an

18   accident reconstructionist/fire cause and origin expert for insurance companies.  (*Id.,* at 24, 74-75;

19   *see also* Lepper CV, Ex. C.)  His only experience with tires relates to his racing hobby and

20   assessing the racing performance of high-performance tires for various manufacturers.  (See, e.g.,

21

22

23   [2] The requirements of *Daubert* and Rule 702 apply with full force at the class certification state.
     The "rigorous analysis" mandated by Federal Rule of Civil Procedure 23, *Gen. Tel Co. of Sw. v.
24   Falcon*, 457 U.S. 147, 161 (1982), requires a full *Daubert* inquiry into the reliability of an expert's
     methodology.  *See Wal-Mart Stores, Inc. v. Dukes, et al.,* _ U.S. _, 131 S. Ct. 2541, 2554 (2011)
25   ("The District Court concluded that *Daubert* did not apply to the expert testimony at the
     certification stage of class-action proceedings.  *We doubt that is so . . .*") (emphasis added); *Am.
26   Honda Motor Co. v. Allen*, 600 F.3d 813, 815-17 (7th Cir. 2010) ("a district court must conclusively
     rule on any challenge to the expert's qualifications or submissions prior to ruling on a class
27   certification motion"); *Unger v. Amedisys Inc.*, 401 F.3d 316, 232 n.6 (5th Cir. 2005) ("[i]n order to
     consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court
28   must first determine whether Plaintiffs' expert testimony supporting class certification is reliable.")

FORD MOTOR COMPANY'S BRIEF IN  IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

**DYKEMA GOSSETT LLP**
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

*Id.*, at 33, 37, 40-41.)  He was primarily a test driver, and this work did not involve analyzing the effects of suspension geometry on tire wear in production vehicles.  (*Id.*, at 28, 33, 37-38, 40.)  In fact, Lepper has never been qualified to provide an automotive design defect opinion:

> Q:     So it's fair to say you have never been qualified by a Court to render design – automotive design defect opinions; correct?
>
> A:     That's correct.

(*Id.*, at 76.)  Lepper has never designed a vehicle suspension or any other component for a mass production passenger vehicle.  (*Id.*, at 149.)  He has never written any articles concerning suspension alignment, vehicle dynamics or tire wear.  (*Id.*, at 20.)  He admits that the only treatise or publication he relies upon is a Society of Automotive Engineers paper concerning double lane change maneuvers, a paper that has no relationship to suspension design or tire wear.  (*Id.*)

Lepper denies that he will be giving design defect opinions in this case, and then proceeds to give design defect opinions:

> Q:     Are you giving any automotive design defect opinions in this case?
>
> A:     No design opinions.  But I will point out the defect.
>
> Q:     When you say you will point out the defect, will you have an opinion to a reasonable degree of engineering certainty that a component or system on the Ford Focus is defective in design?
>
> A:     Yes.

(*Id.*, at 12.)  He admits, though, that since he is not an engineer, he is unqualified to offer opinions on how the rear suspension system should be designed:

> Q:     Do you intend at trial to give opinions regarding the design of the rear suspension of the Ford Focus?
>
> A:     . . . I identified the problem.  I'm not an engineer.  I don't want to say that it should be designed this way versus the other way.  I'm pointing out the problem and identifying the problem so that it can be dealt with or corrected . . . .
>
> Q: . . . And you are not giving an opinion about an automotive design defect in the rear suspension; you are just identifying a problem in the rear suspension?  Is that fair?
>
> A:     That's how I define it to myself.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

\* \* \*

A:     So, generally, I'm saying yes, there's a problem.   Yes, it needs to be corrected, or more specifically should have been corrected.

(*Id.*, at 78-79, 213; *see also* Lepper Report, p. 2: noting that Lepper was retained to "determine whether these five vehicles have a rear suspension problem that causes premature wear to the rear tires.")

This is a design defect case.  Lepper intends to testify that Ford's suspension design causes premature tire wear.  Whether he labels it as a "problem" or a "defect," Lepper is planning to offer an opinion at trial that a defect in the design of the rear suspension of all 2005-2011 model year Ford Focuses cause premature tire wear.  Moreover, Plaintiffs intend to elicit testimony from him at trial about proposed alternative designs.[3]

Based on his own admissions, however, Lepper is not qualified to offer these opinions.  Specifically, he lacks the requisite knowledge, experience and education to opine that (1) the rear suspension of the Ford Focus has "a geometry problem that manifests itself as accelerated wear on the inner tread row of the rear tires" (Lepper Report, p. 3); (2) this suspension geometry "produces undesired movement and substantial loads on the inner edge of the rear tires, leading to premature wear on the inner tread rows of the rear tires" (*Id.*); and (3) "accelerated wear to the rear tires is characteristic of the design of the rear suspension of the vehicle."  (*Id.*, p. 4.)  *See Heisler v. Maxtor Corp.*, No. 5:06-cv-06634, 2001 WL 1496114, at \*9 (N.D. Cal. Apr. 20, 2011) (finding that plaintiffs did not meet their burden of showing their expert was qualified under Rule 702 because the proffered expert did not have the requisite experience in, and knowledge of, the relevant field);

_____

[3] In their Motion for Class Certification, Plaintiffs state, "Mr. Lepper further opined that the alternative repair solutions engineered by Mr. Webb are reasonable, and he proposed an additional alternative solution."  (Class Certification Motion, p. 10.).  But even Lepper admits that he is not qualified to offer alternative design opinions.  (*See* Lepper Dep., p. 78:  "I don't want to be put in the position of telling Ford how they *should have* designed the suspension." (emphasis added); *see also* pp. 153-154, 213.)

*see also Samuels v. Holland American Line-USA Inc.*, 656 F.3d 948, 952-53 (9th Cir. 2011) (holding that an expert opinion is properly stricken where the challenged experts had no recent experience in the industry and had no materials to support their position); *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 516 (C.D. Cal. 2012) (acknowledging that, unlike Lepper, plaintiffs' suspension and tire wear expert in a suspension defect case was qualified because he "worked for BFGoodrich Company for eleven years . . . as a tire engineer," "he has been recognized as an expert in tire cases in many states and jurisdictions," and "has provided deposition testimony in various state and federal court proceedings.")

Even if Lepper was qualified to give design opinions—which he is not—Plaintiffs must also establish that his opinions are reliable. *Daubert*, 509 U.S. at 593-94. They cannot satisfy that burden either.

## III. LEPPER'S OPINIONS ARE NOT RELIABLE AND ARE BASED ON PURE SPECULATION

The courts must determine whether an expert's analysis is based on scientifically reliable methodology—that is, whether the proffered testimony "relates to scientific, technical or other specialized knowledge which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri. Pac. Railroad Co.*, 254 F.3d 825, 829 (9th Cir. 2001). Here, Lepper's opinions have not been tested and are based on the inspection of only five (5) vehicles. Lepper did not apply recognized standards, he did not perform any research independent of this case, and his opinions were developed exclusively for purposes of litigation. His unsupported, speculative opinions are not based on any scientifically reliable methodology. The Court should therefore exclude his opinions.

### A. Lepper's Premature Tire Wear Opinions Should Be Excluded

Lepper opines that the suspension geometry of the 2005-2011 Ford Focus causes premature tire wear. (Lepper Report, pp. 2-3; Lepper Dep., p. 134.) This opinion is unreliable for several

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

independent reasons.  As explained below, Lepper did not conduct any tire wear testing.  His opinions are instead based on the visual inspection of only five vehicles.  He also did not interview the owners of these vehicles to learn their driving habits, maintenance routines, or the type of roads they drove on, nor did he bother to read their depositions.  (Lepper Dep., pp. 61-62.)  He did not research or consider any tire wear data.  Finally, Lepper failed to identify a measurable inboard edge tire wear issue on the five vehicles that he did inspect.

### 1.    Lepper's Tire Wear Opinions Have Not Been Tested

The first and "most significant" *Daubert* factor is whether the proffered opinion has been subject to the scientific method; i.e., testing and retesting of the expert's theories.  *Cummings v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247 (S.D.N.Y. 1997) ("[s]ignificantly, [the expert] did nothing to address the 'key question' articulated in *Daubert* of whether his theory of causation 'can be (and has been) tested.'"); *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 538 (7th Cir. 200) (holding that the expert's "lack of testing" rendered the expert's opinion "nothing more than speculation"); *Shalaby v. Irwin Indus. Toll Co.*, No. 07CV2107, 2009 WL 7452756, at *7-8 (S.D. Cal. July 28, 2009) (excluding expert's testimony despite satisfaction of some of *Daubert* factors, because expert failed to properly substantiate his opinions with proper testing) aff'd by *Shalaby v. Newell Rubbermaid, Inc.*, 379 Fed. Appx. 620, 622 (9th Cir. 2010); *Avila v. Willits Env't Remediation Trust*, No. C99-3941, 2008 WL 360858, at *12 (N.D. Cal. Feb. 6, 2008) (finding that an expert's failure to conduct testing or analysis on prima facie plaintiffs in a toxic tort case rendered his opinions regarding those plaintiffs inadmissible).

Here, Lepper did not perform a single tire wear test, scientific or otherwise, to substantiate his opinions:

Q:    Are you aware of any tire wear testing that has been done in this case?

A:    No, I am not.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

(Lepper Dep., p. 262.)   Lepper did not test his central theory that the Focus suspension causes premature tire wear.  Lepper did measure the tread depth of the tires installed on the five Focuses he inspected.  He found, however, no measurable inboard tire tread wear.  (*See*, *e.g.*, Lepper Dep., pp. 164, 166:  Q: Using that tool, the inboard sides of the tire were not worn more than the outboard sides of the tire according to the tool measurements, correct?  A: Yes.")  In fact, the results of Plaintiffs' only tire wear analysis contradict Lepper's theory.[4]   His opinions are inadmissible because they are not the result of recognized, scientific testing.  Speculation is not enough.

### 2.   Lepper's Tire Wear Opinions Are Not Based on Reliable Data

Furthermore, the limited data Lepper did rely upon is inadequate and unreliable.  Lepper defined "premature tire wear" as "half or less than the expected tire life" absent "extenuating circumstances."  (Lepper Dep., pp. 136-137.)  He agreed, however, with the National Highway Traffic Safety Administration's position that the relative performance of tires depends on the conditions of their use, and a tire may depart significantly from its expected life range due to variations in driving habits, service practices, road characteristics, and climate.  (*Id.*, at 137-138.)  Lepper further acknowledged that the criteria for premature wear varies based on external factors.  (*Id.*, at 141.)  Accordingly, Lepper could not render any opinion on premature tire wear until he had inspected the subject vehicles and understood their history:

> Q:   But you would have to look at each vehicle and how it was driven and how it was maintained to determine whether or not that vehicle had premature tire wear, correct?
>
> A:   Generally, yes.
>
> Q:   And even in this case, you wouldn't render any opinions until you had . . .

---

[4]  As addressed in Section III.A.3, Lepper opines that the extreme outer edge of the tire experiences premature wear.  He admits, however, that he did not—and could not—take measurements of this supposed wear.  (Lepper Dep., p. 166.)  The tread he did measure showed no inboard tread tire wear.  (*Id.*, at p. 164.).  It is noteworthy, however, that despite testifying that he could not measure this supposed wear, Ford's Texas Fleet Testing uses measurement points that are set outboard of the outside shoulder groove to measure tire wear at that location.  (Giapponi Report, Ex. H, p. 5.)

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

1    inspected those vehicles, correct?

2    A:    . . . yes.

3    * * *

4    Q:    So you don't have a number in your head, on average, tires should last x
5    number of thousands of miles?

6    A:    Sorry, I don't.

(*Id.,* at 142, 148-149.)

Lepper will nonetheless testify that every Ford Focus manufactured from 2005-2011 suffers

from premature tire wear (Lepper Report, p. 4) based only on the visual inspection of *five (5)*

vehicles:

11    Q:    If there's a problem with the suspension, as you opine, that causes premature
12    tire wear, how do you explain the Focuses that get full life out of their first set of
tires?

13    A:    . . . I don't know of any Focuses that do get the full tire tread wear out of
14    their tires.

15    Q:    When you say you don't know of any, how many Focuses have you
analyzed?

16    A:    Just these five.

(Lepper Dep., pp. 144-145.)  Despite analyzing only these five vehicles, and despite acknowledging

the importance of driving history and environmental factors on the life of the tires, Lepper did not

interview the vehicle owners or ask them any questions about tire wear.  (*Id.*, at 18-19, 61-62.)  He

did not read their depositions.  (*Id.*, at 61-62.)  His sample size and analytical methods fall well

short of the scientific rigor required by *Daubert*.  His tire wear opinions are therefore unreliable.

*See*, *e.g.*, *Keegan*, 284 F.R.D. at 519 (excluding the portion of the challenged expert's report that

was based on an inadequate, unreliable inspection of only the named plaintiffs' vehicles); *American*

*Honda Motor Co. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) ("The methodology underlying the

tests [the challenged expert] conducted to determine whether the GL1800 met his standard also

gives us pause.  [He] tested a single, used 2006 GL1800, ridden by a single test rider, and

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

FORD MOTOR COMPANY'S BRIEF IN  IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

extrapolated his conclusions to the fleet of GL1800s produced from 2001 to 2008").

Lepper's reliance on his visual inspection of only five vehicles is even more problematic because he failed to analyze any other objective data related to suspension design or tire wear— either for the Focus or *any other* vehicle.  Lepper did not survey any data on the average tire life for the 2005-2011 Ford Focus.  (*Id.*, at 145.)  He has no knowledge of the percentage of customers who complained of tire wear issues.  (*Id.*, at 145-146.)  He has not analyzed customer complaints of tire wear to determine if the suspension was the root cause.  (*Id.*)  He has no knowledge of whether the Focus has a higher percentage of customer complaints for tire wear as compared to any other Ford vehicle.  (*Id.*, at 146.)  He has not done a comparison of the tire wear rate of the Ford Focus versus competitor vehicles.  (*Id.*, at 147.)  Aside from a visual inspection of five vehicles—conducted without first interviewing the owners to rule out other relevant factors—Lepper was satisfied that the suspension of the 2005-2011 Ford Focus was the cause of premature tire wear.  This is the height of unreliability.  Lepper's failure to rely on objective data is another reason his opinions must be excluded.  *See Lust*, 89 F.3d at 597 (the expert "must explain precisely how he went about reaching his conclusions *and point to some objective source* . . . to show that he has followed the scientific method . . . ." (emphasis added)).

### 3.    Lepper Failed to Quantify Any Actual Tire Wear

Even if Lepper's tire wear methodology was somehow reliable (which it is not), his application of that methodology to the facts of this case is severely flawed.  Misapplication of a robust methodology provides an independent basis for exclusion.  See Fed. R. Evid. 702, Advisory Committee's Note (2000 amends.) (the court "must scrutinize not only the principles . . . used by the expert, but also whether those principles . . . have been properly applied to the facts of the case"); *In re Paoli R.R. Yard v. PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994) (explaining that "any step that rendered the analysis unreliable . . . renders the expert's testimony inadmissible" regardless

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

of "whether the step completely changes a reliable methodology or merely misapplies that methodology").

Lepper did not observe any quantifiable inboard edge tire wear.  Lepper acknowledged that the "industry accepted practice" is to measure the depth of the tire tread to determine wear.  (Lepper Dep., p. 164.)  Using the industry accepted practice, none of the named Plaintiffs' vehicles had inboard edge tire tread wear.  The tread wear on the inboard side was no greater than the tread wear in the center or outboard side of the tire:

> Q:      The tread depth that you measured at the inner at both rear tires was either equal to or greater than the rest of the tread depth, right?
>
> A:      Correct.

(*Id.,* at 164; See also his deposition testimony at 191, 195-196 and 202.)  He nonetheless concluded that the Ford Focus had a supposed inboard tread tire wear issue.

Instead of relying on a quantifiable measurement of tread depth, Lepper instead claims that the tire wear occurred at an un-measurable point "inboard of the inner tread groove."  (*Id.,* at 165.) He identified a darker area on the extreme edge of the tire that he claims suffers from premature wear:



DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

(Lepper Report, p. 89, photo of inner edge of Ms. Daniel's left rear tire).   Lepper, however, admitted that there are "no standard dimensions" to measure this area and that "there's not really a good spot to measure that."   (*Id.,* at 164-165.)   Worse yet, he admitted that he did not even attempt to measure this supposed inboard edge tire wear:

> Q:   And you made no measurement of that inboard portion, correct?
>
> A:   Correct.
>
> \* \* \*
>
> Q:   And you took no specific measurements of the very inboard edge other than in the photos, right?
>
> A:   Right.

(*Id.,* at 165-166.)   Lepper did not identify in his report or at his deposition *any authority whatsoever* for his opinion that unmeasured discoloration of the extreme inboard tire edge is recognized as an accurate indication of premature tire wear.   His failure to demonstrate that this is a recognized measure of tire wear discredits his opinion and renders it all the more unreliable.   *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) (excluding an expert's opinion because he did not "demonstrate that he followed a scientific method embraced by at least some other experts in the field."); *see also Heisler*, *supra*, \*7 ("[T]he fact that Plaintiffs offer no evidence that [the challenged expert's] approach is an accepted method for analyzing defects such as those at issue here, nor do they offer evidence with respect to the reliability of the tests that [their expert] performed . . . .").

Lepper's novel "visual appearance" method is actually a transparent effort to explain away the unfavorable results of the objective measurements he took with a standard tread depth gauge. Lepper's own tread depth measurements revealed that the named plaintiffs' tires were not unevenly worn as he claimed in his report, so he resorted to an un-testable, un-repeatable, unrecognized method of looking at a photograph and opining that it shows inboard edge tire wear.  Lepper's novel

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

FORD MOTOR COMPANY'S BRIEF IN  IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

observations—unsupported by measurement, research, scientific scrutiny, or industry practice—are not enough to support his opinions.  *See Guidroz-Brault v. Missouri. Pac. Railroad Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (holding that "unsupported speculation and subjective beliefs" are unreliable)*; see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*").

For all of these reasons, Lepper's tire wear opinions are mere speculation and they should be excluded.

**B.     Lepper's Vehicle Handling Testing and Opinions Should Be Excluded**

Lepper also opines that the modifications to the rear suspension of the Ford Focus "did not affect the handling characteristics of the vehicle." (Lepper Report, p. 4.)  He intends to testify at trial that the production Focus and a Focus fitted with Plaintiffs' alternative design suspension "passed the lane change agility test with no degradation of speed or handling characteristics." (*Id.,* at 15.)  This opinion must also withstand *Daubert* scrutiny.  It does not.  As explained below, Lepper's opinion that Plaintiffs' alternative design does not impact vehicle handling is more speculation based only on a modified, subjective test not recognized by any credible source, and his opinion is incongruent with the actual test results.

Lepper's handling opinion is based solely on a modified ISO 3888-2 double lane change test that Plaintiffs' experts conducted at North Carolina Center for Automotive Research.  Lepper and Plaintiffs' expert Andrew Webb "tested" a production 2007 Focus, and several versions of the Focus with a modified rear suspension.

The parameters of the lane change test are outlined in SAE Paper 2003-01-1009, a document that Lepper attached to his report.  (Exhibit F to Lepper Report, attached separately as Ex. D.)  The course is designed to evaluate emergency obstacle avoidance; it requires the driver to abruptly steer to the left, establish a position in the left lane, and then rapidly return to the original lane of travel.

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

FORD MOTOR COMPANY'S BRIEF IN  IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

(*Id.*; *see also* Lepper Dep., p. 216.)  Lepper drove the test vehicle and ran his own version of that test at speeds of 38-40 m.p.h.  (Lepper Dep., pp. 213, 221.)

Lepper's lane change test is an unreliable gauge of the Focus' handling characteristics.  The original ISO 3888-2 lane change maneuver was designed to assess "light vehicle rollover resistance" and "rollover resistance ratings."  (SAE Paper, p. 1.)  The ISO 3888-2 test, standing alone, is not intended to evaluate overall vehicle handling characteristics.  Further, the authors of the SAE paper upon which Lepper relies rate the ISO 3888-2 test as "Bad" on the factors of objectivity and repeatability.  The authors note that "since the driver generates steering inputs . . . vehicle performance in this maneuver depends upon the skill of the test driver, the steering strategy used by the test driver, plus random run-to-run fluctuations."  (SAE Paper, p. 7.)  To address these repeatability and subjectivity concerns, Lepper could have—and should have—run additional handling tests (such as slaloms, brake-in-turn, or other tests).  The unreliability of Lepper's methodology is laid bare when compared to the methodology used by Ford's suspension and vehicle dynamics Donald F. Tandy.  Mr. Tandy assessed the handling characteristics of the production Focus and Plaintiffs' alternative design Focus by using a selection of mainstream tests similar to those employed by vehicle manufacturers worldwide.  (Donald F. Tandy Report, Ex E, p. 3.)  These tests include the following:  high and low speed slalom tests, I.S.O. severe lane change maneuvers, steering response tests, steering recovery tests, limit turn tests, braking while turning tests, handling course evaluations, and emergency braking tests.  (*Id.*)

Moreover, Lepper used no data acquisition instruments to record his speed.  He simply had a technician shoot the car with a radar gun as it entered the first test gate.  He did not use any instruments to measure or control his steering rate for each run.  (Lepper Dep., at 227.)  The vehicle was not instrumented therefore it is impossible to determine the effects of driver variability on speed, throttle, or steering on the results.  (Tandy report, at 7.)  He had video taken of some of the

runs, but there were also practice runs made where video was deliberately turned off.   (*Id.*) Accordingly, no scientist trying to replicate or repeat Lepper's tests would have any data or video to analyze in an effort to establish the same test conditions and parameters.   In contrast, Mr. Tandy's vehicles were fully instrumented with videotape recording devices and a data acquisition package, all of which can be reviewed in order to replicate or repeat the testing. (Tandy Report, at 5.)

Lepper further decreased the reliability of the test by altering the ISO 3888-2 test procedure. He decided to run the test at 38 m.p.h. instead of the prescribed 35 m.p.h.  (Lepper Dep., p. 224.) He discarded the requirement that the vehicle not hit any cones to constitute a clean or successful run.  (*Id.,* at 223.)  He instead "passed" the vehicle even if it hit a cone.  (*Id.*)  Lepper admitted that his pass/fail criteria was entirely subjective and based solely on his "opinion" of the handling:

> Q:     So the ultimate pass/fail criteria that you and Mr. Webb decided on was a subjective pass/fail criteria, where basically it would be your opinion as to how the car handled; is that fair?
>
> A;     Yes, it is.

(*Id.,* at 225.)  Lepper also did not release the throttle as outlined in the ISO test, but rather kept the vehicle at full speed up until the first turn cone.  (*Id.,* at 231.)  These changes to an already subjective test are not recognized by any automotive engineering authority, are of Lepper's own design, and are not subject to peer review.  His handling opinions should be excluded for these test procedure modifications alone.  See *Daubert*, 509 U.S. at 593-94; *Hermanek*, 289 F.3d at 1094 ("Under Rule 702, the proffered expert must establish that reliable principles and methods underlie the particular conclusions offered."); *Cabrera*, 134 F.3d at 1423 (excluding an expert's opinion because he did not "demonstrate that he followed a scientific method embraced by at least some other experts in the field.")

Even if Lepper's modified test procedure was reliable—which it is not—then he must also accurately apply those test results to his underlying opinion.  *See In re Paoli R.R. Yard*, 35 F.3d at 745.  The vehicle test results do not support Lepper's opinion that Plaintiffs' alternative design did

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

not adversely affect the handling characteristics of the vehicle.  To the contrary, if Lepper's testimony is to be believed, the production vehicle failed the test only once, while the alternative design vehicles failed the test repeatedly:

| Test Condition | Results |
|---|---|
| Production Focus | Hit cones in 1 out of 8 runs |
| Rear suspension modified: Track width widened 20 mm | Hit cones in 5 out of 8 runs |
| Rear suspension modified: Upper control arm mounting point raised and -.14 degrees rear camber | Hit cones in 3 out of 6 runs |
| Rear suspension modified: Upper control arm mounting point raised, -.14 degrees rear camber and track width widened 20 mm | Hit cones in 4 out of 6 runs.  Two spinouts. |
| Rear suspension modified: Upper control arm mounting point raised and -.6 degrees rear camber | Hit cones in 3 out of 4 runs.  Two spinouts. |
| Rear suspension modified: Upper control arm mounting point raised with 20 mm wider track and -.6 deg camber | *** NO VIDEO *** |

(Lepper Dep., pp. 236-248, 255-260.)  Lepper acknowledged that if you use the pass/fail criteria set forth in the SAE paper attached to his report, Plaintiffs' proposed alternative design degraded the handling of the Ford Focus:

> Q:     Mr. Lepper, if a pass on the lane change maneuver testing that you did is to hit no cones, and a fail is when you hit a cone, the vehicle had more fails with the modified suspension test runs that it did with the production suspension, correct?
>
> A:     On your hypothetical of the hitting the cones, yes, you are correct.

(*Id.,* at 261.)

An accurate analysis of the videotapes, however, when cross-referenced with the notes taken by Andrew Webb, reveals that Lepper either misrepresented or does not understand the actual test results.  A painstaking video analysis by Ford Expert Donald Tandy shows that Mr. Lepper's deposition testimony is wrong, and confirms that Lepper's interpretation of the testing is so erroneous that it is completely unreliable.  Mr. Tandy's video analysis revealed the following results:

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

| Test Condition | Results |
|---|---|
| Production Focus | Hit cones in 5 out of 7 runs (8 runs indicated in test notes, but video only taken for 7 runs). |
| Rear suspension modified: Track width widened 20 mm | Hit cones in 3 out of 5 runs (8 runs indicated in test notes, but we only have video for 5 runs). |
| Rear suspension modified: Upper control arm mounting point raised and -.14 degrees rear camber | Hit cones in 3 out of 6 runs. |
| Rear suspension modified: Upper control arm mounting point raised, -.14 degrees rear camber and track width widened 20 mm | Hit cones in 4 out of 5 runs. |
| Rear suspension modified: Upper control arm mounting point raised and -.6 degrees rear camber | Hit cones in 3 out of 4 runs. One spinout. |
| Rear suspension modified: Upper control arm mounting point raised with 20 mm wider track and -.6 deg camber | Hit cones in 4 out of 5 runs. One spinout. |

(Tandy Report, p. 9.)

So, if Lepper's analysis and testimony is to be believed, Plaintiffs' alternative designs performed far worse than the production Focus.  Under Mr. Tandy's analysis, Mr. Lepper hit multiple cones in every single run.  Under either analysis, the experiments performed by Lepper and Webb provide no real conclusion as to what effect their proposed suspension changes would have on the Focus' handling characteristics.  Accordingly, Lepper's opinion that the modified suspension did not decrease the handling characteristics of the Ford Focus is just more conjecture that is not admissible in support of Plaintiffs' class certification motion or at trial.

### C.   Lepper's Repair Cost Estimates Should Be Excluded

Despite lacking the expertise or having a reliable technical basis for his opinion that the Focus rear suspension is defective, Lepper proceeds to give opinions as to the cost of replacing the rear suspension on all of the class vehicles.  (Lepper report, pp. 17-18.)  He opines that the cost of his proposed alternative design is $872.80 - $1,511.50 per vehicle, with an "initial startup cost" of

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071

$6,000.00.  (*Id.*, at 18.)  Mr. Lepper has no reliable basis for these opinions, and he dramatically overstates the cost.

Mr. Lepper used a combination of estimation software and quotes from repair shops to come up with his number.  (Lepper Dep., pp. 271-274.)  He failed to account, however, for economies of scale or volume discounts in his cost estimates.  Mr. Lepper only considered volume pricing for one of his cost estimates, but even then he only considered a run of 100 units. (*Id.*, at 273-274.)  There are 82,290 Class Vehicles.  (DNL1 000001-03.)  Mr. Lepper agrees that the cost of producing parts for the whole class would be lower than his estimate, but admits that he does not know by how much.  (Lepper Dep., p. 275.)  In other words, his estimate is too high, but he doesn't know by how much.  The testimony of one of Plaintiffs' other experts, Peter Tkacik, supports the conclusion that the numbers quoted by Lepper are too high because they fail to account for volume discounts.  Specifically, Tkacik testified that "if you fix people's cars, you are not going to spend whatever those enormous numbers were to do one car."  (Tkacik Dep., Ex. F, p 263.)

Another Plaintiffs' experts, Andrew Webb, conceded in his deposition that he did not see a reason for owners of Class Vehicles that are not experiencing premature tire wear to spend between $800 and $1,200 on parts.  (Webb Dep., Ex. G, pp. 323-324.)  Mr. Webb also agreed there are a number of Putative Class members that are not even experiencing premature tire wear.  (*Id.*, at 323-324.)

Based on Plaintiffs' own experts' testimony, and simple logic, it is clear that Lepper vastly overstates the cost of implementing Plaintiffs' alternative design.  As Lepper concedes, mass production of the replacement part would be cheaper than his opinion of $872.80 - $1,511.50.  But he doesn't know how much cheaper.  Accordingly, he has no reliable basis for his cost estimate, and it should be excluded under *Daubert*.

1

## CONCLUSION

2

      For all of the foregoing reasons, Lepper's opinions and testimony are inherently flawed,

3

unreliable and are based on pure speculation.  Accordingly, the Court should exclude them.

4

5

Dated: March 15, 2013

DYKEMA GOSSETT LLP

6

By:/s/ *Fred J. Fresard*

7

    Fred J. Fresard (admitted *pro hac vice*)
    *ffresard@dykema.com*

8

    39577 Woodward Ave., Suite 300
    Bloomfield Hills, MI 48304

9

10

    John M. Thomas (SBN 266842)
    *jthomas@dykema.com*

11

    Krista L. Lenart (admitted *pro hac vice*)
    *klenart@dykema.com*
    Janet Conigliaro (admitted *pro hac vice*)

12

    *jconigliaro@dykema.com*
    2723 South State Street, Suite 400

13

    Ann Arbor, MI  48104

14

    Tamara A. Bush (SBN 197153)

15

    *tbush@dykema.com*
    333 South Grand Avenue, Suite 2100
    Los Angeles, California 90071

16

17

    Norman Hile (SBN 57299)
    ORRICK
    400 Capitol Mall, Suite 3000

18

    Sacramento, California 95814-4497

19

    Attorneys for Defendants  FORD MOTOR CO.

20

21

BH01\1766488.7
ID\DJCO - 087770\0108

22

23

24

25

26

27

28

FORD MOTOR COMPANY'S BRIEF IN  IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF THOMAS J. LEPPER

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE, SUITE 2100
LOS ANGELES, CALIFORNIA 90071