1  John B. Thomas (Bar No. 269538)
   jthomas@hicks-thomas.com
2  Eric Grant (Bar No. 151064)
   grant@hicks-thomas.com
3  Hicks Thomas LLP
   8001 Folsom Boulevard, Suite 100
4  Sacramento, California 95826
   Telephone:  (916) 388-0833
5  Facsimile:   (916) 691-3261

6  J. Allen Carney (*pro hac vice*)
   acarney@carneywilliams.com
7  Hank Bates (Bar No. 167688)
   hbates@carneywilliams.com
8  Carney Williams Bates Pulliam & Bowman, PLLC
   11311 Arcade Drive
9  Little Rock, Arkansas 72212
   Telephone:  (501) 312-8500
10 Facsimile:   (501) 312-8505

11 Counsel for Plaintiffs MARGIE DANIEL,
   ROBERT McCABE, MARY HAUSER,
12 DONNA GLASS, and ANDREA DUARTE

13

14                    UNITED STATES DISTRICT COURT

15                  EASTERN DISTRICT OF CALIFORNIA

16                       SACRAMENTO DIVISION

17

18 MARGIE DANIEL, ROBERT McCABE,      )  No. 2:11-cv-02890-WBS-EFB
   MARY HAUSER, DONNA GLASS, and       )
19 ANDREA DUARTE, individually and     )
   on behalf of a class of similarly situated  )  **PLAINTIFFS' OPPOSITION TO**
20 individuals,                         )  **DEFENDANT FORD MOTOR COMPANY'S**
                                        )  **MOTION FOR SUMMARY JUDGMENT**
21          Plaintiffs,                 )
                                        )
22      v.                              )
                                        )
23 FORD MOTOR COMPANY, a Delaware       )  Hearing Date:  June 3, 2013
   corporation,                         )  Time:            2:00 p.m.
24                                      )  Courtroom:       5
            Defendant.                  )  Judge:           Hon. William B. Shubb
25                                      )
                                        )
26                                      )
                                        )
27                                      )
                                        )
28

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

{00152021.DOCX}

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iv

INTRODUCTION ....................................................................................... 1

STATEMENT OF RELEVANT FACTS ...................................................... 1

ARGUMENT .............................................................................................. 1

Plaintiff Donna Glass ................................................................................. 2

  I.   CLRA Claim .................................................................................... 2

      A.   Statute of Limitations ........................................................... 2

      B.   Duty of Disclosure ............................................................... 3

          1.   Unreasonable Safety Hazard ..................................... 3

          2.   Ford's Knowledge of the Defect ................................ 5

      C.   Causation ............................................................................. 8

      D.   Actual Damages .................................................................. 10

          1.   Non-Exclusive Relief ............................................... 10

          2.   Civil Code § 3343 .................................................... 11

          3.   Actual Value ............................................................. 12

      E.   Notice Under Civil Code § 1782(a) .................................... 13

  II.   UCL Claim .................................................................................... 16

      A.   Duty of Disclosure and Causation ...................................... 16

      B.   Statute of Limitations ......................................................... 16

      C.   Equitable Restitution .......................................................... 16

  III.   Implied Warranty Claim ............................................................... 18

      A.   Expiration of Warranty Period ........................................... 18

      B.   Inner-Edge Rear Tire Wear ................................................ 20

      C.   Statute of Limitations ......................................................... 22

*///*

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

IV. Express Warranty Claim ............................................................................ 23

    A. Expiration of Warranty Period ........................................................ 23

    B. Premature Rear Tire Wear .............................................................. 24

Plaintiff Andrea Duarte ....................................................................................... 24

I. CLRA Claim ................................................................................................ 24

    A. Statute of Limitations ..................................................................... 24

    B. Duty of Disclosure ......................................................................... 26

        1. Non-Safety Defects Manifested in Warranty Period ............... 26

        2. Inner-Edge Rear Tire Wear ................................................. 27

        3. Ford's Knowledge of the Defect ........................................... 28

    C. Causation ....................................................................................... 29

    D. Actual Damages ............................................................................. 30

    E. Notice Under Civil Code § 1782(a) ................................................ 31

II. UCL Claim .................................................................................................. 31

    A. Duty of Disclosure and Causation ................................................... 31

    B. Equitable Restitution ...................................................................... 31

III. Implied Warranty Claim .............................................................................. 31

IV. Express Warranty Claim ............................................................................. 31

    A. Worn Out Tires and Manufacturing Defects .................................... 31

    B. Premature Rear Tire Wear .............................................................. 32

Plaintiff Mary Hauser .......................................................................................... 32

I. CLRA Claim ................................................................................................ 32

    A. Duty of Disclosure ......................................................................... 32

        1. Inner-Edge Rear Tire Wear ................................................. 32

        2. Ford's Knowledge of the Defect ........................................... 33

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

|  |  |  |  | **Page** |
| --- | --- | --- | --- | --- |
| | B. | Causation | .................................................................. | 34 |
| | C. | Notice Under Civil Code § 1782(a) | ....................... | 34 |
| II. | UCL Claim | | .......................................................... | 34 |
| III. | Implied Warranty Claim | | ..................................... | 35 |
| IV. | Express Warranty Claim | | ..................................... | 35 |

**Plaintiff Robert McCabe** ............................................................... 35

**Plaintiff Margie Daniel** ................................................................. 35

| I. | CLRA Claim | | | .................................................... | 35 |
| --- | --- | --- | --- | --- | --- |
| | A. | Duty of Disclosure | | ............................................ | 35 |
| | | 1. | Inner-Edge Rear Tire Wear | ........................ | 35 |
| | | 2. | Ford's "Exclusive Knowledge" of the Defect | ...... | 36 |
| | B. | Causation | | ........................................................ | 37 |
| | C. | Actual Damages and Notice Under Civil Code § 1782(a) | | ..... | 38 |
| II. | UCL Claim | | | .................................................... | 38 |
| III. | Implied Warranty Claim | | | ................................... | 38 |
| IV. | Express Warranty Claim | | | ................................... | 38 |

**CONCLUSION** .......................................................................... 38

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

# TABLE OF AUTHORITIES

**Page**

## Cases

*Atkinson v. Elk Corp. of Texas,*
    142 Cal. App. 4th 212 (2006) ...................................................... 20

*Baker v. Beech Aircraft Corp.,*
    39 Cal. App. 3d 315 (1974) ........................................................ 26

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) .................................................................... 13

*Belle v. Chrysler Group, LLC,*
    SACV 12-00936 JVS,
    2013 WL 949484 (C.D. Cal. Jan. 29, 2013) .............................. 17

*Builders Corp. of America v. United States,*
    259 F.2d 766 (9th Cir. 1958) ...................................................... 15

*Cardinal Health 301, Inc. v. Tyco Electronics Corp.,*
    169 Cal. App. 4th 116 (2008) ..................................................... 23

*Central Mutual Insurance Co. v. Schmidt,*
    152 Cal. App. 2d 671 (1957) ...................................................... 12

*Chamberlan v. Ford Motor Co.,*
    369 F. Supp. 2d 1138 (N.D. Cal. 2005) .................................. 2-3

*Clayworth v. Pfizer, Inc.,*
    49 Cal. 4th 758 (2010) ............................................................... 17

*Clemens v. DaimlerChrysler Corp.,*
    534 F.3d 1017 (9th Cir. 2008) .................................................... 24

*Colgan v. Leatherman Tool Group, Inc.,*
    135 Cal. App. 4th 663 (2006) ..................................................... 18

*Collins v. eMachines, Inc.,*
    202 Cal. App. 4th 249 (2011) ............................................... 27, 37

*Cooper v. Samsung Electronics America, Inc.,*
    374 Fed. Appx. 250 (3d Cir. 2010) ........................................... 32

*Daugherty v. American Honda Motor Co., Inc.,*
    144 Cal. App. 4th 824 (2006) ..................................................... 20

*Falk v. General Motors Corp.,*
    496 F. Supp. 2d 1088 (N.D. Cal. 2007) .................................... 37

*Fletcher v. Security Pacific National Bank,*
    23 Cal. 3d 442 (1979) ................................................................. 11

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

*Fresno Motors, LLC v. Mercedes-Benz USA, LLC*,
   852 F. Supp. 2d 1280 (E.D. Cal. 2012) ......................................................................... 17

*Gray v. Toyota Motor Sales USA, Inc.*,
   No. CV 08-1690 PSG (JCx),
   2012 WL 313703 (C.D. Cal. Jan. 23, 2012) ................................................................. 36

*Grisham v. Philip Morris U.S.A., Inc.*,
   40 Cal. 4th 623, 637 (2007) ....................................................................................... 25

*Hovsepian v. Apple, Inc.*,
   No. 08-5788 JF (PVT),
   2009 WL 2591445 (N.D. Cal. Aug. 21, 2009) ............................................................ 19

*In re Toyota Motor Corp.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010) ...................................................................... 37

*In re Toyota Motor Corp.*,
   754 F. Supp. 2d 1208 (C.D. Cal. 2010) ...................................................................... 36

*Jolly v. Eli Lilly & Co.*,
   44 Cal. 3d 1103 (1988) ............................................................................................... 2

*Keegan v. American Honda Motor Co.*,
   284 F.R.D. 504 (C.D. Cal. 2012) ...................................................................... 1, 9, 20

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) .......................................................................................16-17

*Krieger v. Nick Alexander Imports, Inc.*,
   234 Cal. App. 3d 205 (1991).............................................................................. 22-23

*Larsen v. Nissan North America, Inc.*,
   No. A121838, 2009 WL 1766797 (Cal. Ct. App. June 23, 2009) .............................. 19-20

*Marchante v. Sony Corp. of America, Inc.*,
   801 F. Supp. 2d 1013 (S.D. Cal. 2011) ...................................................................... 19

*Massachusetts Mutual Life Insurance Co. v. Superior Court*,
   97 Cal. App. 4th 1282 (2002) ................................................................................. 2, 8

*Meyer v. Sprint Spectrum L.P.*,
   45 Cal. 4th 634 (2009) ............................................................................................... 10

*Mexia v. Rinker Boat Co., Inc.*,
   174 Cal. App. 4th 1297 (2009) .............................................................................18-20

*Mitchell v. Skyline Homes*,
   CIV S-09-2241 KJM,
   2010 WL 1791281 (E.D. Cal. May 4, 2010)............................................................ 22-23

*Mirkin v. Wasserman*,
   5 Cal. 4th 1082 (1993) ................................................................................................. 9

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

2    *Morgan v. AT&T Wireless Services, Inc.,*
          177 Cal. App. 4th 1235 (2009) .................................................................. 14-16
3

     *Mullane v. Central Hanover Bank & Trust Co.,*
4         339 U.S. 306 (1950) ..................................................................................... 30

5    *Nelson v. Pearson Ford Co.,*
          186 Cal. App. 4th 983 (2010) ...................................................................... 18
6

     *Ovando v. County of Los Angeles,*
7         159 Cal. App. 4th 42 (2008) .......................................................................... 2

8    *Paz v. Playtex Products, Inc.,*
          No. 07CV2133 JM (BLM),
9         2008 WL 111046 (S.D. Cal. Jan. 10, 2008) .............................................. 11

10   *People v. Superior Court (Jayhill Corp.),*
          9 Cal. 3d 283 (1973) .................................................................................... 11
11

12   *Shersher v. Superior Court,*
          154 Cal. App. 4th 1491 (2007) .................................................................... 17

13   *Stearns v. Ticketmaster Corp.,*
          655 F.3d 1013 (9th Cir. 2011) ...................................................................8-9
14

15   *Steroid Hormone Product Cases,*
          181 Cal. App. 4th 145 (2010) ...................................................................9-11

16   *Thiedemann v. Mercedes-Benz USA, LLC,*
          872 A.2d 783 (N.J. 2005) ............................................................................ 13
17

18   *Unruh-Haxton v. Regents of University of California,*
          162 Cal. App. 4th 343 (2008) ...................................................................... 25

19   *Wagner Tractor, Inc. v. Shields,*
          381 F.2d 441 (9th Cir. 1967) ....................................................................... 12
20

21   *Wilson v. Hewlett-Packard Co.,*
          668 F.3d 1136 (9th Cir. 2012) .........................................................3, 5, 27, 36

22   *Wolin v. Jaguar Land Rover North America, LLC,*
          617 F.3d 1168 (9th Cir. 2010) ................................................................1, 20
23

24   *Yumul v. Smart Balance, Inc.,*
          733 F. Supp. 2d 1117 (C.D. Cal. 2010) ..................................................... 25

25

26

27

28

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

**Statutes and Court Rule**

Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et. seq............................................ 16

    § 17203.................................................................................................................................. 16

    § 17208.................................................................................................................................. 16

Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq................................................ 2

    § 1780....................................................................................................... 8, 10-11, 30, 34, 38

    § 1783..................................................................................................................................... 2

Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790, et seq. .................................. 18

    § 1791.1............................................................................................................................ 18-19

    § 1794.................................................................................................................................... 11

Cal. Civ. Code § 3343 ......................................................................................................... 11-12

Fed. R. Civ. P. 1 ........................................................................................................................ 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

**INTRODUCTION**

Defendant Ford Motor Company ("Ford") has moved "for summary judgment on the individual claims of all five [named] Plaintiffs." Brief in Support of Ford Motor Company's Motion for Summary Judgment ("Motion") at 1:11 (Doc. 39-1, filed Mar. 15, 2013). Except for a single claim of one plaintiff (and a plaintiff as to whom the motion is moot), *see infra* p. 35, Plaintiffs hereby oppose Ford's motion in its entirety. As set out below, Ford misstates the governing law as to many issues; as to other issues, there are genuine disputes as to material facts that preclude summary judgment. In short, Ford's motion should be denied altogether.

**STATEMENT OF RELEVANT FACTS**

Like Ford, we address the facts on a Plaintiff-by-Plaintiff basis below. Nevertheless, it is worth taking a global view of one issue that arises with respect to all Plaintiffs. Ford concentrates heavily on "tire wear" — did Plaintiffs really experience the right kind and in excessive amounts? But the heart of Plaintiffs' case is not that they and their fellow class members all experienced a particular level of excessive or premature tire wear; it is that all class vehicles, by design, have a *suspension defect*. In other words, it is important to keep in mind that Plaintiffs here allege that "the defect exists in the alignment geometry [of the suspension], not in the tires." *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010). Ford, on the other hand, "confuse[s] the defect at issue . . . with the consequences of that defect, which *include*[]" — but are not limited to — "premature or uneven tire wear." *Keegan v. American Honda Motor Co.*, 284 F.R.D. 504, 530 (C.D. Cal. 2012) (emphasis added). Thus, as documented below, Ford itself (eventually) advised its thousands of dealers that *all* class vehicles had safety issues, in that they may exhibit "vehicle drift condition when driving on wet or snow covered roads," and the record bears this out. *See infra* pp. 4-5.

**ARGUMENT**

The Court is doubtless well-versed in the legal standards governing summary judgment, and we will not presume to repeat them. But because the parties have each presented significant amounts of evidence, it is worth emphasizing (as Ford rightly acknowledges) that this competing evidence must be viewed "in a light most favorable to the nonmoving party," namely, Plaintiffs.

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1   Motion at 1:20-21.  With that principle in mind, we turn to the individual parties and claims, fol-

2   lowing Ford's organizational plan.

**Plaintiff Donna Glass**

3

4   **I.    CLRA Claim**

5   Plaintiffs' first claim arises under California's Consumer Legal Remedies Act ("CLRA"),

6   codified at Civil Code §§ 1750, et seq.

7   **A.    Statute of Limitations**

8   Ford correctly observes that actions under the CLRA " shall be commenced not more than

9   three years from the date of the commission of [an unlawful] method, act, or practice."  Cal. Civ.

10  Code § 1783, *quoted in* Motion at 5:14-16.   As recognized in a prior class action against Ford,

11  this "statute of limitations runs 'from the time a reasonable person would have discovered the

12  basis for a claim.' "  *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1148 (N.D. Cal. 2005)

13  (quoting *Massachusetts Mutual Life Insurance Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1295

14  (2002)); *cf.* Motion at 5:17-19 (grudgingly conceding the applicability of this "discovery rule").

15  Crucially, under governing California law, the "question when a plaintiff actually discovered or

16  reasonably should have discovered the facts for purposes of the delayed discovery rule is a ques-

17  tion of fact unless the evidence can support only one reasonable conclusion."  *Ovando v. County*

18  *of Los Angeles*, 159 Cal. App. 4th 42, 61 (2008) (citing *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103,

19  1112 (1988)).

20  Regarding when Ms. Glass "actually discovered or reasonably should have discovered the

21  facts for purposes of the delayed discovery rule," Ford points to just a single item of evidence —

22  the fact that "Ms. Glass replaced all four of her tires on January 4, 2007, at 20,044 miles."  Motion

23  at 5:20.  But in contrast to other Plaintiffs, this replacement did *not* cause Ms. Glass to conclude

24  that there was "something wrong" with her vehicle.  *See* Motion at 5:24-26 (asserting that "Plain-

25  tiffs Mary Hauser and Andrea Duarte" — but *not* Ms. Glass — "concluded there was something

26  wrong with their vehicles when they had to replace two of their tires at relatively low mileage").

27  Nor is it the "only . . . reasonable conclusion," *Ovando*, 159 Cal. App. 4th at 61, that having to re-

28  place a set of four tires after 20,000 miles of wear necessarily puts a reasonable automobile owner

on notice that her vehicle has a rear suspension defect. As Ford itself argues, "[a]ll vehicles, including vehicles with non-defective suspension systems, can experience tire wear at relatively low mileage *for a host of reasons*, including underinflation, overinflation, misalignment, aggressive driving, aggressive road surfaces, etc." Motion at 7:19-21 (emphasis added). Indeed, *Chamberlan* resolved this very same argument against Ford:

> The mere fact that a consumer's manifold failed does not necessarily mean that that person should have discovered Defendant's alleged non-disclosure at that time. Defendant's evidence that two customers did suspect that Defendant was responsible for their defective manifolds prior [to] April 25, 2000 shows that there may be a dispute of fact on this issue, but does not entitle Defendant to summary adjudication of the claims of this class subset.

369 F. Supp. 2d at 1148. The same is true here: Ford is not entitled to summary adjudication, on limitations grounds, as to Ms. Glass's CLRA claim.

### B. Duty of Disclosure

Ford correctly observes that a "manufacturer cannot be held liable for failure to disclose a fact under the CLRA unless the plaintiff establishes that the manufacturer had a duty to disclose that fact." Motion at 6:5-6. Ford argues that it did not have a duty to disclose the rear suspension defect to Plaintiffs because either (1) the defect did not pose an unreasonable safety hazard and was therefore not material, or (2) Ford had no knowledge of the defect at the relevant times. We address these two arguments in turn.

#### 1. Unreasonable Safety Hazard

Ford asserts that "Ms. Glass cannot prove an unreasonable safety risk and therefore cannot prove the allegedly omitted facts were material." Motion at 6:19-20 (capitalization altered). Plaintiffs agree that they must allege — and ultimately prove — that "the design defect caused an unreasonable safety hazard." Motion at 7:1 (quoting *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1143 (9th Cir. 2012)). Ford acknowledges that Plaintiffs have indeed *alleged* the requisite safety hazard. *See* Motion at 7:7-15. Ford contends, however, that "Plaintiffs do not have a scintilla of evidence to support these allegations, except in the insignificant sense that it can be dangerous to let the tires on any vehicle become excessively worn before replacing them." Motion at 7:16-18. But as demonstrated below, this contention is wrong.

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

In the first place, the conceded fact that "it can be dangerous to let the tires on any vehicle become excessively worn before replacing them" is hardly "insignificant." Vehicles with a rear suspension defect that causes tires to become excessively worn *prematurely* — and consequently *more frequently* — are vehicles with an abnormal likelihood of experiencing excessively worn tires. In other words, these are vehicles with an abnormal likelihood of having (to use Ford's own word) a "dangerous" condition. Ford seems to believe that this dangerous condition is somehow less worthy of concern to the law merely because other vehicles may at times experience the same danger. But the fact that "the danger of driving on excessively worn tires [is] *not unique to the Focus*," Motion at 8:24-25 (emphasis added), is cold comfort to drivers of vehicles that have an abnormal likelihood of experiencing such danger. Likewise, the fact that "excessive [tire] wear can create a problem *on any vehicle* if it goes unnoticed and unaddressed," Motion at 8:26-27 (emphasis added), does not help drivers of vehicles with an abnormal likelihood of experiencing such problem.

Ford's present lack of concern with the dangers of premature tire wear is strikingly at odds with Ford's treatment of those dangers outside the context of litigation. Thus, Ford sent no fewer than three "special service messages" to its thousands of dealers, informing them that model year 2005 and subsequent Focus vehicles may exhibit "*vehicle drift when driving on wet or snow covered roads*" in conjunction with premature tire wear. *See* Exhibits K, L, and M (emphasis added). Moreover, while Plaintiffs themselves did not have "difficulty controlling their vehicles," Motion at 8:10, other Focus owners did. Plaintiffs' motion for class certification provided a small sample of reports of this difficulty:

- report that vehicle "snakes when the road is wet";

- report that vehicle is "very hard to control on snow covered roads";

- report that "vehicle drifts in wet roads and real bad in snow diagnostics";

- report that "rear end would slide from side to side while driving on snow-covered roads"; and

- report that "rear of vehicle slides around in any rain or snow weather."

///

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1  Plaintiffs' Motion for Class Certification ("Class Certification Motion") at 7:22-28 (Doc. 33, filed

2  Jan. 11, 2013). Ford's own databases document the handling concerns of which the special ser-

3  vice messages warned. *See* Exhibits S (communications with dealers) and T (communications

4  with customers).

5       Given the foregoing, Ford's hyperbolic assertion that "Plaintiffs do not have a scintilla of

6  evidence to support" their safety-related allegations is demonstrably false. To be sure, Ford has

7  contrary evidence, including the opinions of its expert Dr. Paul Taylor. *See generally* Motion at

8  9:1-20. The jury might be convinced by Dr. Taylor's post hoc repudiation of Ford's own special

9  service messages — or it might not.[1] But because the collective evidence must be viewed in the

10  "light most favorable to [Plaintiffs]," Motion at 1:20-21, Plaintiffs have shown a genuine dispute

11  as to whether the design of the C170 Focus posed a safety hazard. Therefore, Ford is not entitled

12  to summary judgment on this issue.

13          **2.     Ford's Knowledge of the Defect**

14       Ford also asserts that "Ms. Glass cannot prove that Ford knew the allegedly material facts

15  at the time she purchased her vehicle." Motion at 10:8-9 (capitalization altered). In particular,

16  Ford argues that "Ms. Glass purchased her 2005 Focus on April 24, 2005," and she "cannot prove

17  that Ford at that time knew of any defect likely to cause premature tire wear, let alone the specific

18  defect alleged by Plaintiff[s]." Motion at 10:12-14. Plaintiffs agree that they must prove that Ford

19  "was aware of a defect at the time of sale." *Wilson*, 668 F.3d at 1145. But Plaintiffs disagree as

20  to Ford's knowledge: the record demonstrates that Ford did know of the relevant defect by April

21  of 2005.

22       We can dispose first of Ford's argument that "the indisputable fact that Ford never knew

23  of any *safety issue* related to tire wear should alone be dispositive." Motion at 10:25-26 (empha-

---

[1] Dr. Taylor analyzed two databases of safety-related data and purportedly "found no evidence in either database to support a claim that the defects alleged by plaintiffs result in a risk of crashes that is elevated." Motion at 9:18-19. But Plaintiffs' rebuttal expert, Dr. Edward E. Leamer, found that Dr. Taylor's analysis suffers from "serious problems." Exhibit GG at 25, ¶ 51. As a result of those serious problems, Dr. Taylor's analysis simply "does not establish that Focus crash rates were not elevated." *Id.* at 25 (Section C).

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1    sis added).  Under the applicable law, Ford's knowledge of a *safety issue* is irrelevant.  As quoted

2    above, the Ninth Circuit held that a defendant's awareness of "a *defect*" — not its awareness of a

3    safety issue — is dispositive in this context.  Ford adduces no authority for imposing a burden on

4    plaintiffs to prove anything more.[2]

5        As for whether Ford knew of a suspension-related defect in its C170 platform by April of

6    2005, a reasonable jury could easily find so.  The jury could start with Steve von Foerster, whose

7    title was "Vehicle Programs Director" and who was a "chief engineer" for Ford.  See Exhibit O

8    (second page); Exhibit U at 157:11-13 (deposition of Ford engineer Eric Kalis).  In the view of

9    his colleagues, "if Mr. von Foerster put something in writing in an email [then] he knew what he

10   was talking about." *Id.* at 166:2-5.  In an e-mail in February of 2005, Mr. von Foerster observed

11   and acknowledged that "[t]ire wear has been a significant problem for the Focus."  Exhibit O (sec-

12   ond page); *see also id.* (observing that the problem was related to "rear toe," a rear suspension

13   specification).  Plaintiffs' motion for class certification has already documented how engineers'

14   awareness of this suspension-related problem went back as far as 200*2*.  *See* Class Certification

15   Motion at 2:6-22.  As early as 200*1*, moreover, Ford was receiving independent confirmation of

16   the problem from its dealers:  in October of that year, for example, "the dealer technician stated

17   that the customer's 'vehicle has excessive tire wear on the rear tires,' and that '*many of the Focus*

18   *models are starting to show this*.' " *Id.* at 3:17-19.  Finally, "the program manager for the Focus

19   [was compelled] to admit that he was, no later than *October of 2005*, 'aware of . . . known concerns

20   on premature tire wear on the Ford Focus.' " *Id.* at 3:28-4:2.  Given this evidence, a reasonable

21   jury could find that this awareness extended back at least a few months earlier to when Ms. Glass

22   purchased her vehicle in April of 2005.  Therefore, the record belies Ford's assertion that there is

23   "*no evidence* that in April 2005 any Ford engineer believed that the suspension in Focus vehicles

24

25

26   [2] We cannot help but comment on the assertedly "indisputable" fact that Ford "*never*" knew of
     any safety issue related to suspension-related tire wear on Focus vehicles.  In truth, the facts are
     indisputably otherwise.  As we have documented in the previous subsection (p. 4:14-18), Ford
27   sent no fewer than three "special service messages" to its thousands of dealers, informing them
     that model year 2005 and later Focus vehicles may exhibit "*vehicle drift when driving on wet or*
28   *snow covered roads*" in conjunction with premature tire wear.

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

1    was defective because of a potential for excessive [tire] wear of any kind." Motion at 12:4-5 (em-

2    phasis added).

3          To be sure, Ford gamely attempts to explain away this evidence. *See generally* Motion at

4    11:1-12:3. Some aspects of that explanation are ridiculous: the fact that "the Focus was named

5    by *Car and Driver* as one of the ten best cars for 2000 — as well as for the next four model years,"

6    Motion at 11:5-6, is not logically inconsistent with the fact that the Focus had an *undisclosed* de-

7    fect in the design of its rear suspension (and particularly a defect that manifested itself only after

8    *months or years of driving*), of which Ford engineers were aware.[3]

9          Other aspects of Ford's competing explanation are less superficially implausible but, in

10   the end, equally unavailing. The jury might find probative the fact, say, that "the data did not

11   indicate the existence of a problem in the field, and that the 2005 model year was performing

12   significantly better than prior model years" with respect to tire wear. Motion at 12:1-2. But the

13   jury will also learn that the "data" on which these assertions are based is *warranty* data. *See,*

14   *e.g.*, Motion Exhibit C26 (Doc. 42) (second page) (stating that "Focus tire wear has improved

15   significantly for the 2005 [model year]," based on a chart showing "Focus Tire Wear Warranty

16   (Cumulative)"), *cited in* Motion at 12:3. But warranty data is a particular poor indicator of per-

17   formance here, because in order for a complaint to show up in Ford's warranty database (AWS),

18   "Ford has to pay for some part or all of a repair claim." Exhibit X at 211:13-16 (deposition of

19   Ford's expert Dr. Taylor). Where, as here, Ford is actively *denying* that the problem even exists

20   (and therefore not paying claims), it cannot be inferred that complaints make into the database.

21         Ford engineers themselves concede the limited usefulness of warranty data in assessing

22   problems with a vehicle. This independent limitation results from the fact that tires are typically

23

24   _____

25   [3] Particularly pathetic is Ford's attempt to imply that Plaintiffs believe — indeed, "emphasize" —
     that the Focus has "a European type suspension that provided 'exceptional handling finesse' and
     'exceptional maneuverability.'" Motion at 11:4-5. The appellation "exceptional" came not from

26   Plaintiffs but from *Ford's own marketing materials. See* Class Certification Motion at 1:16-18
     (quoting Ford's marketing brochures for 2005-2011 Focus models). In this regard, it is ironic that

27   Ford engineer Paul Roberts observed that "I've been looking at and driving these cars for some
     time now and it only takes a few minutes of spirited driving . . . to feather these tires within the

28   allowable alignment parameters." Exhibit N (first page).

Hᴉᴄᴋs Tʜᴏᴍᴀs LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

warranted for no more than 12 months, *see* Motion at 3:12-17, but "tire wear issues are not generally found prior to 12 months in service so this data *may not completely represent the magnitude of the customer impact*." Exhibit P (emphasis added). Consequently, as early as 2003, the C170 Tire Improvement Team "discussed the inability of current tracking metrics to measure tire wear beyond 12 [months in service] and the probability that high tire wear complaints *will not surface until later*." Exhibit R (emphasis added). By 2005, moreover, Ford engineers knew that "from our past experience with rear tire wear on Focus, warranty data for tires is a *very small part of the big picture*." Exhibit Q (emphasis added); *accord, e.g.*, Exhibit GG at 25, ¶ 48 (conclusion of Plaintiffs' rebuttal expert Dr. Edward E. Leamer that "warranty repairs are a very poor indicator of accelerated tread wear"). Therefore, the warranty data and other facts advanced by Ford are hardly so overwhelming that they must — when viewed in the "light most favorable to [Plaintiffs]," Motion at 1:20-21 — *compel* a reasonable jury to find that Ford had no knowledge of a defect. To the contrary, Ford's competing explanation merely confirms that there is a genuine dispute as to Ford's knowledge, which dispute precludes summary judgment on this issue.

### C. Causation

Ford correctly observes that in order to "[t]o prevail on her CLRA claim, Ms. Glass must also prove that she suffered damage 'as a result of' Ford's alleged omission, i.e., that the alleged omission *caused* her to suffer an injury." Motion at 12:9-10 (emphasis added) (quoting Cal. Civ. Code § 1780(a)). California courts have accordingly referred to "the causation required by Civil Code section 1780." *Massachusetts Mutual*, 97 Cal. App. 4th at 1292.

How to prove the requisite causation in a mass consumer action like this one? The Ninth Circuit recently addressed this very question: "[C]ausation, on a class-wide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class. This rule applies to cases regarding omissions or 'failures to disclose' as well." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (emphasis in original; citations and internal quotation marks omitted). Under California law, a misrepresentation or omission is *material* "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1   in question, and as such materiality is generally a question of fact unless the fact misrepresented

2   is so obviously unimportant that the jury could not reasonably find that a reasonable man would

3   have been influenced by it." *Id.* (quoting *Steroid Hormone Product Cases*, 181 Cal. App. 4th

4   145, 157 (2010)).

5       As described above, Ford's omission here was its failure to inform consumers of the fact

6   that 2005-2011 Ford Focus vehicles had a rear suspension design defect, such that they "may ex-

7   hibit premature front/rear tire wear and/or a vehicle drift condition when driving on wet or snow

8   packed roads." Exhibit M. We think it obvious that a reasonable man would attach importance

9   to this fact in determining whether or not to purchase a Ford Focus, or how much to pay for such

10  vehicle. But the Court need not so rule as a matter of law; at this stage of the case, the Court need

11  only rule that the fact omitted by Ford is *not* "so obviously unimportant that the jury could not

12  reasonably find that a reasonable man would have been influenced by it." *Stearns*, 655 F.3d at

13  1022. That ruling is compelled by common sense, and it is consistent with the recent judgment

14  of *Keegan v. American Honda Motor Co.*, 284 F.R.D. 504, 531 (C.D. Cal. 2012), that "the likeli-

15  hood that [premature tire] wear might occur would have been material to a reasonable consumer."

16      As to Ms. Glass in particular, Ford attempts to overcome the materiality-based inference

17  of causation on the ground that she "did no research before purchasing her vehicle, she does not

18  remember seeing any Ford advertising, and she does not even remember looking at a brochure."

19  Motion at 12:22-24. Thus, reasons Ford, "she cannot prove that she would have seen a disclosure,

20  even if one had been made, and therefore cannot prove that she would have acted differently."

21  Motion at 12:24-25. This reasoning is flawed and cannot overcome the inference of causation

22  that arose when Ford omitted material information about the Focus.

23      To establish reliance (and, consequently, causation) under California law, a plaintiff must

24  "prove that, had the omitted information been disclosed, [she] would have been aware of it and

25  behaved differently." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993). The requisite proof is

26  available here. As detailed in her declaration, before Ms. Glass purchased her Focus, she had a

27  substantive discussion with a Ford salesman about the features of the vehicle; yet that salesman

28  omitted any mention of the suspension defect or related tire wear or safety issues. *See* Exhibit BB

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1  at 1, ¶ 2. Had Ms. Glass "been told such information, this would have greatly affected [her] deci-

2  sion to buy the car"; indeed, she "would have decided against purchasing a Ford Focus and gone

3  elsewhere to purchase a new vehicle." *Ibid.* On this evidence, and especially in light of the in-

4  ference of reliance, a reasonable jury could find the causation required by Civil Code § 1780.

5  **D.  Actual Damages**

6  Ford argues that "[s]ummary judgment is required on Ms. Glass's CLRA claim for actual

7  damages because she cannot prove that she has suffered any such damages." Motion at 13:3-4.

8  **1.  Non-Exclusive Relief**

9  As a preliminary matter, it is crucial to recognize that "actual damages" does not exhaust

10  the scope of authorized relief under the CLRA. The governing statute provides:

11  > Any consumer who suffers *any damage* as a result of the use or employ-
   > ment by any person of a method, act, or practice declared to be unlawful by [Civil

12  > Code] Section 1770 may bring an action against that person to recover or obtain
   > any of the following:

13

14  > (1) *Actual damages*, but in no case shall the total award of damages in a
   > class action be less than one thousand dollars ($1,000).

15  > (2) An order enjoining the methods, acts, or practices.

16  > (3) Restitution of property.

17  > (4) Punitive damages.

18  > (5) Any other relief that the court deems proper.

19  Cal. Civ. Code § 1780(a) (emphasis added). As the California Supreme Court has explained, "the

20  breadth of the phrase 'any damage' indicates a category that includes, but is greater than, 'actual

21  damages,' i.e., those who are eligible for the remedy of 'actual damages' are a subset of those who

22  have suffered 'any damage.'" *Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 640 (2009). In

23  addition, "'any damage' may encompass harms other than pecuniary damages, such as certain

24  types of transaction costs and opportunity costs." *Id.*; *see also Steroid Hormone Product Cases*,

25  181 Cal. App. 4th at 156 (reiterating that *any damage* "is not synonymous with 'actual damages'"

26  and "may encompass harms other than pecuniary damages").

27  Consequently, even if (contrary to the arguments below) Ford were to convince the Court

28  that Plaintiffs may not (as a matter of law) recover "actual damages," Ford would not be entitled

to summary judgment on Ms. Glass's CLRA claim. The remedy sought by Plaintiffs — which Ford characterizes as "cost of repair," Motion at 14:19 — fits comfortably under the rubric of the final category of relief authorized by Civil Code § 1780(a) as quoted above, namely, "[a]ny other relief that the court deems proper." This is the case whether the repair is ordered pursuant to the Court's broad equitable powers or whether the repair is monetized as fixed amount; both forms of relief are entirely "proper" under California law. *See, e.g., Fletcher v. Security Pacific National Bank*, 23 Cal. 3d 442, 452 (1979) (opining that a "court of equity may exercise its full range of powers 'in order to accomplish complete justice between the parties,'" (quoting *People v. Superior Court (Jayhill Corp.)*, 9 Cal. 3d 283, 286 (1973))); Cal. Civ. Code § 1794(b)(2) (providing that in certain circumstances involving consumer goods, "the measure of damages shall include the cost of repairs necessary to make the goods conform").

### 2. Civil Code § 3343

Turning to "actual damages" per se, Ford's arguments lack merit. We begin with Ford's assertion that the "proper measure of damages for fraudulent conduct that violates the CLRA is 'the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.'" Motion at 13:4-7 (quoting *Paz v. Playtex Products, Inc.*, No. 07CV2133 JM (BLM), 2008 WL 111046, at *3 (S.D. Cal. Jan. 10, 2008), in turn quoting Cal. Civ. Code § 3343(a)). The crucial, if implicit, premise of this assertion is that Civil Code § 3343(a) is the *exclusive* measure of the "actual damages" authorized by the CLRA in Civil Code § 1780(a)(1). Although the unpublished decision of the federal district court in *Paz* so stated — in conclusory fashion and without any analysis — nothing in the text of either statute compels this result, and no California court has so held. Indeed, paragraph (b)(2) of § 3343 expressly provides that the statute is *not* an exclusive remedy: it shall *not* "[d]eny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled." Moreover, *Steroid Hormone Product Cases*, 181 Cal. App. 4th at 156, *rejected* a defendant's attempt to view § 1780 and the CLRA exclusively through the lens of § 3343. Because Civil Code § 3343(a) is not the exclusive measure of damages under the CLRA, the premise of Ford's damages argument

1 fails.  Consequently, Ford's damages-related attack on Plaintiffs' CLRA claim should be rejected

2 outright.

3   In any event, even if § 3343(a) — which prescribes a difference-in-value measure — *is*

4 the exclusive measure of damages, that measure does not categorically exclude evidence of "cost

5 of repair."  The sole California case cited by Ford actually states:  "While *cost of repairs has some*

6 *probative worth on the issue of value*, it is not of itself the proper measure of damages."  *Central*

7 *Mutual Insurance Co. v. Schmidt*, 152 Cal. App. 2d 671, 676-77 (1957) (emphasis added), *cited in*

8 Motion at 14:22; *accord, e.g., Wagner Tractor, Inc. v. Shields*, 381 F.2d 441, 444 (9th Cir. 1967)

9 (holding, in a case where the measure of damages was difference-in-value, that "we can only deter-

10 mine the difference in values by looking at what it cost to correct the deficiencies in [the relevant

11 product]").  Therefore, the costs of repairing Plaintiffs' vehicles to a non-defective state has "some

12 probative worth" even if difference-in-value is the formal measure of damages.  Given that worth,

13 and given that the evidence must be viewed the "light most favorable to [Plaintiffs]," Motion at

14 1:20-21, Ford is simply incorrect in asserting that Plaintiffs have "presented no evidence of any

15 damages," Motion at 15:6.

16    **3.  Actual Value**

17   Finally, and in any event, Ford is wrong in asserting that Plaintiffs have "no evidence that

18 the actual value of the vehicle [they] received was less than the actual price [they] paid."  Motion

19 at 13:9-10.  In this regard, let us examine the two kinds of evidence that Ford concedes are rele-

20 vant here, namely, "expert testimony" and "common sense and the realities of the marketplace."

21 Motion at 13:16-18.

22   As for expert testimony, Ford proffers the conclusion of its expert Dr. Bruce Strombom

23 that "depreciation patterns for Plaintiffs' vehicles show no abnormal or excessive depreciation

24 compared to 'non-defective' vehicles, demonstrating that the market does not value the vehicles

25 less because of the alleged defect."  Motion at 13:13-15.  But as powerfully demonstrated in the

26 report of Plaintiffs' rebuttal expert Dr. Edward E. Leamer, Dr. Strombom's depreciation analysis

27 "is deeply flawed, misleading, and does not offer meaningful conclusions pertinent to the issue."

28 Exhibit GG at 30, ¶ 67.  Dr. Strombom's conclusions should therefore be discounted to zero.

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

As for common sense, Ford stitches together snippets from unconnected opinions, none of them from California courts, purporting to demonstrate that "the price paid by all consumers for all vehicles . . . necessarily reflects the potential for defects to occur." Motion at 14:8-9. In so arguing, Ford appears to adopt the theory of the "efficient market," which is the notion (most typically applied to well-developed securities markets) that "most publicly available information is reflected in market price." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Ford appears to reason that because its vehicle warranty is "an express acknowledgement that the product may be defective," and because "Ford's warranty acknowledge[s] the possibility of defects" in its vehicles, Motion at 13:27-14:2, such publicly available information is reflected in the market price of those vehicles. Ford's reasoning is at least plausible for "acknowledged" defects, that is, "defects that arise and are addressed by warranty, at no cost to the consumer." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 794 (N.J. 2005), *cited in* Motion at 13:21-22. By definition, however, Ford's reasoning is categorically flawed — it is contrary to both common sense and the efficient market theory — for *undisclosed defects that are systematically denied by the manufacturer*, as here. By definition, a market price cannot "reflect" information that is not "available" to buyers. *Cf.* Exhibit GG at 30, ¶ 68 (expert economist Dr. Leamer's observation that in order for prices to account for a defect, there must be "widespread availability of information about the economic costs of the defect, including both buyers and sellers").

In sum, Plaintiffs are happy to let Ford argue to the jury that car buyers will systematically pay the same price for a vehicle both before and after the buyers learn that the vehicle contains a design defect that poses an unreasonably safety hazard. But "common sense and the realities of the marketplace," Motion at 13:17-18, do not compel a reasonable jury to buy Ford's argument. Given the unreliability of Ford's expert testimony on this subject, it cannot be said there is "no genuine dispute" regarding value. For this reason and the additional reasons stated above, Ford is not entitled to summary judgment with respect to damages under the CLRA.

**E.       Notice Under Civil Code § 1782(a)**

Ford correctly observes that "[u]nder the CLRA, a consumer must provide specified notice to the defendant '[t]hirty days or more prior to the commencement of an action for damages.' "

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1  Motion at 15:10-11 (quoting Cal. Civ. Code § 1782(a)).  In addition, Ford correctly observes that

2  Plaintiffs "filed their Complaint seeking CLRA damages before they gave the required notice."

3  Motion at 15:26-27.  Plaintiffs' counsel candidly acknowledged these points in a letter to Ford's

4  counsel dated October 15, 2012, which is reproduced as Exhibit B14 to the Motion (Doc. 41-16).

5  Although it is not clear from Ford's papers, that letter included the required notice to Ford, both

6  (1) notifying Ford "of the particular alleged violations of [the CLRA]," and (2) demanding that

7  Ford "correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation

8  of [the CLRA]."  Cal. Civ. Code § 1782(a).  Ford has not responded to that notice and demand,

9  and Ford's papers do not even suggest that the notice fails to satisfy the substantive requirements

10  of § 1782(a).[4]  Consequently, although Paragraph 98 of Plaintiffs' complaint was not accurate at

11  the time it was filed, that paragraph is now entirely accurate in stating:  "Plaintiffs have provided

12  Ford with notice of their alleged violations of the Consumers Legal Remedies Act pursuant to

13  California Civil Code §1782(a).  Ford failed to provide appropriate relief for such violations."

14      Like many other defendants before it, Ford argues that Plaintiffs' failure to give pre-filing

15  notice means that their "CLRA claim for damages should be dismissed with prejudice."  Motion

16  at 17:16-17.  The California Court of Appeal has squarely faced — and expressly rejected — this

17  very argument.  In *Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App. 4th 1235 (2009), the

18  defendant argued that the "plaintiffs were precluded from seeking damages under the CLRA by

19  failing to comply with the notice requirement before filing the . . . complaint in which they first

20  sought such damages"; that is, the plaintiffs' "failure to comply with the notice requirement re-

21  quires dismissal *with prejudice*."  *Id.* at 1260-61.  The court "disagree[d]" with this argument,

22  _____

23  [4] As stated in the text above, Exhibit B14 shows that Plaintiffs sent the notice letter to Ford on
    October 15, 2012.  The letter was sent *via Ford's counsel* in light of the general prohibition on a
24  lawyer's communicating directly with a represented party.  *See* California Rule of Professional
    Conduct 2-100(A) ("While representing a client, a member shall not communicate directly or in-
25  directly about the subject of the representation with a party the member knows to be represented
    by another lawyer in the matter, unless the member has the consent of the other lawyer.").  When
26  Ford's counsel repeatedly and unreasonably refused to acknowledge that receipt by counsel of
    the October 15, 2012 letter constituted receipt of the letter by Ford itself, Plaintiffs sent a copy
27  of the letter directly to Ford on December 10, 2012.  *See* Motion at 17 n.15; Motion Exhibit B15
    (Doc. 41-17).  Ford does not ascribe any significance to the interval between October 15th and
28  December 10th, and neither do Plaintiffs.

opining that it "fail[s] to properly take into account the purpose of the notice requirement," which is "to allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30-day period that it will correct those wrongs within a reasonable time." *Id.* at 1261. "A dismissal *with prejudice* of a damages claim filed without the requisite notice is not required to satisfy this purpose. Instead, the claim must simply be dismissed until 30 days or more after the plaintiff complies with the notice requirements." *Id.*

What would it mean here for the CLRA claim to be "dismissed until 30 days or more after the plaintiff complies with the notice requirements"? Given that Plaintiffs indisputably complied with such requirements *some seven months ago*, dismissal would be an idle and pointless act that would surely "fail to properly take into account the purpose of the notice requirement." That purpose has long been satisfied in the present case: Ford has had not just 30 days, but nearly seven months, to avoid liability for damages by correcting the alleged wrongs (or by at least indicating that it would do so within a reasonable time). In these circumstances, Civil Code § 1782(a) as authoritatively construed by *Morgan* demands nothing more, certainly not a *faux* dismissal.

We are left then with Ford's extended discussion of the propriety of Plaintiffs' amending Paragraph 98 of their complaint. *See generally* Motion at 16-17. In the first place, an amendment is wholly unnecessary because (as discussed above) that paragraph is now entirely accurate — and has been since 30 days after October 15, 2012. In addition, even if some technical and conforming amendment were required (and Ford does not suggest what this amendment might be or what California authority demands it), Ford's notion that it should be treated like a substantive amendment that would add new parties or new claims — requiring extraordinary "good cause" under Federal Rule 16(b) — is ridiculous on its face. Tellingly, Ford concedes the utter "absence of prejudice" from tardily receiving an otherwise compliant CLRA notice. Motion at 17:15.

The procedural rules governing this Court are to "be construed and administered to secure the just . . . determination of every action and proceeding," Fed. R. Civ. P. 1, and the spirit of the rules is that "judgments be founded on facts and not on formalistic defects," *Builders Corp. of America v. United States*, 259 F.2d 766, 771 (9th Cir. 1958). Concerning claims for damages under the CLRA, California law as explicated in *Morgan* evinces a similarly strong preference

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1    for determinations on the merits. For all of these reasons, Ford's hypertechnical argument for

2    dismissal should be rejected here just as it was rejected in *Morgan*.

3    **II.    UCL Claim**

4        Plaintiffs' second claim arises under California's Unfair Competition Law ("UCL"), cod-

5    ified at Business & Professions Code §§ 17200, et seq.

6        **A.    Duty of Disclosure and Causation**

7        Ford attacks Ms. Glass's UCL claim on two of the same grounds as it attacks her CLRA

8    claim. *See* Motion at 18:4-7 ("As discussed above in connection with Plaintiff's CLRA claim,

9    Ford had no duty of disclosure and Ms. Glass cannot prove reliance. Accordingly, summary judg-

10   ment is required on Ms. Glass's UCL claim, just like it is required on her CLRA claim."). Like

11   Ford, Plaintiffs respectfully refer the Court to their previous discussion of these two issues. *See*

12   *supra* Sections I.B and I.C (pp. 3-10).

13       **B.    Statute of Limitations**

14       Ford correctly observes that "[a]ny action to enforce any cause of action pursuant to [the

15   UCL] shall be commenced within four years after the cause of action accrued." Cal. Bus. & Prof.

16   Code § 17208, *quoted in* Motion at 18:9-10, and that "[t]his limitations period is subject to the

17   same discovery rule as Ms. Glass's CLRA claim," Motion at 18:10-11. As it did with the CLRA

18   claim, Ford argues that Ms. Glass discovered her UCL claim "on January 4, 2007, when she re-

19   placed four tires and had reason to suspect she had a claim." Motion at 18:12. We have already

20   explained why this argument lacks merit, and we respectfully refer the Court to that explanation.

21   *See supra* Section I.A. (pp. 2-3).

22       **C.    Equitable Restitution**

23       Ford correctly observes that the UCL authorizes a court to make such orders as may be

24   "necessary to restore to any person in interest any money or property . . . which may have been

25   acquired" by means of unfair competition. Cal. Bus. & Prof. Code § 17203, *quoted in* Motion at

26   18:19-20. Such "restitution is the only monetary remedy expressly authorized by [the UCL]."

27   *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1146 (2003), *quoted in* Motion at

28   18:22-23. Paragraph 108 of Plaintiffs' complaint expressly seeks restitution under the UCL.

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1    Ford argues that "[i]n this case, the funds Ms. Glass paid for her vehicle went to a dealer,

2    not to Ford, and she has made no attempt to trace any portion of these funds to Ford.  Therefore,

3    the relief Ms. Glass is requesting here is not equitable in nature and it is not the type of equitable

4    'restitution' that can be awarded under the UCL."  Motion at 19:4-7.  Ford appears to be arguing

5    that "the availability of restitution under the UCL [is] limited to *direct* purchasers and exclude[s]

6    plaintiffs . . . who purchased [the relevant] product from a retailer."  *Shersher v. Superior Court*,

7    154 Cal. App. 4th 1491, 1494 (2007) (emphasis added).  But The California Court of Appeal has

8    squarely rejected that argument:  "Nothing in *Korea Supply* conditions the recovery of restitution

9    on the plaintiff having made direct payments to a defendant who is alleged to have engaged in

10   false advertising or unlawful practices under the UCL. . . .  Plaintiff in this case has alleged that

11   he paid money to a retailer to purchase [a] product based on false or misleading statements on the

12   product package.  This assertion, if true, supports a claim for restitution."  *Id.*; *see also Clayworth*

13   *v. Pfizer, Inc.*, 49 Cal. 4th 758, 788 (2010) (citing *Shersher* for the proposition that "indirect pur-

14   chases may support UCL standing"); *Belle v. Chrysler Group, LLC,* SACV 12-00936 JVS, 2013

15   WL 949484, at *7 (C.D. Cal. Jan. 29, 2013) (applying *Shersher* and *Clayworth* to hold that "Plain-

16   tiffs' UCL claim is not defective because Plaintiffs did not purchase directly from Chrysler").

17   Next, Ford quotes a recent case from this District holding that under the UCL, "Plaintiffs

18   must identify money or property *that they owned*, which was unlawfully, unfairly, or fraudulently

19   obtained by [the defendant]."  *Fresno Motors, LLC v. Mercedes-Benz USA, LLC*, 852 F. Supp. 2d

20   1280, 1318 (E.D. Cal. 2012), *quoted in* Motion at 19:10-12.  Although this requirement may be

21   satisfied by identifying "a benefit obtained by [the defendant] in which Plaintiffs have an owner-

22   ship interest," it may likewise be satisfied by simply identifying the "sums Plaintiffs or any other

23   party paid to [the defendant]," *Fresno Motors*, 852 F. Supp. 2d at 1317, either (as set out above)

24   directly or indirectly.  The requirement is easily satisfied here:  to purchase her vehicle, Ms. Glass

25   paid the sum of $18,665 to the Ukiah Ford authorized dealership, some portion of which Ford ob-

26   tained fraudulently.  *See* Motion Exhibit G-1 (Part 1 of 4) (Doc. 47-1) at 55:23-25 (deposition of

27   Ms. Glass); *id.*, Page 39 of 45 (bottom of Retail Installment Sale Contract).

28   ///

Finally, Ford quotes a California case observing that restitution must be "based on a specific amount found owing," such that "money or property identified as belonging . . . to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 699 (2006), *quoted in* Motion at 19:13-17. Whatever these very general principles mean for the present case, they do *not* mean that restitution must be "specific" or "particular" in the sense of a *res* or a mathematically precise amount of money.  For example, in *Nelson v. Pearson Ford Co.*, 186 Cal. App. 4th 983, 1016 (2010), "[b]ased on its conclusion that Pearson Ford is liable under the UCL for engaging in an unlawful business practice, the trial court awarded each member of the backdating class restitution in the amount of $50."  On appeal, the plaintiff claimed "the restitution amount should be increased to $63.14, and Pearson Ford claim[ed] the amount should be lowered to $43.40." *Id.* at 1017.  The Court of Appeal rejected these claims and affirmed the restitution award:  based on "a reasonable assumption," the trial court "rounded the figure to $50," and the parties "provided no reasoned argument explaining how the trial court abused its discretion under the circumstances." *Id.*

Therefore, Ford is not entitled to summary judgment on Ms. Glass's UCL claim.

### III.  Implied Warranty Claim

Plaintiffs' third claim arises under California's Song-Beverly Consumer Warranty Act ("Song-Beverly Act"), codified at Civil Code §§ 1790, et seq.

#### A.  Expiration of Warranty Period

As Ford notes, the "implied warranty of merchantability arising under the Song-Beverly Act is expressly limited by statute to a period of one year."  Motion at 19:24-25 (citing Cal. Civ. Code § 1791.1(c)).  Ford argues that summary judgment is required on Ms. Glass's Song-Beverly Act claim because she "purchased her vehicle in April 24, 2005 and did not have to replace her tires until January 4, 2007 — eight months after the implied warranty expired."  Motion at 19:27-20:1.  This argument has superficial appeal, but it is unavailing in light of *Mexia v. Rinker Boat Co., Inc.*, 174 Cal. App. 4th 1297 (2009).

In that case, "Mexia alleged that he purchased from Miller a boat manufactured by Rinker that was unmerchantable due to a latent defect, which subsequently caused the boat's engine to

corrode. He commenced his action within four years after purchasing the boat," but long after the expiration of the one-year duration provision in Civil Code § 1791.1(c). 174 Cal. App. 4th at 1300-01. Like Ford here, the defendants in *Mexia* argued that "the duration provision should be construed so as to bar Mexia's implied warranty claim," because by "the time Mexia brought the boat for repairs, the implied warranty had already expired by over a year"; they also argued that "the duration provision precludes an action for breach of the implied warranty of merchantability under the Song-Beverly Act when the action is based upon a latent condition that is not discovered by the consumer and reported to the seller within the duration period." *Id.* at 1308-09. The California Court of Appeal rejected these arguments. In the first place, "the duration provision is not a statute of limitations." *Id.* at 1308.

In addition, and as especially relevant here, the court rejected any interpretation of the Song-Beverly Act that "would create a notification deadline that would apply *even if the consumer has not discovered or could not have discovered the breach within the duration period.*" *Id.* at 1310. The court held instead that the Act gives consumers at least as much time as the California Uniform Commercial Code, namely, "a 'reasonable' time within which to notify the seller *only after the point the purchaser knew or should have known of the breach.*" *Id.* Therefore, the one-year duration provision "merely creates a limited, *prospective* duration for the implied warranty of merchantability; it does not create a deadline for discovering latent defects or for giving notice to the seller." *Id.* at 1301 (emphasis added). Accordingly, the Court of Appeal reversed the dismissal of Mexia's Song-Beverly Act claim. *See id.* at 1312.

Here, the relevant defect — the defectively-designed rear suspension of the Focus — was obviously a "latent" one, and Ford's motion does not contend otherwise. Because Ford does not argue that Ms. Glass discovered, or could have discovered, the defect within the one-year duration period, *Mexia* precludes summary judgment on Ms. Glass's Song-Beverly Act claim.[5]

---

[5] Ford cites four federal cases and one California case in support of its argument. *See* Motion at 20:2-9. Two of the federal cases did not even discuss *Mexia*, and the other two — *Marchante v. Sony Corp. of America, Inc.*, 801 F. Supp. 2d 1013, 1022 (S.D. Cal. 2011); *Hovsepian v. Apple, Inc.*, No. 08-5788, JF (PVT) 2009 WL 2591445, at *7-8 & n.7 (N.D. Cal. Aug. 21, 2009) — declined to follow *Mexia* because it is assertedly contrary to the *unpublished* opinion in *Larsen v.*

(continued...)

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

**B.      Inner-Edge Rear Tire Wear**

Ford next argues that "Ms. Glass's Song-Beverly implied warranty claim is based on an alleged suspension defect that causes excessive inner edge rear tire wear.  But Ms. Glass has no evidence that she experienced inner edge rear tire wear at any time, let alone evidence that any such wear was caused by the alleged defect."  Motion at 20:16-19.

Before confronting this argument on the facts, it is crucial to make a point about the law.  Without citing any authority for the proposition, Ford simply assumes that Plaintiffs must prove that they experienced "excessive inner edge rear tire wear" in order to prevail on their claims.  As recently recognized in *Keegan v. American Honda Motor Co.*, 284 F.R.D. 504 (C.D. Cal. 2012), however, the law is to the contrary.  *Keegan* rejected the defendant automobile manufacturer's argument that "to succeed on the CLRA claim, plaintiffs would have to prove that each class vehicle experienced premature or uneven tire wear as a result of the purported design defect."  *Id.* at 531.  Rather, California law "mandates only that plaintiffs show there was a defect in the class vehicles that created an 'unreasonable risk' of safety problems."  *Id.* (citing *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 836 (2006)).

Here, Plaintiffs have done just that.  *See supra* Subsection I.B.1 (pp. 3-5).  This point applies not only to the CLRA claim but to all of Plaintiffs claims, because Plaintiffs' allegation "is not that each and every class vehicle exhibited premature and excessive tire wear; it is that as a result of the design defect, class vehicles had a likelihood of doing so."  *Keegan*, 284 F.R.D. at 532.  As we have said before, Plaintiffs allege that "the defect exists in the alignment geometry [of the suspension], not in the tires."  *Wolin*, 617 F.3d at 1173.  Without conceding that Plaintiffs must prove "excessive inner edge rear tire wear," therefore, we confront Ford's factual argument, which has two components.

_____

(continued...)
*Nissan North America, Inc.*, No. A121838, 2009 WL 1766797 (Cal. Ct. App. June 23, 2009).  As this Court well knows, however, an unpublished opinion is no evidence of binding California law.  *See* Cal. R. Ct. 8.1115(a).  Finally, in merely holding that "Atkinson's cause of action under the implied warranty of merchantability is barred as a matter of law because Atkinson filed suit more than five and one-half years after the expiration of the one-year warranty period," *Atkinson v. Elk Corp. of Texas*, 142 Cal. App. 4th 212, 232 (2006), said nothing in conflict with *Mexia*.

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

*First*, Ford argues that "Ms. Glass cannot even show that the excessive wear was occurring while the tires were on the rear and not the front." Motion at 20:20-21. Admittedly, Ford presents some evidence that Ms. Glass experienced *front* tire wear, *see* Motion at 20:21-21:4, but this evidence only goes to show that there is factual dispute on this point. Other evidence points to *rear* tire wear. In particular, on *every* occasion for which there is evidence of excessive wear on Ms. Glass's tires, the *rear* tires exhibited comparatively more wear:

- On January 4, 2007 (at 20,044 miles), the Ukiah Ford technician observed, "Front tires in yellow; rear tires in red." Motion Exhibit B18 (Doc. 41-20), at 8 (Lepper's inspection report for Ms. Glass's vehicle).

- On January 12, 2011 (at 67,690 miles), the Ukiah Ford technician observed, "Front tires 'OK'" and "Rear tires tread depth remaining 3/32; need to be replaced." *Id.* at 11.

- On July 17, 2012 (at 83,134 miles), Mr. Lepper recorded "Tread Depth Measurement[s]" in which all rear tires have less tread depth than the corresponding front tires. *See id.* at 4.

Mr. Lepper's visual observations of Ms. Glass's tires (discussed in the following paragraph) were consistent in this respect:

    Q     On page 20 of Tab D, you took some photographs of [Ms. Glass's] left and right *front* tires?

    A     Yes.

    Q     Did they exhibit signs of inboard edge tire wear?

    A     No.

    Q     Photograph number 12 on page 21 is of her left *rear* tire. Did that have signs of inboard edge tire wear?

    A     Yes, it does.

Motion Exhibit G10 (Doc. 47-14) at 196:23-197:8 (emphasis added) (Lepper's deposition). From this evidence, and even in the face of Ford's "explanations" involving tire rotations, a jury could reasonably conclude that Ms. Glass experienced comparatively more wear on her *rear* tires.

*Second*, Ford asserts that "Ms. Glass has no evidence that her tire wear, wherever it was occurring, was caused by the alleged defect." Motion at 21:5-6. Ford here reasons that the "defect she alleges would result in inner edge wear, wear that according to her expert, Mr. Lepper, is unmeasurable. But nothing in the documentary record suggests that Ms. [Glass] was experiencing inner edge tire wear as opposed to other types of wear, let alone immeasurable inner edge wear."

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Motion at 21:6-9 (citation omitted). Mr. Lepper never stated, however, that inner edge wear is "unmeasurable," only that it cannot be readily measured using the "standard industry method," which is to "measure [tread depth] in the tread groove of the tires . . . outer, center and inner." Motion Exhibit G10 (Doc. 47-14), at 165:13-22. Because inner edge tire wear is "*inboard* of that inner tread groove," *id.* at 165:4 (emphasis added), it must be observed in other ways. Thus, on Ms. Glass's rear tires, Mr. Lepper visually observed several instances of such wear, as revealed by a "high heat friction zone . . . that really shows the force and the wear that's going on to that tire." *Id.* at 199:23-25; *see also, e.g., id.* at 197:4-8, 198:9-17, 198:9-18 (discussing, among other examples, the rear tires shown in photograph numbers 12, 13, and 21).

Mr. Lepper's observations were confirmed by his measurements of comparative temperatures of tires following test drives of Plaintiffs' vehicles: "In each vehicle, the temperature at the inner tread row was higher than the inner center, outer center, and outer tread rows. The higher temperature will and did result in the accelerated wear of the tread on the rear tires." Exhibit CC at 7 (footnote omitted) (Lepper's expert report); *accord, e.g.*, Exhibit EE at 5 (report of Plaintiffs' expert Dr. Peter Thomas Tkacik) ("A gradient of tire temperatures about 6° F higher at the inside shoulders across these vehicles is the result of the combination of rear toe and camber. This tire temperature gradient has a correlation to tire life in that the higher the gradient, the shorter the life."). Therefore, Ford's assertion that Ms. Glass has "no evidence" that she "was experiencing inner edge tire wear as opposed to other types of wear," Motion at 21:5-9, is demonstrably wrong.

For these reasons, Ford is not entitled to summary judgment for lack of evidence regarding inner-edge rear tire wear.

**C.      Statute of Limitations**

Ford is correct that a "Song-Beverly implied warranty claim is subject to the four-year limitations period of California Uniform Commercial Code § 2725." Motion at 21:14-15 (citing *Krieger v. Nick Alexander Imports, Inc.*, 234 Cal. App. 3d 205, 211 (1991)).[6] Assuming that the

---

[6] Ford contends that the applicability of the discovery rule to a Song-Beverly Act claim is "an unsettled issue." Motion at 21:16 (citing *Mitchell v. Skyline Homes*, CIV S-09-2241 KJM, 2010 WL 1791281 (E.D. Cal. May 4, 2010)). That contention is incorrect. The California case cited
(continued...)

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1  discovery rule applies, Ford argues that "Ms. Glass had reason to suspect she had a claim no later

2  than January 4, 2007, when she first replaced four tires. Therefore, the four year statute of limi-

3  tations expired no later than January 4, 2011, well before this action was filed on November 2,

4  2011." Motion at 21:20-23. We have already explained why this argument lacks merit, and we

5  respectfully refer the Court to that explanation. *See supra* Section I.A. (pp. 2-3).

6  **IV.    Express Warranty Claim**

7      **A.    Expiration of Warranty Period**

8      Ford argues that the "warranty that covered Ms. Glass's vehicle expressly provided that

9  uneven or rapid tire wear was covered only for 12 months or 12,000 miles, whichever came first.

10  Ms. Glass did not have to replace her tires until eight months after this warranty period had ex-

11  pired. Therefore, there has been no breach of the express warranty and summary judgment is re-

12  quired." Motion at 22:23-26. The obvious premise of this argument is that Ms. Glass's express

13  warranty claim is predicated solely upon what Ford calls the warranty's "limited coverage" for

14  "uneven or rapid tire wear" for "the first 12 months in service or 12,000 miles, whichever occurs

15  first." Motion at 3:13-14.

16      That premise is incorrect. As Ford itself describes the general warranty on Ms. Glass's

17  vehicle, it "lasts for three years or 36,000 miles, whichever occurs first"; and during this period,

18  "authorized Ford Motor Company dealers will repair, replace, or adjust *all parts* on your vehicle

19  that are defective in factory-supplied materials or workmanship." Motion at 3:3-6 (emphasis add-

20  ed)). Plaintiffs unmistakably alleged a breach of this general warranty, not merely a breach of

21  the "limited provision" regarding tire wear: "Ford breached its express and implied warranties

22  by . . . extending a vehicle 3-year/36,000-mile bumper-to-bumper limited warranty, . . . thereby

23  _____

(continued...)

24  by Ford adopted "the rule that a cause of action for a warranty of future performance accrues on
discovery" under California Uniform Commercial Code § 2725(2), and that an automobile man-

25  ufacturer's "promise to repair defects that occur during a future period is the very definition of
express warranty of future performance." *Krieger*, 234 Cal. App. 3d at 217; *cf.* Motion at 3:5-6

26  (recounting Ford's promise to "repair, replace, or adjust all [defective] parts" on Ms. Glass's ve-
hicle for three years or 36,000 miles into the future); *see also, e.g., Cardinal Health 301, Inc. v.*

27  *Tyco Electronics Corp.*, 169 Cal. App. 4th 116, 133 (2008) (treating *Krieger* as good law while
finding it "inapposite" on the facts). *Mitchell* failed to grapple with *Krieger* or with the factual

28  distinctions drawn by *Cardinal Health 301.*

warranting to repair or replace *any defective part* at no cost to the owner or lessee." Complaint ¶ 122(a), at 32:25-28 (emphasis added). For purposes of this general warranty, the "defective" parts were not Ms. Glass's tires but rather the rear suspension of her vehicle. It was that "factory-supplied material[]" that Ford promised to "repair, replace, or adjust" — but failed to do so. For this reason, Ford is not entitled to summary judgment on Ms. Glass's express warranty claim.

### B. Premature Rear Tire Wear

Ford argues that "[a]s discussed in detail above, Ms. Glass has no evidence that she ever experienced excessive rear tire wear, let alone that it was caused by the alleged defect during the warranty period. Summary judgment on her express warranty claim is required for this reason as well." Motion at 23:6-8. Like Ford, Plaintiffs respectfully refer the Court to their previous discussion of this issue as well. *See supra* Section III.B (pp. 20-22).[7]

### Plaintiff Andrea Duarte

## I. CLRA Claim

### A. Statute of Limitations

Ford contends that "Ms. Duarte *actually* discovered the basis for her claim, and the three year statute began to run, no later than August 12, 2008," more than three years before this action was filed. Motion at 26:26-27. According to Ford, Ms. Duarte testified that "she concluded that the Focus was defective on August 12, 2008, when North Bay Ford told her that her tires required immediate attention after only about 12,000 miles." Motion at 26:24-26.

To be sure, Ms. Duarte did testify that "when they started with the tires, saying I needed new tires, that's when I thought, something is not right. Q And that's when the dealer told you your rear tires needed immediate attention? A Immediate attention, yeah." Motion Exhibit G-2 (Part 1 of 2) (Doc. 47-5), at 131:6-11. But she *also* testified that the same Ford dealer concealed the nature of the problem with her vehicle:

---

[7] For purposes of this motion, we agree with Ford that "claims under the Magnuson-Moss Act stand or fall with Plaintiffs' express and implied warranty claims under state law," such that "this Court's disposition of the state law warranty claims determines the disposition of the Magnuson-Moss Act claims." Motion at 23 n.7 (citing *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)).

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

**Q** And was it your contention Ford should have told you something about the nature of the tire wear in the Ford Focus?

**A** I would think so, that there was a problem that a lot of people were having the same problem. *They made it sound like it wasn't a problem.*

**Q** You're talking about when you were having it serviced?

**A** Yeah, uh-huh.

*Id.* at 132:9-18 (emphasis added). Indeed, as elaborated in her declaration, the Ford dealer discouraged Ms. Duarte from pursuing the claims herein by telling her that "the rapid tire wear was caused by [her] daughter's driving habits." Exhibit Y at 1, ¶ 4; *cf.* Exhibit FF at 1, ¶ 3 (declaration of Abbi Levine, Ms. Duarte daughter, that she "typically had two or three additional persons besides myself in the car on any given day," a perfectly legitimate "driving habit"). Ford customer relations representatives likewise discouraged Ms. Duarte by affirmatively misrepresenting to her that "there was no defect in [her] vehicle," Exhibit Y at 1, ¶ 6, and that her "tires were simply worn out and that the premature tire wear did not occur due to a defect in [her] vehicle," *id.* at 2, ¶ 13. *Cf. id.* at 3, ¶ 17 (explaining that she did not discover Ford's fraud until October 12, 2011, less than a month before filing this action).

These facts raise a genuine dispute as to whether Ford is guilty of "fraudulent concealment" of Ms. Duarte's claims, such that the statute of limitations was tolled for her. Under California law, as specifically applicable to CLRA claims, when "the defendant is guilty of fraudulent concealment of the cause of action the statute [of limitations] is deemed not to become operative until the aggrieved party discovers the existence of the cause of action." *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1131 (C.D. Cal. 2010) (quoting *Unruh-Haxton v. Regents of University of California*, 162 Cal. App. 4th 343, 367 (2008)). That is to say, a "defendant's fraud in concealing a cause of action against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable." *Id.* (quoting *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007)). The ground of relief in fraudulent concealment is that "the defendant, having by fraud or deceit concealed material facts and by misrepresentations hindered the plaintiff from bringing an action within the statutory period, is estopped from taking advantage of his own wrong"; it covers not only "concealment of a cause of action," but

also "concealment of material facts which would have disclosed to appellants the nature and extent of their right of action." *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 323 (1974).

Here, a reasonable jury could find that the Ford dealer — by making premature tire wear "sound like it wasn't a problem" with Ms. Duarte vehicle — concealed material facts that would have disclosed to her the nature of her claim against Ford. Therefore, although Ms. Duarte knew that "something [was] not right" on August 12, 2008, Ford representatives affirmatively misrepresented that the "something" was her daughter or her tires — *anything but* the defectively designed suspension of her vehicle. These misrepresentations were in accord with Ford's repeatedly making flatly untrue statements about premature tire wear on class vehicles, as expressly admitted by Ford's Rule 30(b)(6) representative on this issue. *See* Class Certification Motion at 4:3-5:6. The affirmative misrepresentations to Ms. Duarte fraudulently concealed the true nature of the problem with her vehicle, and in particular the fact that she had a right of action against *Ford*. Because Ms. Duarte did not learn the truth until just a month before this action was filed, *see* Exhibit V at 134:16-135:3 (her deposition); Exhibit Y at 3, ¶ 17 (her declaration), the doctrine of fraudulent concealment sufficiently tolled her claims against Ford. Accordingly, Ford is not entitled to summary judgment on limitations grounds.

## B. Duty of Disclosure

Ford argues that it "owed no duty of disclosure to Ms. Duarte for the same basic reasons that it owed no such duty to Ms. Glass," namely, "Plaintiffs have no evidence that the alleged defect creates an unreasonable safety hazard, and Ford had no duty to disclose defects that are not related to safety." Motion at 27:5-7. Regarding the unreasonable safety hazard posed by the defective suspension, *see supra* Subsection I.B.1 of Donna Glass (pp. 3-5). Regarding Ford's duty to disclose defects that are not related to safety, we address this issue in the following section.

### 1. Non-Safety Defects Manifested in Warranty Period

Ford acknowledges that the vehicle warranty "applicable to Ms. Duarte's vehicle does not expressly limit the warranty for uneven or rapid tire wear to 12 months/12,000 miles," so that "the warranty period applicable to Ms. Duarte's vehicle is 3 years/36,000 miles"; that "Ms. Duarte had to replace her tires within that period"; and that "[s]ome cases do suggest that Ford owes a duty

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1    of disclosure to those Plaintiffs who experience the alleged defect during the warranty period."

2    Motion at 27:9-14.  As for these cases, which include the Ninth Circuit's decision just last year

3    in *Wilson*, Ford concedes that they "recognize the general rule that there is no duty to disclose

4    non-safety defects but suggest, without necessarily holding, that an exception may exist where the

5    defect occurs in the plaintiffs' vehicle during the warranty period."  Motion at 27:22-24.

6        In fact, the governing cases do more than "suggest" this point.  In holding that "the weight

7    of authority suggests that the duty to disclose is limited to safety issues," *Wilson*, 668 F.3d at 1141,

8    the Ninth Circuit expressly distinguished situations in which plaintiffs "alleged that they began

9    experiencing problems 'within the first months of purchasing the Machine' — i.e., *within* the ex-

10   press warranty period."  *Id.* at 1142 n.1 (emphasis in original).  Likewise, the California Court of

11   Appeal did not require a "safety issue" to find that a complaint stated a violation of the CLRA,

12   where the complaint alleged that the defect manifested itself "during and before the warranty ex-

13   pired."  *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 257 (2011).  In the face of these auth-

14   orities, the Court should reject Ford's unsupported argument that this "exception cannot logically

15   exist."  Motion at 28:2.  In Ms. Duarte's case, Ford had a duty to disclose the suspension defect

16   regardless of whether it implicated a safety issue.

17                    **2.    Inner-Edge Rear Tire Wear**

18       Ford next argues that "Ms. Duarte has no evidence that she experienced inner edge rear

19   tire wear caused by the design of the rear suspension at any time, let alone during the warranty

20   period."  Motion at 28:13-14.  This argument has several components, which we address in turn

21   (again, without conceding that Ms. Duarte must prove inner edge tire wear in order to prevail).

22       *First*, Ford argues that "like Ms. Glass, Ms. Duarte cannot even prove that she was exper-

23   iencing rear tire wear; on the contrary, the evidence strongly suggests that she was experiencing

24   front tire wear."  Motion at 28:20-21.  Ford's own evidence refutes this argument, however.  As

25   Ford concedes, on August 12, 2008 (at 12,806 miles), North Bay Ford serviced Ms. Duarte's ve-

26   hicle and returned to her "with a 'Multi-Inspection Report Card' reporting that the front tires . . .

27   had 7/32" of tread left, while the rear tires . . . had only 3/32"."  Motion at 25:16-18.  Ford further

28   concedes that on December 3, 2010 (at 31,450) miles, Ms. Duarte "purchased a second set of two

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1   new Fuzion tires," and that the tire dealer "installed this second set of Fuzion tires on the rear."

2   Motion at 25:24-26.  Ford tries to explain away this obvious evidence of excessive *rear* tire wear

3   with numerous speculations regarding the handling of Ms. Duarte's tires.  *See* Motion at 25:17

4   (referring to "tires that were *presumably* on the rear before rotation"); Motion at 25:18 (referring

5   to tires that "*presumably* had been on the front" before rotation); Motion at 25:26-26:1 (stating

6   that the tire dealer *presumably* moved the first set of Fuzion tires from the rear to the front to re-

7   place the worn-out Hankook tires on the front").  Ford is free to argue these points to the jury,

8   but no reasonable jury is required to "presum[e]" the truth of Ford's speculations.

9       *Second*, Ford speculates about various things that "could" have caused the premature rear

10  tire wear on Ms. Duarte's vehicle instead of a suspension defect.  *See* Motion at 29:15-16 (stating

11  that between November 12, 2007 and August 12, 2008, "two potentially significant things occur-

12  red that *could* have changed the rate at which one set of tires was wearing"); Motion at 29:17-18

13  (stating that the "nature of this event is *unknown*, but an event significant enough to cause a side-

14  wall puncture *could* also be significant enough to require an alignment").  A party is not entitled

15  to summary judgment simply because it can speculate about what "could" have happened.  Again,

16  a reasonable jury is free to reject Ford's alternative explanations.

17      *Third*, Ford argues that "there is no evidence that the tire wear that required replacement

18  of Ms. Duarte's tires was *inner* edge tire wear."  Motion at 30:1-2 (emphasis added).  Not so.  We

19  have already explained that excessive inner edge results in comparatively greater temperatures at

20  the inner tread row of a tire.  *See supra* p. 22:10-19.  Mr. Lepper observed just such temperatures

21  following a test drive of Ms. Duarte's vehicle.  *See* Motion Exhibit B17 (Doc. 41-19) at 8.

22      For these reasons, Ford has *not* demonstrated that no reasonable jury could find "(1) that

23  Ms. Duarte was experiencing rear tire wear on the inner edge and (2) that the rear tire wear was

24  caused by the alleged defect."  Motion at 30:10-12.  Accordingly, Ford is not entitled to summary

25  judgment on this ground.

26              **3.      Ford's Knowledge of the Defect**

27      Ford argues it "owed no duty of disclosure to Ms. Duarte because the contemporaneous

28  documentation shows beyond any doubt that when she purchased her vehicle in February 2007

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1  no responsible Ford engineer believed the Focus had a defect that was causing rear tire wear."

2  Motion at 30:16-18. We have already demonstrated, however, that a reasonably could find that

3  "Ford did know of the relevant defect by *April of 2005*." *Supra* p. 5:20-21 (emphasis added). As

4  set forth below, the nearly two additional years from then until February of 2007 only confirmed

5  Ford's knowledge.

6      As we have already documented, "the program manager for the Focus [was compelled]

7  to admit that he was, no later than *October of 2005*, 'aware of . . . known concerns on premature

8  tire wear on the Ford Focus.' " Class Certification Motion at 3:28-4:2. Moreover, in 2006, "Dan

9  Lavey — who was a 'management-level' engineer — reported to his colleagues that the 'C170 is

10  out of the box [i.e., not within specification on the alignment health chart] for nominal total rear

11  toe at curb and further out of the box at 25 mm into jounce,' such that the 'total rear toe on a 3

12  sigma vehicle can be as high as 0.56 degrees at curb and will be at approx[imately] 0.86 degrees

13  when loaded. The tire experts report that anything past 0.50 degree *will result in excessive tire*

14  *wear*.' " *Id.* at 2:25-3:2. In 2007, engineer Paul Roberts reported that Ford was "getting quite a

15  number of calls from FCSD [Ford Customer Service Division] about customer complaints / tires

16  returned to the warranty center involving rear tire wear." *Id.* at 3:3-5. Ford can attempt to explain

17  away this evidence, *see* Motion at 30-31, but there is undoubtedly at least a genuine dispute as to

18  whether Ford had the requisite knowledge.

19      **C.**     **Causation**

20      Ford argues that "like Ms. Glass, [Ms. Duarte] cannot prove that she suffered damage 'as

21  a result of' Ford's alleged omission." Motion at 32:5-6. In this regard, Ford acknowledges that

22  there is evidence that (1) Ms. Duarte obtained a brochure from the dealership, and (2) she did see

23  some television advertisements about the Focus. *See* Motion at 32:10-11. Ford would have the

24  Court discount this evidence, however, on the ground that Plaintiffs assertedly "do not contend

25  that Ford should have made a disclosure in television advertising or in brochures." Motion at

26  32:14-15 (emphasis deleted) (citing Plaintiffs' Interrogatory Response No. 5).

27      That is a tendentious interpretation of Plaintiffs' interrogatory responses. In those very

28  responses, Plaintiffs specified four distinct pieces of information that Ford should have disclosed

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

to purchasers of its 2005-2011 Focus vehicles. *See* Motion Exhibit B-19 (Doc. 41-21) at 3:11-24 (Plaintiffs' Interrogatory Response No. 4). But Plaintiffs declined to specify *precisely how* Ford should have complied with its legal obligation to make the required disclosures: "Plaintiffs do not have a contention regarding *how* the disclosures identified in the foregoing Response to Interrogatory No. 4 should have been made." *Id.* at 4:2-3 (emphasis added). Doubtless Ford could have made the disclosures by any means reasonably calculated, under all the circumstances of the relevant purchases, to apprise purchasers of 2005-2011 Focus vehicles of the information required to be disclosed. *Cf. Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). But having failed to make the required disclosures by *any means*, Ford cannot now credibly argue that Ms. Duarte — who otherwise saw at least two different sources of information about the Focus before purchasing her vehicle — "cannot prove that she would have seen any disclosure made by Ford." Motion at 32:15-16.

In any event, in addition to viewing television advertisements and obtaining a brochure, Ms. Duarte discussed features of the Focus with a Ford salesman before purchasing the vehicle; yet that salesman omitted any mention of the rear suspension defect or related tire wear or safety issues. *See* Exhibit Y at 3, ¶ 16. But had Ms. Duarte "been told such critical information, [she] would not have purchased the 2007 Ford Focus." *Ibid.* On this evidence, and especially in light of the inference of reliance resulting from Ford's omission of material information, a reasonable jury could find the causation required by Civil Code § 1780. Accordingly, Ford is not entitled to summary judgment on this ground.

### D. Actual Damages

Ford argues that "[s]ummary judgment is required on Ms. Duarte's CLRA claim for actual damages because, like Ms. Glass, she cannot prove that she has suffered any such damages." Motion at 32:20-21. Plaintiffs respectfully refer the Court to their previous discussion of this issue. *See supra* Section I.D of Donna Glass (pp. 10-13).

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

1  **E.      Notice Under Civil Code § 1782(a)**

2      Ford argues that like "Ms. Glass, Ms. Duarte failed to give the statutorily required notice

3  and her CLRA claim fails for this reason."  Motion at 32:25-26.  Plaintiffs respectfully refer the

4  Court to their previous discussion of this issue.  *See supra* Section I.E of Donna Glass (pp. 13-16).

5  **II.   UCL Claim**

6      **A.      Duty of Disclosure and Causation**

7      Ford argues that "[a]s discussed above in connection with Plaintiff's CLRA claim, Ford

8  had no duty of disclosure and Ms. Duarte cannot prove reliance.  Accordingly, summary judgment

9  is required on Ms. Duarte's UCL claim, just like it is required on her CLRA claim."  Motion at

10  33:4-6.  Plaintiffs respectfully refer the Court to their previous discussion of these two issues.

11  *See supra* Sections I.B. and I.C. (pp. 26-30).

12     **B.      Equitable Restitution**

13     Ford argues that "Ms. Duarte cannot prove entitlement to restitution for the same reason

14  that Ms. Glass cannot do so, and summary judgment is required on her UCL claim for this reason

15  as well."  Motion at 33:10-11.  Plaintiffs respectfully refer the Court to their previous discussion

16  of this issue.  *See supra* Section II.C of Donna Glass (pp. 16-18).

17  **III.   Implied Warranty Claim**

18     Ford argues that "[l]ike Ms. Glass, Ms. Duarte did not have to replace her tires until after

19  the one-year Song-Beverly implied warranty had expired.  Therefore, summary judgment against

20  Ms. Duarte is required for the same reasons it is required against Ms. Glass."  Motion at 33:15-17.

21  Again, Plaintiffs respectfully refer the Court to their previous discussion of this issue.  *See supra*

22  Section III.A of Donna Glass (pp. 18-19).

23  **IV.   Express Warranty Claim**

24     **A.      Worn Out Tires and Manufacturing Defects**

25     Ford argues that "Ms. Duarte's express warranty claim is predicated on a design defect in

26  the rear suspension that caused her tires to wear out prematurely.  But the warranty provided by

27  Ford [1] expressly excludes worn out tires.  Moreover, that warranty [2] expressly applies only to

28  '*manufacturing* defects.'  Thus, Ms. Duarte's claim has no merit."  Motion at 33:22-25 (emphasis

added).  As to the asserted exclusion for worn out tires, we have already addressed this argument.  *See supra* Section IV.A of Donna Glass (pp. 23-24).

As for the asserted coverage of only "manufacturing" defects, the only authority cited by Ford is an unpublished opinion that expressly applies non-California law.  *See Cooper v. Samsung Electronics America, Inc.*, 374 Fed. Appx. 250, 253 n.2 (3d Cir. 2010) ("[W]e apply New Jersey law to Cooper's breach of express warranty claim."), *cited in* Motion at 33:25-26.  More importantly, the warranty language itself implies that the warranty covers *design* defects:

> This warranty does not mean that each Ford vehicle is defect free.  Defects may be unintentionally introduced into vehicles during *the design and manufacturing processes* and such defects could result in the need for repairs.  For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy *any such defects* that result in vehicle part malfunction or failure during the warranty period.

Motion Exhibit G-2 (Part 2 of 2) (Doc. 47-6) at 9 (emphasis added).  Ford cannot escape its express warranty obligations on this ground.

### B.      Premature Rear Tire Wear

Ford argues that "[a]s discussed in detail above, Ms. Duarte has no evidence that she ever experienced excessive rear tire wear, let alone that it was caused by the alleged defect during the warranty period.  Summary judgment on her express warranty claim is required for this reason as well."  Motion at 34:6-8.  Plaintiffs respectfully refer the Court to their previous discussion of this issue.  *See supra* Subsection I.B.2 (pp. 27-28).

**Plaintiff Mary Hauser**

### I.      CLRA Claim

### A.      Duty of Disclosure

### 1.      Inner-Edge Rear Tire Wear

Ford argues that "[j]ust like the evidence with respect to Ms. Duarte, the evidence suggests that Ms. Hauser was experiencing front tire wear, not rear tire wear."  Motion at 37:9-10.  In particular, Ford argues that "Ms. Hauser has no evidence that she experienced anything other than front tire wear caused by front-end misalignments."  Motion at 38:23-24.  Without conceding that Ms. Hauser must prove this point, the record contains sufficient evidence that Ms. Hauser's *rear* tires exhibited comparatively more wear:

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

- On July 10, 2010 (at 20,826 miles), Walmart technicians measured the tread depth of her front tires at 5/32" and that of her *rear* tires at (the more worn) 3/32". *See* Exhibit DD at 10 (Mr. Lepper's inspection summary).

- On November 4, 2010 (at 27,141 miles), Walmart technicians installed a set of two new tires on the *rear* axle of Ms. Hauser's vehicle. *See id.*

- On March 22, 2011 (at 33,043 miles), Walmart technicians likewise installed a set of two new tires on the *rear* axle of her vehicle. *See id.* at 11.

- On November 19, 2011 (at 44,441 miles), Walmart technicians measured the tread depth of Ms. Hauser's front tires at 7/32" and that of her *rear* tires at (the more worn) 5/32". *See id.* at 12.

- On March 10, 2012 (at 49,152 miles), Walmart technicians measured the tread depth of her front tires at 5/32" and that of her *rear* tires at (the more worn) 4/32". *See id.*

- In Mr. Lepper's measurements of the temperatures of the inner tread rows of Ms. Hauser's tires following two test drives of her vehicle, the *rear* tire usually had a higher temperature than its front counterpart (and never a lower temperature). *See id.* at 7.

Not surprisingly, Ford points to the fact that when Ms. Hauser needed to have her tires replaced (for the first of many times) at about 13,000 miles, "the tires that needed to be replaced at that time were the *front* tires." Motion at 37:11-12 (emphasis added). But as Ford itself suggests, that replacement appears to have been uniquely "related to the front end," i.e., a necessary "front-end alignment," Motion at 37:13-14, which was in fact done at the time of the tire replacement, *see* Motion at 35:12-13. This record presents at least a genuine dispute as to whether Ms. Hauser was experiencing premature wear on her *rear* tires.[8]

## 2. Ford's Knowledge of the Defect

Ford observes that "Ms. Hauser purchased her 2009 Focus in October 2008. At this time, Ford's knowledge was not significantly different than when Ms. Duarte purchased in February 2007." Motion at 39:3-4. Given that Ford already had the requisite knowledge in 2007, *see supra* Subsection I.B.3 of Andrea Duarte (p. 29), that should be sufficient for a reasonable jury to find knowledge. For completeness' sake, we note that that Ford sent a "special service message" to its

---

[8] Ford argues that "[t]o the extent Ms. Hauser attempts to rely on Thomas Lepper's alleged observations [about Ms. Hauser's penultimate set of tires] to the contrary, such reliance is improper because Ms. Hauser in this case is guilty of inexcusable spoliation of evidence." Motion at 37:26-38:1. Ford's hyperbole can safely be ignored, as Ms. Hauser in fact does *not* attempt to rely on the referenced observations of Mr. Lepper.

Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment

hundreds of dealers in early November of 2008, informing them that 2008 and 2009 model year

Focus vehicles "may exhibit premature front and/or rear tire wear." Exhibit J.

**B. Causation**

Ford argues that in contrast to Ms. Duarte, "who at least saw television commercials and might have seen a brochure, Ms. Hauser saw nothing in which a disclosure might have been made . . . . Thus, even more so than Ms. Duarte, Ms. Hauser cannot prove that she would have seen a disclosure, even if one had been made, and therefore cannot prove that she would have acted differently." Motion at 40:7-14. But as detailed in her declaration, Ms. Hauser did speak with a Ford sales representative:

> We took the Focus on a test drive, and afterwards discussed the purchase price and general features of the vehicle. I was interested in purchasing an affordable car that was reliable. While we did discuss general features of the vehicle, the Ford sales representative did not inform me that there was a known suspension defect, tire wear problem, or safety issue with the Ford Focus. I was also never told that there had been numerous complaints made by Ford Focus owners concerning premature tire wear. Had I heard any of this information during the discussion with the Ford sales representative, the negotiations to purchase the Focus would have ended immediately. *I would not have purchased the 2009 Ford Focus if I had been told such important information about the vehicle.*

Exhibit Z at 1, ¶ 2 (emphasis added). On this evidence, and especially in light of the inference of reliance, a reasonable jury could find the causation required by Civil Code § 1780.

**C. Notice Under Civil Code § 1782(a)**

Ford argues that like "all Plaintiffs, Ms. Hauser failed to give the required CLRA notice." Motion at 40:17. Plaintiffs respectfully refer the Court to their previous discussion of this issue. *See supra* Section I.E of Donna Glass (pp. 13-16).

**II. UCL Claim**

Ford contends that "[s]ummary judgment is required on Ms. Hauser's UCL claim for the same reasons it is required on Ms. Duarte's UCL claim." Motion at 40:19-20. Those reasons were no duty to disclose, no causation, and no entitlement to restitution. *See* Motion at 33:1-11. As for the duty to disclose and causation, see *supra* Sections I.A and I.B (pp. 32-34). As for restitution, see *supra* Section II.C of Donna Glass (pp. 16-18).

///

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

### III.   Implied Warranty Claim

Ford argues that it is entitled to summary judgment on Ms. Hauser's Song-Beverly Act claim because (1) she "purchased her vehicle in October 2008, but she did not have to replace any of her tires until January 2010 — three months after the one-year Song-Beverly implied warranty expired," and (2) she "cannot prove that she ever experienced excessive rear tire wear caused by the alleged defect at any time."  Motion at 40:24-41:1.  As for the expiration of the warranty period, see *supra* Section III.A of Donna Glass (pp. 18-19).  As for Ms. Hauser's experiencing premature *rear* tire wear, see *supra* Subsection I.A.1 (pp. 32-33).

### IV.   Express Warranty Claim

Ford seeks summary judgment on Ms. Hauser's express warranty claim.  *See* Motion at 41:5-14.  Ms. Hauser does not oppose summary judgment on this one claim.

### Plaintiff Robert McCabe

Ford's arguments as to Mr. McCabe are moot, as he is in the process of withdrawing as a named plaintiff in this action.

### Plaintiff Margie Daniel

### I.   CLRA Claim

### A.   Duty of Disclosure

#### 1.   Inner-Edge Rear Tire Wear

Ford contends that "there is no evidence that Ms. Daniel's vehicle experienced excessive inner edge rear tire wear at any time."  Motion at 47:7-8.  Without conceding that Ms. Daniel must prove this point, the record is to the contrary:

- On August 30, 2011 (at 20,723 miles), technicians at Big Valley Ford found "front and rear tires in RED," with "[r]emaining tread depth measured at 3/32 or less."  Motion Exhibit B16 (Doc. 41-18) at 10.  (New tires were purchased at 25,220 miles.  *See id.* at 12).

- On July 27, 2012 (at 42,292 miles), technicians at Big Valley Ford found the new "[t]ires in YELLOW — need attention."  *Id.* at 13.

In this light, a reasonable jury could conclude that Ms. Daniel was experiencing premature wear on her *rear* tires (if not her front ones as well).  Moreover, Mr. Lepper's measurement of temperatures of Ms. Daniel's rear tires were consistent with *inner edge tire wear*: "These temperature

readings indicate that the inside tread row of the rear tires were running at a higher temperature than the outer tread row." *Id.* at 7.[9]

## 2. Ford's "Exclusive Knowledge" of the Defect

Ford argues that "[e]ven if Ms. Daniel could prove that Ford was obligated to disclose the alleged defect to her because she suffered a manifestation of the defect during the warranty period . . . her claim would still fail because she cannot prove that Ford had exclusive knowledge of the alleged defect at the time she purchased her vehicle." Motion at 48:13-16. For the proposition that Ford must be shown to have had "exclusive knowledge" of the defect, Ford relies solely on *Gray v. Toyota Motor Sales USA, Inc.*, No. CV 08-1690 PSG (JCx), 2012 WL 313703 (C.D. Cal. Jan. 23, 2012).

*Gray* indicates that a defendant's "exclusive knowledge of material facts not known to the plaintiff" is only *one* of *several* alternative scenarios in which "a failure to disclose can constitute actionable fraud," i.e., one of several scenarios that give rise to the "duty to disclose." *Id.* at *3. Thus, while exclusive knowledge is certainly one way to demonstrate a duty to disclose, it is not the only way. Under California law, a known safety concern is sufficient to trigger a manufacturer's duty to disclose. *See, e.g., Wilson*, 668 F.3d at 1141 (agreeing that defendants are under "a duty to disclose a known defect in a consumer product when there are safety concerns associated with the product's use"); *In re Toyota Motor Corp.*, 754 F. Supp. 2d 1208, 1230 (C.D. Cal. 2010) (agreeing that there is a duty to disclose regarding matters of public safety). *Gray* is in accord. *See* 2012 WL 313703, at *4 (holding that a "manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation *or a safety issue*" (emphasis added)). Accordingly, because the suspension defect in the Focus raises a safety issue, *see supra* Subsection I.B.1 of Donna Glass (pp. 3-5), Plaintiffs have sufficiently demonstrated that Ford had a duty to disclose, independent of whether Ford had "exclusive knowledge" of the defect.

---

[9] Ford argues that "Ms. Daniel is precluded from relying upon such evidence [i.e., certain photographs] due to her inexcusable spoliation of the tires so fundamental to her claims." Motion at 47:23-24. Again, Ford's hyperbole can safely be ignored, as Ms. Daniel in fact does *not* attempt to rely on the referenced photographs.

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Independently, and contrary to Ford's assertion, the record demonstrates that a reasonable jury could also find that Ford had a duty to disclose because of its superior knowledge regarding the condition of the defective vehicles. A defendant has "exclusive knowledge" giving rise to a duty to disclose when the defendant "knew of [the] defect while plaintiffs did not, and, given the nature of the defect, it was difficult to discover." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256 (2011); *see also Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1096-97 (N.D. Cal. 2007) (finding "exclusive knowledge" because the defendant had access to significant data about that defect that was unavailable to the public, and because "customers only became aware of the problem if they actually experienced it first-hand"). In the present case, Ford knew of the rear suspension defect while Plaintiffs did not. *See supra* pp. 3-8. Moreover, given the nature of the defect, it was difficult to discover, especially in light of Ford's dealers' affirmative denials to consumers of any defect in the Focus. *See, e.g., supra* pp. 24-25. Finally, the mere existence of consumer complaints with NHTSA, *see* Motion at 49:1-5, does not negate Ford's superior knowledge. *See In re Toyota Motor Corp.*, 754 F. Supp. 2d 1145, 1192 (C.D. Cal. 2010) (holding that "Toyota remained in a superior position of knowledge," because "[w]hile prospective customers could have been tipped off to the possibility of [sudden unintended acceleration] by researching past complaints filed with NHTSA, many customers would not have performed such a search, nor would they be expected to"). Thus, a reasonable jury could find that Ford "knew significantly more about [the rear suspension defect] than the limited information that was eventually shared." *Id.* Consequently, Ford is not entitled to summary judgment on this issue.

### B. Causation

Ford contends that "Ms. Daniel cannot prove that she would have seen a disclosure regarding the alleged defect, even if one had been made, and she therefore cannot prove reliance." Motion at 49:23-24. But as Ford acknowledges, "[b]efore purchasing her Focus, Ms. Daniel saw 'quite a bit' of television advertising" by either Ford itself or by her local Ford dealer. Motion at 45:3. Moreover, she paid attention — and deemed important — what the dealer's representative told her about expected maintenance and operating costs. *See* Exhibit W at 63:1-14 (her deposition). Finally, she "discussed general features of the vehicle with the Ford sales representative,

1  [including] certain safety features."  Exhibit AA at 1, ¶ 3 (her declaration).  On this record, there

2  is at least a genuine dispute as to whether Ms. Daniel would have seen or heard disclosures about

3  the suspension defect had Ford made them.

4      In any event, the information omitted by Ford would have made difference to Ms. Daniel:

5  "During my discussions with the sales representative concerning general features of the vehicle,

6  the Ford representative did not tell me that there was a known suspension defect, tire wear prob-

7  lem, or safety issue with the Ford Focus.  He also did not indicate to me that previous owners had

8  made complaints about premature tire wear.  If I had known any of this information, I would not

9  have purchased the 2011 Ford Focus."  *Ibid.*  On this evidence, and especially in light of the in-

10  ference of reliance, a reasonable jury could find the causation required by Civil Code § 1780.

11      **C.**    **Actual Damages and Notice Under Civil Code § 1782(a)**

12      Ford does not make any arguments unique to Ms. Daniel.  *See* Motion at 50:4-8.

13  **II.**    **UCL Claim**

14      Ford does not make any arguments unique to Ms. Daniel.  *See* Motion at 50:10-17.

15  **III.**    **Implied Warranty Claim**

16      Ford concedes that "[u]nlike the other Plaintiffs, Ms. Daniel did replace her tires within

17  the first year of ownership of her vehicle."  Motion at 51:1-2.  But Ford argues that "summary

18  judgment is nonetheless appropriate on her Song-Beverly claim because as described above, there

19  is no evidence that Ms. Daniel's vehicle suffered any excessive inner edge rear tire wear during

20  the first year — or at any time."  Motion at 51:2-4.  Plaintiffs respectfully refer the Court to their

21  previous discussion of the wear issue.  *See supra* Subsection I.A.1 (pp. 35-36).

22  **IV.**    **Express Warranty Claim**

23      Ford does not make any arguments unique to Ms. Daniel.  *See* Motion at 51:12-16.

24  **CONCLUSION**

25      For all of the foregoing reasons, Defendant Ford Motor Company's motion for summary

26  judgment should be denied.

27      Dated:  May 2, 2013.

28  *///*

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

Respectfully submitted,

/s/ Eric Grant
John B. Thomas
Eric Grant
Hicks Thomas LLP

J. Allen Carney
Hank Bates
Carney Williams Bates Pulliam & Bowman, PLLC

Counsel for Plaintiffs MARGIE DANIEL,
ROBERT McCABE, MARY HAUSER,
DONNA GLASS, and ANDREA DUARTE