John B. Thomas (Bar No. 269538)
jthomas@hicks-thomas.com
Eric Grant (Bar No. 151064)
grant@hicks-thomas.com
Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833
Facsimile: (916) 691-3261

J. Allen Carney (*pro hac vice*)
acarney@carneywilliams.com
Hank Bates (Bar No. 167688)
hbates@carneywilliams.com
Carney Williams Bates Pulliam & Bowman, PLLC
11311 Arcade Drive
Little Rock, Arkansas 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Counsel for Plaintiffs MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware corporation,

Defendant.

No. 2:11-cv-02890-WBS-EFB

**DECLARATION OF ERIC GRANT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT (including Exhibits J through GG)**

Hearing Date: June 3, 2013
Time: 2:00 p.m.
Courtroom: 5
Judge: Hon. William B. Shubb

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

I, Eric Grant, declare as follows:

1. I am one of the counsel for Plaintiffs in the above-entitled action, and I make this declaration in support of Plaintiffs' Opposition to Defendant Ford Motor Company's Motion for Summary Judgment, filed concurrently herewith. I make the statements of fact herein of my own personal knowledge. If called as a witness in this proceeding, I could and would testify competently to those facts.

2. In this declaration, "Ford" refers to Defendant Ford Motor Company.

3. To date, Ford has produced greater than 200,000 pages of documents to Plaintiffs in various electronic forms. In submitting some of these documents herewith, Plaintiffs have necessarily converted them to Adobe PDF format and 8½" x 11" paper size. As modified by this conversion and resizing, and with yellow highlighting added for readability, Exhibits J through R attached hereto are true and correct copies of documents produced by Ford. (Note that although some of the attached documents are designated "Subject to Protective Order in Daniel v. Ford," Ford has agreed through the Protective Order's meet-and-confer process that such documents may be filed with the Court notwithstanding such designation.)

4. Individuals working under my direction excerpted 31 so-called "CQIS" reports (dated from January 2006 to January 2013) directly from documents produced by Ford to Plaintiffs in this action. For each report, the excerpts include the relevant date, the vehicle model year and mileage, and (using selected but *direct quotations*) the customer's safety-related complaint as reported by the dealer. These excerpts, with yellow highlighting added for readability, are collectively attached hereto as Exhibit S.

5. Individuals working under my direction excerpted 20 so-called "MORS" reports (dated from January 2008 to March 2013) directly from documents produced by Ford to Plaintiffs in this action. For each report, the excerpts include the relevant date, the vehicle model year and mileage, and (using selected but *direct quotations*) the customer's safety-related complaint. These excerpts, with yellow highlighting added for readability, are collectively attached hereto as Exhibit T.

///

6. With the addition of yellow highlighting for readability, Exhibits U through X attached hereto are true and correct electronic copies of excerpts of transcripts of depositions taken in this action.

7. Exhibits Y through BB attached hereto are true and correct electronic copies of the declarations executed by the named Plaintiffs in this action.

8. Exhibits CC through GG attached hereto are true and correct electronic copies of the documents listed as such on the following pages.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 2, 2013.

/s/ Eric Grant
Eric Grant

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

{00152021.DOCX} 2
Declaration of Eric Grant in Support of Plaintiffs' Opposition to Ford's Motion for Summary Judgment

**INDEX OF EXHIBITS**

**Documents produced by Ford to Plaintiffs in this action**

J. DNL1 017219: special service message 20518 (Nov. 6, 2008).

K. DNL1 017220: special service message 20703 (Mar. 10, 2009).

L. DNL1 017222: special service message 21195 (Feb. 1, 2010).

M. DNL1 017223: special service message 21399 (July 1, 2010).

N. DNL2 00000463-65: e-mail message from Paul Roberts (Aug. 26, 2010).

O. DNL2 00003921-22: e-mail chain headed by message from Steve van Foerster (Mar. 20, 2005).

P. DNL2 00005336-37: C170 Tire Wear Improvement Team: 2/4/03 Meeting Minutes.

Q. DNL2 00006129: e-mail chain headed by message from Matthew Montini (Aug. 31, 2005).

R. DNL2 00006193-94: C170 Tire Wear Improvement Team: 2/18/03 Meeting Minutes.

**Counsel-generated excerpts of documents produced by Ford**

S. Excerpts of 31 CQIS reports.

T. Excerpts of 20 MORS reports.

**Excerpts of depositions taken in this action**

U. Eric Kalis (Sept. 7, 2012).

V. Andrea Duarte (Oct. 10, 2012).

W. Margie Daniel (Dec. 14, 2012).

X. Paul M. Taylor (Apr. 17, 2003).

**Declarations of Plaintiffs**

Y. Andrea Duarte (Apr. 26, 2013).

Z. Mary Hauser (Apr. 30, 2013).

AA. Margie Daniel (Apr. 30, 2013).

BB. Donna Glass (May 2, 2013).

///

///

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

**Other materials**

CC. Excerpts of Rule 26 Opinion Report of Thomas J. Lepper (Jan. 11, 2013).

DD. Exhibit A, Inspection Summary (Dec. 16, 2012) (without enclosures).

EE. Excerpts of Rule 26 Opinion Report of Dr. Peter Thomas Tkacik (Jan. 11, 2013).

FF. Declaration of Abbi Levine (May 1, 2013).

GG. Rebuttal Expert Report of Edward E. Leamer, Ph.D. (May 2, 2013) (without attachments).

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

{00152021.DOCX}
4
Declaration of Eric Grant in Support of Plaintiffs' Opposition to Ford's Motion for Summary Judgment

# Exhibit J

**Article Number:** 20518

**Article Type:** S

**Global Concern Number:**

**Market(s):**

| Area Code | Geo Sales Area | Date of Activation | Date of Deactivation |
|---|---|---|---|
| NA | *** | 11/06/2008 | 03/09/2009 |
| WD | *** | 11/06/2008 | 03/09/2009 |

**Title:**

2008-2009 FOCUS - PREMATURE FRONT AND/OR REAR TIRE WEAR

**Text:**

SOME 2008-2009 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT AND/OR REAR TIRE WEAR.TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIOR TO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT ANDREAR TOE SETTINGS.

**Vehicles:**

2008-2009 FOCUS (00122)

**Symptom Code:**

300000 CHASSIS
303000 CHASSIS STEERING/HANDLING
304000 CHASSIS SUSPENSION SYSTEM
306000 CHASSIS TIRES/WHEELS
700000 NOISE AND VIBRATION
702000 NVH OTHER NOISE CONCERNS

# Exhibit K

**Article Number:** 20703
**Article Type:** S
**Global Concern Number:**
**Market(s):**

| Area Code | Geo Sales Area | Date of Activation | Date of Deactivation |
|---|---|---|---|
| NA | *** | 03/10/2009 | 01/31/2010 |
| WD | *** | 03/10/2009 | 01/31/2010 |

**Title:**

2005-2009 FOCUS - PREMATURE FRONT/REAR TIRE WEAR AND/OR VEHICLE DRIFT ON WET OR SNOW COVERED ROADS

**Text:**

SOME 2005-2009 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR A VEHICLE DRIFT CONDITION WHEN DRIVING ON WET OR SNOW PACKED ROADS. TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIORTO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT AND REAR TOE SETTINGS.

**Vehicles:**

2005-2009 FOCUS (00122)

**Symptom Code:**

| | |
|---|---|
| 300000 | CHASSIS |
| 303000 | CHASSIS STEERING/HANDLING |
| 304000 | CHASSIS SUSPENSION SYSTEM |
| 306000 | CHASSIS TIRES/WHEELS |
| 700000 | NOISE AND VIBRATION |
| 702000 | NVH OTHER NOISE CONCERNS |

# Exhibit L

**Article Number:** 21195

**Article Type:** S

**Global Concern Number:**

**Market(s):**

| Area Code | Geo Sales Area | Date of Activation | Date of Deactivation |
|---|---|---|---|
| NA | *** | 02/01/2010 | 06/30/2010 |
| WD | *** | 02/01/2010 | 06/30/2010 |

**Title:**

2005-2010 FOCUS - PREMATURE FRONT/REAR TIRE WEAR AND/OR VEHICLE DRIFT ON WET OR SNOW COVERED ROADS

**Text:**

SOME 2005-2010 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR A VEHICLE DRIFT CONDITION WHEN DRIVING ON WET OR SNOW PACKED ROADS. TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIORTO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT AND REAR TOE SETTINGS.

**Vehicles:**

2005-2010 FOCUS (00122)

**Symptom Code:**

| | |
|---|---|
| 300000 | CHASSIS |
| 303000 | CHASSIS STEERING/HANDLING |
| 304000 | CHASSIS SUSPENSION SYSTEM |
| 306000 | CHASSIS TIRES/WHEELS |
| 700000 | NOISE AND VIBRATION |
| 702000 | NVH OTHER NOISE CONCERNS |

# Exhibit M

**Article Number:** 21399
**Article Type:** S
**Global Concern Number:**
**Market(s):**

| Area Code | Geo Sales Area | Date of Activation | Date of Deactivation |
|---|---|---|---|
| NA | *** | 07/01/2010 | 07/01/2014 |
| NA | CAN | 07/01/2010 | 07/01/2014 |
| NA | MEX | 07/01/2010 | 07/01/2014 |
| NA | USA | 07/01/2010 | 07/01/2014 |
| WD | *** | 07/01/2010 | 07/01/2014 |

**Title:**

2005-2011 FOCUS - PREMATURE FRONT/REAR TIRE WEAR AND/OR VEHICLE DRIFT ON WET OR SNOW COVERED ROADS

**Text:**

SOME 2005-2011 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR A VEHICLE DRIFT CONDITION WHEN DRIVING ON WET OR SNOW PACKED ROADS. TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIORTO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT AND REAR TOE SETTINGS.

**Vehicles:**

2005-2011 FOCUS (00122)

**Symptom Code:**

300000 CHASSIS
303000 CHASSIS STEERING/HANDLING
304000 CHASSIS SUSPENSION SYSTEM
306000 CHASSIS TIRES/WHEELS
700000 NOISE AND VIBRATION
702000 NVH OTHER NOISE CONCERNS

**Global Customer Symptom Codes:**

| Category | Q1 | Q2 | Q3 | Full Code |
|---|---|---|---|---|
| Stop/Steer/Ride | | | | 6***** |
| Stop/Steer/Ride | Steering/Steering Wheel | | | 662*** |
| Stop/Steer/Ride | Steering/Steering Wheel | Feel/Wander/Pull | | 6623** |
| Stop/Steer/Ride | Steering/Steering Wheel | Feel/Wander/Pull | Right | 662381 |

# Exhibit N

**From:** Roberts, Paul (P.W.)
**Sent:** Thursday, August 26, 2010 11:11:27 AM
**To:** Arnold, Bruce (B.C.); Keller, John (J.D.); Roberts, Mark (M.A.); Allard, Chris (C.E.)
**CC:** Hearn, Chet (C.); Lysenko, Michael (M.G.); Nemeh, John (J.S.)
**Subject:** RE: C170 tire wear

Bruce, John, Mark, Chris,

Getting pit info is not possible given our system at WSAP. We can look at on-trac alignment performance for the times the cars were built. Can check to see if those actually saw the hunter etc.

I pled the case with FCSD about the emerging issue on 15" tires that we are very solid green for alignment Cp/Cpk toe in at wsap, the platform is a bit of a tire eater given alignment nominals and tolerance range, that the Hankook 15" tire is just a fast wearing tire despite the UTQG tire wear rating of 600, and that we cannot redesign tires or establish new alignment with only weeks to go in production.

I've been looking at and driving these cars for some time now and it only takes a few minutes of spirited driving on / off freeway ramps/cloverleafs, or lots of steering lock to lock turns (ie tight turns getting in and out of ones garage say) to feather these tires within the allowable alignment parameters.

We have LOTS of new to Focus customers because of our fuel economy and price point, bringing with them different expecations - rightly so but also using the Focus as the new family truckster. It is not uncommon anymore to see 3 & 4 people in a Focus motoring around, meaning we lots more duty cycle at design vs curb or 1 passenger loading. We know this car is RED on the alignment health chart for caster/camber/toe gradients between curb and loaded.

We also have a well documented spring sag / ride height change issue during shipping that we try to mitigate with toe-set at the plant. Depending how the car is loaded / transported on rail (especially the truck haulers) we get a different degrees of toe shift/ride height change (ie seen cars on the back /rear of haulers leaving the plant **way** nose or tail up (looking like a missle shot) on the trailer after they load it.) We have 3 different spring rates depending on tire selection, each respond differently to shipping settling but all cars use the same "in plant" nomial off-set from field spec alignment. We tried early on to have unique offsets for each of the spring rates/tires size but the complexity to track and monitor was monumental. We were convinced at the beginning of 2010MY to go to 1 in-plant nominal offset for all configurations by both John Keller and John Wilds. Overall the drift/pull warranty is better from the year before so I have to believe one offset for all is right. We have fewer overall alignment ECBs than 2009

I field many calls to and from dealers with cars technically "in spec" for alignment and having drift/pull problems, that once I get them to set the car to "nominal" generally the problem goes away. It's not a hard stretch of the imagination that tire wear can vary considerably depending on which way caster, camber and toe front and rear can stack up and cause wear problems but still be in spec.

Not sure what more can be done. ALL internal indicators say we are amung of the best plants in North America for alignment Cp/Cpk, and if you look at just "toe" we generally run 2.0 to 2.5 for Cp/Cpks - damn good on this old horse of a platform and an ANCIENT plant and equipment. We have continually improved pull warranty in the 3.5 years I have been here, to a level not thought possible with this platform.

This wear issue is nothing really new and from what I can tell nothing we can do to improve unless we put a power output limiter on the engine as soon as the car sees something more than 0.1g lat force while driving (I'm kidding - laugh - ha ha ha......)

I appreciate the concern, know of it, recognize it, but just don't know what more can be done, especially in the time left that this platform exists in production. We've already tightened in process toe-set limits and any tighter WILL cause cycletime and throughput issues (you can confirm with John Wilds if you don't believe me) - Toe in and Dynos are THE 2 major throughput bottle necks right now for WSAP and backing them up even further is not possible. We struggle on an hour by hour basis to keep the flow moving at toe in from shutting the main final line down.

Just trying to keep in the green and the wheels on the cart with all the supplier ramp down turmoil and plant personnel change over getting ready for MAP & C346.

***Have you driven a Ford lately?***

"No good decision was ever made in a swivel chair" - Gen. George S. Patton Jr.

Paul W. Roberts
Ford Motor Company
Wayne Assy. PVT - Veh Dyn
**Cell Phone (313) 805-2070**
**Text Page:** 3138052070@VTEXT.COM
Wayne Assembly Plant
37625 Michigan Ave.
Wayne, MI 48184
Cube 21, PVT Office

---

**From:** Arnold, Bruce (B.C.)
**Sent:** Thursday, August 26, 2010 9:44 AM
**To:** Keller, John (J.D.)
**Cc:** Roberts, Paul (P.W.)
**Subject:** FW: Daily ECB File

Here is one of them....seems like this comes and goes with Focus....at one point in time we were on the emerging issues / QSF list, then it magically disappeared.

Can you search for the other recent vehicles (Mark claims there have bee three this week) and:
(a) see if any of these by chance went across the Hunter (unlikely)
(b) compare toe settings to vehicles produced during the same period
© identify tire sizes of all complaint vehicles (on ECB summary)

Thanks

Regards,

**Bruce C. Arnold**
Supervisor, NA Chassis Systems Engineering
Ford Motor Company
barnold2@ford.com - 313.805.3845
https://mysite.sp.ford.com/personal/barnold2/default.aspx

---

**From:** Roberts, Mark (M.A.)
**Sent:** Thursday, August 26, 2010 9:34 AM
**To:** Arnold, Bruce (B.C.); Allard, Chris (C.E.)
**Subject:** FW: Daily ECB File

Guys, in the last couple days I have seen a couple reports of tire wear on Focus at pretty low mileage (2-6K). Pls look into them and see if any patter exists( e.g. same tire size, date of manufacture ...toe capability / pit, etc.). Should not be seeing "cupping" and "feathering" at mileages like this.

---

**From:** Boullin, Stephanie (S.)
**Sent:** Thursday, August 26, 2010 6:40 AM
**To:** Roberts, Mark (M.A.); Arnold, Bruce (B.C.); Holmes, Alison (A.M.); White, Brent (B.M.); White, Dale (D.A.); Clark, William (W.M.); Fowler, Rich (R.O.); Hamernik, Dave (D.); McCarthy, Dan (D.J.); Nichol, Daniel (D.); Arnold, Bruce (B.C.); Barrett, Eric (E.W.); Smith, Stephen (S.G.); Norton, Russ (R.L.); Hawkes, Frank (F.B.)
**Subject:** RE: Daily ECB File

Today's ECB file is available at the following link:

https://www.tc2.ford.com/ts/ChassisQualityWarranty/Suspension/Suspension%20Documents/1/ECB%20Aug%2026%202010.xls

Regards,

*Stephanie Boullin*
ssherer@ford.com
313.805.5969

Subject to Protective Order in Daniel v. Ford

DNL2 00000465

# Exhibit O

**From:** von Foerster, Steve (SvF.)
**Sent:** Sunday, March 20, 2005 2:45:24 PM
**To:** Mayer, Paul (P.A.)
**Subject:** FW: 2007/8 Focus Rear Toe Change

fyi

-----Original Message-----
**From:** Arbitter, Daniel (D.S.)
**Sent:** Friday, March 18, 2005 2:04 PM
**To:** Davis, Jeffrey (J.S.); von Foerster, Steve (SvF.)
**Subject:** RE: 2007/8 Focus Rear Toe Change

Latest news- pass at 3.5 deg / meter and point .36 static

Need input on tire wear testing recently completed. Rumor is that we did better than anticipated and wear was relatively insensitive to bump steer over range we are discussing

-----Original Message-----
**From:** Arbitter, Daniel (D.S.)
**Sent:** Friday, March 04, 2005 4:40 PM
**To:** Arbitter, Daniel (D.S.); Davis, Jeffrey (J.S.); von Foerster, Steve (SvF.)
**Subject:** RE: 2007/8 Focus Rear Toe Change

Testing was conducted at the following conditions;
3 deg /m and .2 static- fail R205
3deg /m and .36 static- fail R205
We have a preliminary pass at 4 deg and .36 Static

Next steps hold; static at .2 and increase toe change. Beyond that we are into a retune. Need results of tire wear testing recently completed to determine magnitude of change required.

-----Original Message-----
**From:** Arbitter, Daniel (D.S.)
**Sent:** Monday, February 21, 2005 12:27 PM
**To:** Davis, Jeffrey (J.S.); von Foerster, Steve (SvF.)
**Subject:** RE: 2007/8 Focus Rear Toe Change

Testing completed on worst case configurations (pt and body styles) at .2 static and 4deg toe change last week. Results were promising. We stopped testing and are now reconfiguring vehicle for 3 deg change. Team has low confidence in pass at .2 static and 3 deg change based on prior testing. Issues with R205 and 216 depending on configuration. I assume if we need to do trade offs we would prefer to hit .2 static and trade off toe change versus opposite. Expect to have worst case configurations evaluated by end of next week.

-----Original Message-----
**From:** Davis, Jeffrey (J.S.)
**Sent:** Monday, February 21, 2005 10:10 AM
**To:** von Foerster, Steve (SvF.); Arbitter, Daniel (D.S.)
**Subject:** RE: 2007/8 Focus Rear Toe Change

Vehicle was/is being set up with this level of toe change for drive evaluation. I will get timing.

Jeffrey S. Davis
Chassis Chief Engineer - Small FWD/RWD
Building 1, Rm. 13G095
Tel: 313.845.5224 Cell: 313.283.4702

-----Original Message-----

**From:** von Foerster, Steve (SvF.)
**Sent:** Monday, February 21, 2005 7:57 AM
**To:** Arbitter, Daniel (D.S.)
**Cc:** Davis, Jeffrey (J.S.)
**Subject:** 2007/8 Focus Rear Toe Change

Dan, I went through the status of the 2007 and 2008 Focus to the alignment affinity health chart. I was disappointed to learn that we do not plan to get to the requirement of " no greater than 3 deg/M rear toe change in jounce". I know we are much worse than this today but I do not understand why we would give up now and only say we are going to get to 4 deg/M. Tire wear has been a significant problem for the Focus and it seems like we would want to get green to the requirement. I was told it was a vehicle dynamics constraint. Can you please look into this and see what it would take to overcome this constraint. Thanks!

*S. von Foerster*
**Vehicle Programs Director**
**SUV/BoF**

# Exhibit P

# C170 Tire Wear Improvement Team
# 2/4/03 Meeting Minutes

**Attendees:** Tim Rinke, Jim Hale, Tiffany Baker, Dan Lavey, Eric Zinkosky

## The following issues and information were reviewed

Those in attendance reviewed tire wear data and projections presented by Dan Lavey. Based on current trends the 12 months in service information indicates mildly elevated tire wear for the C170. Typically tire wear issues are not generally found prior to 12 months in service so this data may not completely represent the magnitude of the customer impact.

The alignment data indicates that the vehicles are being built with too much negative camber. The cause of the excessive camber is unclear at this time. Higher levels of complaints have been noted with vehicles from Canada and station wagons. Tim Rinke is working to get tire warranty data from the tire suppliers to validate the types and locations of customer and dealer incidents.

Eric Zinkosky presented the results of his preliminary ADAMS model kinematic and compliant study of the rear suspension. Several key issues are present:

- Significantly more roll steer and toe change than would generally be acceptable for rear suspensions of this type
- Roll center height higher than would be expected causing high levels of tread change with jounce.
- Low camber stiffness
- The alignment toe specification insures large amounts of toe in; more than would be expected for any vehicle

The ADAMS model has not been correlated to measured vehicle data so this information is only preliminary. Ride data obtained on K&C testing suggests the model does not accurately reflect all the suspension motions. In any case, the level of static toe, the static camber levels, the toe change gradient and the tread change geometry all insure more than acceptable tire wear. A system level approach suggests changes be made to the suspension geometry to improve compliant issues while simultaneously reducing the toe change gradient and lowering the roll center.

Jim Hale shared the results of the component and knuckle investigation. Suspensions built with validated parts do not produce camber values within specification. Tests were conducted on the affect of the hub to knuckle fasteners with results suggesting compliance is affecting the assembled results. Additional testing is planned for next week. It was also suggested that the assembly sequence of all the fasteners may cause some of the issues.

Jim Hale also shared that the suspension module is assembled and secured at design position. Curb position is 40+mm higher. Changes in the assembly pallets would be necessary to change the assembled position.

Mike Sims joined the team for a brief time. He indicated that a QSF is expected on the tire wear issue. Effort should be applied to validating the hub shim hardware to support field adjustment of camber.

## The following actions and assignments were determined

- Jim Hale and Tiffany Baker will lead the effort to CMM 3 cars. The cars will be CMM'ed as built and then retrofitted with the Euro knuckle assemblies and re-measured. K&C data including the compliance test will be conducted on at least 1 of the CMM vehicles to support ADAMS model correlation
- Eric Zinkosky will initiate a correlation study of the ADAMS model to better predict system performance
- Al Oslapas is requested to measure the alignment on a number of vehicles as delivered, neutralize the bushings and then re-measure the alignment. The intent is to determine if the assembly process at design position is affecting the end of line camber.

- Tim Rinke will peruse the camber adjustment hardware issues. A shared durability vehicle is planned soon and the shim should be included on that vehicle if possible.
- Tim Rinke will also investigate the manufacturing issues involved with moving the 3 bushing holes or changing the tolerances on the hub mounting face. This may be done to shift the nominal camber to the lower end of the spec for improved tire wear.
- Eric Zinkosky will review the available K&C data with Al Oslapas and discuss any vehicle development issues that may result from changing the alignment specification or altering the geometry.

# Exhibit Q

**From:** Montini, Matthew (M.J.)
**Sent:** Wednesday, August 31, 2005 9:33:31 AM
**To:** O'Dell, Tim (.)
**CC:** Rinke, Timothy (T.)
**Subject:** RE: 2006-2011 Deviation for Rr Alignmt Toe Setting: Need FCSD Concurrence

Tim O'Dell,

I have gone through the data and had discussions with my PVT people out at Wayne (Rick Bonifas) about this subject for current model C170. They are not currently seeing any indications or undercurrents of an emerging field issue for tire wear as a result of the alignment settings. What was mentioned was that the aggressive settings do put allot emphasis on the scheduled maintenance tire rotation but it is a manufacturers recommendation. You will get some dissatisfaction out of those customers but then again they are not following the recommended maintenance.

As Tim Rinke knows from our past experience with rear tire wear on Focus, warranty data for tires is a very small part of the big picture. However, from the look at where we are currently to where we were, I don't see that this deviation would cause great customer satisfaction issues if it hadn't already.

*Matthew Montini*

Upstream Program Manager(C170)
Ford Customer Service Division
Ph# 313-3223760
MMONTINI@FORD.COM

-----Original Message-----
**From:** O'Dell, Tim (.)
**Sent:** Friday, August 26, 2005 4:28 PM
**To:** Montini, Matthew (M.J.)
**Cc:** Rinke, Timothy (T.)
**Subject:** 2006-2011 Deviation for Rr Alignmt Toe Setting: Need FCSD Concurrence
**Importance:** High

Matt,

I am processing a deviation for rear alignment toe setting. It is a 'catch-up' deviation that has been overlooked in the past (since C170 came to NA). We are in violation of SDS SU-0002 (specification), which is primarily intended to prevent/address tire wear.

Please review the attached deviation, and warranty data. I am seeking your acknowledgement / concurrence that the approval of this deviation will not negatively impact customer satisfaction for rear tire wear.

<< File: c170_rrtoe_dev_6-0H-S-0010_todell3_050826.zip >>
<<\\pdc00024\proj\Y230\NAC\Focus\CSI\Health Chart_R&H\Rr Toe Target Adjust_Deviation Aug05>>

Thanks,

**Tim O'Dell**

Small FWD/RWD Chassis Systems
(313) 31-77540
todell3@ford.com

# Exhibit R

# C170 Tire Wear Improvement Team
# 2/18/03 Meeting Minutes

**Attendees:** Tim Rinke, Jim Hale, Tiffany Baker, Dan Lavey, Eric Zinkosky, Leroy Shepheard, Hari Addanki, All Oslapas & staff.

## The following issues and information were reviewed

Tiffany Baker and Jim Hale indicated that CMM work on the subject cars was being completed as we meet. The work is being done at AEC with a new process that does not disturb the vehicle during measurements. Results should be available for review this week. Much is to be learned from this data.

Earlier this week, Jim published results of the Kinematic study of the vehicles using the U.S. and Euro knuckles. There is a noteable difference in the toe gradient results between vehicles with the knuckle change. This result is confirmed by John Willis in the model as well. Though the changes to the knuckle alone for the Euro product included only an upper arm attachment relocation for static camber, there is a toe gradient change as well. Again, much is to be learned from the CMM data.

Tiffany shared the results of her ride height study. The Focus Wagons are building high in the rear by as much as 13mm.

The group discussed the lack of a true suspension "D" dimension in the plant. Europe has a wheel lip requirement (chart provided by Al Oslapas after the meeting) but no suspension ride height. Jim and Tiffany have developed a tool to measure ride height. It is the opinion of the team that the 634 chart should be updated to include a ride height requirement and that the plant be required to review capability (Shepherd)

A review of the provided K&C data indicates that we continue to build vehicles with as much as 11 deg/M rear toe change. The ADAMS model shows about 5 deg/M. John Willis reviewed previous data that indicates that the cars were originally being built with 4.5 – 5 deg/M of toe change in the 2000MY. Something has changed.

The team discussed the potential toe impact of the vehicle with this level of toe gradient and the static toe setting. Consider that with a static toe setting of 0.36 degrees at curb, assuming 40+mm of deflection to design position, the actual toe setting at design nominal is more than **0.6 degrees** with the intended **5 deg/M** of toe change. With **11 deg/M** of toe change the nominal design toe is actually **0.85 degrees**. Using the allowable toe range, this vehicle can achieve **more than 1 degree** of toe at design loading. This almost certainly plays into the issues being experience with the wagons and the related loading. We must control/reduce the toe gradient and strive to reduce the static toe settings.

Al Oslapas shared the results of his investigation into the  affect of not securing the suspension at or near curb height. His testing shows that neutralizing the suspension fasteners at curb has a positive affect on roll steer influences. A report will follow. It may be necessary to run a K&C test with a vehicle secured as build and then neutralized to provide sufficient metrics to support changing the assembly fixtures (Oslapas).

John Willis review the ADAM model correlation effort. The team confirmed that the C11 and C12 CAD data differ only by a 3mm ride height change. The change is uiquie to the automatic 2003 vehicles for ground clearance. John has completed a DOE of suspension points to understand those most influencial on toe change and camber. The results will be confirmed with the CMM data to follow this week.

Eric Z is meeting with VSA today. The model will be updated to the latest component tolerances and ground reference plane. The intent is to understand the suspension points and component tolerances that need greatest attention to avoid future alignment and toe change problems. Completion estimated to be 4 weeks.

Subject to Protective Order in Daniel v. Ford

Tire wear data from the two tire suppliers is not readily available. Tim Rinke reported that the manufactures have indicated that nothing in their search suggests a tire wear issue in the field. CP2, P390 and P396 tire wear data has been reviewed by Jerry Metters with no particular problem indicated. The team would like to review the CP2 data against other comparable cars as a base line for future changes. It is John Sakioka's request that any changes be validated with a tire wear test to confirm improvement.

Tim also reviewed his 6 panel chart on tire wear. The Focus currently shows among the best cars in our product line for tire wear at 3, 6 and 12 MIS. The team discussed the inability of current tracking metrics to measure tire wear beyond 12 MIS and the probability that high tire wear complaints will not surface until later.

Tim is proceeding with testing plans for the QFS shim plate. CAD data now exists and Tim is reviewing fastener options. Initial review with the fasterner TS did not raise any particular concerns. A cam bolt upper adjustment is also being reviewed. An aftermarket product does is exist and is being purchased for review. Benteler will report on the potential of lengthening the upper control arm to improve camber. The information is due on Friday. Note that there are two arms; one for the sedans and one for the wagons. They are not interchangeable and both will need to be changed to support a QSF. More next week.

**The following actions and assignments should be addressed this week**

- Investigate releasing a ride height specification and prove out plan (Shepherd)
- Provide Eric Z with all the rear suspension component prints for inclusion in the VSA model (Shepherd)
- Complete and distribute the CMM data for the subject vehicles (Hale, Baker)
- Obtain the aftermarket upper cam bolt for review (Rinke)
- Continue to develop test plan for QSF hardware including the shim, cam bolt or a revised arm (Rinke)
- Update the ADAMS model to reflect the CMM and K&C results (Willis)
- Locate the CMM data points in CAD and provide a review of issues (Addanki, Eric Z)
- Develop revised suspension points/tuning for team consideration and evaluation (Addanki, Willis, Eric Z)
- Provide the team with CP2 tire wear report and investigate future test for QSF confirmation (Shepherd)
- Review Bentelers upper arm proposals and timing (Rinke, Shepherd, Eric Z, Addanki)

# Exhibit S

**Excerpts of CQIS Reports**

**Date:** 01/11/2006 **MY:** 2005 Focus **Mileage:** 15,476 MILES

1 **Symptom:** HANDLING CONCERN

**Dealer:** SW HAS VEHICLE IN FOR A HANDLING CONCERN ON SNOW AND ICE. SW STATES VEHICLE MOVES OVER THE ROAD WHEN DRIVING STRAIGHT. SW STATES VEHICLE EQUIPPED WITH 16" PIRELLI TIRES AND THEY SWAPPED A SET OF GOODYEARS ON AND CONCERN WAS RESOLVED. SW STATES ALIGNMENT IS WITHIN SPECS. SW SEEKING INFORMATION.

**Ford Technician:** 01/11/2006 10:22AM DAN GARANT MSS - FOE - PROD CONCERN ENG.ADVISED SW TO COMPARE TO LIKE UNIT WITH PIRELLIS. IF DRIVES THE SAME, CONSIDER NORMAL CHARACTERISTIC OF TIRE/WHEEL COMBINATION. ADVISED TECH TO CONTACT ZONE IF CUSTOMER STILL UNHAPPY.

DNL1 002528 - 529

---

**Date:** 12/26/2007 **MY:** 2007 FOCUS **Mileage:** 21,300 MILES

2 **Symptom:** STOP/STEER/RIDE STEERING / STEERING WHEEL FEEL/WANDER/PULL UNKNOWN (CODE NOT AVAILABLE) REAR CAMBER OFF

**Dealer:** WEB FORM DATA - CONCERN: REAR TIRES WEARING BAD ON INSIDES DIAGNOSTICS: TRIED TO ALIGN BUT NOT IN SPECS, CAMBER OUT TECH QUESTION: IS THE ALIGHMENT AND UPPER CONTROL ARM KIT 3S4Z-1A154-AA COVERED UNDER WARRANTY

**Ford Technician**: 12/26/2007 01:15PM TOM FUMEROLA MSS - FCSD - TECH SVC HOTLINE RAYMOND, THE TECHNICAL HOTLINE DOES NOT DEAL WITH WARRANTY QUESTIONS, FOLLOW SSM 20076 AND HAVE YOUR WARRANTY ADMIN DETERMINE IF THIS IS COVERED BY WARRANTY

DNL1 008453 - 454

---

**Date:** 03/04/2008 **MY:** 2008 FOCUS **Mileage:** 3,215 MILES

3 **Symptom:** REAR DRIFTS TO RT ON ICEY ROAD

**Excerpts of CQIS Reports**

**Dealer:** WEB FORM DATA: DESCRIPTION OF VEHICLE CONCERN: WHEN ON ICY ROAD CONDITIONS THE REAR END WANTS TO WANDER TO THE RIGHT DIAGNOSTICS ALREADY COMPLETED: ROAD TEST HOIST INSPECT CHECK SUSPENSION AND TIES NO PROBLEM FOUND PARTS REPLACED: NONE TECHNICIAN QUESTION: IS THERE A REAR ALIGHMENT ADJUSTMENT THAT CAN CORRECT THIS CONCERN? … CALL DATA: -THE CUSTOMER IS COMPLAINING THAT WHEN DRIVING ON ICY ROAD CONDITIONS THE REAR END WANTS TO WANDER TO THE RIGHT. -I HAVE NOT BEEN ABLE TO VERIFY THE CONCERN. -I CHECKED ALL TIRES, TIRE INFLATIONS AND SUSPENSION COMPOENNTS DID NOT FIND ANY FAULTS

**Ford Technician:** -THERE ARE NO KNOWNS OR PRIOR REPORTS THAT MATCH UP EXACTLY TO THIS CONCERN. -I FOUND ONE PAST REPORT FOR THE REAR END FEELING LOOSE OVER BUMPS AND THE FRONT END ALIGNMENT WAS OUT OF SPEC ON THAT UNIT, IT WAS RESET AND THAT CORRECTED THE CONCERN ON THAT UNIT. -PLEASE PERFORM A FOUR WHEEL ALIGNMENT CHECK AND ADJUST AS NEEDED USING THE ALIGNMENT SPECS LISTED IN THE ONLINE SHOP MANUAL, AN OUT OF ALIGNMENT SETTING COULD CAUSE SOME STABILITY CONCERNS THAT MAY BE AMPLIFIED ON ICEY OR LOW TRACTION SURFACES. -IF ALL ALIGNMENT SETTINGS ARE IN SPEC, THEN COMPARE TO A LIKE UNIT IF POSSIBLE AND IF WEATHER AND ROAD CONDITIONS ARE PERMITTING. REPORT #: 8BUAK009 REPLACE ALIGNMENT TECH COMMENTS: FRONT END OUT OF ALIGNMENT ISM 08-01-012 PULL/DRIFT CONDITION - CAMBER ADJUSTMENT SSM 20076 REFER TO WORKSHOP MANUAL SECTION 204-00 FOR NEW REAR CAMBER ADJUSTMENT PROCEDURE

DNL1 008728 - 730

---

**Date:** 03/26/2008 **MY:** 2005 FOCUS **Mileage:** 22,121 MILES

4 **Symptom:** FEELS LIKE LOSING CONTROL REAR

**Dealer:** WEB FORM DATA - CONCERN: WHEN GOING OVER DIPS ON EITHER SIDE OF REAR SUSP. FEELS LIKE CAR IS LOOSING CONTROL. CKD SUSP. OK ALIGN OK ANY IDEAS? DIAGNOSTICS: CKD SUSP. ALIGN TECH QUESTION: THIS IS THE

**Excerpts of CQIS Reports**

3RD TIME IVE RUN INTO THIS WITH NO FIX. DOEST MATTER MILES LOW OR HIGH

**Ford Technician:** 03/26/2008 01:46PM LLUCZKOW TY, NO KNOWN CONCERNS OF THE VEHICLE FEELING LIKE IT'S LOOSING CONTROL OVER BUMPS FROM THE REAR. SINCE YOU HAVE CHECKED THE ALIGNMENT, PLEASE GIVE US A CALL WITH THE RESULTS AND WE CAN TAKE A CLOSER LOOK AT THE PROBLEM.

DNL1 005840 - 841

---

**Date:** 04/07/2008 **MY:** 2007 FOCUS **Mileage:** 15,512 MILES

5 **Symptom:** TIRE PULL LEFT

**Dealer:** WEB FORM DATA: DESCRIPTION OF VEHICLE CONCERN: TIRE WEAR … CALL DATA: *DLR STATES THE VEHICLE HAS BEEN IN MULTIPLE TIMES FOR ALIGNMENT ISSUES. *ALIGNMENTS HAVE BEEN PERFORMED. *RACK HAS BEEN REPLACED. *VEHICLE NOW PULLS TO THE LEFT AND WILL CHANGE TO THE RIGHT IF TIRES ARE SWAPPED SIDE TO SIDE. *VEHICLE IS DRIVEN ON GRAVEL ROADS. *VEHICLE MAY BE BEING DRIVEN HARD DUE TO ROAD CONDITION AND CUSTOMER DRIVING HABITS. *VEHICLE HAS HAD COLLISION DAMAGE REPAIRED ALSO. *CUSTOMER IS UNSATISFIED WITH THE VEHICLE AND MAY BE SEEKING A REPURCHASE. *ALIGNMENT IS WITHIN SPECS AT THIS TIME. *TIRE WEAR SEEMS NORMAL AT THIS TIME BUT VEHICLE IS EXHIBITING A TIRE PULL. *DLR CALLED FOR INFO.

**Ford Technician:** 04/07/2008 03:52PM FRED SHEPHERD MSS - FCSD - TECH SVC HOTLINE *ADVISED DLR NO KNOWNS. *RECOMMEND DLR CONTACT THEIR ZONE MANAGER FOR ASSISTANCE.

DNL1 004478 - 480

---

**Date:** 05/30/2008 **MY:** 2007 FOCUS **Mileage:** 32,551 MILES

6 **Symptom:** REAR SWAYS OVER BUMPS

**Excerpts of CQIS Reports**

**Dealer:** WEB FORM DATA - CONCERN: WHILE DRIVING VEHICLE OVER BUMPS, THE REAR END FEELS LIKE IT SWAYS SIDE TO SIDE. DIAGNOSTICS: ROTATED TIRES, SWAPPED TIRES OFF ANOTHER VEHICLE, INSPECT SUSPENSION TECH QUESTION: ANY KNOWN CONCERNS? MAYBE SOMETHING I OVERLOOKED ON THE SUSPENSION?

**Ford Technician:** 05/30/2008 09:50AM ANTHONY PASTORINO MSS - FCSD - TECH SVC HOTLINE DALE, THERE ARE NO KNOWNS FOR THIS CONCERN. IF KNOWN GOOD WHEELS AND TIRES DID NOT AFFECT THIS CONCERN THEN IT IS RECOMMENDED TO PERFORM AN ALIGNMENT. INSPECT THE REAR FOR BEING OUT OF ALIGNMENT AND BENT SUSPENSION COMPONENTS THAT COULD CAUSE THIS CONCERN. IF YOU WOULD LIKE TO DISCUSS THIS CONCERN IN FURTHER DETAIL PLEASE OBTAIN YOUR ALIGNMENT READINGS AND CALL THE HOTLINE. USE CONTACT ID 102632101. THANK YOU.

DNL1 007119 - 121

---

**Date:** 12/18/2008 **MY:** 2008 FOCUS **Mileage:** 12,342 MILES

7 **Symptom:** FEEL/WANDER/PULL/WANDER FEEL W/DRIVING

**Dealer:** WEB FORM DATA - CONCERN: WANDERS ON ROAD FEELS LIKE REAR OF CAR SHIFTS FROM SIDE TO SIDE SLIGHTLY ABOUT EVERY 50 FEET. DIAGNOSTICS: CHECK FOR ANY LOOSE SUSPENSION,ANY LOOSE FRAME TO BODY BOLTS LOOSE WHEELS ALL OK.PERFORM 4 WHEEL ALIGNMENT OK CHECK TIRE BALANCE OK. TECH QUESTION: ANY PROBLEMS WITH THE STEERING OR HANDLING OF THESE? ANY ROAD FEEL CONCERNS?

**Ford Technician:** 12/18/2008 09:52AM WILLIAM LEIBENGOOD MSS - FCSD - TECH SVC HOTLINE HI NORMAN. IF POSSIBLE, ROAD TEST KNOWN GOOD SIMILAR COMPARISON VEHICLE. ENSURE THERE ARE NO VEHICLE MODIFICATIONS INDUCING CONCERN. ENSURE TIRE PRESSURE IS SET TO PLACARD SEPCIFICATION. THERE IS A SOMEWHAT SIMILAR HOTLINE REPORT DEEMED TO BE NORMAL ROAD FEEL WHEN COMPARED TO SIMILAR VEHICLE. FEEL FREE TO PHONE HOTLINE TO REVIEW ALIGNMENT READINGS AS NEEDED. CONTACTID 102956976

**Excerpts of CQIS Reports**

**Dealer:** 06/25/2009 05:10PM BRANDON DIXON(FSE) MSS - FCSD - REG – CHICAGO FSE INSPECTED VEHICLE WHILE AT DEALER 6/24/09. THIS VEHICLE THE FSE HAD DRIVEN A FEW MONTHS PRIOR AS THE CUSTOMER COMPLAINED THAT THEIR WAS A VEHICLE HANDLING CONCERN (LOOSE IN REAR END). VEHICLE OPERATED NORMALLY AT THAT TIME IN A VARIETY OF DRIVING SITUATIONS. ON 6/24, THE REAR TIRES ARE BALD. THE CUSTOMER COMPLAINS OF THE REAR END BEING LOOSE ON THE ROAD, POSSIBLE GRAVEL ROAD USE. FSE REVIEWED GCQIS HISTORY FOR TIRE WEAR ON 08 FOCUS AND ADVISED SM TO ADJUST TO TO NEAR ZERO DEGREES WITH VEHICLE LOADED AS CUSTOMER IS USING. IF THERE IS USUALLY A LOAD IN THE TRUNK OR PASSENGERS IN THE REAR THEN THE VEHICLE NEEDS TO BE ALIGNED WITH THE LOAD APPLIED. EXCESSIVE REAR TOE IS THE ROOT CAUSE OF THE RAPID REAR TIRE WEAR. BDIXON5.

**Dealer:** 07/20/2009 11:51AM BRANDON DIXON(FSE) MSS - FCSD - REG – CHICAGO FSE RE-VISITED DEALER 7/17/09 AND DROVE WITH CUSTOMER FOR ONE HOUR TO DUPLICATE CONCERN OF VEHICE LOOSE IN REAR ON PAVED ROADS. CUSTOMERS STS CONCERN HAS NOT REPRODUCED SINCE TIRES REPLACED BUT IT WAS HIGHLY INTERMITTENT IN PAST. ONE HOUR OF DRIVING IN A VARIETY OF CONDITIONS COULD NOT DUPLICATE CONCERN. REAR END 'SKATE' ON GRAVEL ROADS AT 40 MPH WAS DUPLICATED AND CUSTOMER STATED IT HAD THE SAME SENSATION BUT THE PROBLEM THAT THE CUSTOMER IS CONCERNED ABOUT OCCURS INTERMITTENTLY ON PAVED ROADS. DEALER IS WORKING OUT TRADE OPTIONS FOR THIS CUSTOMER.

**Dealer:** 07/23/2009 10:47AM BRANDON DIXON(FSE) MSS - FCSD - REG – CHICAGO ADD-ON 07/23/2009 10:47AM BRANDON DIXON(FSE) MSS - FCSD - REG – CHICAGO DEALER SENT CAR OUT TO A COMPETITIVE SHOP WITH MODERN ALIGNMENT EQUIPMENT AND THE REAR THRUST ANGLE WAS OUT OF SPECIFICATION. CORRECTED REAR TOE TO RESOLVE CONCERN. THIS DEALERS ALIGNMENT EQUIPMENT WILL NOT PROVIDE A THRUST ANGLE MEASUREMENT.

DNL1 009153 - 155

**Excerpts of CQIS Reports**

**Date:** 01/20/2009 **MY:** 2007 FOCUS **Mileage:** 38,351 MILES

8 **Symptom:** REAR FEELS LIKE STEPPING OUT

**Dealer:** WEB FORM DATA - CONCERN: WHEN ROADS ARE ICY, VEHICLE IS VERY UNCONTROLLABLE. SEEMS LIKE THE BACK END IS COMING LOOSE AND IS HARD TO CONTROL OVER 40 MPH WHEN THE REST OF THE TRAFFIC CAN GO FASTER. DIAGNOSTICS: VERIFIED CONCERN TECH QUESTION: IS THERE A REPAIR FOR THIS CONCERN, I HAVE SEVERAL VEHICLE WITH THIS CONCERN?

**Ford Technician:** 01/20/2009 12:22PM LLUCZKOW ALAN, NO KNOWN CONCERNS FOR THE REAR END FEELING LIKE IT'S LOOSE OR COMING AROUND WHEN DRIVING ON ICY ROADS IN A 2007 FOCUS. VERIFY THE ALIGNMENT ANGLES ARE WITHIN SPECIFICATION AND MAKE SURE THE ALIGNMENT MACHINE IS GIVING YOU THE SAME SPECIFICATION AS THE ON-LINE WSM.

DNL1 006099 - 100

---

**Date:** 02/05/2009 **MY:** 2009 FOCUS **Mileage:** 2,994 MILES

9 **Symptom:** WANDDERS DRIVING

**Dealer:** WEB FORM DATA - CONCERN: 09 FOCUS 1204 MILES 4 WHEEL ALIGMENT WAS OFF REAR TOE AND FRONT TOE SET TOE NOW SAYS DRIFTS AT 60 MPH CANT HOLD STEERING WHEEL STRIGHT DIAGNOSTICS: PUT ON ALIGMENT AND ALL WITH IN SPECS TECH QUESTION: DO YOU HAVE A FIX FOR DRIFTING

**Ford Technician:** 02/05/2009 06:22PM WILLIAM LEIBENGOOD MSS - FCSD - TECH SVC HOTLINE HI DARRELL. THERE ARE NO SIMILAR HOTLINE REPORTS AS DESCRIBED AT THIS TIME. FEEL FREE TO RECONTACT HOTLINE WITH CURRENT ALIGNMENT READINGS. TOE,CAMBER,CASTER, & SAI. WOULD LIKE TO KNOW IF THERE IS ANY ABNORMAL TIRE WEAR. PLEASE REFER TO ONLINE WORKSHOP MANUAL SECTION 204-00 FOR CURRENT ALIGNMENT SPECIFICATIONS.

**Dealer:** 02/05/2009 06:44PM JOSEPH REDDMANN MSS - FCSD - TECH SVC HOTLINE WEB FORM DATA - CONCERN:

**Excerpts of CQIS Reports**

WONDERING ON FREEWAY 6O MPH DIAGNOSTICS: 4 WHELL ALIGMENT 01/10/09 WAS OFF REAR AND FRONT PUT ON ALIGMENT ALL IN SPEC S TECH QUESTION: IS THERE A FIX FOR WONDERING ON FREE WAY

**Ford Technician:** DARRELL, WE ARE GOING TO NEED THE ACTUAL ALIGNMENT ANGLES AS PREVIOUSLY REQUESTED. PLEASE OBTAIN THESE NUMBERS THEN CALL THE HOTLINE.

DNL1 002993 - 995

---

**Date:** 03/05/2009 **MY:** 2008 FOCUS **Mileage:** 5,230 MILES

10 **Symptom:** POOR HANDLING ON SNOW/ICE

**Dealer:** WEB FORM DATA - CONCERN: CUSTOMER STATES VEHICLE DOES NOT HANDLE WELL ON SNOW AND ICE. DIAGNOSTICS: 4WHEEL ALIGN AS REAR TOE WAS OFF AND VEHICLE WAS DOGTRACKING TECH QUESTION: WOULD UPGRADE OF TIRE HELP CONCERN. WE USED TSP ALIGNMENT SPECS. ANY OTHER HELP WERE YOU ABLE TO VERIFY THE CONCERN? YES IS THERE AN APPROPRIATE PINPOINT TEST IN THE WSM FOR THIS CONCERN? NO WAS THE PINPOINT TEST FOLLOWED? YES

**Ford Technician:** 03/05/2009 01:06PM TOM FUMEROLA MSS - FCSD - TECH SVC HOTLINE GEORGE, A WINTER TIRE WILL IMPROVE HANDLING ON SNOW AND ICE. COMPARE HANDLING TO A LIKE UNIT.

DNL1 1010263 - 264

---

**Date:** 03/11/2009 **MY:** 2007 FOCUS **Mileage:** 23,459 MILES

11 **Symptom:** TIRE WEAR WANDER

**Dealer:** WEB FORM DATA - CONCERN: TIRE WEAR AND IS VERY HARD TO CONTROL ON SNOW COVERED ROADS DIAGNOSTICS: SSM #20703 TECH QUESTION: THIS IS MY PERSONAL VEHICLE AND I ALIGNED IT AT 3000 MI. CAR WAS STILL VERY HARD TO CONTROL ! I TALKED TO MY INSTRUCTOR AT STEERING AND SUSP. CLASS AND HE TOLD ME TO SET THE ALIGNMENT TOE TO THE MIN SPEC. THE CAR

**Excerpts of CQIS Reports**

DRIVES BETTER BUT STILL NOT GOOD AT ALL. PLEASE HELP ME ! …

**Ford Technician:** 03/11/2009 10:00AM GHILLAKE KEITH WE ARE GOING TO NEED THE ALIGNMENT SPECIFICAITON TO AID IN THIS CONCERN. PLEASE ALSO MAKE SURE THAT THE TIRES ARE AT THE CORRECT PSI AND THAT THEY ARE ROTATED AT THE CORRECT INTERVALS.  TSB 07-04-02 PULL/DRIFT - FRONT SUBFRAME ALIGNMENT CORRECTION SERVICE PROCEDURE

**Dealer:** TECHNICIAN REPLY: FRONT CAMBER L -.03 R -.05 CASTER L 2.5 R 2.4 TOE L -.03 R -.03 REAR CAMBER L -1.3 R -1.2 REAR TOE .17 AND .15 SET AT 3000 MI. NOW THE REAR TOE IS AT .05 ON EACH SIDE THE TIRES ARE WEARING OK (NOT UNEVEN) BUT ARE BETWEEN 4 AND 5 32NDS (NOT VERY GOOD FOR ONLY 23000 MI) TIRE PSI 35 ALL 4

**Ford Technician:** KEITH I ADVISE TO INCREASE THE CASTER CLOSER TO THE MIDDLE SPECIFICATION 2.75‡ KEEPING THE SPLIT THE SAME. THIS VEHICLE IS PICKY ABOUT HAVING THE CASTER SET TO THE MIDDLE SETTING. IF THE CAMBER IS INDEED AT 0.05 I WOULD SET THAT CLOSE TO THE MIDDLE RANGE OF .50 KEEPING THE SPLIT THE SAME AS WELL.

**Dealer:** TECHNICIAN REPLY: FRONT CAMBER IS L -.3 R-.5 CASTER IS L 2.5 R 2.4 HOW DO I CHANGE CASTER ? WHEN THE CAR GOES OVER A ICEY PATCH THE BACK END WILL TRY TO CATCH THE FRONT END. THE FRONT FEELS OK. IT IS A SCARY FEELING AT 50 MPH. TIRES ?

**Ford Technician:** KEITH, THE CASTER ADJUSTMENT IS LISTED IN SECTION 204-00 OF THE WSM UNDER GENERAL PROCEDURES. IF THE CASTER ADJUSTMENT DOES NOT HELP, ENSURE ALL SUSPENSION AND STEERING COMPONENTS ARE TIGHT AND PROPERLY ENSURE ALL SUSPENSION AND STEERING COMPONENTS ARE TIGHT AND PROPERLY MOUNTED.  IF  SO,  COMPARE  THE  HANDLING CHARACTERISTICS TO A LIKE UNIT TO ENSURE THEY ARE NOT CHARACTERISTIC.

DNL1 004169 - 171

**Excerpts of CQIS Reports**

**Date:** 04/03/2009 **MY:** 04/03/2009 **Mileage:** 29,830 MILES

12 **Symptom**: POOR HANDLING

**Dealer:** WEB FORM DATA - CONCERN: VEHICLE VERY HARD TO CONTROL AT FREWAY SPEEDS... DIAGNOSTICS: ROAD TEST AN VERIFIED CONCERN... TECH QUESTION: CAN YOU HELP ME WITH THIS, ITS VERY UNCONTROLABLE AT HIGH SPEEDS...SCARY TO DRIVE...

**Ford Technician:** 04/03/2009 11:26AM BRADLEY KUMMLER MSS - FCSD - TECH SVC HOTLINE LOU, THERE ARE NO KNOWN CONCERNS FOR THIS SYMPTOM. PLEASE VERIFY THE ALIGNMENT IS SET TO THE NOMINAL SPECIFICATIONS. WITH 29,000 MILES ON THE ODOMETER I'D SUSPECT AN ALIGNMENT CONCERN, WORN SUSPENSION BUSHING, OR BENT COMPONENTS, WORN TIRES OR SEPARATED BELT IN TIRE.

**Dealer:** 04/03/2009 11:58AM TOM FUMEROLA MSS - FCSD - TECH SVC HOTLINE TECHNICIAN REPLY: I HAVE SWAPPED TIRES WITH NEW UNIT AND STILL HAS CONCERN

**Ford Technician:** 04/03/2009 11:58AM TOM FUMEROLA MSS - FCSD - TECH SVC HOTLINE LOU, IT IS VERY IMPORTANT TO HAVE THE TOE SET CORRECTLY ON THIS VEHICLE. IT SHOULD BE SET IN THE MIDDLE OF THE SPECS. IF YOU REQUIRE FURTHER ASSISTANCE THEN PLEASE INCLUDE YOUR ALIGNMENT ANGLES IN THE NEXT CONTACT. SEE SSM 20703.

DNL1 004884 - 886

---

**Date:** 05/05/2009 **MY:** 2007 FOCUS **Mileage:** 29,333 MILES

13 **Symptom:** IN RAIN/SNOW DARTING CONCERN

**Dealer:** WEB FORM DATA - CONCERN: VEHICLE DRIFTS IN WET ROADS AND REAL BAD IN SNOW DIAGNOSTICS: CHECKED ALIGNMENT AND SET TO FORD SPECS TECH QUESTION: HAVE MORE THAN ONE VEHICLE COMPAINT ON THIS LOOKING FOR SPECIAL ALIGNMENT SPECS OR ANY THING TO CURE PROBLEM. PEOPLE COMPALINING ABOUT BEING UNSAFE. PLEASE GIVE ME ANY INFO TO HELP!!!

**Excerpts of CQIS Reports**

**Ford Technician:** 05/05/2009 11:32AM BMIYA1 TODD, SOME OF THIS CONCERN IS NORMAL DEPENDING ON THE EXTENT OF THE CONCERN. THIS TYPE OF DART FEELING CAN BE EXAGGERATED BY THE TOE ANGLE. YOU WILL WANT TO VERIFY THE FRONT AND REAR TOE AND MAKE SURE YOU ARE AS CLOSE TO ZERO AS POSSIBLE TO AVOID THIS FEELING.

DNL1 000036 - 037

---

**Date:** 05/18/2009 **MY:** 2008 FOCUS **Mileage:** 18,446 MILES

14 **Symptom:** TREAD PERFORMANCE

**Dealer:** tires on rear worn severly and vehicle wanders. both rear tires need replacement and 4 wheel alignment.

**Ford Technician:** denied to replace 4 tires and alignment. alignments and tire wear issues are warrantable 12/12 only. thanks, Scott

DNL1 009254 - 255

---

**Date:** 05/22/2009 **MY:** 2008 FOCUS **Mileage:** 14,166 MILES

15 **Symptom:** TIRE APPEARANCE

**Dealer:** shaking in rear end & tires wearing, ssm 306000 advise to reset alignment specs. to close to center , 2 new rear tires.

**Ford Technician:** Warranty denied to replace 2 tires. Warranty coverage for alignment/tire wear due to alignment is for the first 12 months or 12k miles, whichever occurs first. Thanks, Mark P.

DNL1 006368 - 369

---

**Date:** 06/29/2009 **MY:** 2008 FOCUS **Mileage:** 26,285 MILES

16 **Symptom:** WANDER

**Dealer:** WEB FORM DATA - CONCERN: WANDERS AT HIGHWAY SPEEDS AFTER ALIGNMENT AND 2NEW REAR TIRES DIAGNOSTICS: CHECKED TIRE PRESSURE AND RECHECKED ALIGNMENT FRONT TOE IS .O8 TOTAL REAR TOE IS .37 TOTAL ALIGNMENT IN SPECS PARTS REPLACED:: REAR TIRES TECH

**Excerpts of CQIS Reports**

QUESTION: ANY HISTORY OF THIS AND WHAT WOULD CAUSE THIS CONCERN …

**Ford Technician:** 06/29/2009 10:34AM EDERY GLEN, SUGGEST CHECKING THE TIRE PRESSURE, TIRE WEAR, AFTER MARKET TIRES?, ALIGNMENT, STEERING AND SUSPENSION COMPONENTS. I KNOW THE ALIGNMENT HAS BEEN CHECK BUT CAMBER, SAI AND CASTER CAN ALSO PLAY A IMPORTANT ROLE IN HANDLING CHARACTERISTICS. IF CAMBER, CASTER, SAI,THRUST ANGLE AND TOE IS WITH IN THE WSM SPECIFICATIONS SECTION 204-00 SUGGEST SWAPPING OUT TIRES FROM A LIKE UNIT AND RETEST.

DNL1 003556 - 558

---

**Date:** 07/15/2009      **MY:** 2008 FOCUS          **Mileage:** 18,941 MILES

17                              **Symptom:** TIRE APPEARANCE

**Dealer:** CUSTOMERS CONCERN AT SPEEDS MORE THAN 40 MPH THE VEHICLE VIBRATES VERY HARSHLY AND HARD TO HANDLE. TECH DIAG DURING TEST DRIVE VEHICLE HAS A VERY HARD VEBRATION. RAISED ON HOIST AND INSPECTED FRONT END AND IS GOOD AND FOUND BOTH REAR TIRES VERY BAD TREAD SEPERATION ON THE BOTH REAR TIRES VEHICLE IS UNSAFE TO DRIVE AND NEEDS TWO REAR TIRES REPLACED. AT THIS TIME REQUESTING FORD TO REPLACE THE TWO TIRES

**Ford Technician:** 07/15/2009 05:24PM ERIC NEILSON MSS - FCSD - TECH SVC HOTLINE APPROVED TO REPLACE LEFT AND RIGHT REAR TIRES FOR NOISE VIBRATION CONCERN

DNL1 006216 - 217

---

**Date:** 07/29/2009      **MY:** 2008 FOCUS          **Mileage:** 14,977 MILES

18                              **Symptom:** TREAD PERFORMANCE

**Dealer:** CUSTOMER STATES; TIRES ARE NOISEY AND VEHICLE PULLS AND WANDERS. WE PUT VEHICLE ON ALIGNMENT MACHINE AND FOUND THAT THE LEFT REAR CAMBER WAS OUT AND ALL 4 TOE POINTS ARE OUT OF SPECS CAUSING ALL

**Excerpts of CQIS Reports**

4 TIRES TO SCALLOP AND CUP.TO REPAIR WE NEED TO REPLACE LEFT REAR UPPER CONTROL ARM, ALIGN VEHICLE TO SPECS AND REPLACE ALL 4 TIRES

**Ford Technician:** APPROVED TO REPLACE LEFT REAR UPPER CONTROL ARM, ALIGN VEHICLE TO SPECS AND REPLACE ALL 4 TIRES. THANKS GARY

DNL1 009755 - 756

---

**Date:** 08/12/2009 **MY:** 2008 FOCUS **Mileage:** 28,149 MILES

19

**Symptom:** TIRE WEAR

**Dealer:** WEB FORM DATA - CONCERN: "SWAYING TYPE FEELING WITH CROSSWINDS". THIS IS THE SECOND TIME THEY HAVE HAD THE VEHICLE HERE FOR THIS. THEY ARE ALSO COMPLAINING ABOUT A PULL TO THE LEFT ALSO. DIAGNOSTICS: DROVE 21 MILES, DID A VISUAL INSPECTION, CHECKED ALL SUSPENSION COMPONENTS. PARTS REPLACED:: REPLACED THE RF HALFSHAFT LAST TIME FOR A BAD CARRIER BEARING. TECH QUESTION: I CANT DUPLICATE IT AND CANT FIND A BAD COMPONENT BUT I DID FIND ALL THE TIRES ARE WEARING ABNORMAL ON THE INSIDE TREAD WORSE ON THE LEFT SIDE. JUST A SHOT IN THE DARK ANY ALLIGNMENT PROBLEM CONCERNS KNOW TO CAUSE ANYTHING LIKE THESE SYMPTOMS. OBVIOUSLY IT COULD CAUSE THE TIRE WEAR CONCERN BUT I WAS CURIOUS TO KNOW IF YOU HAD ANYTHING CAUSING THE SWAYING SYMPTOM …

**Ford Technician:** 08/12/2009 02:05PM JOSEPH REDDMANN MSS - FCSD - TECH SVC HOTLINE CHRIS, <A HREF='HTTP://WWW.VREP.FORDTECHSERVICE.DEALERCONNECTION.COM/VDIRS/SSM/S SM.ASP?SSM=20703' TARGET='_BLANK'>SSM 20703</A>. PLEASE RECORD ALL ACTUAL ALIGNMENT ANGLES AND SET ALL ANGLES AS CLOSE TO NOMINAL AS POSSIBLE.

DNL1 005703 - 705

---

**Excerpts of CQIS Reports**

**Date:** 11/17/2009      **MY:**   2007 FOCUS           **Mileage:** 35,484 MILES

20                            **Symptom:** REAR INNER TIRE WEAR

**Dealer:** WEB FORM DATA - CONCERN: CUSTOMER STATES THAT THE INNER SHOULDERS ARE WORN AND CUPPING AGAIN. THIS IS HIS 2ND SET OF TIRES TO DO THE SAME THING IN 20,000 MILES. HE ALSO NOTICES ON SNOW COVERED ROADS THAT THE REAR OF THE VEHICLE WILL FEEL AS THOUGH IT COULD COME AROUND ON HIM. THIS HAS HAPPENED WITH TWO DIFFERENT BRANDS OF TIRES.  DIAGNOSTICS: THE REMAINDER OF THE TREAD ACROSS IS WEARING NORMALLY. THE CUSTOMER HAS HAD US ALIGH AND OR CHECK THE ALIGNMENT NOW 3 TOTAL TIMES IN 34,000 MILES. THE ALIGNMENT IS WITHIN SPECS AND EACH SPEC IS TOWARDS THE CENTER OF THE SPEC, PER WSM. SPECS ARE AT: LF TOE 0 IN, 2.6 DEG CAMBER, & -.5 CASTER--RF TOE 0 IN, CAMBER 2.6 DEG, & CASTER -.7 DEG--LR TOE 1/16TH IN & -1.4 DEG CAMBER--RR TOE 1/16TH IN & -1.2 DEG CAMBER--TOTAL REAR TOE 1/8TH IN AND -.02 DEG THRUST ANGLE--TOTAL TOE FRONT 0 IN, CROSS CAMBER .1 DEG, CROSS CASTER 0 DEG. VEHICLE DOES NOT DRIFT OR PULL. TIRES ARE CORRECT FOR VEHICLE AND TIRE ROTATIONS HAVE BEEN DONE PROPERLY …

**Ford Technician:** STEVE, THERE IS AN SSM POSTED FOR THIS CONCERN DESCRIBED. PER THE ALIGNMENT READINGS THE VEHICLE IS SET PER THE SSM. RECOMMEND TO PAY CLOSE ATTENTION TO THE REAR TOE. THERE ARE SEVERAL REPORTS ON REAR TOE AS THE ROOT CAUSE FOR INNER TIRE WEAR. QUESTION THE CUSTOMER SEE IF HEAVY BALLAST IS PLACED IN THE TRUNK THAT COULD INDUCE INNER TIRE WEAR. <A HREF='HTTP://WWW.VREP.FORDTECHSERVICE.DEALERCONNE CTION.COM/VDIRS/SSM/S                SM.ASP?SSM=20703' TARGET='_BLANK'>SSM   20703</A>   TO   ADDRESS   THIS CONDITION.

**Dealer:** 11/17/2009 04:18PM MYOUN163 TECHNICIAN REPLY: THE CUSTOMER STATES HE MAY HAVE A SUITCASE BACK THERE FORM TIME TO TIME BUT NOT ENOUGH THAT WOULD CAUSE AN ISSUE. THE VEHICLE IS IN VERY GOOD CONDITION AND WELL MAINTAINED. WE HAVE SEEN THIS NOT ONLY ON FOCUS BUT ALSO ESCAPE VEHICLES. BUT THERE SEEMS TO BENO REAL REPAIR FOR THIS. ALL ALIGNMENT SPECS ARE GREEN. SSM 20703 WAS NO REAL REPAIR FOR THIS. ALL

**Excerpts of CQIS Reports**

ALIGNMENT SPECS ARE GREEN. SSM 20703 WAS ALREADY FOLLOWED BUT REALLY MINIMAL CHANGE. IS THERE A CHANCE FOR SUCCESS BY SETTING THIS TO ZERO TOE?

**Ford Technician:** STEVE, IT IS RECOMMENDED TO SET ALIGNMENT ANGLES EXACTLY TO NOMINAL SPECIFICATIONS. FOR THIS REASON, SETTING THE TOE TO 0 IS NOT RECOMMENDED. NOTE THAT YOU HAVE LISTED REAR CAMBER AS LR -1.4 AND RR -1.2. NOMINAL SPECIFICATION IS -1.0. SINCE THE CAMBER IS SET MORE NEGATIVE THAN THE NOMINAL SPECIFICATION, THIS COULD CAUSE EXCESSIVE REAR INNER TIRE WEAR. AT THIS TIME, RECOMMEND YOU SET ALL ALIGNMENT ANGLES AS CLOSE AS POSSIBLE TO NOMINAL SPECIFICATION, THEN RE-EVALUATE THIS CONCERN.

**Dealer:** 11/17/2009 05:34PM ALEXANDER ROGERS MSS - FCSD - TECH SVC HOTLINE TECHNICIAN REPLY: THESE VEHICLES ARE NOT EQUIPPED WITH AN ADJUSTMENT FOR REAR CAMBER. ARE YOU SUGGESTING AN AFTERMARKET SHIM KIT TO MAKE THIS HAPPEN?

**Ford Technician:** STEVE, THE ADDITION OF AN AFTERMARKET SHIM KIT IS NOT RECOMMENDED. SUSPECT THE EXCESSIVELY NEGATIVE REAR CAMBER IS CAUSED BY A SAGGING CONDITION. RECOMMEND YOU MEASURE THE VEHICLE'S RIDE HEIGHT USING THE PROCEDURE IN SECTION 204-04 OF THE WORKSHOP MANUAL AND COMPARE THE MEASUREMENT TO A KNOWN GOOD LIKE VEHICLE. IF SIGNIFICANT DIFFERENCE IS PRESENT IN RIDE HEIGHT, REPLACE THE REAR SPRINGS ON THE AFFECTED SIDE, AND RE EVALUATE THE CONCERN.

**Dealer:** TECHNICIAN REPLY: YES, I JUMPED TO THAT AFTERMARKET IDEA PREMATURELY, WE WERE JUST DISCUSSING THE RIDE HEIGHT ISSUE AS WELL.

**Ford Technician:** STEVE,  IF YOU NEED MORE ASSISTANCE PLEASE CALL US HERE AT THE TECHNICAL HOTLINE. IF YOU HAVE MEASURED THE RIDE HEIGHT AS PER THE WORKSHOP MANUAL THEN INSPECT FOR A BENT COMPONENT WHICH IS CAUSING THIS CONCERN.

DNL1 004507 - 510

**Excerpts of CQIS Reports**

**Date:** 04/29/2010 **MY:** 2008 FOCUS **Mileage:** 11,663 MILES

21 **Symptom:** REAR FEELS LOOSE OVER BUMPS

**Dealer:** WEB FORM DATA - CONCERN: CUSTOMER IS COMPLAINING OF A SWAYING FROM SIDE TO SIDE WHEN GOING OVER LARGER BUMPS. I RODE WITH, AND WAS ABLE TO VERIFY THIS. THE INSTABILITY SEEMS TO BE FROM THE REAR OF THE VEHICLE, LIKE THE BACK END LOSES CONTROL … TECH QUESTION: ANY OTHER REPORTS LIKE THIS ON FOCUSES?

**Ford Technician:** ROBERT, RECHECK THE ALIGNMENT ANGLES AND NOTE THE REAR CAMBER. THE CAMBER SHOULD BE SET TO -1 DEGREE. AS REAR CAMBER IS INCREASED MORE POSITIVE THE VEHICLE WILL FELL MORE LOOSE IN THE REAR. CORRECT THE REAR CAMBER AS NECESSARY AND RECHECK FOR ANY LOOSE REAR SUSPENSION COMPONENTS. COMPARE THE VEHICLE TO A LIKE UNIT AS NECESSARY.

DNL1 006261 - 263

---

**Date:** 07/07/2010 **MY:** 2009 FOCUS **Mileage:** 35,573 MILES

22 **Symptom:** SUSPENSION REACTION TO ROAD

**Dealer:** WEB FORM DATA - CONCERN: DRIVEING HIGHWAY SPEEDS WHEN YOU HIT A WET PATCH OF TAR ON THE ROAD THE REAR END OF THE CAR WILL MOVE 6 INCHS OR SO DIAGNOSTICS: ALIGNMENT WE ADJUSTED ALL ANGLES TO FACORY SPECKS THE THRUST ANGLE WE ADJUSTED TO 0 PARTS REPLACED:: NONE TECH QUESTION: HAVE YOU RUN ACCROSS THIS BEFORE

**Ford Technician:** GREG, IF YOU ARE ADDRESSING A BUMP IN THE ROAD CAUSING A JUMP ORSHIFT FEELING IN THE VEHICLE IT MAY BE NORMAL. DEPENDING ON THE ROAD, SPEED, AND VEHICLE LOADING IT COULD BE CAUSED ON MOST VEHICLES. COMPARE TO A LIKE UNIT IN THE SAME OPERATING CONDITIONS. IF COMPARABLE THEN NOTHING FURTHER IS RECOMMENDED.

**Dealer:** TECHNICIAN REPLY: I DROVE A SAME LIKE CAR DOWN THE SAME ROAD AND IT HANDLED FINE BOTH CARS HAVE THE SAME TIRES ON THEM WHAT IS WEARD IS THE BACK

**Excerpts of CQIS Reports**

SLIDES OVER WHEN PASSING OVER THE PATCHES IN THE ROAD BUT THE FRONT WILL NOT MOVE NOTHING LOOSE IN THE REAR AND OFCOARSE THE THRUST ANGLE IS 0 WE EVEN SET TOE AT 0 TO SEE IF THAT MADE ANY DIFFERENCE BUT IT DIDNT I DONT KNOW WHAT TO SAY TO THE CUSTOMER MAYBE WE COULD HAVE THE FIELD SERVICE ENGINEER COME AND DRIVE IT ?????  THANKS

**Ford Technician:** GREG,   IF THE TWO VEHICLES ARE COMPARABLE WE WOULD NOT RECOMMEND ANY REPAIRS BE MADE AT THIS TIME. IF FURTHER ASSISTANCE IS NEEDED WE RECOMMEND CONTACTING THE HOTLINE BY PHONE USING THE CONTACT ID IN RED AT THE TOP OF THE PAGE TO DISCUSS THE CONCERN IN MORE DETAIL AND POSSIBLE FSE INVOLVEMENT.

DNL1 002603 - 605

---

**Date:** 04/11/2011   **MY:**   2009 FOCUS        **Mileage:** 20,401 MILES

23                **Symptom:** TIRE WEAR WARRANTY QUESTION

**Dealer:** CONCERN: CUSTOMER HAS A 2008 FOCUS WITH 20,401 MILES.CUSTOMERS REAR TIRES HAVE FLAT SPOTS WORN ALL OVER HIS REAR TIRES AND HE SAID THAT HE LOST CONTROL ON A WET ROAD WITH THE VEHICLE. AFTER RUNNING OASIS WE HAVE FOUND SSM 21399 THAT SPEAKS TO THIS VERY CONDITION. OUR QUESTION IS THAT THIS CUSTOMERS TIRES ARE ALREADY WORN BEYOND REPAIR AND ALIGNMENT WILL NOT HELP THEM. ARE THESE TIRES COVERED UNDER WARRANTY SINCE THIS SSM SPEAKS TO THIS PROBLEM. I UNDERSTAND THAT THE SSM STATES TO ALIGN AND CORRECT SPECS TO MINIMIZE TIRE WEAR BUT WHAT IF THE TIRES ARE WORN BEYOND REPAIR ALREADY. DIAGNOSTICS: ALIGNMENT  PARTS REPLACED:: NONE  TECH QUESTION: CAN WE PROVIDE TIRES UNDER WARRANTY TO THIS CUSTOMER

**Ford Technician:** NOLAN,  WE DO NOT HAVE AUTHORIZATION TO  APPROVE  A  WARRANTY  CLAIM  OR  TO  ANSWER WARRANTY QUESTIONS HERE AT THE TECHNICAL SERVICE HOTLINE. TO BETTER ASSIST YOU ON THIS WARRANTY RELATED QUESTION, THE TECHNICAL SERVICE HOTLINE RECOMMENDS THAT YOU REFER TO THE DEALERSHIP WARRANTY ADMINISTRATOR, THE WARRANTY AND POLICY

**Excerpts of CQIS Reports**

MANUAL, OR YOU MAY CONTACT THE WARRANTY ASSISTANCE CENTER DIRECTLY AT 1-800-423-8851

DNL1 000097 - 099

**Date:** 05/10/2011 **MY:** 2011 FOCUS **Mileage:** 1,521 MILES

24

**Symptom:** FEELS LOOSE AT TIMES

**Dealer:** CONCERN: CUSTOMER STATES THAT THE VEHICLE ACTS LIKE IT IS HYROPLANING WHEN HE IS ON A CERTAIN PARTS OF THE HIGHWAY WHEN TRAVELING TO WORK DIAGNOSTICS: WE PERFORMED A 4 WHEEL ALIGNMENT THE REAR TOE AND STEER AHEAD WAS OFF PARTS REPLACED:: NONE TECH QUESTION: I CHECKED OASIS AND TSBS NOTICED TSB FOR REAR CAMBER ISSUE IS THERE ANY OTHER ISSUES I SHOULD BE AWARE OF …

**Ford Technician:** RAY, THE CONCERN MAY BE RELATED TO THE TYPE OF ROAD SURFACE WHEN THE CONCERN OCCURS. GROOVED ROADS OR OTHER ROAD SURFACES MAY BE INDUCING THE FEELING THAT IS OCCURING. RECOMMEND COMPARING THE CONCERN WITH ANOTHER 2011 FOCUS. IF THE SAME OCCURS IT IS CHARACTERISTIC OF THE VEHICLE THAT THAT SPECIFIC TYPE OF ROAD SURFACE. IF IT DOESN'T COMPARE VERIFY THE REAR CAMBER AND TOE ARE SET AS CLOSE TO FACTORY SPECIFICATIONS AS POSSIBLE. INSPECT THE REAR TRAILER ARM FRONT BUSHING FOR BEING TOO SOFT AS THIS CAN CAUSE INSTABILITY TYPE SENSATIONS. TSB 11-01-01 2011 FOCUS STEERING DRIFT, STEERING WHEEL OFF CENTER OR REAR TIRE WEAR DO TO EXCESSIVE CAMBER ON THE RIGHT REAR WHEEL. FOLLOW THE SERVICE PROCEDURE TO CORRECT THIS CONDITION. SSM 21399 SOME 2005-2011 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR VEHCILE DRIFT CONDITION-TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES.

**Dealer:** TECHNICIAN REPLY: WE HAD THE VEHICLE BACK IN RE-CHECKED THE ALIGNMENT AND THE BUSHING DID NOT SEE ANY CONCERNS WITH THE BUSHING ALIGNMENT WAS A LITTLE WE REALIGNED IT CUSTOMER CALLED BACK IN SAYS IT STILL DOES IT. ANY OTHER SUGGESTIONS

**Excerpts of CQIS Reports**

**Ford Technician:** RAY, IF THIS HASN'T BEEN DUPLICATED AT THE DEALERSHIP, VERIFY MORE INFORMATION FROM THE CUSTOMER IN REGARD TO THE CONDITIONS PRESENT IN WHICH THIS CONCERN IS TYPICALLY NOTICED (TURNING, SPEED, WEATHER RELATED, SPECIFIC ROAD, ETC). COMPARE THIS TO A LIKE VEHICLE IN THE SAME OPERATING CONDITIONS. IF THE SAME OPERATION IS NOTICED, THIS IS RELATED TO THE OPERATING CONDITIONS OF THE VEHICLE AND THERE SHOULD BE NO VEHICLE REPAIRS. IF THIS OPERATION DOESN'T COMPARE TO A LIKE NO VEHICLE REPAIRS. IF THIS OPERATION DOESN'T COMPARE TO A LIKE VEHICLE, SWAP KNOWN GOOD WHEELS AND TIRES. IF THE CONCERN ISN'T NOTICED WITH KNOWN GOOD WHEELS AND TIRES, REPLACE THE TIRES. IF FURTHER ASSISTANCE IS NEEDED WITH THIS CONCERN, PLEASE CALL THE HOTLINE TO DISCUSS THIS CONCERN IN GREATER DETAIL. WHEN CALLING, PLEASE HAVE ALL OF THE DIAG PERFORMED, DETAILED RESULTS, AND PARTS REPLACED PREPARED FOR DISCUSSION

DNL1 001481 - 483

---

**Date:** 07/26/2011 **MY:** 2007 FOCUS **Mileage:** 77,686 MILES

25 **Symptom:** REAR END SWAYS

**Dealer:** WEB FORM DATA - CONCERN: AT HIGHWAY SPEEDS AND HITTING A BUMP OR A DIP IN THE ROAD THE ASS END OF THE CAR SWAYS KINDA LIKE ITS ON ICE AND AT TIMES ITS PRETTY SEVERE I HAVE FELT THIS ON SEVERAL OF THESE CARS BUT THIS ONE IS PRETTY BAD ESP ON HIGHWAY DIAGNOSTICS: VISUAL INSPECTION OF FRONT AND REAR SUSPENSION PARTS REPLACED::NONE TECH QUESTION: ANY KNOWNS

**Ford Technician:** ROGER, ENSURE THE TIRES ARE INFLATED TO THE DOOR PLACARD SPECIFICATIONS. ALSO ENSURE THAT THEY ARE FACTORY SIZE WHEELS AND TIRES. INSPECT THE REAR STRUTS FOR ANY LEAKS OR DEFECTS AND REPLACE AS NEEDED. ALSO ENSURE REAR TOE IS WITHIN SPECIFICATIONS

DNL1 007877 - 879

---

**Excerpts of CQIS Reports**

**Date:** 09/16/2011 **MY:** 2009 FOCUS **Mileage:** 16,961 MILES

26 **Symptom:** TREAD PERFORMANCE

**Dealer:** CUSTOMER HAS A CONCERN WITH THE VEHICLE WANDERING COMPLETED FEA. ALL FOUR TIRES WEARING ON INSIDE EDGE, WILL NEED TO REPLACE ALL 4 TIRES

**Ford Technician:** CONTACT ID: 104758898 Denied to replace all four tires. NOTE: AS PER THE FORD TIRE REFERENCE GUIDE: NORMAL TIRE WEAR NORMAL TIRE WEAR IS DEFINED AS EVEN WEAR AROUND AND ACROSS THE TREAD. BECAUSE THERE ARE MANY FACTORS (E.G.., DRIVING STYLE, ROAD SURFACES, TYPE OF VEHICLE, TYPE OF TIRE ETC.) THAT CAN AFFECT TIRE WEAR, THERE IS NO ABSOLUTE MILEAGE EXCEPTION FOR NORMAL WEAR CONDITIONS. A TIRE IS CONSIDERED WORN OUT WHEN THE TIRE THREAD HAS WORN TO THE LEVEL OF THE TREAD –WEAR INDICATORS . FORD MOTOR COMPANY TIRE WARRANTY DOES NOT COVER NORMAL TIRE WEAR. Thanks, Jerry

DNL1 008552 - 554

---

**Date:** 10/17/2011 **MY:** 2009 FOCUS **Mileage:** 36,641 MILES

27 **Symptom:** PULLS LEFT

**Dealer:** CONCERN:VEHICLE HAD A PULL TO THE LEFT. DIAGNOSTICS: PERFORMED 4 WHEEL ALIGNMENT. AND ROADTESTED. STILL HAD A DRIFT TO LEFT. TIRES WERE VERY CUPPED. CUST REPLACED TIRES. STILL HAS DRIFT TO LEFT. WHEN UNDER HARD ACCEL. IT GOES STRAIGHT. AT CRUISE IT DRIFTS LEFT. THE FRONT CAMBER READINGS ARE L/F -0.7 R/F -0.5 THE CASTER IS L/F 2.3 R/F 2.6 TOE IN IS -0.01 REAR CAMBER L/R -1.2. R/R -0.8 REAR TOE IS 0.35 PARTS REPLACED:NONE TECH QUESTION:ANY KNOWN FIXES?

**Ford Technician:** DENNIS, FIRST ENSURE THAT THE METHOD FOR DETERMINING THE PULL IS NOT REMOVING HANDS FROM THE STEERING WHEEL AS THIS IS NOT A VALID TEST FOR DETERMINING PULL/DRIFT. IF THIS IS BEING DONE AND THE CONCERN ONLY HAPPENS WHEN HANDS ARE REMOVED FROM THE WHEEL, SUSPECT THAT THE VEHICLE IS OPERATING WITHIN DESIGN TOLERANCES AND NO REPAIR WOULD BE

**Excerpts of CQIS Reports**

INDICATED. PULLS CAN OCCUR FROM IMPROPER TIRE PRESSURES, INCORRECT ALIGNMENT ANGLES, ENVIRONMENTAL FACTORS(ROAD CROWN), BRAKE BIAS, AND STEERING BIAS. IF TIRE PRESSURES ARE CORRECT, RECOMMEND TO ROAD TEST (ON A ROAD WITH MINIMAL ROAD CROWN) THE VEHICLE AND NOTE IF THE PULL IS RESOLVED BY TURNING OFF THE ENGINE. IF IT IS SUSPECT THAT STEERING GEAR BIAS IS CAUSING THE CONCERN. IF NOT, INSPECT THE VEHICLE ON A LIFT AND NOTE IF THE WHEELS SPIN FREELY AND NOTING ANY FRONT BINDING. REPAIR AS NECESSARY AND RETEST IF NOTED. IF NO BIND IS NOTED, RECOMMEND TO MEASURE FOR CORRECT RIDE HEIGHT WITH A FULL FUEL TANK AS A INCORRECT RIDE HEIGHT COULD SKEW ALIGNMENT READINGS AND POSSIBLY INDUCE A PULL. IF ALL ARE CORRECT, AND THE PULL REMAINS, CASTER CAN BE DECREASED ON THE RIGHT AND IF NECESSARY INCREASED ON THE LEFT TO LESSEN THE LEFT PULL BIAS.

DNL1 004897 - 899

---

**Date:** 10/25/2011 **MY:** 2011 FOCUS **Mileage:** 10,067 MILES

28 **Symptom:** STEERING DRIFT

**Dealer:** WEB FORM DATA - CONCERN:CUST. CONCERN OF CAR WANDERS DIAGNOSTICS: ROADTESTED AND VERIFIED STEERING SEEMS VERY TOUCHY. CAR WANDERS ON ROAD. SET TIRE PSI AND VISUAL INSPECTION. REMOVED TIERODS AND CHECKE BALLJOINTS AND STRUT PLATES. PARTS REPLACED:NONE TECH QUESTION:THIS CAR SEEMS TO HAVE A VERY TOUCHY STEERING. IF A SMALL CORECTION IS MADE ITS LIKE YOU HAVE TO KEEP STEERING THE CAR FIRST ONE WAY THEN THE NEXT. ALMOST FEELS LIKE A TIGHT BALLJOINT BUT CANNOT VERIFY THAT. ALSO DONT SEEM TO RETURN STEERING NORMALLY. THE FASTER YOU GO THE WORSE IT GETS. ALSO GET TOUCHIER THE FASTER YOU GO. NO EVIDENCE OF ABNORMAL TIRE WEAR. ANY AID IN DIAG WOULD BE HELPFUL AS I CANNOT SEEM TO FIND A REASON FOR THIS. ALSO WAS WONDERING IF THERE IS ANY UPDATED ALIGNMENT SETTINGS FROM THE ONLINE MANUAL?

**Ford Technician:** CHARLES, THIS IS USUALLY DUE TO THE REAR WHEEL ALIGNMENT. REFER TO TSB 11-01-01 TO

**Excerpts of CQIS Reports**

CORRECT THIS CONDITION. TSB 11-01-01 2011 FOCUS STEERING DRIFT, STEERING WHEEL OFF CENTER OR REAR TIRE WEAR DO TO EXCESSIVE CAMBER ON THE RIGHT REAR WHEEL. FOLLOW THE SERVICE PROCEDURE TO CORRECT THIS CONDITION

DNL1 002615 - 617

---

**Date:** 02/23/2012 **MY:** 2007 FOCUS **Mileage:** 55,331 MILES

29 **Symptom:** VEHICLE FISH TAILS

**Dealer:** WEB FORM DATA - CONCERN:VEHICLE SKATES AT HIGHWAY SPEEDS AND IN TOWN AT 35MPH IF YOU HIT A BUMP DIAGNOSTICS: CHECKED OASIS TEST DROVE AND CHECKED SHOCKS PARTS REPLACED:NONE TECH QUESTION:IF YOU HIT A MANHOLE COVER WHEN DRIVING THE REAR OF CAR SEAMES TO SKATE IN THE REAR ANY KNOWN PROBLEMS ?

**Ford Technician:** BRIAN, VERIFY THAT THE TIRES ARE PROPERLY INFLATED AND EVENLY WORN. REFER TO THE DOOR JAMB LABEL. REPLACE TIRES AS NEEDED. ROTATED THE TIRES AND VERIFY IF THE ISSUE CHANGES. IF THE ISSUE CHANGES OR GOES AWAY, REPLACE THE TIRES AS NEEDED AND RE-EVALUATE. CHECK THE ALIGNMENT OF THE VEHICLE. IF ANY ANGLES ARE OUT OF SPECIFICATION, VERIFY IF ANY DAMAGED SUSPENSION COMPONENTS ARE PRESENT. ADJUST THE ANGLES AS NEEDED

DNL4 000902 -904

---

**Date:** 02/23/2012 **MY:** 2011 FOCUS **Mileage:** 16,055 MILES

30 **Symptom:** LOOSENESS AND DRIFT CONCERN

**Dealer:** WEB FORM DATA - CONCERN:CUSTOMER FEELS LOOSENESS - SWAYS WHILE DRIVING. DIAGNOSTICS: REPLACED REAR CONTROL ARMS - BUSHING WORN AND MAKING NOISE. TIRES WERE CUPPED AND WE GOODWILL 3 TIRES AND CUSTOMER PAID FOR ONE TIRE. TEST DROVE LIKE VEHICLE AND THEY BOTH FEEL THE SAME. PARTS REPLACED:REAR SUSP. ARM. TECH QUESTION:HAVE YOU

**Excerpts of CQIS Reports**

HAD ANY OTHER CALLS ON THIS CONCERN WITH THE 2011 FOCUS AND ANY OTHER TYPE OF REPAIR? EVERY THING WE HAVE CHECKED IS NORMAL.

**Ford Technician:** ROGER, AS YOU HAVE TEST DRIVEN A LIKE VEHICLE AND IT OPERATES THE SAME AS THE CUSTOMER'S VEHICLE, THIS INDICATES THAT THIS IS LIKELY A NORMAL CHARACTERISTIC OF THE VEHICLE AND NO FURTHER DIAGNOSIS SHOULD BE PERFORMED. CHECK THE ALIGNMENT OF THE VEHICLE AS THE TOE AND CAMBER MAY CAUSE THIS DRIFT CONDITION. REFER TO SSM 21399 AND TSB 11-1-1 FOR INFORMATION REGARDING THE ALIGNMENT OF THE VEHICLE AND THE DRIFT CONDITION.-----TSB 11-01-01 2011 FOCUS STEERING DRIFT, STEERING WHEEL OFF CENTER OR REAR TIRE WEAR DO TO EXCESSIVE CAMBER ON THE RIGHT REAR WHEEL. FOLLOW THE SERVICE PROCEDURE TO CORRECT THIS CONDITION. SSM 21399 SOME 2005-2011 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR VEHCILE DRIFT CONDITION- TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES.

DNL4 000893 - 895

---

**Date:** 01/30/2013 **MY:** 2008 FOCUS **Mileage:** 53,603 MILES

31 **Symptom:** PREMATURE TIRE WEAR

**Dealer:** WEB FORM DATA - CONCERN: CUSTOMER CONCERN OF WOBBLE AT 40MPH PLUS AND TIRES WEARING OUT TO CUICK DIAGNOSTICS: CHECKED TIRE PRESSURE, WERE LOW IN FRONT APROX 5 TO 8 LBS AND 4 LBS LOW IN REARS ALL SUSPENSION COMPONETS ARE FINE. CHECKED VEHICLE ON FRAME RACK AND ALL MESURMENTS WERE IN SPEC. CHECKED ALIGNMENT PRE SSM 21399 AND AS PRE WSM SECTION 204-04 VEHICLE IS IN ALIGNMENT. THE VEHICLE TIRES WERE REPLACED ON 7-7-2010 AT 26970 MILES WITH PIRELLI P6 TIRES THAT WERE OE TIRES, THE REPLACEMENT TIRES ARE NOW AT THE WEAR BARS AND THE CUSTOMER DOES NOT UNDERSTANT WHY THEY ARE WORE OUT IN 26633 MILES. PARTS REPLACED: NONE TECH QUESTION: IS THERE ANY OTHER KNOWN CONCERNS WITH THIS VEHICLE LINE THAT WOULD CAUSE THE TIRES TO WEAR THIS SOON

**Excerpts of CQIS Reports**

**Ford Technician:** TOM, OPERATING THE VEHICLE WITH LOW TIRE PRESSURE WILL CAUSE ACCELERATED WEAR ON THE TIRES, AND CAN RESULT IN POOR VEHICLE HANDLING. SINCE THE ALIGNMENT WAS VERIFIED TO BE IN SPECIFICATION, SUSPECT THAT THE LOW TIRE PRESSURE OR CUSTOMER DRIVING HABITS MAY HAVE CAUSED THE TIRES TO WEAR OUT PREMATURELY

DNL4 000487 - 489

---

# Exhibit T

**Excerpts of MORS Reports**

**Date:** 01/21/2008 **MY:** 2007 **Mileage:** 24000

1 **Symptom:** 306800 TIRES/WHEELS VIBRATION

**Customer:** VEH IS AT THE DLR-THEY WERE GOING TO TRADE THE VEH IN -THE VEH WOULDN'T HOLD THE ROAD-THE REAR END WAS VIBRATING-THE VEH FELT LIKE THE BACK END WAS BOUNCING-THE VEH WOULD NOT STAY ON THE ROAD DUE TO CONCERNS WITH THE REAR END-THE REAR END WOULD SLIDE OUT FROM UNDERNEATH THEM-THE DLR SAYS THE REAR TIRES HAVE FLAT SPOTS IN THEM-TRYING TO GET TIRES REPLACED-CUST WANTS FORD TO REPLACE THE TIRES

**Response:** I HAVE REVIEWED IF ANY AVAILABLE COVERAGES MAY ASSIST IN YOUR REPAIR REQUEST. THERE IS NO ACTIVE ESP TO COVER THE PART OR THE REPAIR AND THE VEHICLE IS OUTSIDE OF ANY APPLICABLE WARRANTY.

DNL1 025445

---

**Date:** 04/16/2008 **MY:** 2005 **Mileage:** 41000

2 **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** HE HAS PUT FOUR NEW TIRE ON HIS 2005 FORD FOCUS-LAST WINTER, THE VEH'S REAR END WOULD SLIDE FROM SIDE TO SIDE WHILE DRIVING ON SNOW-COVERED ROADS-HE TOOK THE VEH TO A MECHANIC AND HE FOUND THAT THE NEW TIRES WERE SCALLOPED AND THE REAR TIRES WERE WORN OUT-HE HAD THE VEH'S ALIGNMENT CHECKED TWICE AT A FIREST ONE TIRE DLR WHO TOLD HIM THAT THE FORD FOCUS HAD PROBLEMS WITH THE REAR TIRES WEARING OUT RAPIDLY-HE CONTACTED TWO FORD DLR'S WHO SAID THAT THEY DON'T KNOW ANYTHING ABOUT THIS PROBLEM

**Response:** WE RECOMMEND YOUR SERVICE/REPAIR BE PERFORMED BY A FORD/LINCOLN MERCURY DEALERSHIP.! HAVE DOCUMENTED YOUR COMMENTS AND I WILL FORWARD A COPY TO YOUR SERVICING DEALERSHIP OF YOUR CHOICE. PLEASE CONTACT THE DEALERSHIP TO SCHEDULE A SERVICE APPOINTMENT. PLEASE BE ADVISED A DIAGNOSTIC FEE MAY BE CHARGED

**Excerpts of MORS Reports**

DNL1 020939

---

**Date:** 05/29/2008 **MY:** 2007 **Mileage:** 25000

3 **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** ANY TIME GETTING ON THE ROAD AND ITS WET OR DRY THE VEH IS ALL OVER THE ROAD- THE VEH BOUNCES YOU FROM LEFT TO RIGHT IN THE REAR END ONLY BUT THE STEERING WILL BE STRAIGHT -LOOKED AT THE TIRES AND THE REAR END WAS VERY WARN BROUGHT TO DLR WEDNESDAY - DLR SAID THEY ARE TALKING TO FORD WARRANTY TRYING TO GET EVERYTHING SQUARED AWAY - VEH IS AT THE DLR - CUST IS TRYING TO DO IT ON HIS OWN TO MAKE THE PROCESS FASTER -CUST SEEKING FINANCIAL ASSISTANCE

**Response:** BEFORE WE CAN MAKE A DECISION REGARDING ANY FORD WARRANTY OR ESP COVERAGE IT MUST BE REVIEWED BY A FORD/LINCOLN MERCURY DEALERSHIP. THEY WILL NEED TO INSPECT THE VEHICLE AND DETERMINE WHAT IS WRONG WITH IT BEFORE A DECISION ON WARRANTY OR ESP COVERAGE IS MADE. ANY REPAIRS OR SERVICES NOT COMPLETED AT A FORD/LINCOLN MERCURY DEALERSHIP WOULD BE THE RESPONSIBILITY OF THE CUSTOMER… ADVISED CUST THAT SINCE THE DLR IS CURRENTLY IN THE PROCESS OF RUNNING A CLAIM THROUGH FMC WE CANNOT DO ANYTHING UNTIL THERE IS A RESOLUTION OF THAT CLAIM - ADVISED CUST THAT IF THAT CLAIM IS DENIED HE CAN CALL US BACK AND WE CAN LOOK INTO IT FURTHER ON OUR END BUT AS OF RIGHT NOW WE CANNOT DO ANYTHING

DNL1022477

---

**Date:** 07/07/2008 **MY:** 2007 **Mileage:** 29000

4 **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** 1. REAR OF VEH SLIDES AROUND=HAPPENS WHEN ROAD IS WET=ST ART ED ABOUT 6 MOS AG02. ROARING NOISE FROM REAR=HAPPENS AROUND 50-60 MPH=STARTED ABOUT 6 MOS AG03. GROOVES IN FRONT ROTORS=CUST TOOK VEH TO DLR & AN INDEP GARAGE FOR ABOVE CONCERNS=MECH SAID

**Excerpts of MORS Reports**

REAR STRUTS ARE BAD & REAR WHEELS ARE BOUNCING AROUND CAUSING FLAT SPOTS=CUST FEELS HE ONLY NEEDS 2 TIRES, NOT 4=CUST IS SEEKING VEH TO BE REPAIRED UNDER WARR

**Response:** ROTORS ARE WEARING NORMALLY=NEED NEW TIRES=NEED 4-WHEEL ALIGNMENT=$600 REPAIR ESTIMATE CRC ADVISED: WARRANTY COVERAGE IS LIMITED TO DEFECTS OCCURRING UNDER NORMAL USE OF THE VEHICLE DURING THE WARRANTY COVERAGE PERIOD; AND CAN BE VOIDED IF THE VEHICLE IS ABUSED OR IMPROPERLY MAINTAINED. IT HAS BEEN DETERMINED BY YOUR DEALERSHIP THAT THIS FAILURE DID NOT OCCUR DUE TO A WARRANTABLE FACTORY DEFECT…ADVISED CUST THAT DLR FOUND THAT TIRE CONCERNS ARE PARTIALLY DUE TO LACK OF ROTATIONS & BALANCING=CUST SAYS HE'S GOING TO BUY 2 NEW TIRES BUT IF IT HAPPENS AGAIN HE'S GOING TO RETURN VEH TO DLR***OBC TO DLR***=SPOKE TO SA KEVIN=UNEVEN WEAR OF REAR TIRES PARTIALLY DUE TO LACK OF ROTATIONS & BALANCING=THIS SEEMS COMMON FOR THESE PIRELLl TIRES=SOME GROOVES ON ROTORS ARE NORMAL=BRAKES ARE NOT PULSATING

DNL1 022261

---

**Date:** 10/02/2008 **MY:** 2005 **Mileage:** 25841

5

**Symptom:** 306600 TIRES/WHEELS TIRE FAILURE

**Customer:** VEH IS HAVING ISUE WITH THE TIRES SECOND SET OF TIRES SINCE PURCHASE NEEDS NEW TIRES ON THE BACK OF THE VEH **WHEN CUST HITS A BUMP THE REAR END ON THE VEH SHAKES THE VEH IS WORN ON THE TREAD ON THE VEH **INFORMATION ABOUT THE ANY WARRANTY ***SEEKING TO KNOW IF THERE ARE ANY SAFETY RECALLS FOR THE VEH

**Response:** WE RECOMMEND YOUR SERVICE/REPAIR BE PERFORMED BY A FORD/LINCOLN MERCURY DEALERSHIP. I HAVE DOCUMENTED YOUR COMMENTS AND I WILL FORWARD A COPY TO YOUR SERVICING DEALERSHIP OF YOUR CHOICE. PLEASE CONTACT THE DEALERSHIP TO SCHEDULE A SERVICE APPOINTMENT. PLEASE BE ADVISED A DIAGNOSTIC FEE MAY BE CHARGED.

**Excerpts of MORS Reports**

DNL1 021586

---

**Date:** 01/13/2009 **MY:** 2005 **Mileage:** 550000

6 **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** AT 35,000 MILES THE ORIGINAL TIRES BECAME BALD -FIRST REPORT WENT DEAF -RESPONSE WAS "THERE ARE NO REPORTED PROBLEMS WITH PREMATURE TIRE WEAR ON THE FOCUS"-DLRSHP DOES NOT SHARE YOUR OPINION ON THIS MATTER-HAD THE WHEELS ALLIGNED AND PURCHASED NEW TIRES AT THE DLRSHP-HAVE 17,000 MILES ON THEM AND THEY ARE WORN AS WELL-HAVE NO TRACTION IN SNOW-FRONT IS BEGINNING TO GROAN AT SPEEDS OF 20-30 MPH-DLRSHP HAS WITNESSED THE TIRE WEAR CONSISTANTLY - WANT TO KNOW IF FORD WILL LOOK INTO THIS

**Response:** ADVISED CUST WE WILL NOT BE MEETING THE REQUEST FOR REIMBURSEMENT FOR THE TIRES- THE VEH IS OUT OF WARRANTY ALSO THE TIRE WARRANTY EXPIRED EITHER 12/12 OR 12/18- THEY ARE NOT COVERED FOR THE FULL 3/36

DNL1 021308-021309

---

**Date:** 03/26/2009 **MY:** 2008 **Mileage:** 21000

7 **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** CUST ADV PASSENGER SIDE REAR TIRE WEARING VEH BADLY=TOOK VEH TO DL R= DLR REPLACED ALL 4TIRES= DLR ALIGNED TIRES = RIGHT REAR TIRE WORE OUT AGAIN=TOOK VEH BACK TO DLR= ALIGNED TIRES = PUT FRONT ON BACK = PUT 2 NEW TIRES ON FRONT= TOTAL OF 6 NEW TIRES PUT ON VEH= RIGHT REAR STILL WEARING OUT= TIRE WEAR OUT ABOUT 4000 MILES=3/24/09 HAD TO BUY USED TIRE FOR RIGHT SIDE IN ORDER TO PASS STATE INSPECTION== TOOK VEH TO ANOTHER DLR FOR 2ND OPINION = DLR ADV SOMETHING COULD BE BENT = DLR DID NOT HAVE TIME TO DO FULL DIAG= CUST SEEKING REPAIR… CUSTOMER STATES CK REAR TIRES WEARING… REAR OF VEHICLE SLIDES AROUND IN ANY RAIN OR SNOW WEATHER

**Excerpts of MORS Reports**

**Response:** 0BC TO DLR, SPOKE TO LYNN S/M, WHO STATED THAT THE VEH HAS BEEN IN 3 TIMES PRIOR TO THIS AND EACH TIME THE TIRES WERE REPLACED AND THERE WAS AN ALIGNMENT VEH CAME IN AT 6900 MILES,7400 MILES AND 11 ,000 MILES LAST TIME WITH THE SAME COMPLAINT TIRES WEARING IN THE REAR. THERE HAS ALWAYS BEEN AN EVEN WEAR AND THAT WARRANTY WILL NOT COVER. REP ADVISED THAT REP WILL HAVE CUST SET UP AN APPOINTMENT AND REP SUGGESTED TECH HOTLINE BE INVOLVED AFTER INSPECTION AND THEN IF THE THERE ARE NO RECOMMENDS OR NOT A RECOMMENDATION THAT HAS ALREADY BEEN DONE BEFORE THEN REP WILL INITIATE A TAR AND HAVE A FSE COME OUT TO INSPECT VEH.-S/M AGREED… 0BC TO DLR, SPOKE CHRISTINE S/A, WHO STATED THAT THE CUST PURCHASED 2 NEW TIRES AND PAID FOR AN ALIGNMENT VEH IS REPAIRED AND BACK IN CUST POSSESSION… OBC TO DLR ==SPOKE TO LYNN S/M==THE DLR PAID FOR 2 TIRES AND THE CUST PAID FOR 2 TIRES == THE VEH IS NOT CURRENTLY AT THE DLR… DEALER REPLACED TWO TIRES ON THE VEHICLE AT THIS TIME ALONG WITH AN ALIGHMENT. DEALER IS ASKING FOR ASSISTANCE FOR THE REPAIR. DEALER USED CLP FUNDS LAST MONTH FOR SIMILAR REPAIR… ASSISTING DLR WITH THE COST OF THE REPAIR OF THE VEH IN THE AMOUNT OF 273.00

DNL1 023952-023959

---

**Date:** 07/21/2009 **MY:** 2007 **Mileage:** 63400

8

**Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** THE BACK TIRES ON THE VEH WEAR OUT WITHIN 10,000-15,000 EVEN WITH ROTATION-HAS ABOUT 60,000 MILES AND IS NOW IN THE PROCESS OF PUTIING ON A 4TH SET OF TIRES-CUST WAS TOLD BY DLR THAT HE COULD ORDER A NEW SET OF UPPER CONTROL ARMS BUT THEY WERE UNSURE IF THAT WOULD FIX THE PROBLEM-DLRSHP DOESN'T SEEM TO BE ABLE TO FIX IT AND CUSTIS SEEKING ASSISTANCE

**Response:** 0BC TO DLR-SPOKE WITH S/M SCOTI-CUST WAS IN THE OTHER DAY-HAS MAJOR INSIDE TIRE WEAR-CUST JUST PUT 4TH SET OF TIRES ON-FOCUS ARE KNOWN ABOUT THE TIRE WEAR THE IS A TSB FOR THE TO REPLACE THE CONTROL

**Excerpts of MORS Reports**

ARMS-DLRSHP GAVE AN ESTIMATE OF $775 (CUST PAY)-CUST BOUGHT THE VEH AT THIS DLRSHP BUT HAS NEVER BEEN BACK-CCS ADV. S/M THAT I WILL RESE ARCH FURTHER AND POSSIBLY PROVIDE NO MORE THAN 40%-WILL NOT TAKE CARE OF WET/SNOWY ROAD DEAL… DENNIS--THE CUST HAD BEEN LOOKING UP THE CONCERN ON THE INTERNET AND WAS ASKING ABOUT TSB'S AND SSM'S. WE TOLD HIM WE COULD TRY THEM, BUT WE DIDNT THINK IT WOULD HELP MUCH IF AT ALL. HE HAD ALSO CALLED ME BACK AND ASKED ABOUT A SSM TO ADJUST THE REAR TOE. ALSO TOLD HIM WE COULD TRY IT, BUT IT WOULD ONLY CHANGE IT 1/20TH OF A DEGREE--PROBABLY WOULDNT HELP AT ALL.--THE VEHICLE IS CURRENTLY WITHIN SPECS AND ANY ADJUSTMENTS WOULD PROBABLY TAKE IT OUT OF RECOMMEND SPECS… THE VEH IS WITHIN FORD SPECIFICATIONS-CCS ADV. THAT THERE IS NOTHING FURTHER WE CAN DO-CCS CLOSING CASE, NO FURTHER ACTION REQUIRED

DNL1 022772-022773

---

**Date:** 08/11/2009   **MY:** 2008   **Mileage:** 21000

9   **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** FORD FOCUS 2008 -21K MILES ON VEH-BROUGHT TO FORD DLR- TIRES ARE WEARING DOWN QUICKLY- 80K MILE TIRE, ONLY 11K MILES ON VEH, CUSTOMER FEELS TIRES ARE WEARING AWAY TO FAST.- DLR SAYS IT CAN BE AN ALIGNMENT PROBLEM- HYDROPLAINS WHEN HE DRIVE IN WET WEATHER.- CUSTOMER FEELS TIRES ARE POORLY MADE

**Response:** THIS IS A DLR CASE AND TO BE HANDLED AT THE DLR LEVEL WITH NO CCS INVOLVEMENT== DLR NEEDS TO UPDATE CASE AND ADVISED THAT CUST HAS BEEN GIVEN RESOLUTION AND CLOSE CASE. = = THANKS

DNL1 023681-023682

---

**Date:** 01/28/2010   **MY:** 2008   **Mileage:** 400000

10   **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:**   **EXECUTIVE   OFFICES   2/2/10   ****EXECUTIVE

**Excerpts of MORS Reports**

REFERRAL CUSTOMER SAYS HIS VEHICLE HAS ALIGNMENT ISSUES. THE CUSTOMER SAYS THE TIRES ON HIS VEHICLE WEAR EXCESSIVELY. THE CUSTOMER SAYS AT APPROXIMATELY 10,000 MILES, ONE TIRE HAD A FLAT AND HAD TO BE PATCHED. THE CUSTOMER SAYS AT APPROXIMATELY 24,000 MILES, THE VEHICLE ALSO REQUIRED LUBRICATION FOR BRACKETS AND CABLES BECAUSE OF A SQUEAKING NOISE FROM THE REAR OF THE VEHICLE. THE CUSTOMER SAYS THE VEHICLE WAS ALSO INVOLVED IN AN ACCIDENT IN WHICH THE VEHICLE HYDROPLANED AND WENT OFF THE ROAD. THIS RESULTED IN APPROXIMATELY $3400 IN DAMAGES. THE CUSTOMER SAYS ONE CONCERN IS THAT THE TIRE IS COMPLETELY BALD. THE CUSTOMER IS SEEKING TO HAVE THE VEHICLE REPLACED.

**Response:** **EL CONTACTED THE CUSTOMER AND ADVISED HIM OUR FIRST OBLIGATION IS TO REPAIR THE VEHICLE, NOT REPLACE IT. EL ARRANGED FOR THE CUSTOMER TO TAKE THE VEHICLE TO THE DEALERSHIP AND ALSO ARRANGED FOR A LOANER. THE CUSTOMER TOOK THE VEHICLE TO THE DEALERSHIP ON 2/2…THE DEALERSHIP CONTACTED EL AND STATED THE VEHICLE CURRENTLY NEEDS AN ALIGNMENT. THE DEALERSHIP ALSO STATED THAT THE CUSTOMER RECENTLY ROTATED THE TIRES AND CHANGED THE OIL. THE DEALERSHIP SAYS THE LEFT REAR TIRE IS BADLY CUPPED AND SUGGESTED THAT THE CUSTOMER REPLACE THE TIRE. THE DEALERSHIP SAYS THE WILL ALIGN THE VEHICLE AT NO COST TO THE CUSTOMER AS A GESTURE OF GOODWILL…DEALERSHIP TO FOLLOW-UP WITH EL UPON COMPLETION OF REPAIRS…EXECUTIVE OFFICES 2/4/2010****CUSTOMER CONTACTED EL AND STATED HE RETRIEVED HIS VEHICLE FROM THE DEALERSHIP. THE CUSTOMER SAYS THE VEHICLE IS NOW DRIVING WORSE THAN IT WAS BEFORE. **EL ADVISED THE CUSTOMER TO HAVE THE TIRE REPLACED AS THEDEALERSHIP SUGGESTED. **THE CUSTOMER SAYS HE NO LONGER WANTS THE VEHICLE AND WANTS TO PURSUE LEMON LAW. THE CUSTOMER REQUESTED AN ADDRESS TO MAIL A LETTER REGARDING LEMON LAW. EL PROVIDED ADDRESS. **NO FURTHER ACTION REQUIRED FROM EL AT THIS TIME…EXECUTIVE OFFICES 2/5/2010****EL IS CLOSING THE CASE AT THIS TIME. PLEASE SEE THE COMMENTS FROM PREVIOUS ACTION. **NO FURTHER ACTION REQUIRED.

**Excerpts of MORS Reports**

DNL1 024035-024036

---

**Date:** 08/13/2010 **MY:** 2007 **Mileage:** 66984

11 **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** VEH HAS PROBLEM WITH TIRES WEARING OUT-TIRES GET THE MOST WEAR WHEN THEY ARE ON THE BACK-ROTATING THE TIRE AND END UP BUYING FOUR NEW TIRES EVERY 18 MONTHS- VEH HANDLES REALLY BAD IN THE SNOW AND SEEMED GOOD ONLY FOR THE FIRST YEAR- BROUGHT THE VEH BACK TO THE DLR AND WAS TOLD THAT THE ALIGNMENT WAS GOOD BUT THEY ALIGNED THE REAR CLOSE TO ZERO- HAVE SPOKEN TO OTHER FORD FOCUS OWNERS AND WAS TOLD THAT THEY ARE HAVING THE SAME PROBLEM- GAS MILEAGE IS DOWN TO 22 MPH COMPARED TO 28- WANT TO KNOW IF FORD KNOW THE PROBLEM AND IF THERE IS ANY THAT HE CAN DO

**Response:** CUST BROUGHT THE VEH LAST JUNE- DLR PUT CONTROL ARMS ON THE VEH- VEH WAS ALREADY REPAIRED- WILL SENT CUST OF ABOVE

DNL1 022153

---

**Date:** 12/14/2010 **MY:** 2008 **Mileage:** 42000

12 **Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** VEH HAS RETURNED TO THE DLRSHP 2 TIMES TO HAVE THE REAR TIRES REPLACED--ALSO HAD THE VEH TO THE DLRSHP 2 TIMES FOR VIBRATION ISSUES--3RD VISIT WAS TO REPLACED THE TIRES--WAS TOLD THAT THEY WOULD NEED TO PURCHASE THE TIRES--HE SPOKE WITH THE S/M AND WAS TOLD THAT THIS IS A KNOWN PROBLEM… IBC FROM CUST WHO ADVISED THAT THE TIRES START WEARING ON THE REAR DRIVER SIDE AND THEN ON THE REAR PASS SIDE BUT THAT IT WEARS FLAT. WHEN THE DRIVER SIDE WEARS TO ABOUT 50% THE PASS SIDE STARTS AND THEN IT LEVELS OFF. CUST STATED THAT HE IS ONLY GETTING ABOUT 8-10K MILES ON THE REAR TIRES AND HE HAS TAKEN THE VEH TO 2 OTHER DLRS AS WELL AS 2 INDEP AND THEY HAVE ALL SAID THAT IT IS AN ALIGNMENT ISSUE BUT THAT THE ALIGNMENT

**Excerpts of MORS Reports**

IS PERFECT. CUST STATES THAT HE CANNOT DRIVE THE VEH IN ICE OR RAIN BECAUSE THE REAR END OF THE VEH FEELS AS IF IT IS BEING DRUG ACROSS THE ROAD INSTEAD OF ROLLING ON IT.

**Response:** OBC TO S/M TIMOTHY JONES--LAST VISIT WAS 8/3/2010 FOR ALIGNMENT--THEY PUT MULTIPLE TIRES ON THE VEH--THIS IS COMMON PROBLEM… THAT CAR HAS BEEN IN MUTILPE TIMES FOR TIRE AND VIBRATION ISSUES.WE HAVE REPLACED THE REAR TIRES AT LEAST 2 TIMES.PREFORMED TSBS THAT ARE OUT ON THIS CAR. THIS IS NOT THE ONLY 2008 FOCUS THAT HAS THIS ISSUE. I HAVE OTHER CUSTOMER WITH THE SAME PROBLEM. TIRES ARE NOT LASTING 16K TO 20K MILES.THIS CAR HAS BEEN IN THE SPECS WHEN ALIGNMENT HAS BEEN CHECKED… OBC TO SM TIM…WHO STATED THAT THEY FOUND NO PROBLEMS W\ THE VEH. THE ALIGNMENT WAS PERFECT… ADVISED THAT THE REASON NOTHING HAS BEEN DONE BEFORE NOW IS THAT NOBODY CAN FIND ANYTHING WRONG W\ THE VEH AND THEREFORE NO REPAIRS CAN BE MADE.

DNL1 023927-023930

---

**Date:** 01/27/2011 **MY:** 2009 **Mileage:** 35000

13

**Symptom:** 306600 TIRES/WHEELS TIRE FAILURE

**Customer:** SINCE PURCHASE WHEN GOES FROM A DEAD STOP WHEN WET BACK TIRES SPIN UNDER NORMAL ACCELERATION- THOUGHT MAYBE IT WAS THE ROADS OR DESIGN OF CAR- TIRES THAT ARE EQUIPPED ON THE CAR ARE 205/50/16- TIRES ARE NO SAFETY RATED FOR THE VEH- THESE TIRES ARE NOT SAFE FOR THE VEH- THEY DO NOT WORK PROPERLY- THE TIRES THAT ARE SUPPOSED TO BE ON THE 195/60/16- WANTS TO BE SAFE ON THE ROAD- NEW TIRES WOULD SET CUST BACK $500- DLR AGREES WITH CUST AND SAYS THEY DON'T SELL THE TIRES WITH THIS VEH- DOESN'T WANT TO GET IN AN ACCIDENTDLR RECOMMENDED CUST CALL FORD- TIRES ON VEH CAN CAUSE-S/A: BARRE- LOWER PROFILES ARE GOOD FOR THE VEH- DLR SAYS THAT'S WHAT THE INVOICE SAYS- FORD IS GOING TO STAND BEHIND THIS IS THE RIGHT TIRE AND THERE IS NOTHING THEY WILL DO

**Excerpts of MORS Reports**

**Response:** OBC TO DLR***- SPOKE T0 S/A: BARRE- ARE THE TIRES THE RIGHT ONES- VERIFIED THE TIRE SIZE- IS THE TIRE SIZE- CUST NOTICED THE PREVIOUS VEH HAD WIDER TIRES- HIS SLIPPING ISSUES- TIRES HAS WORN DOWN- CUST STATED THAT THE TIRES DID IT THE WHOLE TIME- THE TIRES ARE THE CORRECT ONES FOR THE VEH- THERE IS NOTHING THAT FORD WILL DO

DNL1 025121

**Date:** 05/03/2011 **MY:** 2008 **Mileage:** 46000

14

**Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** CUST STATES ORDERED VEH NEW - RIGHT REAR TIRE KEEPS WEARING OUT- IT KEEPS CUPPING - THIS IS MY SECOND TIRE REPLACED ON THE VEH - I PAID FOR THE TIRE AND IT STILL IS CUPPING - TOOK BACK TO THE DEALER & TOLD ME WITHIN SPECS- JUST HAD ALIGNMENT CHECKED AND WITHIN SPECS - WHY IS THE
REAR TIRE KEEP CUPPING ON MY VEH - I HAVE TO TAKE VACATION DAY TO BRING THE VEH TO BE CHECKED AT THE DEALER - I CANT DRIVE THE VEH IN THE WINTER WHEN SNOW ON THE ROAD IT GETS CAUGHT ON GROOVE AND DANGEROUS TO DRIVE WHEN IT SNOWS - DEALER TOLD ME TO CALL FORD WHEN I TOLD THEM ABOUT IT

**Response:** I WILL ESCALATE THIS TO OUR CUSTOMER CARE SOLUTIONS TEAM. A SPECIALIST WILL CONTACT YOU WITHIN 2 BUSINESS DAYS.

DNL1 024008

**Date:** 08/23/2011 **MY:** 2010 **Mileage:** 19000

15

**Symptom:** 306100 TIRES/WHEELS TIRE WEAR

**Customer:** HAVE A PROBLEM WITH THE CAR-CUSTOMER HAS BEEN IN THE DLR 4 TIMES FOR THE TIRES W HOBBLING AND THE TIRES THREADING; ESPECIALLY IN THE BACK- WENT UP THERE ON SATURDAY-NO ONE TOLD CUSTOMER THAT THE TIRES NEEDED TO BE ROTATED EVERY 5000 MILES- DLR STATES THERE IS TIRE WEAR PROBLEM THAT IT IS TOO LIGHT IN THE BACK- THE INNER THREAD ON THE BACK TIRES IS

**Excerpts of MORS Reports**

WEARING DOWN FASTER THAN THE OUTER- THE CUSTOMER FEELS HE HAS BEEN GETIING THE RUN AROUND- EITHER FIX THE CAR OR GIVE HER SOMETHING DIFFERENT- FEELS VEH IS UNSAFE AND IS TIRED OF GOING BACK AND FORTH TO THE DLR

**Response:** SPOKE TO S/M KEVIN =STATES THE VEH IS NOT AT THE DLR =STATES THE VEH WAS THERE SEVERAL TIMES AND TOASTED DUE TO LACK OF ROTATED AND LACK OR MAINTENANCE =STATES THEY TOLD THE CUST IT STATES IT IN THE MAINT GUIDE =OBC TO CUST…CSM ADVISED THAT I UNDERSTAND THE ISSUE WITH THIS VEH IS DUE TO LACK OF MAINT TIRE ROTATION AND IT DOES STATE IN HIS MAINT GUIDE THE MAINT INTERVALS =STATES HE DOES NOT HAVE A MAINT GUIDE =CSM ADVISED EVERY VEH COMES WITH A MAINT GUIDE AND OWNERS MANUAL =STATES SHE GOT INTO AN ACCIDENT SOME ONE BACKED INTO HER AND STARTED WOBBLING SINCE THEN =CSM ADVISED WELL IF THAT'S THE CASE THEY NEED TO WORK WITH THERE INSURANCE CO… OBC TO CUSTOMER…CUSTOMER ADVISED REAR LEFT TIRE S WORN AND UNEVEN COMPARED TO THE OHE TIRES ON THE VEHICLE. CUSTOMER ADVISES THAT HE WAS TOLD THAT VEHICLE ONLY NEEDS TIRE ROTATIONS AND OIL CHANGES EVERY 7500 MILES (INFO CAME FROM HIS FATHER WHO IS A MECHANIC). ADVISED CUSTOMER THAT OIL CHANGE/ROTATIONS ARE MAINTENANCE ITEM REQUIRED EVERY 5K MILES. ADVISED CUSTOMER THAT WE WOULD NOT BE REPLACING HIS TIRE NOR OFFERING ASSISTANCE TOWARDS REPAIRS…ADVISED CUSTOMER THAT ROTATION OF TIRES, ALIGNMENT, OIL CHANGES ARE MAINTENANCE ITEMS. REPAIRS/ MAINTENANCE ITEMS A RE NOT WARRANTABLE ITEMS… CCT WILL NOT BE OFFERING FIN ASSISTANCE TOWARDS TIRE REPLACEMENT/REPAIR.

DNL1 026259-026261

---

**Date:** 02/02/2012 **MY:** 2009 **Mileage:** 28000

16 **Symptom:** Stop/Steer/Ride/Tire Appearance/Wear

**Customer:** CUSTOMER SAID: -CUST HAS BEEN TO TWO DLRS AND RECIEVED TWO DIFFERENT ANSWERS-DIAGNOSED;REAR TIRES ARE BALD. VEH IS OUT OF ALIGNMENTORIGINAL DLR SAYS THAT VEH ALIGNMENT WAS WITHIN SPECIFICATION

**Excerpts of MORS Reports**

BUT TIRES ARE IN FACT BALD- VEH IS EXPERIENCING A SHIMMY; BACK END FEELS LOOSE-VEH IS VERY LOOSE WHEN ITS WET AND OR SNOWING-TIRES WERE ALWAYS "GREEN" DURING MULTI POINT CHECKS

**Response:** CRC ADVISED: AFTER REVIEWING MY RESOURCES, I SEE THAT THERE ARE NO FACTORY WARRANTIES OR PROGRAMS IN EFFECT ON YOUR VEHICLE THAT WOULD PROVIDE FINANCIAL ASSISTANCE FOR YOUR CURRENT CONCERN WE APPRECIATE YOU TAKING THE TIME TO MAKE US AWARE OF THIS ISSUE AND THANK YOU FOR CONTACTING FORD MOTOR COMPANY.-ADVISED TO HAVE VEH TIRES REPLACED-ADVISED OF TIRE REBATES PER FORD OWNER.COM-ADVISED OF LOCAL QUICK LANE DLR

DNL4 001854

---

**Date:** 06/21/2012 **MY:** 2007 **Mileage:** 36,568

17 **Symptom:** Stop/Steer/Ride/Tire Appearance/Wear

**Customer:** CUST STATES****-HAVING DIFFICULTY GETTING VEH REPAIRED AT DLRSHIP-BEEN ONGOING ISSUE WITH VEH-CUST HAS PUT 3 SETS OF TIRES ON VEH-VEH IS CUPPING THE TIRES-WHEN HITTING A BUMP, REAR END OF CAR JUMPS-CAR SWAYS BACK AND FORTH-CUST FEELS VEH IS UNSAFE TO DRIVE-TOOK VEH TO DLRSHIP FOR ISSUES-WENT FOR TEST DRIVE WITH S/A-DROVE AROUND THE BLOCK AT 25MPH-CUST REQUESTED DLRSHIP TAKE THE VEH ON THE HIGHWAY SO THEY CAN FEEL THE SWAYING AND VIBRATION-DLRSHIP REFUSED STATING THEY ARE NOT ALLOWED-HAS ROTATED TIRES ON A REG BASIS—CUST FEELS SHE IS GETTING THE RUNAROUND BECAUSE HER ESP EXPIRES IN 2 WEEKS-LAST SET OF TIRES ARE SUPPOSED TO LAST 60,000 MILES, ONLY WENT 9,000 BEFORE THEY WERE RUINEDCUST FEELS THE SUSPENSION ON THE VEH IS NOT GOOD

**Response:** CRC ADVISED*****"I WILL ESCALATE THIS TO OUR CUSTOMER CARE SOLUTIONS TEAM SO THEY CAN INVESTIGATE YOUR CONCERN. A SPECIALIST WILL CONTACT YOU WITHIN 2 BUSINESS DAYS.***NOTE TO CCR: IF THE VEHICLE IS CURRENTLY NOT AT THE DEALERSHIP, PLEASE ADVISE THE CUSTOMER TO SCHEDULE A SERVICE APPOINTMENT FOR THEIR VEHICLE"****OBC TO DLRSHIP****-

**Excerpts of MORS Reports**

SPOKE TO ROD-ON CUST LAST VISIT, ALIGNMENT WAS
CHECKED-ALIGNMENT ALL IN THE GREEN-VEH IS CUPPING
TIRES-UNABLE TO LOCATE CAUSE OF CUPPING … WHO
ADVISED THAT THIS IS A FAIRLY GOOD CUST AND THAT THE
ISSUE WAS SUPPOSED TO HAVE BEEN FIXED OVER A MONTH
AGO BUT IT SEEMS THAT FORMER SM PAUL DROPPED THE
BALL ON IT. SM ADVISED THAT THEY ARE GETTING THE VEH
BACK IN … THE CUST IS THERE NOW AND THEY JUST
FINISHED PUTTING NEW TIRES ON THE CUST VEH AS HE HAD
DIRECTIONAL TIRES ON AND THAT WAS THE WRONG TYPE OF
TIRES FOR A FOCUS. SA STATED THAT THE DLR IS ABSORBING
THE COST OF THE NEW TIRES. SA GAVE PH TO CUST AND CSM
ADVISED THAT IF CUST HAS ANY ISSUE RELATED TO THIS
CONCERN IN THE FUTURE TO CALL CSM. CUST WAS PLEASED
THAT THIS SEEMS TO BE RESOLVED FOR THE TIME BEING

DNL4 002043-002044

---

**Date:** 10/12/2012    **MY:**  2011              **Mileage:**      37000

18                          **Symptom:** Stop/Steer/Ride/Noise/Tire

**Customer:** CUSTOMER SAID: … I UNDERSTAND YOUR
WARRANTY - BECAUSE OF THE DESIGN ONLY 1/2 OF THE TIRE
LIFE IS ACQUIRED- SEVERE CUPPING IS ALSO CREATING POOR
TRACTION AND DANGEROUS DRIVING CONDITIONS- THE RIDE
AND NOISE ARE HORRIBLE- WHY WON'FORD ACKNOWLEDGE
AND HELP THEIR CUST RATHER THAN REPEATEDLY STATE
THE WARRANTY AND IGNORE THE PROBLEM THAT CAME
FROM THE FACTORY …

**Response:** CRC ADVISED: BASED UPON YOUR REQUEST I HAVE
DOCUMENTED YOUR COMMENTS. THANKS FOR CALLING
FORD MOTOR COMPANY.*SEE HISTORICALS--- ADV ABOVE
MODIFIED PHRASEOLOGY--- INCORPORATED PHRASEOLOGY
AS PER SRT ON FEEDBACK NEG VEH QUALITY AND PART
DURABILITY--- CREATED C/W INFO ---EMAIL ALREADY
ATTACHED

DNL4 002706

---

**Date:** 02/27/2013    **MY:**  2010              **Mileage:**      43000

19                          **Symptom:** Stop/Steer/Ride/Tire Appearance/Wear

**Excerpts of MORS Reports**

**Customer:** CUST STATES THAT SHE IS HAVING ISSUES WITH THE TIRE WEARING QUICKLY ..-CUST STATES THAT SHE HAS BEEN HAVING ISSUES WITH THE ALIGNMENT AS WELL… ..-CUST IS SEEKING SOME TYPE OF COMPENSATON AND HELP IN REFERENCE TO GETTING HER VEH REPAIRED

**Response:** ..-CUST IS SEEKING SOME TYPE OF COMPENSATON AND HELP IN REFERENCE TO GETTING HER VEH REPAIRED

**Customer:** Alignment and tires as needed,(every six months) for as long as we own the car … however as this time we feel duped by Ford and taken advantage of. We are left paying for a car with an obvious design flaw and safety concerns especially when driving in slippery conditions

**Response:** I AM SORRY YOU FEEL THAT THE VEHICLE IS FLAWED OR THAT YOU WERE TAKEN ADVANTAGE OF BY YOUR PURCHASING DEALER ..- AS I HAD EXPLAINED BEFORE, TIRES ROTATED ON A REGULAR BASIS DO HAVE A TENDENCY OF LASTING LONGER AND THE LOWER PROFILE/SOFTER TIRES, THE MILEAGE BETWEEN ROTATIONS SHOULD BE A MINIMUM OF 5000 AS PROBABLY RECOMMENDED BY YOUR DEALERSHIP...

DNL4 001334-001335

---

**Date:** 03/01/2013 **MY:** 2010 **Mileage:** 37000

20 **Symptom:** Stop/Steer/Ride/Tread Performance

**Customer:** CUST STATES VEH IS ONLY TWO YEARS OLD ..-DSECOND TIME FOR REAR TIRES ..- AT 21,000 MILES AND TWO REAR TIRES TOTALLY WORN OUT AND ..REPLACED AND TOOK THE FRONT ONES AND PUT ON THE REAR ..- NOW THE TWO REAR TIRES AT 37,000 MILES ARE COMPLETELY BALD ..- ON TRIP GOT INTO WET AREA AND COULDNT STEER THE VEH ..-SO DANGEROUS TO DRIVE WITH THESE TIRES ..- NOTHING LEFT ON THEM ..- CUST CALLING FORD TODAY I KNOW I HAVE 37,000 MILES ..- HAD THE VEH AT 21,000 MILES AND ONGOING PROBLEM AND TIRES NEED TO BE REPLACED

**Response:** CRC ADVISED ..I will escalate your case/request to the Service Manager at your dealership. The Service Manager will work with their assigned Ford Customer Service Manager to ensure that all resources available through Ford Motor Company are utilized to assist you …

**Excerpts of MORS Reports**

**Customer:** CUST WIFE ADDED ON AT THE END OF THE CALL - VEH IS HYDRO PLANING AND COULD HAVE GOT KILLED ..WHEN DRIVING ON THE HWY AND THE TIRES OR IS IT THE VEH AND IF SOMETHING WRONG AND SCAREY ..- THE VEH COMPLETELY DID WHAT IT WANTED TO DO ..- CANT SELL THE VEH TO ANYONE BECAUSE IT CAN BE DANGEROUS

**Response:** csm advised would not be able to pay for new tires - offered customer 3/45 lmp as goodwill - customer did not accept this as it does not solve his problem - customer mentioned a concern with "hydroplaning" also - csm offered assistance with repair if dealer finds something defective - customer declined this as well - customer said we could not help him and said he would do what he needs to do - closing case

DNL4 001337-001338

# Exhibit U

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

MARGIE DANIEL, ROBERT McCABE,
MARY HAUSER, et al,
Plaintiffs,

-vs- No. 2:11-CV-02890-WBS-EFB

FORD MOTOR COMPANY, a Delaware
corporation,
Defendant.
_____________________________________/

VIDEOTAPED DEPOSITION

DEPONENT: 30(b)(6) WITNESS - ERIC KALIS
DATE: Friday, September 7, 2012
TIME: 9:31 a.m.
LOCATION: DYKEMA GOSSETT, PLLC
2723 South State Street, Suite 400
Ann Arbor, Michigan
REPORTER: Karen Fortna, CRR/RMR/RPR/CSR-5067
VIDEO: Patrick Murphy



shuffled deck. One last document perhaps on this issue.

(Marked for identification: Plaintiffs' Exhibit No. 22.)

Q. (By Mr. John B. Thomas): Let me show you Exhibit 22. This is a memorandum from Dan Lavey to Don Polidori, dated February 18, 2005. Plaintiffs' Exhibit 22. Have you ever seen this document?

A. No, I have not.

Q. This subject matter of this document is "February 16 Alignment Affinity Review on 2008 C170." Do you see that?

A. I do.

Q. Did you research and review the alignment affinity team that was assembled to address these issues in 2005?

A. Not -- no, I did not.

Q. Do you see -- on page 2, do you see that there's a bullet point there that begins, "SVF"?

A. Yep.

Q. It states that "SVF" -- and what is that, SVF?

A. Steve von Foerster.

Q. Steve von Foerster. That's the first time we've seen his name today. And tell us who he is.

A. Oh, boy. He is a director in vehicle engineering.

Q. That's a pretty high-up guy?
A. Yeah.
Q. He would be one step below a vice-president? You talked about an org chart earlier and I thought that -- or maybe our guy yesterday did. You don't know? He's a fairly senior guy, I guess.
A. Yeah. At this point in time, though -- I mean, that's what he is today. I don't know -- back in 2005, I don't think -- I think he was a vehicle engineering manager, if I remember right, at that point in time, or chief -- I'm sorry, he was a chief engineer at this point in time, if memory serves me, but yeah, director, I -- at some point, they go up to the vice-president. They report -- there could be other layers in there. Who knows.
Q. Do you see in here, Dan Lavey reports that, "Steve von Foerster will send a note to the C170 vehicle engineer management along the lines of 'Are you sure that you can't meet handling requirements with rear toe curves in a rear nominal toe which is within the current health chart ranges?'" Do you see that?
A. I do.
Q. He goes on to say, "Since the vehicle has a known rear tire wear issue, this is considered relevant



on the Focus."

My question to you, Mr. Kalis, is, you did not speak to Mr. Lavey in your work to prepare for this deposition, did you?

A. No, I did not.

Q. Nor did you speak with Don Polidori, did you?

A. In regards to this deposition, no, I did not. I've spoken with Don in the past, as I've spoken with Paul Mayer as well in the past, who is the author of this particular note.

Q. And you have not talked to him about this -- Paul Mayer, you have not talked to him -- did you just say you haven't talked to him about this issue?

A. I speak with Paul, I wouldn't say with a significant amount of frequency, but I do speak with him from time to time. I don't recall speaking with him regarding this particular deposition or this particular topic.

Q. Okay. I want to talk some concepts here. And I don't mean to be flip, to borrow a phrase from my colleague, but we -- I want to see if we can do this the hard way or the easy way.

I want to talk about geometry changes to the rear suspension. If one were to look at the WERS reports and the drawings for the various



you didn't know what his title was back then. That refreshes your recollection?
A. It does. Thank you. Yes. He's had several titles.
Q. And what does -- what does Mr. von Foerster do in his capacity of vehicle programs director?
A. Okay. So he was a vehicle programs director for the SUV body-on-frame. That's what the SUV BOF stands for below his name. But primarily, from the vehicle programs director, he had responsibility for various programs and the chief engineers would report to him, if I remember correctly, all right. So he kind of had responsibility for all the vehicles, in this case, SUV body-on-frame programs, all right, and just kind of shepherding them along.
He was also the affinity team for the alignment affinity, I think he was the quarterback or something they called it at that point in time.
Q. And you touched on this earlier, but what is an affinity team? What is their purpose?
A. Their purpose in life was basically to look at customer satisfaction issues. What can we do to improve customer satisfaction? So that was -- and they would develop an affinity team for a particular attribute, be it road NVH, alignment, so

forth.
Q. Would you agree that if Mr. von Foerster put something in writing in an email that he knew what he was talking about?
A. He's a very smart man, yes.
Q. Let's talk about what he had to say in February of 2005. He's writing to Dan Arbitter?
A. Dan Arbitter.
Q. Dan Arbitter. And Dan -- what was his title? What was his role?
A. Oh, boy. At that point in time, I think he was -- I'm not certain what he was at that point in time. I think he had something to do with vehicle dynamics, but I'm not certain as to what, if he was a manager or chief engineer at that point. I just don't recall.
Q. Steve van Foerster writes, "Dan, I went through the status of the 2007 and 2008 Focus to the alignment affinity health chart. I was disappointed to learn that we do not plan to get to the requirement of 'no greater than three degrees per meter' -- correct?
A. Correct.
Q. -- 'rear toe change in jounce.'"
I want to stop here for a second and ask



 you what he's talking about there in the concept of three degrees per meter and rear toe jounce, and that is, how much does the rear toe move in as it moves into the jounce position, correct?

A. Correct, but that's -- it's not saying it's moving three degrees from rebound to jounce, it's moving three -- the rate is three degrees per meter. So in one meter of vertical travel, you would get three degrees of toe.

Q. Okay. And I guess from the health chart -- alignment health chart standpoint, that's where they wanted to be as far as a target; that's your reading of the document?

A. That's my understanding of the document, yes.

Q. He goes on to say that, "I know we are much worse than this today" -- and what he's referring to in the subject line is the Focus toe, correct?

A. Yes.

Q. "We are much worse than this today, but I do not understand why we would give up now and only say we are going to get to four degrees per meter. Tire wear has been a significant problem for the Focus and it seems like we would want to get green to the requirement. I was told it was a vehicle dynamics constraint. Can you please look into this and see



# Exhibit V

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

vs. CASE NO. 2:11-cv-0289-WBS-EFB

FORD MOTOR COMPANY, a Delaware corporation,

Defendant.

___________________________________________________

VIDEOTAPED DEPOSITION OF ANDREA DUARTE

San Francisco, California

Wednesday, October 10, 2012

Volume I

Reported by:
LORI STOKES
CSR No. 12732
Job No. 1533578
PAGES 1 - 145

A A recall. 12:15:19

Q You did not own a Ford Focus before you bought it, right?

A No.

Q Okay. 12:15:25

A Not myself.

Q So you would not have received a recall notice --

A No, but something in the paper. You always see, you know, they just recalled some -- 12:15:32 about three different model cars -- not Ford, but you know, I think it was a Honda CRV, different year than I had. I mean, it's always in the paper.

Q Okay. So your thought is that if Ford had recalled the vehicles, and it had been in the 12:15:49 newspaper before you purchased a Ford Focus, that's the type of notice that you were looking for?

A Well, I think if they're selling unsafe tires that wear out, and they knew about it, yeah, that should have been up front. 12:16:07

Hopefully that they would have fixed the problem, and then from there on, it would be a -- you know, it wouldn't matter.

Q All right. Other than the recall, is there any other format that you think Ford should 12:16:18

have put a notice out in? 12:16:21

A I don't know. I'm not, you know, a major company.

Q All right. Did the salesman tell you anything about expected tire wear on the Ford 12:16:33 Focus?

A No.

Q Have you talked to anyone else about -- other than your lawyers -- about the problems that you believe exist with the Ford Focus? 12:16:44

A I must have said something to friends, you know, hey, I have, like, you know, just have this car less than a year, and I have to return -- you know, replace the tires or however it was. Something like that. 12:17:00

Q And how did it come that you decided to get involved in this lawsuit?

A I saw an ad in the paper.

Q For the class action lawsuit?

A Uh-huh. 12:17:10

Q And did you call the number in the ad?

A Yes. Because I said, whoa, that happened to me.

Q What did the ad say?

A Something about tires wearing out real 12:17:18

quick. 12:17:21

Q Do you recall when that was?

A Let's see. Probably last year.

Q Okay. Do you claim that the Ford -- the 2007 Ford Focus has an extremely rough ride? 12:17:44

A I think, compared to a lot of cars that I was -- that I've driven, yes, I think it does have a rough ride.

Q All right. Is it rougher than every car you've ever driven or is it rougher than some and 12:17:58 smoother than others?

A Well, if you're comparing it to a truck that my husband had, it would be better, but it was an old truck.

Q Okay. 12:18:10

A So it's a pretty rough ride for a little car. I mean, I like the car, but it's a rough ride.

Q What do you like about the car?

A Small, compact. 12:18:20

Q Other than your issues with the tires, has it been a good car for you?

A Except for the lights and the battery, yeah, it's been okay.

Q All right. Do you claim that the Ford 12:18:29

Focus generates exceptionally loud noise when you drive it? 12:18:32

A Well, you should hear the locks, the automatic locks. Very, very loud. Never heard a car have automatic locks like that. And the windshield wipers are very, very loud. 12:18:43

Q All right. How about the tires? Do the tires generate exceptionally loud noise when you drive?

A I never thought about it as the tires making the noise, to tell you the truth. 12:18:55

Q Okay. Have you ever had any problems braking in the 2007 Escort?

A It's a Focus.

Q Focus. 12:19:07

A Braking? You mean using the brakes?

Q Yes.

A No, I -- no.

Q All right. Are there any other Focuses in the family? 12:19:25

A No.

Q Okay.

MR. BOWMAN: Is that Focuses or "Focii"?

MR. FRESARD: That's what I wonder. At least I didn't say Escorts. 12:19:37

# Exhibit W

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,

Plaintiff(s),

vs.

FORD MOTOR COMPANY, a Delaware corporation,

Defendant(s).

CASE NO. 2:11-cv-02890-WBS-EFB

VIDEOTAPED DEPOSITION OF MARGIE DANIEL
Sacramento, California
Friday, December 14, 2012
Volume I

Reported by:
Carrie Pederson
CSR No. 4373
Job No. 1574796
Pages 1 - 142

remember what the other one was, but I knew I wanted the phone on the steering column.

BY MR. FRESARD:

Q. Okay. And that is Synk, S-Y-N-K, that's the hands free? 10:34AM

A. Hands-free phone.

Q. And there's one other feature you can't remember?

A. I don't remember what it was.

Q. All right. Did you want air conditioning 10:34AM and power windows and those kind of things?

A. Yes.

Q. All right. And transmission. Did you want an automatic transmission?

A. Yes. 10:35AM

Q. Did it matter to you whether the car was front-wheel drive or rear-wheel drive?

A. I don't know what it is.

Q. Okay. When you decided on the Focus, was annual maintenance cost a consideration at all? 10:35AM

A. I'm not sure.

Q. Did you ask anyone at the dealership about what the anticipated annual maintenance costs would be for the Ford Focus?

A. No. 10:35AM

Q. Did anybody tell you what the expected annual maintenance costs would be?

A. Other than every 7,500 miles to be -- have the oil changed, no.

Q. All right. When you bought the Focus, were you aware that it didn't require a tune-up for 100,000 miles? 10:36AM

A. Yes.

Q. Was that an attractive feature to you?

A. Yes. 10:36AM

Q. Did you have an understanding of what the miles per gallon was -- the anticipated miles per gallon was for the Focus?

A. Yes.

Q. What was your understanding at the time you were looking at them? 10:36AM

A. Twenty-six or twenty-eight.

Q. Better than the F-150?

A. Uh-huh, yes.

Q. Okay. So you test drove it, and then did you go back in and talk to the sales rep about options and pricing and colors and things like that, or did you just say "I'll take the one I test drove"? 10:36AM

A. I did not buy the one I test drove.

Q. Okay. 10:37AM

A. I decided on what color I wanted and the options I wanted on it.

Q. And did you order it, or did he or she find one in the system?

A. No. There was one right there on the lot. 10:37AM

Q. There was one on the lot?

A. Uh-huh.

Q. Okay. Did you buy it that day?

A. Yes.

(Exhibit 2 marked) 10:37AM

BY MR. FRESARD:

Q. Ms. Daniel, I'll hand you what we've marked as Exhibit 2 which should be the sales documents for your Focus.

Did you know your sales -- is it salesman, 10:38AM sales woman?

A. No, I did not know him.

Q. Okay. You met him when you went there?

A. Yes.

Q. All right. And did you think you were 10:38AM probably going to buy a car when you went there that day?

A. Yes.

Q. All right. Historically had you ever bought an extended service plan with your vehicles? 10:38AM

# Exhibit X

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

---o0o---

MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

vs. No. 2:11-cv-02890-WBS-EFB

FORD MOTOR COMPANY, a Delaware corporation,

Defendants.

---

VIDEOTAPED DEPOSITION OF PAUL M. TAYLOR

Palo Alto, California

Wednesday, April 17, 2013

Volume 1

REPORTED BY:
LYNNE LEDANOIS
CSR No. 6811
Job No. 509804

PAGES 1-304



So I asked for data and ran the analysis that we see, and it's shown in Figure 7, showing the data that I collected in looking at the customer concern of improper tire wear to determine how that looked.

Q Let me see if I understand this. Are the labels -- because I can't read this very well. Are the labels of the access in Figures 6 and 7 the same?

A They are intended to be -- the X axis is intended to be months in service; and the Q -- the Y axis are -- they sometimes call it R1000.

Q Say it again?

A The ford nomenclature is R1000, which is the cumulative rates per thousand vehicles, which I wrote as cumulative claims per thousand vehicles. So they are intended to be mirrors of one another.

Q When you say are they the same, I can't tell whether --

A Yes. What they call --

Q Are the axis the same, are the scales the same?

A The scale, let's see.

Q You tried to keep the same scale and axis?

A The scale on the X axis is, the horizontal axis is the same, zero to 36. I broke it up by six-month intervals with ticks for every individual month. They wrote really small numbers and put a tick for each month



 against each other on the X axis.

For the Y axis, they went zero to 15 as a rate per thousand because I did not have data at one point that high, my scale only went zero to 8.

Q Now, the data went over 10,000 on the chart on nine?

A That's correct. Because they are looking at model year 2002 and one. I started, since I had data for 2004 through 2011, I plotted my data from 2004 to 2011.

Q Okay.

A I did not have the earlier data.

Q All right. Now, what does it take for a car to show up on the AWS database?

A Ford has to pay for some part or all of a repair claim through -- it's almost invariably through a dealership. But I guess some fleets are authorized to do repairs as well.

Q So -- say that again.

MR. HICKS: Would you read that back to me?

(Record Read.)

BY MR. HICKS:

Q Some fleet?

A If you have a large flee that are authorized to file directly with Ford. But by and large, you know, a



consumer would go through a dealership to have a repair done. If part of that repair is paid by Ford, it would appear in the AWS.

Q So unless Ford accepts a claim and decides it's going to pay some or all of the claim, that claim does not show up in the AWS?

A My understanding is that is correct. Ford has to have -- pays for something on the claim.

Q So if Ford has a policy of denying tire wear claims, they are not going to show up in the AWS database?

MS. LENART: Objection, assumes facts not in evidence. Go ahead.

THE WITNESS: I'm not sure about a policy.

MR. HICKS: He is an expert. I want you to assume --

MS. LENART: That's a different question.

BY MR. HICKS:

Q I want to you assume something. If Ford has a policy -- is that going to work for you?

MS. LENART: It resolves that objection.

MR. HICKS: All right. I'm going to use an extra word.

BY MR. HICKS:

Q I want you to assume, if Ford has a policy of



# Exhibit Y

John B. Thomas (Bar No. 269538)
jthomas@hicks-thomas.com
Eric Grant (Bar No. 151064)
grant@hicks-thomas.com
Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833
Facsimile: (916) 691-3261

J. Allen Carney (*pro hac vice*)
acarney@carneywilliams.com
Hank Bates (Bar No. 167688)
hbates@carneywilliams.com
Carney Williams Bates Pulliam & Bowman, PLLC
11311 Arcade Drive
Little Rock, Arkansas 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Counsel for Plaintiffs MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware corporation,

Defendant.

No. 2:11-cv-02890-WBS-EFB

**DECLARATION OF ANDREA DUARTE**

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

I, Andrea Duarte, declare as follows:

1. I am one of the named Plaintiffs in the above-entitled action, and I make the statements of fact herein of my own personal knowledge. If called as a witness in this proceeding, I could and would testify competently to those facts.

2. On August 13, 2008, I took my 2007 Ford Focus to the North Bay Ford dealership in Santa Cruz, California for servicing. There were 12,086 miles on my vehicle and I wanted to have the regular service performed to ensure the car was safe for my daughter to drive.

3. After the dealership inspected my vehicle, I was told that both rear tires needed to be replaced. The technicians at North Bay Ford advised me that it was unsafe to drive the car with my rear tires in that condition. I was upset about the fact that my tires needed to be replaced because I only had 12,086 miles on the car and tires. A copy of the invoice from my August 13, 2008 visit to North Bay Ford is attached to this declaration.

4. At the time of my visit to North Bay Ford, I asked the dealership why my tires wore out so quickly. The dealership personnel asked about the primary driver and I told them that my daughter drove the car the most. Because my daughter was 17 years old at the time, the dealership told me that the rapid tire wear was caused by my daughter's driving habits. The representative blamed the tire wear on my daughter's driving abilities without ever having ridden in the car with my daughter.

5. The dealership personnel at North Bay Ford informed me that I needed to get an alignment and pay for it myself. At no time did the dealership personnel inform me that to minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

6. After leaving the dealership on August 13, 2008, I called the Ford Customer Relations Hotline to register a complaint. At that time, I was told that the vehicle had been abused or improperly maintained and that the premature tire wear was my fault. The Ford representative on the telephone also indicated that the tires were simply worn out, that there was no defect in the vehicle, that there was no defect in the tires, and that there was no assistance that they could provide me for my premature tire wear.

7.	At no time did the Ford representative indicate to me that tire wear had been a significant problem for the Ford Focus.

8.	At no time did the Ford representative state to me that the Ford Focus has a known rear tire wear issue.

9.	At no time did the Ford representative indicate to me that they were receiving a number of calls from their customer service division about customer complaints and tires being returned to the warranty center involving rear tire wear.

10.	At no time did the Ford representative say that the Focus had been wearing tires for a long time.

11.	At no time did the Ford representative indicate to me that the alignment on my vehicle, particularly the alignment in the rear, must be very accurate or that I will get this kind of tire wear.

12.	At no time did the Ford representative state to me that to minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

13.	The only thing the Ford representative told me is that it had been determined by the dealership that my tires were simply worn out and that the premature tire wear did not occur due to a defect in my vehicle.

14.	On August 16, 2008, with 12,105 miles on the odometer, I took my car to Holser's Tire Service in Santa Cruz, California and purchased two new 195/60R15 Fuzion HRi all season rear tires for $190.62. No Holser's personnel informed me that to minimize tire wear concerns on my Focus, I had to position all alignment settings as close to the middle of the specified range as possible.

15.	A few days later on August 19, 2008, after I had paid the $190.62 for two new rear tires, I placed another call into the Ford Customer Relations Hotline to express my disappointment in the quality of service I received from North Bay Ford and my disappointment in the product. I told the Ford representative that I thought the situation was unacceptable, that I had already purchased two new rear tires from Holser's Tire Service, and again requested

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

reimbursement for the cost of new tires due to the premature tire wear. The Ford representative once again advised me that the Focus was outside of any applicable warranty and that Ford could not provide me with any assistance to help with the premature tire wear.

16. During my visits to the dealership in February 2007, when I ultimately decided to purchase my 2007 Ford Focus, the Ford representative and I discussed certain vehicle features and the purchase price. At no time did the Ford representative tell me that there was a known suspension defect, tire wear problem, or safety issue with the Focus or that there had been numerous complaints from previous Ford Focus owners regarding tire wear. Knowing such information would have been very important to me in making my decision to purchase the vehicle. Had I been told such critical information, I would not have purchased the 2007 Ford Focus.

17. It was not until on or around October 12, 2011 when I saw and responded to the advertisement for the class action in my local newspaper and contacted my lawyers, that I discovered that I had been misled by Ford's representatives and that my vehicle had the suspension defect alleged in the Complaint. Until that time, although I knew something might be wrong because the tires were wearing so quickly, I did not know that the premature tire wear was being caused by a defect in my vehicle. Instead, I had believed the statements of Ford's representatives that the premature tire wear on my vehicle did not occur due to a defect in my vehicle.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct. Executed on April 26, 2013.

/s/ Andrea Duarte
(original signature retained by attorney Eric Grant)
Andrea Duarte

# Exhibit Z

John B. Thomas (Bar No. 269538)
jthomas@hicks-thomas.com
Eric Grant (Bar No. 151064)
grant@hicks-thomas.com
Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833
Facsimile: (916) 691-3261

J. Allen Carney (*pro hac vice*)
acarney@carneywilliams.com
Hank Bates (Bar No. 167688)
hbates@carneywilliams.com
Carney Williams Bates Pulliam & Bowman, PLLC
11311 Arcade Drive
Little Rock, Arkansas 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Counsel for Plaintiffs MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation,<br><br>Defendant. | No. 2:11-cv-02890-WBS-EFB<br><br>**DECLARATION OF MARY HAUSER** |

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

I, Mary Hauser, declare as follows:

1. I am one of the named Plaintiffs in the above-entitled action, and I make the statements of fact herein of my own personal knowledge. If called as a witness in this proceeding, I could and would testify competently to those facts.

2. In October 2008, I purchased a 2009 Ford Focus from Walnut Creek Ford in Walnut Creek, California. At the time of my purchase, I visited the Walnut Creek Ford dealership and spoke to a Ford sales representative. We took the Focus on a test drive, and afterwards discussed the purchase price and general features of the vehicle. I was interested in purchasing an affordable car that was reliable. While we did discuss general features of the vehicle, the Ford sales representative did not inform me that there was a known suspension defect, tire wear problem, or safety issue with the Ford Focus. I was also never told that there had been numerous complaints made by Ford Focus owners concerning premature tire wear. Had I heard any of this information during the discussion with the Ford sales representative, the negotiations to purchase the Focus would have ended immediately. I would not have purchased the 2009 Ford Focus if I had been told such important information about the vehicle.

3. I routinely had the car serviced at Wal-Mart and Jackson Tire Service in Jackson, California for tire rotations and oil changes. To the best of my recollection, I had my tires rotated at least once during the first year of ownership, prior to my first tire replacement on January 19, 2010 at approximately 13,000 miles. It was my normal habit to have the tires rotated on a regular basis. On the following dates, I had to have tires replaced on my Focus because I was told they were worn out: January 19, 2010 (Jackson Tire); November 4, 2010 (Wal-Mart); March 22, 2011 (Wal-Mart); and November 8, 2012 (Wal-Mart).

4. At no time did any Wal-Mart or Jackson Tire representative on any of these occasions indicate to me that the alignment on my vehicle, particularly the alignment in the rear, must be very accurate or that I will get this kind of tire wear.

5. At no time did any Wal-Mart or Jackson Tire representative state to me that to minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

6. At some point after I had several of the tires replaced due to premature wear but before I authorized the filing of this lawsuit in November 2011, I called the Sonora Ford dealership in Sonora, California. My best recollection is that I made this phone call in mid to late 2011. I asked the Ford representative if Ford was aware that the Focus has a problem with premature tire wear. The Ford representative told me he had no idea what I was talking about and could not give me an answer. At no time did the Ford representative tell me that the Focus had a significant problem with rear tire wear, or that they had received numerous complaints concerning premature tire wear.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct. Executed on April 30, 2013.

/s/ Mary Hauser
(original signature retained by attorney Eric Grant)
Mary Hauser

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

# Exhibit AA

John B. Thomas (Bar No. 269538)
jthomas@hicks-thomas.com
Eric Grant (Bar No. 151064)
grant@hicks-thomas.com
Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833
Facsimile: (916) 691-3261

J. Allen Carney (*pro hac vice*)
acarney@carneywilliams.com
Hank Bates (Bar No. 167688)
hbates@carneywilliams.com
Carney Williams Bates Pulliam & Bowman, PLLC
11311 Arcade Drive
Little Rock, Arkansas 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Counsel for Plaintiffs MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware corporation,

Defendant.

No. 2:11-cv-02890-WBS-EFB

**DECLARATION OF MARGIE DANIEL**

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

I, Margie Daniel, declare as follows:

1. I am one of the named Plaintiffs in the above-entitled action, and I make the statements of fact herein of my own personal knowledge. If called as a witness in this proceeding, I could and would testify competently to those facts.

2. In January 2011, I purchased a 2011 Ford Focus from Big Valley Ford in Stockton, California. A few days before I went into the dealership to make the purchase, I emailed Big Valley Ford to ask them about their smaller compact vehicles, such as the Ford Focus and Ford Fusion. John Willis from Big Valley Ford replied with an email containing pictures, certain features of the vehicle, and quoted prices. I was attracted to both of these cars because of the price, gas mileage and the safety features.

3. After receiving the email response from Big Valley Ford, I went into the dealership on January 2, 2011. I test drove the Focus and discussed general features of the vehicle with the Ford sales representative, such as certain safety features and gas mileage. During my discussions with the sales representative concerning general features of the vehicle, the Ford representative did not tell me that there was a known suspension defect, tire wear problem, or safety issue with the Ford Focus. He also did not indicate to me that previous owners had made complaints about premature tire wear. If I had known any of this information, I would not have purchased the 2011 Ford Focus.

4. I periodically took the car back to Big Valley Ford for several maintenance checkups, oil changes and tire rotations. In particular, I had the tires on my Focus rotated on March 11, 2011 and June 6, 2011, at 6,415 miles and 12,916 miles, respectively. Then, on August 30, 2011, with 20,723 miles on the odometer, the service advisor Jesse Alvarez told me that I needed four new tires because they were worn out. Jesse informed me that it was "normal" for tires to wear out at 20,000 miles on the Ford Focus. I was so angry that I left the dealership without purchasing tires. On my way home, I called the dealership back and asked if there was any available warranty to cover my new tires. The Ford representative told me that no warranty was available to cover this cost. I did not purchase new tires that day because I honestly did not believe that the tires could be worn out so quickly.

5. On October 31, 2011, I went to Jackson Tire to get the alignment checked. At no time did a representative from Jackson Tire indicate to me that in order to prevent or minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

6. On November 2, 2011, I authorized the filing of this lawsuit.

7. I returned to Big Valley Ford on November 4, 2011 to purchase a new set of tires with 25,220 miles on the odometer. At this time, I discussed the premature tire wear I was experiencing in detail with Ford Service Manager Paul Singh. Mr. Singh suggested that I get a four-wheel alignment because he believed that may help relieve the rapid tire wear issue. He informed me that someone from their dealership office had similar tire wear concerns, and that an alignment fixed the problem. I took his advice and also purchased four new tires from Big Valley Ford. At no time during this visit did any Ford representative indicate to me that the alignment on my vehicle, particularly the alignment in the rear, must be very accurate or that I will get this kind of tire wear. At no time did the Ford representative state to me that to minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

8. On December 28, 2012 at 52,799 miles, I again was informed by Big Valley Ford representatives that my tires were wearing out (all tread depths measured at 3/32") and that I would need new tires soon. I returned to the dealership in February 2013 at 54,565 miles to purchase four new tires. I had these tires replaced and had a four-wheel alignment performed, as suggested by the dealership, to try and reduce the rapid tire wear. Again, at no time during this visit did any Ford representative indicate to me that the alignment in the rear of the vehicle must be very accurate and to minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

9. At no time did any Ford representative on any of these occasions indicate to me that they were receiving a number of calls from their customer service division about customer complaints and tires being returned to the warranty center involving rear tire wear.

///

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

10.     At no time did any Ford representative on any of these occasions say that the Focus had been wearing tires for a long time.

11.     At no time did the Ford dealership offer to pay in full for my tire replacement on any of the above referenced occasions.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.  Executed on April 30, 2013.

/s/ Margie Daniel
(original signature retained by attorney Eric Grant)
Margie Daniel

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

# Exhibit BB

John B. Thomas (Bar No. 269538)
jthomas@hicks-thomas.com
Eric Grant (Bar No. 151064)
grant@hicks-thomas.com
Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833
Facsimile: (916) 691-3261

J. Allen Carney (*pro hac vice*)
acarney@carneywilliams.com
Hank Bates (Bar No. 167688)
hbates@carneywilliams.com
Carney Williams Bates Pulliam & Bowman, PLLC
11311 Arcade Drive
Little Rock, Arkansas 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Counsel for Plaintiffs MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation,<br><br>Defendant. | No. 2:11-cv-02890-WBS-EFB<br><br>**DECLARATION OF DONNA GLASS** |

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

I, Donna Glass, declare as follows:

1. I am one of the named Plaintiffs in the above-entitled action, and I make the statements of fact herein of my own personal knowledge. If called as a witness in this proceeding, I could and would testify competently to those facts.

2. In April 2005, I purchased a 2005 Ford Focus from Ukiah Ford Lincoln Mercury in Ukiah, California. I visited the Ukiah Ford dealership and spoke to the Ford sales representative, Stephen Lair. We took the Focus on a test drive for about ten miles. Mr. Lair and I discussed the purchase price and general features of the vehicle, as price and gas mileage were the primary considerations I had in making this purchase. While we did discuss general features of the vehicle, Mr. Lair did not inform me that there was a known suspension defect, tire wear problem, or safety issue with the Ford Focus. I also was unaware at that time that complaints had been made by other Focus owners that their tires were wearing out too fast. While I do not remember the specifics of our conversation on the day I purchased the vehicle, if Mr. Lair or any other Ford representative had told me that there was a suspension defect, tire wear problem or safety issue with the vehicle, I would have been alarmed and remembered such a statement being made. During my deposition, I was asked whether or not I would have still purchased the vehicle if Ford had disclosed to me that something was wrong with the Focus. At the time of my deposition, I hadn't thought about the question before and stated that I did not know. After having thought more about this question and having looked at various Ford internal documents, I know now that if I had been told such information, this would have greatly affected my decision to buy the car. I would have decided against purchasing a Ford Focus and gone elsewhere to purchase a new vehicle.

3. I took the car back into Ukiah Ford to be serviced on multiple occasions. On the following dates, Ukiah Ford reported to me that either all or some of my tires needed to be replaced because they had worn out: January 4, 2007, June 1, 2009, January 12, 2011 and January 31, 2013.

4. At no time did any Ford representative on any of these occasions indicate to me that tire wear had been a significant problem for the Ford Focus.

5. At no time did any Ford representative on any of these occasions state to me that the Ford Focus has a known rear tire wear issue.

6. At no time did any Ford representative on any of these occasions indicate to me that they were receiving a number of calls from their customer service division about customer complaints and tires being returned to the warranty center involving rear tire wear.

7. At no time did any Ford representative on any of these occasions say that the Focus had been wearing tires for a long time.

8. At no time did any Ford representative on any of these occasions indicate to me that the alignment on my vehicle, particularly the alignment in the rear, must be very accurate or that I will get this kind of tire wear.

9. At no time did the Ford representative state to me that to minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

10. At no time did the Ford dealership offer to pay for my tire replacement on any of the above referenced occasions.

11. Each statement outlined in paragraphs 5-10 is extremely significant. Therefore, had any of these statements been disclosed to me, I would have been alarmed and would have recalled hearing such statements from Ford representatives.

12. After receiving word that my tires needed to be replaced from Ukiah Ford, I would then on each occasion purchase new tires at Les Schwab in Ukiah, California because it was more economical to purchase tires there. At no time when purchasing any sets of tires at Les Schwab did a Les Schwab representative tell me that in order to prevent or minimize tire wear concerns, I had to position all alignment settings as close to the middle of the specified range as possible.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct. Executed on May 2, 2013.

/s/ Donna Glass
(original signature retained by attorney Eric Grant)
Donna Glass

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

# Exhibit CC

# Thomas Lepper Associates

**Forensic Automotive Consultants**
**Certified Fire Investigations ▪ Certified Forensic Locksmith**

**(866) 812-4204 Toll Free ▪ (707) 751-3836 Office ▪ (707) 751-3833 FAX**
**tom@thomaslepper.com ▪ tseroogy@thomaslepper.com**

**RULE 26 OPINION REPORT OF THOMAS J. LEPPER**

**PREPARED FOR**

**MR. JOHN THOMAS, ESQ.**

**HICKS THOMAS LLP**

**700 LOUISIANA, SUITE 2000**

**HOUSTON, TX 77002**

**CASE NAME: DANIEL V. FORD**

**OUR CASE NUMBER: 1206R06**

Ford Focus class vehicles, the tire temperature readings were recorded on the tread blocks of the rear tires.[12] In each vehicle, the temperature at the inner tread row was higher than the inner center, outer center, and outer tread rows.[13] The higher temperature will and did result in the accelerated wear of the tread on the rear tires.

Many factors can adversely affect the health of a tire, such as driving too fast for conditions, late or hard braking, poor road conditions, improper loading, incorrect tire pressure, lack of tire rotation and general maintenance. The topography in the vehicle owners' residential areas differed in extremes considering elevation levels, road types and conditions, and environmental factors. Despite the wide variations of the driving conditions encountered by the inspected vehicles, all vehicles exhibited accelerated wear of the rear tires due to the rear suspension geometry deficiencies.

<u>Mary Hauser's Vehicle – Exhibit A</u>

Mary Hauser's 2009 Ford Focus[14] is driven daily, and she accesses her residence on a long dirt driveway; yet the vibrations and instability felt during the test drive were only slightly increased over the other four vehicles. The differences in vibrations and driving stability between the class vehicles inspected are not significant. Therefore, Ms. Hauser's driveway condition should not be considered a contributing factor to the accelerated wear of the rear tires. No evidence was found that Ms. Hauser's tires or vehicle was abused or neglected.

The original equipment tires on Mary Hauser's vehicle, Hankook Optimo H725 size 195/60R15,[15] held a tread wear warranty of 5 years or 80,000 miles.[16] Her first replacement tires, Goodyear Eagle RSA 88H, were purchased at Jackson Tire Service on January 19, 2010 with 13,295 miles

[12] The temperature readings were displayed and recorded on a Longacre brand pyrometer.

[13] Found in Exhibit A, page 7; Exhibit B, page 7; Exhibit C, page 8; Exhibit D, page 7; Exhibit E, page 7.

[14] Ms. Hauser resides in Mokelume Hill, CA.

[15] *See* 2009 Focus N.A. (C170) Wheel & Tire Matrix (DNL2 00027541-51).

[16] *See* www.tirerack.com.

# Exhibit DD

# Thomas Lepper Associates

**Forensic Automotive Consultants**
**Certified Fire Investigations ▪ Certified Forensic Locksmith**

**(866) 812-4204 Toll Free ▪ (707) 751-3836 Office ▪ (707) 751-3833 FAX**
**tom@thomaslepper.com ▪ tseroogy@thomaslepper.com**

**INSPECTION SUMMARY**

**PREPARED FOR**

**MR. JOHN THOMAS, ESQ.**

**HICKS THOMAS LLP**

**700 LOUISIANA, SUITE 2000**

**HOUSTON, TX 77002**

**CASE NAME: DANIEL V. FORD**

**CASE VEHICLE OWNER: MARY HAUSER**

**CASE VEHICLE OWNER'S LOCATION: MOKELUMNE HILL, CA**

**OUR CASE NUMBER: 1206R06-A**

December 16, 2012

John Thomas, Esq.
Hicks Thomas, LLP
700 Louisiana, Suite 2000
Houston, TX 77002

| Re: | | |
|---|---|---|
| Re: | Case Name: | Daniel v. Ford |
| | Case Vehicle Owner: | Mary Hauser |
| | Case Vehicle Owner's Location: | Mokelumne Hill |
| | Our File Number: | 1206R06-A |

Dear Mr. Thomas:

**PRELIMINARY INSPECTION SUMMARY:**

**PRELIMINARY ASSIGNMENT:**

We were assigned to examine Ms. Mary Hauser's 2009 Ford Focus, Vehicle Identification Number 1FAHP34N79W128967, and determine the condition and alignment settings of the rear suspension, wheels, and tires.

**SEQUENCE OF PRELIMINARY INSPECTION EVENTS:**

- Tow Ms. Hauser's 2009 Ford Focus from her residence in Mokelumne Hill, California to Modern Bench Operations, in Campbell, California;
- Take frame rack measurements of Ms. Hauser's 2009 Ford Focus at Modern Bench Operations, in Campbell, California;
- While at Modern Bench Operations, perform an inspection of the undercarriage components with specific emphasis on the rear suspension components, wheels, and tires;
- Deliver the vehicle to Roger Kraus Racing in Castro Valley, California to measure and document the current wheel alignment settings;
- Determine whether the vehicle's current condition prevented proper wheel alignment;
- Test drive the vehicle to evaluate its handling characteristics; and
- Return the vehicle to Ms. Hauser.

**TAKING POSSESSION OF VEHICLE AND PERTINENT VEHICLE INFORMATION:**

Ms. Hauser's 2009 Ford Focus was prepared for towing and taken into our possession on July 8, 2012. The truck, trailer, and Ford Focus were parked at a secured location overnight. The vehicle was then towed to Modern Bench Operations on the flatbed trailer.

| | |
|---|---|
| Year, Make and Model: | 2009 Ford Focus |
| Color and Body: | Silver, Four-Door Sedan |
| California License Plate: | 6GBN316 |
| Registration Stickers: | OCT 2012 |
| Vehicle Identification Number: | 1FAHP34N79W128967 |
| Date of Manufacture: | 08 / 08 |
| Odometer: | 54,078 |
| Service Sticker: | 06/08/2012 49,152 |
| Transmission: | Automatic |
| Drive: | Front – Wheel Drive |
| Keys: | Yes |
| Driveable: | Yes |
| Brakes: | Vacuum Booster |
| Airbags: | Dual Front – Not Deployed |

**FRAME MEASUREMENT – MODERN BENCH OPERATIONS:**

On July 9, 2012, the Ford Focus was towed to Modern Bench Operations (MBO), 665 East McGlincy Lane, Campbell, California. The vehicle's unibody alignment was measured at this facility. The unibody and suspension of the vehicle were examined, measured, and documented.

Attached to this summary are the documented frame rack measurements and print-outs from Modern Bench Operations (attachments 1-4). No indications of damage or prior repairs were located to the underside of the vehicle.

No mechanical or service failures were found within the vehicle's steering or suspension system. The steering column, steering rack, and steering tie-rods were undamaged; their steering tie-rod end ball joints were found in place and intact.

The left and right lower control arms and their ball joints were found in place with their lock nuts properly tightened. The left and right front suspension struts were found in place and intact.

The rear suspension knuckles, control arms, and their bushings were in normally worn condition with the accepted amount of wear for a vehicle of this age and mileage. The suspension shock absorbers were found in place and in normal condition for a vehicle of this age and mileage.

No modifications, extra duty parts, or aftermarket components were located on the vehicle's suspension.

**FRONT AND REAR TIRE INSPECTION:**

The tires currently on the vehicle were examined. The front and rear tires were over half way through their lifespan as determined by their remaining tread depth. The wear patterns on the tires' tread indicated that the tires had been rotated in the past. The rear tires and wheels had been moved to the front and the front tires and wheels had been moved to the rear.

The present tire data is as follows:

| | | |
|---|---|---|
| Make and Model: | Bridgestone Turanza LS-T | |
| Size: | P195/60R15 87T M+S | |
| Type: | Tubeless Radial | |
| D.O.T. Numbers: | Left Front: | 0BV9 LT1 3410 |
| | Right Front: | 0BV9 LT1 4310 |
| | Left Rear: | 0BV9 LT1 4310 |
| | Right Rear: | 0BV9 LT1 3410 |

| UTQG Data:[1] | | Treadwear: 700[2] | |
|---|---|---|---|
| | | Traction: A | |
| | | Temperature: B | |
| Tread Depth Remaining: | | | |
| | Left Front: | Outer 3/32 | Outer Center 4/32 |
| | | Inner Center 4/32 | Inner 4/32 |
| | Right Front: | Outer 3/32 | Outer Center 4/32 |
| | | Inner Center 4/32 | Inner 3/32 |
| | Left Rear: | Outer 4/32 | Outer Center 5/32 |
| | | Inner Center 5/32 | Inner 4/32 |
| | Right rear: | Outer 3/32 | Outer Center 4/32 |
| | | Inner Center 5/32 | Inner 5/32 |

The tires were manufactured by Bridgestone/Firestone North American Tire, Bridgestone Brand, Firestone Parkway, Wilson, North Carolina 27893, USA, during the thirty-fourth week of 2010 (left front, right rear), and during the forty-third week of 2010 (right front, left rear).[3] The Bridgestone Turanza LS-T tires were manufactured with a measureable tread depth of 12/32 of an inch.[4]

**ORIGINAL EQUIPMENT TIRE DATA:**[5]

| Make and Model: | Hankook Optimo H725 |
|---|---|
| Size: | 195/60R15 |
| Type: | Tubeless Radial |

---

[1] According to the Consumer Guide to Uniform Tire Quality Grading (UTQG), "[t]he treadwear grade is a comparative rating based on the wear rate of a tire when tested under controlled conditions on a specified government test course. For example, a tire graded 150 would under one and a half (1 ½) times as well on the government course a tire graded 100." Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

[2] Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

[3] Who Makes It And Where: Tire Directory, Tire Guides, Inc. 2012.

[4] Measureable tread depth on new Bridgestone Turanza LS-T was found at www.pilgerstire.com.

[5] *See* 2009 Focus N.A. (C170) Wheel & Tire Matrix (DNL2 00027541-51).

| UTQG Data: | Treadwear: | 620[6] |
|---|---|---|
| | Traction: | B |
| | Temperature: | B |

The original equipment tires were manufactured with 9.5/32 of an inch measureable tread depth.[7]

**ALIGNMENT MEASUREMENTS – ROGER KRAUS RACING:**

Ms. Hauser's vehicle was then towed to Roger Kraus Racing, 2896 Grove Way, Castro Valley, California 94546 to measure and record the suspension alignment on a Hunter brand alignment machine.

As per the attached print-outs (attachments 5-8), the suspension was generally within specifications. Attachment 5 shows the alignment specification per the Hunter alignment machine software. This shows the specification and dimensions of the various suspension adjustments. Values that are within specifications are printed in green, and those values outside of the allowed tolerances are printed in red. Attachment 5 shows the setting found upon initial set-up of the vehicle on the alignment rack at curb weight, a full tank of fuel and fluids, but no passengers.

As shown in attachments 6, 7, and 8, the rear suspension alignment and track width changed considerably during vertical movement of the suspension. The vehicle's ride height was measured at the upper openings of the wheel wells. With four people aboard, the ride height was again measured and the alignment reading recorded. Attachment 6 shows the effects of loading the vehicle with four normal size and weight people. The front suspension toe-in alignment slightly changed, to within specifications. However, the rear suspension underwent a large change in both camber and toe, in particular the rear toe-in increased by 0.26 of an inch, a large amount by suspension alignment standards.

The rear of the vehicle was then raised two inches and the alignment was re-measured and recorded, as shown in attachment 7. Again, the front suspension only moved slightly and added a minimal amount of toe-in.

[6] Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

[7] Original equipment tire tread measurement depth found at www.tirerack.com.

However, the rear suspension underwent a small change in both camber and toe. In particular, the rear toe-in decreased by 0.09 of an inch.

The ride heights at the time of the alignment measurements are as follows:

| EMPTY RIDE HEIGHT | | 4 PASSENGER RIDE HEIGHT | |
|---|---|---|---|
| (LF) 25 5/16 | (RF) 25 1/2 | (LF) 24 1/4 | (RF) 24 3/8 |
| (LR) 26 7/16 | (RR) 26 5/8 | (LR) 24 5/8 | (RR) 24 3/4 |

**PREPARATIONS FOR TEST DRIVE AND TEST DRIVE RESULTS:**

Preparations were made for a test drive. The tires were set to 32 PSI. The ambient temperature was 65 degrees Fahrenheit; the pavement temperature was measured at 81 degrees Fahrenheit. The test drive covered 46.9 miles.

At the end of the test drive, the temperature of the tires' tread rows was measured and recorded. The temperatures, in degrees Fahrenheit, were as follows:

| | | | |
|---|---|---|---|
| Left Front: | Outer – 96 | Center – 94 | Inner – 97 |
| Right Front: | Outer – 92 | Center – 93 | Inner – 98 |
| Left Rear: | Outer – 92 | Center – 95 | Inner – 101 |
| Right Rear: | Outer – 89 | Center – 91 | Inner – 98 |

Another test drive was performed. The tires were again set to 32 PSI. The ambient temperature was 72 degrees Fahrenheit. The second test drive covered 18.1 miles. At the end of the second test drive, the temperature of the tires' tread rows was measured and recorded. The temperatures, in degrees Fahrenheit, were as follows:

| | | | |
|---|---|---|---|
| Left Front: | Outer – 105 | Center – 107 | Inner – 110 |
| Right Front: | Outer – 107 | Center – 107 | Inner – 114 |
| Left Rear: | Outer – 104 | Center – 109 | Inner – 112 |
| Right Rear: | Outer – 106 | Center – 107 | Inner – 115 |

These temperature readings indicate that the inside tread row of the rear tires were running at a higher temperature that the outer tread row.

**OBSERVATION OF FORD'S INSPECTION OF MARY HAUSER'S VEHICLE:**

Ford Motor Company provided representatives to inspect and measure Mary Hauser's 2009 Ford Focus on December 15, 2012 at Future Ford in Sacramento, California. Mr. Eric Kalis, from Ford Motor Company, and another Ford representative named Bob, inspected the vehicle. Ford Motor Company's attorney, Ms. Tamara A. Bush, was also in attendance.

The vehicle was photographed and then placed on the dealership's alignment rack by Future Ford personnel. The underside of the vehicle, the tires, and suspension were photographed. The suspension component part numbers were checked and recorded.

Ms. Hauser recently replaced her tires on November 8, 2012. The current tire data is as follows:

| | | |
|---|---|---|
| Make and Model: | Uniroyal Tiger Paw Touring | |
| Size: | P195/60R15 88T M+S DT | |
| Type: | Radial Tubeless | |
| UTQG Data: | Treadwear: | 660[8] |
| | Traction: | A |
| | Temperature: | B |

The air pressure readings were recorded and are as follows:

| | | | |
|---|---|---|---|
| Left Front: | 34 PSI | Right Front: | 33 PSI |
| Left Rear: | 32.5 PSI | Right Rear: | 33 PSI |

[8] Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

| D.O.T. Numbers:[9] | Left Front: | Y9RB FPUU 3312 |
|---|---|---|
| | Right Front: | Y9RB FPUU 3312 |
| | Left Rear: | Y9RB FPUU 2712 |
| | Right Rear: | Y9RB FPUU 3312 |

The Tread Depth Remaining was measured as follows:

| | | |
|---|---|---|
| Left Front: | Outer 9/32 | Outer Center 9/32 |
| | Inner Center 9/32 | Inner 9/32 |
| Right Front: | Outer 9/32 | Outer Center 9/32 |
| | Inner Center 9/32 | Inner 9/32 |
| Left Rear: | Outer 10/32 | Outer Center 10/32 |
| | Inner Center 10/32 | Inner 10/32 |
| Right Front: | Outer 10/32 | Outer Center 10/32 |
| | Inner Center 10/32 | Inner 10/32 |

The tires were manufactured by P.T. Gadjah Tungual, Desa Gemos Curug, Keeamatan Jati Uwung, Kabupaten Tangerang, Jawa Barat, Republic of Indonesia during the thirty-third week of 2012 (Front and right rear tires) and during the twenty-seventh week of 2012.[10]

Selected photographs taken during the Ford inspection regarding alignment findings and measurements are enclosed as photographs 18 through 22. The alignment print-out shows that the wheels' alignment had slightly increased right front toe-in since the inspection of the vehicle on July 9, 2012. The documentation of the Ford inspection is preserved on multiple film clips.

The vehicle was test driven by Eric Kalis from 11:42AM to 11:57PM. The mileage at the start of the test drive was 61,894.6 miles and 61,902.0 miles at the end of the test drive.

[9] There is a discrepancy in the D.O.T. numbers of the new Uniroyal tires. The left rear tire's D.O.T. number documented at the Ford inspection on 12/15/2012 as Y9RB FPUU 2712 indicates a manufacturing date during twenty-seventh week of 2012. This differs from the Walmart invoice for these tires dated November 8, 2012.

[10] Who Makes It And Where: Tire Directory, Tire Guides, Inc. 2012.

**REVIEW OF MARY HAUSER SERVICE ORDERS:**

**January 19, 2010** JACKSON TIRE SERVICE, INC.;

**Mileage 13,295**; Invoice Number 1-68232;

**First pair of new tires purchased**

- 2 – 19560R15 Goodyear Eagle RSA 88H[11] – Note: mount position of tires not documented
- 2 – Electronic Spin Balance
- Front End Alignment

**July 10, 2010** WALMART TIRE & LUBE EXPRESS – Store Number 2054;

**Mileage 20,826;**[12] Service Order Number 06854;

- Standard maintenance
- Tire air pressure checked at 32PSI front and rear
- Tread depth measurements
  - Left Front – 5/32 Right Front – 5/32
  - Left Rear – 3/32 Right Rear – 3/32

**November 4, 2010** WALMART TIRE & LUBE EXPRESS – Store Number 2054;

**Mileage 27,141**; Service Order Number 16576;

**Second pair of new tires purchased**

- New tires placed on rear axle – P195/60R15 TZA LS-T[13]
  - Rear wheel lug nuts torqued to 95 foot pounds
  - New valve stems on rear wheels
  - TPMS (Tire Pressure Monitoring System) Reset on rear wheels
  - Wheel balance on rear tires

---

[11] The D.O.T. numbers for Goodyear Eagle RSA 88H tires not documented on Jackson Tire Service, Inc. Invoice dated January 19, 2010.

[12] Odometer reading incorrectly recorded as 208264. *See* Walmart Service Order dated July 10, 2010.

[13] The D.O.T. numbers documented on the Walmart Invoice dated November 4, 2010 for the Bridgestone Turanza LS-T tires (0BV9LT13410) indicate they were manufactured by Bridgestone/Firestone North American Tire during the thirty-fourth week of 2010. Who Makes It And Where: Tire Directory, Tire Guides, Inc. 2012.

- Tire pressure checked – all four tires at 32 PSI
- Tread depth measurements after rear tire replacement
  - Left Front – 2/32 Right Front – 3/32
  - Left Rear – 10/32 Right Rear – 10/32

**March 22, 2011** WALMART TIRE & LUBE EXPRESS – Store Number 2054; **Mileage 33,043;** Service Order Number 94273; **Third pair of new tires purchased**

- Standard Bulk Service including fluids checked, oil and filter changed
- New rear tires - P195/60R15 TZA LS-T[14]
  - New valve stems on rear wheels
  - Wheel balance on rear wheels
  - Rear wheel lug nuts torqued to 95 foot pounds
- Tire Pressure Checked, all four tires at 30 PSI
- Tread depth measurements after rear tire replacement
  - Left Front – 2/32 Right Front – 2/32
  - Left Rear – 10/32 Right Rear – 10/32

**July 12, 2011** WALMART TIRE & LUBE EXPRESS – Store Number 2054; **Mileage 37,714;** Service Order Number 26371;

- Tire air pressure checked at 30PSI front and rear
- Rotated front and rear tires
- Tread depth measurements
  - Left Front – 9/32 Right Front – 8/32
  - Left Rear – 9/32 Right Rear – 9/32

[14] The D.O.T. numbers documented on the Walmart Invoice dated March 22, 2011 for the Bridgestone Turanza LS-T tires (0BV9LT14310) indicate they were manufactured by Bridgestone/Firestone North American Tire during the forty-third week of 2010. Who Makes It And Where: Tire Directory, Tire Guides, Inc. 2012.

**September 21, 2011** WALMART TIRE & LUBE EXPRESS – Store Number 2054;

**Mileage 41,259;** Service Order Number 92111;

- Standard maintenance
- Tire air pressure checked at 30PSI front and rear
- Tires remaining tread depth measured
  - Left Front - 7/32 Right Front - 7/32
  - Left Rear - 8/32 Right Rear - 8/32

**November 19, 2011** WALMART TIRE & LUBE EXPRESS – Store Number 2054;

**Mileage 44,441;** Service Order Number 59853;

- Standard maintenance
- Rotate front and rear tires
- Tire air pressure checked at 30PSI front and rear
- Tires remaining tread depth measured
  - Left Front - 7/32 Right Front - 7/32
  - Left Rear - 5/32 Right Rear - 5/32

**March 10, 2012** WALMART TIRE & LUBE EXPRESS – Store Number 2054;

**Mileage 49,152**; Service Order Number 32369

- Technician's Note
  - Rear tires will have to be replaced by the next rotation
- Oil Change
- Tire Rotation
- Tire Pressure Checked all four tires at 32 PSI
- Tread Depth Checked
  - Left Front – 5/32 Right Front – 5/32
  - Left Rear – 4/32 Right Rear – 4/32

**November 8, 2012** WALMART TIRE & LUBE EXPRESS – Store Number 2054; **Mileage 60,207**; Service Order Number 74919

- General maintenance check
- All four tires need to be replaced, purchased 4 Uniroyal 195/60R15 Tiger Paw[15] tires. Each new tire rebated $45.00.
- Tread depth measurements after tire replacement
  - Left Front – 10/32 Right Front – 10/32
  - Left Rear – 10/32 Right Rear – 10/32

**SUMMARY OF REAR TIRE WEAR:**

| DATE | VEHICLE MILEAGE | MILES ON REAR TIRES | REPLACED TIRES | REAR TIRE ACTION |
|---|---|---|---|---|
| 1/19/2010 | 13,295 | 13,295 | Hankook Optimo H725[16]<br>Treadwear: 620<br>Traction: B<br>Temperature: B | Jackson Tire Service - Replaced two tires, purchased 2 Goodyear Eagle RSA 88H[17] **(First pair of new tires purchased)** |
| 7/10/2010 | 20,826 | Unknown | | Walmart – Remaining tread depth measured at 3/32 of an inch for rear tires. |
| 11/04/2010 | 27,141 | Unknown | Hankook Optimo H725<br>Treadwear: 620<br>Traction: B<br>Temperature: B | Walmart – Replaced two rear tires, purchased 2 TZA LS-T[18] **(Second pair of new tires purchased)** |

[15] The D.O.T. numbers documented on the Walmart Invoice dated November 8, 2012 for the Uniroyal Tiger Paw tires (Y9RBFPUU3312) indicate they were manufactured in the Republic of Indonesia during the thirty-third week of 2012. Who Makes It And Where: Tire Directory, Tire Guides, Inc. 2012.

[16] *See* 2009 Focus N.A. (C170) Wheel & Tire Matrix (DNL2 00027541-51).

[17] The treadwear rating on the Goodyear Eagle RSA tire is 260, Traction – A, Temperature – A. Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

[18] The treadwear rating on Bridgestone Turanza LS-T tire is 700, Traction – A, Temperature – B. Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

| | | | | |
|---|---|---|---|---|
| 3/22/2011 | 33,043 | 5,902 | Unknown | Walmart – Replaced two rear tires, purchased 2 Bridgestone TZA LS-T[19] **(Third pair of new tires purchased)** |
| 7/12/2011 | 37,714 | 10,573 | | Walmart – Tires rotated; Remaining tread depth measured at 9/32 of an inch on rear tires. |
| 9/21/2011 | 41,259 | Unknown | | Walmart – Remaining tread depth measured at 8/32 of an inch on rear tires. |
| 11/19/2011 | 44,441 | Unknown | | Walmart – Tires rotated; Remaining tread depth measured at 5/32 of an inch on rear tires.. |
| 7/9/2012 | 54,078 | Unknown | | Vehicle inspection by Tom Lepper - Remaining tread depth ranging from 3/32 of an inch to 5/32 of an inch. |
| 11/08/2012 | 60,207 | Unknown | Bridgestone TZA LS-T<br>Treadwear: 700<br>Traction: A<br>Temperature: B | Walmart – Replaced all four tires, purchased Uniroyal Tiger Paw Touring[20] **(Complete set of new tires purchased)** |
| 12/15/12 | 61,894 | 1,687 | Treadwear: 660<br>Traction: A<br>Temperature: B | Ford inspection with Lepper in attendance. Future Ford – remaining tread depth measured by Lepper at 10/32 of an inch |

[19] The treadwear rating on the Bridgestone Turanza LS-T tire is 700, Traction – A, Temperature – B. Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

[20] Tire data documented at Ford inspection December 15, 2012. The treadwear rating on the Uniroyal Tiger Paw Touring tire is 660, Traction – A, Temperature – B. Consumer Guide to Uniform Tire Quality Grading, U.S. Department of Transportation, National Highway Traffic Safety Administration, August 2011.

Case Name: Daniel v. Ford
Case Vehicle Owner: Mary Hauser - Car A
Page 15

Thank you for allowing us to be of service. If you have any questions regarding this report, or if you need any further assistance, please contact our office.

Respectfully submitted,

**Thomas J. Lepper**

Automotive, Tire, And Fire Consultant

| Enclosures: | I | 22 Photographs |
|---|---|---|
| | II | Modern Bench Frame Rack Measurements – Attachment 1 – 4 |
| | III | Roger Kraus Racing Alignment measurements – Attachment 5 – 8 |
| | IV | Ford Inspection alignment print-outs 12-15-2012 – Attachment 9 – 11 |

# Exhibit EE

# *Rule 26*

# *Opinion Report of Dr. Peter Thomas Tkacik*

***The University of North Carolina at Charlotte***
***Mechanical Engineering and Engineering Science***
***103 Motorsports Research Building***
***Charlotte, NC, 28223***
***Ph. (704) 687-8114***
***ptkacik@uncc.edu***

***Case name, Daniel, et al. versus Ford Motor Company***

**suspension change**. ("2007 Ford Focus K&C Full Report.pdf" p. 29, and 30) ("2012 Ford Focus K&C Full Report.pdf" p. 29, and 30)

j.   **Ford rated the cost** of wear not by how much worn tires were costing, but rather, **by how much they were paying out in warranty service** and this warranty payout was dropping (Exhibit 29, p. 141, Bates DNL2 00001879).  The **Ford "customer service" reduced this payout by deflecting tire wear problems**, often telling customers that there was "no known" problem with the car.  They also then said the tires needed to be rotated every 5000 miles and then often asked if the customer was driving too hard, rotating properly, loaning the car to a teenager, etc. (Exhibit 31, p. 145, DNL2 00006129) When pushed, "customer service" provided a modified camber link to reduce the wear.  Although it does reduce camber by one degree and bump steer by 1.5°/m (Exhibit 12, p. 68, DNL2 00012033), no wear test results have been provided for the efficacy of this 'fix'.

k.   With my experience in writing test protocols, if I was interested in the real world effect of bump steer, I would have wear tested at conditions the vehicle operates at in the field, particularly loading.  The **testing Ford used for tire wear evaluation was critically flawed** in that it didn't reflect these 'normal' load conditions. In the 2005 Texas tire wear development testing, Ford evaluated tire wear only at curb plus a 150lb driver which is 954lb below gross cargo weight rating (GCWR). (Exhibit DNL2 00006204, p. 2, Bates DNL2-00006205).  That is, this little car could be loaded almost a thousand pounds heavier (and not be considered overloaded) and its rear toe could climb to as high as 1.0°.

l.   The **"high bump steer vehicle testing" was similarly critically flawed** for the same reason (Exhibit 24, p. 110, DNL2 00001417) & (Exhibit DNL2 00028555, p. 7, Bates DNL2 00028561). Test protocols are designed to provide repeatable answers to questions and limit variability.  Tire wear tests are run at specific conditions; however, for the tests run by Ford on vehicles with a range of Bump Steer, they used the 'standard' test protocols that eliminate the bump (loading) and thus the influence of the bump steer.  This is why the test resulted in no influence of bump steer.

## *The Basis and Reasons for the Opinions:*

m.   **My background includes a dozen years at Michelin Research** designing and building tire test machines, analyzing test results, studying wear phenomena, and working with wear test vehicle fleets.  **My PhD dissertation research was a detailed study of the sliding of rubber** in contact with the ground.  It was done at Michelin Research and used a hybrid model of machine vision of tread block deformations under load and a finite element analysis model, (see section 4). I have raced and worn out tires very quickly, have been careful and have had tires last 80,000 miles, and have personally aligned cars and understand the nuances of alignment.

n.   In **my review of the vehicle reports of Mary Hauser, Andre Duarte, Donna Glass, Robert McCabe, and Margie Daniel** as done by Thomas Lepper Associates; I found them to be nominal examples of the Focus.  That is, they were 2005MY through 2011MY, mostly four doors and a three door hatchback.  In review of the chassis measurements (FIAKI measurements) none demonstrated any significant damage.  My opinion is that they were all aligned where I would expect at their mileage, that is, either in tolerance or pretty close. These are not outliers in the population of Ford Focus vehicles on the road.

A **gradient of tire temperatures** about 6° F higher at the inside shoulders across these vehicles is the result of the combination of rear toe and camber. This tire temperature gradient has a correlation to tire life in that the higher the gradient, the shorter the life. For this small population (ten rear wheel locations), the correlation is that the tires should last 32,000 miles with a loss of 1,900 miles for every degree of shoulder to shoulder temperature gradient. Although higher wear with higher temperature seems intuitively obvious, it is also supported by experimental results. ("The Pneumatic Tire", Chapter 13 K. A. Grosch, "Rubber Abrasion and Tire Wear", DOT HS 810 651, U.S. Department of Transportation – NHTSA, Washington D.C. revised 2006, p547)

o. Michelin prides itself in having a greater understanding of tires and tire phenomena than anybody else. It is no surprise that the first mention of tire alignment and tire wear as seen on the "Ford Tire Alignment Health Chart" was from Michelin. (Exhibit 5, p. 49, Bates DNL2 00006338)

p. I have also considered and relied upon **what Ford engineers say** about tire wear on the rear of the Focus.

Eric Zinkosky (Exhibit 14, p. 71, Bates DNL2 00006364) said the:

- "large toe change values, both ride steer and roll steer; **more than twice any acceptable range**"
- "low camber stiffness; even the predicted value and we tend to under predict until the models are correlated"
- "high rear roll center; **at least 30mm higher than typical FWD rear suspension** and 40-50mm more than target for a given front roll center".

He went on to report (Exhibit 6, p. 55, Bates DNL2 00005336)

- "**Significantly more roll steer** and toe change **than would generally be acceptable** for rear suspensions of this type"
- "Roll center height **higher than would be expected causing high levels of tread change** with jounce."
- "Low camber stiffness"
- "The alignment toe specification insures large amounts of toe in; **more than would be expected for any vehicle**"

Jim Hale (Exhibit 8, p. 59, Bates DNL2 00006193) did a study of the US and European knuckles and reported:

- "a noticeable difference in the toe gradient results between vehicles".

Ford Executive Steven von Foerster (Exhibit 23, p. 109, Bates DNL2 00003922) says:

- "Tire wear has been **a significant problem** for the Focus and it seems like we would want to get green to the requirement".

Paul Mayer comments that **something needs to be done about getting** the rear "Rear toe curves and a Rear nominal toe" "**within the current health chart ranges**". (Exhibit 22, p. 107, Bates DNL2 00002039)

# Exhibit FF

John B. Thomas (Bar No. 269538)
jthomas@hicks-thomas.com
Eric Grant (Bar No. 151064)
grant@hicks-thomas.com
Hicks Thomas LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833
Facsimile: (916) 691-3261

J. Allen Carney (*pro hac vice*)
acarney@carneywilliams.com
Hank Bates (Bar No. 167688)
hbates@carneywilliams.com
Carney Williams Bates Pulliam & Bowman, PLLC
11311 Arcade Drive
Little Rock, Arkansas 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Counsel for Plaintiffs MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation,<br><br>Defendant. | No. 2:11-cv-02890-WBS-EFB<br><br>**DECLARATION OF ABBI LEVINE** |

HICKS THOMAS LLP
8001 Folsom Boulevard, Suite 100
Sacramento, California 95826
Telephone: (916) 388-0833

I, Abbi Levine, declare as follows:

1. I am the daughter of Andrea Duarte, one of the named Plaintiffs in the above-entitled action, and I make the statements of fact herein of my own personal knowledge. If called as a witness in this proceeding, I could and would testify competently to those facts.

2. On January 18, 2007, I turned sixteen years old and obtained my driver's license. In February 2007, my mother purchased a 2007 Ford Focus, and I was the primary driver of this vehicle. I drove the car consistently from February 2007 to September 2009, and less frequently from September 2009 to present.

3. When I first started driving the Focus in February 2007, I was attending high school. Because I was the oldest of all my friends, I was the first to obtain my driver's license. Therefore, I typically had two or three additional persons besides myself in the car on any given day. For the first six months to a year of having my license, I took friends to school in the Focus, would drive them off campus for lunch, would take them home after school, and would drive them around town in Santa Cruz. As my friends began to obtain their own driver's licenses, the frequency of having passengers in my car lessened, but was still not uncommon. I graduated high school in December 2008, but still continued to drive the Focus throughout 2008 and 2009 while attending Cabrillo Community College and working. Given my commute to both work and school for these first two years of ownership, I would drive anywhere from 10 to 15 miles round trip each day.

4. After moving to San Francisco in September 2009, I drove the vehicle less frequently because I typically utilized alternate transportation. Since that time I have also lived in Europe for periods of time, so the Focus has likely been driven less frequently and with less passengers than those first two years of ownership. However, whenever I have come home for several months at a time, I will still use the Focus regularly to drive to and from work.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct. Executed on May 1, 2013.

/s/ Abbi Levine
(original signature retained by attorney Eric Grant)
Abbi Levine

# Exhibit GG

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

**MARGIE DANIEL, ROBERT McCABE, MARY HAUSER, DONNA GLASS, and ANDREA DUARTE, individually and on behalf of a class of similar situated individuals,**

**Plaintiffs**

**v.**

**FORD MOTOR COMPANY, a Delaware corporation,**

**Defendant**

**No.: 2:11-cv-02890-WBS-EFB**

# REBUTTAL EXPERT REPORT OF EDWARD E. LEAMER, PH.D.

**May 2, 2013**

## TABLE OF CONTENTS

**I. Experience and Qualifications ........................................................1**

**II. Introduction, Assignment, and Summary of Conclusions ..........2**

**III. The Taylor Report Analysis is Statistically Flawed.....................5**

A. Dr. Taylor's Auction Data Analysis and Conclusions Are Unreliable .......... 5

1. The Manheim Auction Data Are Not a Representative Sample............ 7
2. The Auction Data Are Contaminated By Tire Replacements ............... 9
3. The Auction Data Are Contaminated By Large Measurement Errors .. 11
4. The Manheim Data Lack Controls that Account for Differences in Wear Rate ........................................................................... 16
5. Tire Wear on Non-Focus Vehicles is Not the Right Benchmark ......... 17
6. Dr. Taylor Fails to Define the Peer Vehicles Narrowly Enough and Ignores the Ford Fusion ........................................................... 18
7. Eyeball Estimation is Not Scientifically Acceptable.......................... 22

B. Ford Warranty Data Are Not Pertinent ............................................. 23

C. Crash Data Analysis Does Not Establish that Focus Crash Rates Were Not Elevated.......................................................................... 25

D. Summary............................................................................... 25

**IV. Dr. Strombom's Analyses Are Flawed and Uninformative........26**

A. Dr. Strombom's Fleet Data Analysis is Incapable of Supporting His Conclusions........................................................................ 26

1. The Fleet Vehicles Are not Representative of Class Vehicles ............ 27
2. The Fleet Tire Expenditure Data are Unreliable............................. 27
3. The Fleet Data Lack a Benchmark ............................................. 28
4. Dr. Strombom's Analysis of These Data is Wrong. ......................... 28

B. Dr. Strombom's Depreciation Analysis is Flawed and Misleading........... 29

1. The Analysis Assumes Complete Information in the Market............. 30
2. The Analysis Assumes the Benchmark Vehicles Represent the Ford Focus with a Retrofitted Rear Suspension ..................................... 31
3. The Analysis Does Not Control for Relevant Factors ....................... 34

C. Named Plaintiffs Are Not, and Need Not Be, a Random Sample ............ 34

D. Repeat Customers' Experience is Uninformative................................ 34

E. Summary ........................................................................ 35

**V. Conclusion ........................................................................ 36**

**APPENDIX A. Tread Wear on Vehicles with Less Than 1,000 Miles 37**

**APPENDIX B. Tread Wear Distributions for Average Sedans Less Than 20,000 Miles ........................................................ 41**

ii

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

# I. Experience and Qualifications

1. I am the Chauncey J. Medberry Professor of Management, Professor of Economics and Professor of Statistics at the University of California at Los Angeles. I earned a B.A. degree in Mathematics from Princeton University in 1966, and a Masters in Mathematics and a Ph.D. degree in Economics at the University of Michigan in 1970. I was an Assistant and Associate Professor of Economics at Harvard University from 1970 to 1975, and joined the Economics Department at UCLA in 1975 as a Full Professor. I served as Chair of the Department of Economics from 1983 to 1987 and Area Head of Business Economics from 1990 to 1993. I had a tenured appointment in the Economics Department at Yale University in 1995 and I have been a Visiting Professor at several universities, including the University of Chicago. I have been a Guest Professor at the University of Basel in Switzerland, at the Central European University in Prague, Czech Republic, at the Institute for Advanced Studies in Vienna, Austria, and at the Universidad de San Andreas in Buenos Aires, Argentina. I have served as the Director of the UCLA Anderson Forecast since 2000 and Chief Economist of the Ceridian-UCLA Pulse of Commerce Index from 2010-2012.

2. I have published extensively in the fields of econometric methodology and statistical analysis, in international economics, and in macro-economic forecasting. I have written five books and over 90 academic articles, many of which deal with the subject of inferences that may appropriately be drawn from non-experimental data. My academic research in econometrics and international economics has been profiled in **New Horizons in Economic Thought, Appraisals of Leading Economists**, edited by Warren Samuels. My papers in econometrics have been republished in a volume in the Edward Elgar Series: **Economists of the 20th Century**. My research has been funded by the National Science Foundation, the Ford Foundation, the Sloan Foundation, and the Russell Sage Foundation.

3. I am an elected Fellow of two of the most important honorific societies in my field: the American Academy of Arts and Sciences and the Econometric Society. I have been a consultant for the Federal Reserve Board of Governors, the

Department of Labor, the Department of Energy, the International Monetary Fund, the World Bank, the Inter-American Development Bank, and the Treasury of New Zealand. I have been a visiting scholar with the Federal Reserve Board and the International Monetary Fund. I have served as an expert in a variety of matters dealing with issues of interpretation of data.

4. My curriculum vitae is incorporated in this report as **Exhibit 1**. My testimonial experience is incorporated in this report as **Exhibit 2.** My hourly rate for time spent working on this matter is $650.

5. I have in this report relied on the best information available to me at the time of its preparation. A list of documents on which I relied in the preparation of this report is provided in **Exhibit 3**. I understand that discovery in this matter is ongoing and that Defendants or third parties may produce additional information that has a bearing on my analysis. I reserve the right to supplement or amend my conclusions as necessary in light of such additional information.

## II. Introduction, Assignment, and Summary of Conclusions

6. I have been asked by Plaintiffs in this matter to review the reports of two of Defendant's Experts, Dr. Strombom[1] and Dr. Taylor[2], and opine on whether the data they rely on and their methods of data analysis support their conclusions. I have concluded that much of the data they use is unreliable and/or is not pertinent to their conclusions about Ford Focus tire wear, and I further conclude that their methods of statistical analysis fall short of standard scientific standards.

7. Dr. Taylor provides five principal opinions in his report[3]:

   a. Measured tread depths of the tires on the Ford Focus vehicles auctioned by Manheim are

---

[1] Expert Report of Bruce A. Strombom, Ph.D. ("Strombom Report") and Supplemental Expert Report of Bruce A. Strombom, Ph.D. ("Supplemental Strombom Report").

[2] Expert Declaration of Paul M. Taylor, Ph.D., P.E. ("Taylor Report").

[3] Taylor Report, p. 27.

comparable to peer vehicles with similar mileages. There is no evidence from auction data that Ford Focus had significantly higher tire wear rate compared to peer vehicles.

b.   The rates of warranty repairs for Improper Tire Wear dropped significantly with the introduction of the 2005 model year.

c.   There are statistically significant variations in the rates of 12-month warranty repairs for Improper Tire Wear claims by month of production, which is evidence that individual vehicle-to-vehicle variations can affect rates of tire wear.

d.   Tire Defects were not the most frequent reason for a warranty claim. Many components in Ford Focus vehicles had higher warranty repair rates than Tire Defects.

e.   No evidence was found that the alleged defects result in a risk of crashes with an occupant fatality for Ford Focus that is elevated compared to peer vehicles.

8.   Based upon my review to date, I have reached the following conclusions:

a.   Dr. Taylor's Manheim Auction Data Analysis is unreliable and his casual eyeball estimation does not provide scientific support for his conclusions regarding Ford Focus's tire wear.

b.   The Manheim Auction Data are not a representative sample of the Class Vehicles and are contaminated by tire replacements and measurements errors.

      c. The analysis of the auction data fails to control for important factors that affect tire wear rate and Dr. Taylor's conclusions regarding excess tire wear rely on improper benchmarks - "ranges" of peer vehicles. In addition, the conclusions rely on an unscientific "eyeball" inference method.

d. Ford Warranty Data are a very poor place to find reliable information about accelerated tire wear because the problem is recorded in this database only if vehicle owner, dealer and Ford all agree that the wear was accelerated, and because the Ford tire warranty expired too early for all cases of accelerated tire wear to be evident to all three parties.

e. Dr. Taylor's study of the Crash Data relies on the unsupported assumption that tire wear and vehicle suspension problems that contributed to crashes would be evident to whoever entered the data, whenever the data were entered. Furthermore, Dr. Taylor fails to process these data in a way that would allow statistically reliable inferences.

9. Dr. Strombom provides four principal opinions in his report[4]:

a. Based on a review of tire repair costs for fleet vehicles, the Class Vehicles were not experiencing premature tire wear.

b. Based on a review of used car sale transactions, the depreciation rate of Class Vehicles was inconsistent with Plaintiffs' claims of premature tire wear.

---

[4] Strombom Report, p.3 and Supplemental Strombom Report, p.1 .

     c. The experiences of Named Plaintiffs with respect to tire wear are not representative of the class.

d. The existence of repeated customers is inconsistent with Focus's accelerated tire wear.

10. Based upon my review to date, I have reached the following conclusions:

a. Dr. Strombom's Fleet Data Analysis relies on a small, non-representative, sample of vehicles and he uses a flawed method to draw inferences about tire wear from these data.

b. Dr. Strombom's Depreciation Analysis relies on erroneous assumptions that the market has complete information and that the benchmark vehicles have no defects. The analysis also fails to control for any factors that may affect relative depreciation rates. This analysis cannot provide meaningful conclusions with regards to the alleged accelerated tire wear.

c. Named Plaintiffs need not be a random sample.

d. Repeat purchasers may be satisfied with other aspects of the vehicles and not recognize the tire wear defect.

# III. The Taylor Report Analysis is Statistically Flawed

## A. Dr. Taylor's Auction Data Analysis and Conclusions Are Unreliable

11. Based on a dataset of auction records obtained from Manheim, a firm which organizes automobile auctions,[5] Dr. Taylor concludes that he sees no indication

[5] Manheim, "About Manheim," http://www.manheim.com/about/?WT.svl=m_footer_about. "Manheim was established in 1945 as a wholesale vehicle auction operation."

5/2/2013

of abnormal tread wear on Ford Focus vehicles. Manheim recorded certain data on automobiles put to auction from 2005-2012. These data are described as containing records of the minimum measured tread depths for each of the four tires for the Ford Focus and several other vehicles brought for auction.

12. Dr. Taylor uses these data to compare the tread wear for Ford Focus tires with a set of selected "peer vehicles," namely, Honda Civic, Toyota Corolla, Chevy Cobalt, and Mazda 3 for model years 2005-2011. He compares tread depth distributions for Ford Focus vehicles to this set of peer vehicles. Figure 1 summarizes the frequency distribution of vehicle models in the dataset Dr. Taylor provided with his analysis.[6]

**Figure 1: Manheim Auction Data**

Share of Sales by Model
Share of Sales
.3
.2
.1
0
Civic
Cobalt
Corolla
Focus
Fusion
Mazda3
Note: Includes Model Year = 2005-2011.
Source: Auction Records backup.xlsx.

[6] The dataset also included Ford Fiesta which accounted for less than 1 percent of the sales.

Page 6

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

13. Based on his visual inspection of the charts in his report, Dr. Taylor opines that the "data do not show any substantial difference between tread wear rates on the Ford Focus and tread wear rates on peer vehicles."[7] Therefore, the data "does not support the hypothesis that owners or lessees of the Ford Focus would sustain substantially higher tread wear."[8]

14. A crucial requirement of a reliable data analysis is reliable data. Reliable inference about tread wear rates requires accurate, pertinent data and an adequate analysis. Dr. Taylor's data and analysis are unreliable on multiple counts.

15. As I describe below, there are important questions about the procedures used to collect the data that have not been answered by Dr. Taylor (or even asked by him of the entities that assembled this data set). I understand that all his information about the data comes from Ford --the Defendant in this case-- rather than from Manheim, which collected and created the dataset. [9]

16. There are important requirements a dataset must meet to be considered reliable for the purpose to which he intends to put it. My review of the dataset indicates it is seriously flawed and cannot be relied upon to accurately identify whether or not there was accelerated tire wear on the Ford Focus.

### *1. The Manheim Auction Data Are Not a Representative Sample*

17. In order to make valid inferences about the rates of tread wear for the population of vehicles on the road one needs to obtain a representative sample of this population. Random sampling from the target population is required to assure that a sample is representative of the population. The Manheim Auction Data are not a random sample representative of the Class. The tires in the Manheim data are on automobiles sold at auction and are consequently a

---

[7] Taylor Report, p. 6.

[8] Ibid.

[9] See Deposition of Paul M. Taylor, April 17, 2013 at 94:16-95:10.

specially selected subset of vehicles listed for sale, which are a selected subset of vehicles on the roads.

18. There are two filters which make these data non-representative. The first filter is the decision by an owner-operator to sell a vehicle, which creates a non-representative subset of the population of all operator-owned cars. The second filter allows these vehicles for sale to pass through a Manheim auction. Only certain types of sellers are allowed to bring their vehicles to a Manheim auction.[10] These include dealers, financial institutions, banks, lenders, repo companies, rental car agencies, state government, federal government, municipal and local government and big business fleet cars.[11] Many cars sold at auction have been repossessed.[12] Even those cars sold by dealers are not typical of the overall vehicle-for-sale population. A dealer vehicle must come in as a trade-in, a sale by a previous owner, or possibly an unsold new vehicle.

19. These two filters have potentially important implications regarding the condition of the tires in the Manheim data compared with the population of tires on the Class vehicles, which by definition, are vehicles owned or leased by individuals.[13] Individual owners are likely to service and operate their vehicles differently from the fleet operators, and may experience different tire wear. Dealers choose which vehicles to sell by auction based on criteria that do not apply equally to the ordinary population of class member vehicles for sale. For

---

[10] See e.g., Deposition of Paul M. Taylor, April 17, 2013 at 31:24-32:8. "...You know like dealerships, used car, fleet dealers. You know, for example, Hertz or many of the others, would -- can dispose of vehicles through auction as well. So for whatever reason if they decide they no longer want to have the vehicle, or a vehicle is brought to them because of a trade-in or some other repossession or whatever, that data would -- those are the vehicles that are brought to one of these places that has the ability to sell them at auction."

[11] See e.g., Manheim, "A Guide to Wholesale Vehicle Remarketing Auction Handbook: Second Edition 2007," pp. 16, 26 and 47-48, http://www.manheim.com/content_pdfs/help/Auction_Handook.pdf.

[12] See e.g., Auto Remarketing, "Manheim's Analysis of Repossession Remarketing Challenges," February 12, 2013, http://www.autoremarketing.com/print/wholesale/manheim%E2%80%99s-analysis-repossession-remarketing-challenges.

[13] Margie Daniel, Robert McCabe, Mary Hauser, Donna Glass, and Andrea Duarte, individually and on behalf of a class of similarly situated individuals v. Ford Motor Company, Complaint, November 2, 2011(Complaint), p. 26 ¶ 76.

example new car dealers may sell the trade-ins with potential quality issues they'd rather not deal with or pass on to their customers. Used car dealers may use auctions as a mechanism to get rid of cars that are hard to sell.

20. Individual owners who are happy with their vehicles are likely to hold onto them, and as a result the auction data probably over-represent poor quality vehicles ("lemons"). These vehicles cannot be expected to be a representative sample of the vehicle population.

### *2. The Auction Data Are Contaminated By Tire Replacements*

21. Another serious flaw of Dr. Taylor's analysis is his failure to account for tire replacements. Dr. Taylor mentions the issue of tire replacements, but provides no sound explanation for completely ignoring it in his analysis.[14] The sole statement Dr. Taylor makes in this regard is that "if the tread wear on the Ford Focus was substantially different from Peer Vehicles, the distribution of tread depth with mileage would be very dissimilar."[15] It is unclear what Dr. Taylor means by this statement (dissimilar by what statistical criteria?), but in any case the disconnect between odometer readings of the vehicle and mileage driven on each tire because of replacements is a serious problem with these data.

22. The ideal data set for estimating tread wear would be a dataset of repeated measurements of the same tires as they age and as their miles-in-use-increase. In addition, either operating conditions of these tires that contribute to wear need be held fixed or operating conditions need to be observed along with declining tire depth.

23. However, the auction data do not involve repeated measurements of the same tire or even the same vehicle, but instead describe the tire depths on a non-random set of vehicles that happen to have different odometer readings. Inevitably, the cars with the high odometer readings will have second (or even

---

[14] "Some vehicles may have had replacement tires at the time of auction. There is no entry in the database for whether the tires on a vehicle are original equipment or replacement tires." Taylor Report, p. 5.

[15] Taylor Report, pp. 5-6.

later) generations of tires, and their presence in the data make it appear that tires have longer lives than they actually experience.[16] Beyond the normal replacement cycle, dealers or other interim owners (auction vehicles could change hands multiple times) may have changed the tires for either newer (or perhaps older) ones before Manheim records tire tread. There is no way to eliminate the replacement tires because the Manheim data contain no information whether the record has been made on the original or a replacement tire.[17]

24. The presence of replacement tires in the data is quite clear in Figure 2 below which illustrates the "typical" tire depth of a Ford Focus right rear tire in the dataset as a function of mileage.[18] Here, after an interval of declining tread depth, the typical tread depth actually increases, as if tires were growing more tread. Then, at higher mileage the typical tread depth stabilizes completely, as if tire wear ended. These are both symptoms of tire replacements. As Dr. Taylor states himself, "if you have a high mileage and you have tread that looks like it's brand new, you can reasonably assume that those tires were replaced."[19] Although Dr. Taylor's study focuses on tires on cars with odometer readings of 60,000 or less, there is a virtual certainty some tires have been changed before that odometer reading was obtained.

---

[16] Dr. Taylor acknowledges that replacement tires affect tread depth. "Your tread depth would be effected by replacement tire, yes. If you replace the tires you start over again and your tread depth is higher." Deposition of Paul M. Taylor, April 17, 2013 at 124:20-22.

[17] Dr. Taylor is aware of this issue. "Q. [Manheim data] really does not tell you whether you're looking at a replacement tire or original equipment tire? A. That's correct." Deposition of Paul M. Taylor, April 17, 2013 at 125:6-9.

[18] I employ the "nearest neighbor" estimator, which is a commonly used data smoothing technique. See e.g., Greene, W.H., *Econometric Analysis: Fifth Edition*, New Jersey: Pearson Education, Inc., 2003, pp. 457-459.

[19] Deposition of Paul M. Taylor, April 17, 2013 at 125:2-5.

**Figure 2: Auction Data Shows Evidence of Tire Replacements**

### *3. The Auction Data Are Contaminated By Large Measurement Errors*

25. A scientific experiment intended to measure tread wear would have a very clear protocol for measuring tread depth and would have systems in place to assure that whoever was doing the measurements followed the protocol closely. As far as I can tell, Taylor did not check directly whether Manheim had either.[20] Nor do there seem to have been any consequences if the tread depth were measured incorrectly by Manheim. As Dr. Taylor notes, there may be "hundreds or even thousands" of vehicles going through an auction lot on a given day.[21] It is

[20] He seems to have relied entirely on Ford in this regard.

[21] Deposition of Paul M. Taylor, April 17, 2013 at 117:7-16.

possible, for example, that to save time a technician might simply look at the odometer and appearance of the vehicle, and make a guess what was the appropriate tread depth. When one looks at the actual dispersion of readings, that looks like a very plausible possibility.

26. A symptom of the measurement problem is the vast differences in measured tread depth on vehicles with low odometer readings. Table 1 below indicates the measurements of the Ford Focus right rear tire tread depth in 1/32nds on vehicles with odometer readings greater than 100 miles and less than 2,000 miles. If those odometer readings applied to the tires, there should be very little wear, yet the distribution of tread depths is very dispersed. The mode is 9/32nds which has 31 percent of the readings, but there are quite a few readings at 8 and 10. A substantial fraction of the reported tread depths are 6/32nds. And there are implausible values at 0, 3, 30, and 32.

**Table 1**

**Distribution of Right Rear Tire Tread Depths**
**Ford Focus Vehicles with Less than 2,000 Miles**

| Value of Tread Depth | Count | Percent | Cumulative Count | Cumulative Percent |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 0 | 2 | 1.04% | 2 | 1.04% |
| 3 | 1 | 0.52% | 3 | 1.55% |
| 4 | 2 | 1.04% | 5 | 2.59% |
| 5 | 4 | 2.07% | 9 | 4.66% |
| 6 | 26 | 13.47% | 35 | 18.13% |
| 7 | 7 | 3.63% | 42 | 21.76% |
| 8 | 46 | 23.83% | 88 | 45.60% |
| 9 | 60 | 31.09% | 148 | 76.68% |
| 10 | 27 | 13.99% | 175 | 90.67% |
| 11 | 7 | 3.63% | 182 | 94.30% |
| 12 | 8 | 4.15% | 190 | 98.45% |
| 13 | 1 | 0.52% | 191 | 98.96% |
| 30 | 1 | 0.52% | 192 | 99.48% |
| 32 | 1 | 0.52% | 193 | 100.00% |
| Total | 193 | 100.00% | | |

Note: Base Model = FOCUS, Model Year = 2005-2011, 100<Mileage< 2000.

Source: Auction Records backup.xlsx.

27. Measurement errors that behave in a similar way on all vehicles might not affect Dr. Taylor's comparison of the Ford Focus with what he calls "peer" vehicles, but it is very surprising to discover how different are the distributions of measured tread on different vehicles, all with very low mileage. Figure 3 shows one example of Dr. Taylor's tread-depth distribution charts comparing Ford

Focus with Chevy Cobalt with less than 1,000 miles driven.[22] Comparisons with other peer vehicles are presented in Appendix A.

**Figure 3: Dr. Taylor's Tread Depth Distributions for Low-Mileage Vehicles**

Note: Model Year = 2005-2011, 1<Mileage<1000.

Source: Auction Records backup.xlsx.

28. It is my understanding that new tires have tread-depths of 10/32nds or 11/32nds[23], and the strong mode for the Cobalt at 10/32nds is consistent with this fact, but the left tail of Cobalt measurements at 8, 7 and 6/32nds suggests either extraordinary wear rates, or serious measurement errors in this case biased in favor of lower tread depths. The Ford Focus measurements lack the distinct

[22] I eliminate vehicles with mileage equal to 0 or 1 per "Auction Information Email.pdf." Following Dr. Taylor, I also eliminate observations indicating vehicles with tire tread depth over 12/32" or when all four tire treads were 0".

[23] Tire Rack, "Tire Specs Explained," p. 3, http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=194.

mode of the Cobalt, leaving the starting depth quite unclear. And the very substantial left tail of the Focus tire depth distribution indicates that Ford Focus vehicles with very few miles driven had highly worn tires.[24] These charts resemble Dr. Taylor's exhibits of what he would expect to see as an evidence of accelerated tire wear on Ford Focus vehicles.[25] Although Dr. Taylor omitted these low mileage vehicles from his analysis "so tires would have at least some minimal amount of wear," [26] Dr. Taylor's methodology indicates (were the data reliable) that very low mileage Focus vehicles had more rapid tread wear than the peer vehicles.

29. Alternatively, the nearly brand new vehicles showing substantial tread wear indicates considerable data errors and systematic misreporting. Distributions for vehicles with greater mileages that Dr. Taylor presented show a similar pattern. For example, approximately 18 percent of Focus tires on vehicles with 1,000 to 4,999 miles have tread depth of 6/32nds or less.[27] This indicates that there are either many Focus vehicles with extremely rapid tread wear or that—due to data collection issues or representativeness issues—these data do not accurately reflect true tread depths for typical vehicle owners.

30. Dr. Taylor's distribution charts demonstrate another peculiar feature of his data. At the ranges of 1,000 to 4,999 miles and 5,000 to 9,999 miles the distribution has a local spike at 6/32".[28] For all subsequent mileage ranges up to 60,000

---

[24] Typical tread depths of brand new tires range from 10/32" to 11/32" See Tire Rack, "Tire Specs Explained: Tread Depth," http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=197; Office of Regulatory Analysis and Evaluation Planning, Evaluation and Budget, "NPRM on Tire Pressure Monitoring System FMVSS No. 138," U.S. Department of Transportation, September 2004, p. 15.

[25] "And lower mileages you would see that the curves for the Ford Focus would be to the left of the curves of the other vehicles that were wearing out faster, and therefore, at lower mileages, having faster tread wear." Deposition of Paul M. Taylor, April 17, 2013 at 130:12-16; See also Taylor Report, p. 7.

[26] Taylor Report, fn. 5. It is surprising that Dr. Taylor did not notice the large portion of Ford Focus vehicles with substantial tread wear in this category.

[27] Taylor Report, Exhibit E-2.

[28] Taylor Report, Exhibits E-2 - E-3.

miles the distribution peaks at around 6/32".[29] It would appear in this broad 5,000 to 60,000 mileage range that tires don't wear despite the additional use. Dr. Taylor provides no explanation as to why his distribution charts show this peculiar feature. One reason could be that this peculiarity is indicative of systematic misreporting of the measurements. Another explanation could be that the owners' tire-change behavior may be affected on the expectation or the fact of sale. The latter would result in a self-selection bias of the sample. Either way these highly peculiar features of these data raise fundamental questions about their reliability.

#### 4. The Manheim Data Lack Controls that Account for Differences in Wear Rate

31. Tire wear does not depend only on the vehicle—which is the foundation of Dr. Taylor's comparisons across vehicles. Tire wear also depends on tire quality. All tires display standardized grades for tread wear, traction, and temperature (Uniform Tire Quality Grading).[30] All tires display a tread wear grade ranging from 100 to 700. The number indicates how fast tires are expected to wear out compared to a control tire with grade 100. For example, a tire with grade 200 is rated to last twice as long as the control tire with grade 100.[31] It is unclear if Manheim collects (or if Dr. Taylor requested) this information.

32. Tire wear also depends on how the tires are used and maintained. When the Department of Transportation measures tread wear, it very carefully controls the condition of use: "UTQG Tread wear Grades are based on actual road use in which the test tire is run in a vehicle convoy along with standardized Course Monitoring Tires. The vehicle repeatedly runs a prescribed 400-mile test loop in West Texas for a total of 7,200 miles. The vehicle can have its alignment set, air

---

[29] Taylor Report, Exhibits E-4 - E-13.

[30] See e.g., U.S. Department of Transportation, National Highway Traffic Safety Administration, "Consumer Guide to Uniform Tire Quality Grading," August 2012, p. i.

[31] See e.g. U.S. Department of Transportation, National Highway Traffic Safety Administration "Consumer Guide to Uniform Tire Quality Grading," August 2012, pp. 1-170; SaferCar.gov, "Tire Rating Lookup," http://www.safercar.gov/Vehicle+Shoppers/Tires/Tires+Rating.

pressure checked and tires rotated every 800 miles. The test tire's and the Monitoring Tire's wear are measured during and at the conclusion of the test."[32]

33. The Manheim data refer to tires with different UTQG grades that have been used by their owners in vastly different ways. These data can be used to estimate tire wear rates on different vehicles only if there were controls in the statistical analysis for differences in tire quality and controls for differences in operating conditions such as typical vehicle load and region of operation and also controls for differences in maintenance, including alignment, air pressure checking and rotations, all of which are fixed for UTQG grading. But none of these controls are used in Dr. Taylor's analysis.

### *5. Tire Wear on Non-Focus Vehicles is Not the Right Benchmark*

34. At issue in this case is whether or not tires mounted on the rear axle of Ford Focus vehicles had significantly accelerated wear compared to the wear rate the tires would have experienced if defects in the rear suspension on these vehicles had been corrected. The Manheim data do not contain (or at least do not record) any Ford Focus vehicles with retrofitted suspensions that might be useful as a benchmark. Absent an appropriate benchmark Dr. Taylor offers a group of so-called "peer" vehicles which he implicitly suggests can serve as a proxy for the Focus with a retrofitted rear suspension.

35. There is no way to know which, if any, of these vehicles have tire wear rates that are the same as a retrofitted Ford Focus, and in the case of the Honda Civic, there is reason to suspect it is a distinctly inappropriate comparison, since the Honda Civic has been reported to also have problems of accelerated tire wear.[33] Hence, Dr. Taylor's faulty comparison unjustifiably implies that both vehicles have tread wear within a normal range. This example shows the conceptual

---

[32] Tire Rack, "Uniform Tire Quality Grade (UTQG) Standards," p.1, http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=48.

[33] See e.g., See e.g., Honda Problems, "Honda Civic Premature Tire Wear: Rapidly Worn Tires Caused by Short Rear Upper Control Arms," http://www.hondaproblems.com/Civic/tire-wear.shtml or Honda, "Honda Service Bulletin: 08-001," January 22, 2008, http://ww2.justanswer.com/uploads/thebesthonda/2010-11-28_180103_uneven_tire_wear.pdf.

error in comparing a vehicle at-issue with a *range* of different "benchmark" vehicles.[34]

#### 6. Dr. Taylor Fails to Define the Peer Vehicles Narrowly Enough and Ignores the Ford Fusion

36. Dr. Taylor fails to account for the differences in vehicles even where the information is available. He presents tread wear range comparisons that include vehicles with different body types (e.g. sedans, coupes, and hatchbacks) and different conditions (salvage, clean, extra clean, etc.). The distributions of vehicles in the data by body type and condition grade are presented in Figure 6 and Figure 7, respectively. These factors are important. For example, to the extent the tire wear is affected by the loads and speed in the vehicle, generally lighter loads and higher speed may be expected for coupes than for sedans and hatchbacks.[35] Also, the vehicle condition might be a symptom of the driving style which can in turn affect the tire wear. Failure to control for vehicle differences, tire replacements, and all other important factors results in a broader range of wear and an unreliable comparison between the vehicles.

---

[34] Many factors affect tire wear such as: tire running temperature, air temperature, pavement temperature, pavement characteristics, use of new rubber and improved carbon blacks, nature of work (driving), tire and vehicle maintenance, load, tire pressure, position front vs. back, speed, alignment and tire durability. See Expert Report of Robert J. Pascarella, pp. 2-3; Deposition of Paul M. Taylor, April 17, 2013 at 194:22-197:7; Veith, A.G., "Tire Treadwear: The Joint Influence of $T_g$, Tread Composition and Environmental Factors. A Proposed 'Two-Mechanism' Theory of Treadwear," *Polymer Testing*, Vol. 7, Issue: 3 (1987), pp. 177-202 at 177-178, 181-182, 184, 204; AA Membership, "Tyre life and age," http://www.aaireland.ie/AA/Motoring-advice/Driving-advice/Tyres/Tyre-life-and-age.aspx; "Comparing The Durability of Tires," http://www.stat.ualberta.ca/statslabs/casestudies/files/tires2.pdf; JK Tyres, "Factors affecting tyre performance," http://www.jktyre.com/Customer_Service/Tyre_Care.aspx; Tyre Damage, "Tyre Wear," http://www.tyredamage.com/content/view/3/4/.

[35] Tire speed ratings usually differ between coupes and family sedans. See e.g. Tire Rack, "How to Read Speed Rating, Load Index & Service Descriptions," http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=35.

**Figure 4: Distribution of Sales by Body Types**



Note: Includes Model Year = 2005-2011.

Source: Auction Records backup.xlsx.

5/2/2013

**Figure 5: Distribution of Vehicles by Condition Grade**

Share of Sales by Condition Grade
Percent of Sales
.4
.3
.2
.1
0
Poor/Salvage
Rough
Average
Clean
Extra Clean
Note: Includes Model Year = 2005-2011. Numeric and alphabetic codes were standardized.
Source: Auction Records backup.xlsx.

37. In Figure 6, I present Dr. Taylor's distribution charts with several modifications. The distribution charts in the figure 1) compare Ford Focus to Chevy Cobalt separately; 2) restrict the mileage to 20,000 to eliminate at least some tire replacements; 3) include only sedans; and 4) include only vehicles in "Average" condition.[36] Comparisons with the other peer vehicles are shown in Appendix B.

[36] Auction Data contains "Vehicle Condition Grade/Code" reported in alphabetic grade and numeric grades. See "Auction Record Field Decodes.docx" in Dr. Taylor's backup materials. I standardize the two grading systems into a common form.

Page 20

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

**Figure 6: Tread Depth Distribution of Ford Focus vs. Cobalt**

Note: Model Year = 2005-2011, Mileage<20K, Condition = Average, Body Type = Sedan.

Source: Auction Records backup.xlsx.

38. These exhibits do not show a "match" as Dr. Taylor claims to observe in his charts. In this display the rear tire distributions are clearly left-shifted consistent with Dr. Taylor's characterization of what he thinks would constitute evidence of accelerated tire wear.

39. Again without any further explanation, Dr. Taylor also omits Ford Fusion from his analysis, only stating that "since the purpose of this analysis was to compare tread wear between the Ford Focus and Peer Vehicles, data on the Ford Fusion and Fiesta were not used."[37] While Fiesta may not have enough records in the dataset for comparison, it is unclear why Dr. Taylor doesn't consider Fusion a

[37] Taylor Report, fn. 3.

Peer Vehicle. Figure 7 shows Dr. Taylor's distribution charts comparing Focus to Fusion for vehicles with less than 20,000 miles in "Average" condition. The distribution for Focus again appears "left-shifted"—just what Dr. Taylor expects when there is accelerated tire wear.

**Figure 7: Tread Depth Distribution of Focus vs. Fusion**

Note: Model Year = 2005-2011, Mileage<20K, Condition = Average, Body Type = Sedan.

Source: Auction Records backup.xlsx.

### *7. Eyeball Estimation is Not Scientifically Acceptable*

40. Finally, Dr. Taylor's inference method of visual comparisons risks the possibility that he sees what he wants to see. To avoid that possibility, professional statisticians always carry out a numerical data analysis that is governed by very clear rules which allow the statisticians to form unbiased estimates and corresponding measures of reliability (standard errors). There is no assurance that Dr. Taylor's "eyeball" comparisons provide unbiased inferences from these data and he has provided no measure of the reliability of his casual conclusions.

### B. Ford Warranty Data Are Not Pertinent

41. Dr. Taylor uses Ford Warranty Claims Data ("AWS Data"), which contain information on "repairs performed at authorized dealerships where Ford has paid for some or all of the repair."[38] The principal conclusion from this analysis appears to be that there were fewer Ford Focus tire issues reported for the 2005 model than with the 2004 model.[39] I find this analysis unpersuasive and its conclusions irrelevant to the issues in this case.

42. A Warranty Claim is filed by an authorized dealership and included in the AWS data only if it is at least partially honored by Ford. This seems to require at least two and possibly all three of the parties to agree that there was excess tire wear: the owner, the dealer and Ford. The dealer is critical here and may treat some customer complaints different from others, and may not initiate a complaint when tires are replaced. Changes in these data across years can result from changes in behavior of any of these three parties, as well as from changes in tire wear.

43. The category of "Improper Tire Wear" is broad enough to include defects that arise with wear that leave the tread depth normal, and dealers wishing to please their customers may use this category for tire replacements.

44. An early tire replacement due to accelerated tire wear may only come after the warranty has expired. Typically, Ford tire warranty lasts for 12 months and 12,0000 miles, whichever comes first.[40] The fact that a tire survives through 12,000 miles of use is not proof that it does not suffer from accelerated wear.

45. The relevant question here is how many warranty claims should be expected but-for the accelerated tread wear. To answer this question, Dr. Taylor compares tire-related warranty repairs for 2004 Focus vehicles with the later

---

[38] Taylor Report, p. 8.

[39] Taylor Report, p. 9.

[40] Brief In Support of Ford Motor Company's Motion For Summary Judgment, March 15, 2013, p. 3.

models.[41] Dr. Taylor's implicit use of a 2004 Focus as a comparison point is a very poor choice.

46. I understand that Ford Focus may have suffered from the tire wear defect several years prior to 2005—as early as 2002.[42] Consequently, this analysis does not establish that the 2005 model did not contain the alleged defect--only that the warranty claims have declined. This may indicate that the 2004 model had even more serious problems with respect to premature tire wear or that practices involving tire warranty claims changed.

47. Dr. Taylor also compares the rate of warranty claims under the code of "Tire Defects" with other component repairs. This analysis is also beside the point. The relevant benchmark is not the frequency of warranty claims for other components but instead is the frequency of tire warranty claims on the Focus with a retrofitted suspension that does not cause accelerated tire wear. This benchmark is completely absent from this data set.

48. Moreover, it seems unsurprising that tire warranty claims are not as frequent as other claims. One reason is that excess tire wear might become apparent only at tire replacement time which may come after the warranty expired. Furthermore, accelerated tread wear would not commonly be attributed to vehicle defects by average drivers. And vehicle owners may not be in a position to determine whether their vehicle's tires are wearing faster than those of peer vehicles. In addition, Ford made no attempt to inform Focus owners of potential

---

[41] Taylor Report, pp. 9-14.

[42] Plaintiff's Motion for Class Certification, January 11, 2013, p. 2. See also DNL2 00006366, A Ford Test Report dated May 6, 2002 whose objective is "To evaluate subjectively a proposed vehicle (front and rear) alignment setting (0.0 degree toe) vs. current production rear toe (0.5 degree) for steering and handling characteristics. The purpose of the change is to resolve a customer concern of excessive rear tire wear on Focus vehicles."; DNL2 00006364-65, Emails from 2003 discussing Focus rear tire wear. Discuss that EU had a tire wear problem and made changes to fix it. This change was rejected in US.; DNL2 00005326, Email dated August 20, 2004 "The tire (or tyre) tests in Europe showed a 20% increase in tire life without any shoulder wear when they changed the geometry and alignment specs. This is huge! They claim to have known for some time that we have quality issues regarding the suspension geometry."; DNL2 00001329, an email from a Ford engineer dated July 09, 2004 wanting to "speed resolution of tire wear concern."

accelerated tire wear. For all of these reasons, warranty repairs are a very poor indicator of accelerated tread wear.

### C. Crash Data Analysis Does Not Establish that Focus Crash Rates Were Not Elevated

49. Dr. Taylor uses two datasets (Fatality Analysis Reporting System and Illinois Crash Data), collectively referred to as "Crash Data," to analyze whether the alleged tire defects caused Ford Focus vehicles to have fatal accidents.

50. Dr. Taylor has provided neither the source data nor the computations behind his analysis.[43] As a consequence it is impossible for me to reproduce his work.

51. However, this work suffers from some of the same serious problems already discussed: (1) there is no system in place to assure accurate, relevant and reliable data; (2) there is no meaningful benchmark against which to compare the Ford Focus; (3) there are no "controls" for conditions that affect crash rates; and (4) There is no statistical analysis that includes estimates and measures of reliability, thus indicating if these data are sufficient to conclude that the crash rates for the Focus are statistically distinguishable from the crash rates of other vehicles. The accuracy of the data is particularly critical. The dataset is compiled from entries into Traffic Crash Report after the accident. [44] Dr. Taylor does not demonstrate that he has studied the accuracy and reliability of the assessments of the vehicle defect reported in the crash.

### D. Summary

52. Dr. Taylor utilizes unreliable data and methods to make inferences regarding the alleged premature tire wears on Ford Focus vehicles. Dr. Taylor has no valid statistical basis to conclude that either 1) the rates of tread wear for the Ford

---

[43] See Deposition of Paul M. Taylor, April 17, 2013 at 39:1-41:8.

[44] See e.g., Illinois Department of Transportation, Division of Traffic Safety, "Illinois Traffic Crash Report SR 1050 (2009), Instruction Manual for Law Enforcement Agencies," 2009, http://www.ce.siue.edu/faculty/hzhou/ww/paper/Illinois%20Traffic%20Crash%20Report%20SR%201050.pdf ; NHTSA, "Manuals & Documentation - FARS," http://www-nrd.nhtsa.dot.gov/CATS/listpublications.aspx?Id=J&ShowBy=DocType.

Focus were similar to the rates for "peer" vehicles, or 2) the rates of tread wear for the Ford Focus were not accelerated by rear suspension problems.

53. Dr. Taylor's AWS Data analysis is irrelevant and cannot be relied upon to assess whether Ford Focus vehicles were experiencing premature tire wear.

54. Dr. Taylor's crash data analysis is not reproducible. Dr. Taylor does not demonstrate the accuracy and the reliability of the Crash Data.

## IV.   Dr. Strombom's Analyses Are Flawed and Uninformative

### A. Dr. Strombom's Fleet Data Analysis is Incapable of Supporting His Conclusions

55. Dr. Strombom uses a dataset of roughly 500 fleet vehicles to evaluate whether the Class Vehicles exhibited premature tire wear. His analysis is based on the observations of tire-related expenditures for Ford Focus vehicles (model years 2005 - 2009) driven in the 2009 - 2012 period.[45]

56. The analysis does not directly address the issue of tire wear, rather infers it indirectly through reported tire related costs by fleet owners to Utilimarc--a consulting firm serving fleet clients. Dr. Strombom first defines a "tire event" as an instance when $150 or more was incurred in tire-related expenditures (tire labor costs, tire parts costs, and tire vendor costs). He assumes that such events can be interpreted as tire replacements. Dr. Strombom then computes the number of times tires were presumed to be replaced as a function of the miles driven from 2009 to 2012.[46]

57. Dr. Strombom, observing that most vehicles had zero "tire events", concludes that Class Vehicles did not experience premature tire wear.[47] However, as described below, Dr. Strombom's analysis is incapable of supporting this conclusion.

---

[45] Strombom Supplemental Report, p. 2.

[46] Strombom Report, pp. 5-6.

[47] Strombom Supplemental Report, p. 2.

### 1. The Fleet Vehicles Are not Representative of Class Vehicles

58.     First, I note that Ford sold over 1.2 million of Ford Focus vehicles for model
        years 2005 through 2011.[48]  Dr. Strombom's data analysis utilizes 518 Ford
        Focus vehicles. This would constitute a very small number of Class Vehicles
        even if it were representative.

59.     However, this data set is not a representative sample from the Class Vehicle
        population. Indeed, it includes no Class Vehicles.  As noted earlier, the Class
        consists only of vehicles owned or leased by individuals.[49]  The vehicles in this
        data set are not individually owned, but rather owned by fleets of unspecified
        types and numbers, with possibly limited and restricted uses.[50]  Fleet vehicles
        differ from individually owned vehicles as well as within fleet types by many
        factors including type of use (e.g. government vehicles are less likely to be used
        for long-distance trips), driving behavior, carried loads (fleet vehicles are less
        likely to carry heavier loads), and maintenance (e.g. tire rotations). Dr.
        Strombom does not appear to have investigated any of these issues before he
        reaches his conclusions.[51]  Indeed, Dr. Strombom has expressed no opinion on
        the representativeness of this dataset.[52]

### 2. The Fleet Tire Expenditure Data are Unreliable

60.     These tire expenditure data are assembled from fleet operators by Utilimarc,
        "which is a North American fleet consulting and technology solutions firm

---

[48] See e.g., Declaration of Janet Conigliaro, March 15, 2013, pp. 4-5.

[49] Complaint, p. 26 ¶ 76.

[50] Dr. Strombom does not explain how many and what types of fleets are included in the sample. See Deposition of Bruce Strombom , April 18, 2012 at 76:17-78:3, 85:19-24, 91:22-92:2, 100:18-101:10, 113:3-6 and 127:5-10.

[51] See Deposition of Bruce Strombom, April 18, 2012 at 100:18-101:2, "Q...Is there any indication in the Utilimarc data as to how the hundred 44 Ford focuses were used by the fleet operators? A. No, there weren't. Q. Any indication on number of passengers typically in the Ford Focus? A. No. Q. Any information about typical load in the Ford Focus? A. No, there's not." See also 113:3-6, "Q. Is there any information in the Utilimarc data that you reviewed that identifies the geographical location of the cars? A. No."

[52] Deposition of Bruce Strombom , April 18, 2012 at pp. 195:20-24.

serving large, diverse, complex fleet clients in the government, utility, and private sectors."[53] Dr. Strombom has not provided any reason to believe that fleet operators report accurately to Utilmarc either odometer readings or tire expenditures. There is nothing in his report that addresses who provides the information, from what internal data set, and under what circumstances.

61. The reporting of tire expenditures in the dataset may be incomplete and accordingly under-represent actual tire wear. For example, Exhibit 22 of the Supplemental Strombom Report shows the number of tire events by mileage of vehicles. The table implies that 18 out of 24 Ford Focus vehicles (75 percent) did not have a single tire replacement after driving 80,000 miles. Also, 16 out 30 vehicles (53 percent) were driven over 80,000 miles without a single tire replacement. Considering the average lifetime of a tire is 45,000 miles,[54] these numbers seem implausible.

### 3. *The Fleet Data Lack a Benchmark*

62. Dr. Strombom's analysis does not compare the number of tire repairs to the number that would have occurred in the same circumstances but for the defect. Instead he arbitrarily decides on a level of tire incidents that should be observed in the dataset and declares that having failed to find it, these data provide evidence that there is no defect in Focus vehicles.

### 4. *Dr. Strombom's Analysis of These Data is Wrong.*

63. Dr. Strombom's Exhibits 1 and 1A which form the basis for his conclusions identify "tire events" that occur during a 40,000 mile increment to the odometer of a vehicle, but these exhibits ignore completely the initial conditions: (1) the initial odometer reading and (2) the initial condition of the tires. A tire that already has 50,000 miles of use seems almost certain to require replacement if

---

[53] Strombom Report, p. 4.

[54] See U.S. Department of Transportation National Highway Traffic Safety Administration, "NHTSA Tire Aging Test Development Project: Phase 1," October 2009, p. 3; U.S. Department of Transportation National Highway Traffic Safety Administration, "An Evaluation of Existing Tire Pressure Monitoring Systems," July 2001, p. 111;

driven for another 40,000 miles, while a brand new tire stands a good chance of working without incident for 40,000 miles.  As a result, Dr. Strombom's casual conclusions from these tables are unreliable.

64.  Dr. Strombom also opines that, while there are large number of CQIS (Common Quality Indicator Systems) reports related to premature tire wear, "the frequency of CQIS reports as a percentage of vehicles sold (i.e., the rate of such repairs) is actually lower for the Ford Focus than for Ford, Lincoln, and Mercury."[55]

65.  The issues with regard to CQIS are similar to the one described in my review of Dr. Taylor's Ford Warranty Data Analysis. I understand that in order for a CQIS report to be filed by a dealership, first the defect must be recognized by the owner who is willing to file a claim, then honored by the dealer and acknowledged by Ford.  This seems to require at least two of the parties to agree that there was excess tire wear:  the owner and the dealer. The dealer's role is critical as it may treat some customer complaints different from others, and may not initiate complaints when tires are replaced.

### B. Dr. Strombom's Depreciation Analysis is Flawed and Misleading

66.  Dr. Strombom conducts an analysis of used vehicle sales utilizing a dataset from National Automobile Dealers Association ("NADA"). First, Dr. Strombom selects "a set of vehicles comparable to the Class Vehicles" ("Benchmark Vehicles").[56] The set of Benchmark Vehicles consists of 33 models within a category of "Intermediate Compact Vehicles" classified by NADA.[57] Dr. Strombom displays a series of charts with percentage changes in prices for used Ford Focus and several Benchmark Vehicles, in order to visually compare their rates of depreciation. Further, Dr. Strombom "evaluates the difference in depreciation rates between Class Vehicles and Benchmark Vehicles using

---

[55] Strombom Report, p. 11.

[56] Strombom Report, p. 12.

[57] Strombom Report, Exhibit 7.

regression analysis."[58] Dr. Strombom argues that if Ford Focus vehicles had accelerated tire wear, one would see higher depreciation rates for this model compared to the set of his Benchmark Vehicles. He concludes that the Class Vehicles did not experience excess depreciation compared to his Benchmark Vehicles.[59]

67. This analysis is deeply flawed, misleading, and does not offer meaningful conclusions pertinent to the issue. In particular, the conclusions of this analysis rely on three erroneous assumptions: 1) the market is fully aware of the tire defect, 2) the tire defect problem is big enough to be evident in this small sample of used car prices which depend on a myriad of other unobserved variables that affect the selling prices, and 3) the depreciation rates on benchmark vehicles are the same as a Ford Focus with a retrofitted suspension..

### *1. The Analysis Assumes Complete Information in the Market*

68. The premise of this analysis is that the market will depreciate faster any vehicle that causes accelerated tire wear even if the vehicle is sold with brand-new tires. The mechanism by which the market might accelerate the depreciation of defective vehicles requires widespread availability of information about the economic costs of the defect, including both buyers and sellers.

69. In the case of Focus's tire wear defect this is an unlikely scenario. The tire wear defect is not a major, immediately noticeable defect. Vehicle owners may have a difficulty recognizing premature tire wear unless the problem is severe. For instance, an owner may attribute the premature wear to tire quality instead. It may take more than one tire replacement to recognize that the wear is actually a result of a vehicle defect.

70. Assuming the owner is aware of the defect, the vehicle's value would be discounted only if the buyer is aware of it as well. The owner is not likely to share this information with the buyer. Hence, the buyer can only learn of the

---

[58] Strombom Report, p. 15.

[59] Strombom Report, pp. 14, 17.

defect from public sources if such information is available. In economic literature this problem is described as a problem of asymmetric information.[60]

71. In support of his analysis, Dr. Strombom cites a paper by Hartman (1987) that investigates the relationship between vehicle defects and car value.[61] The paper by Hartman addresses "how resale markets discount the *new* information on product quality signaled by product recalls."[62]

72. In general, both buyers and sellers can learn about the defects through recalls. However, there have been no recalls issued for the Focus's tire wear defect to date. What is more, my understanding is that Ford has not acknowledged or disseminated information to customers in regard to this defect. In fact, Plaintiffs allege that Ford attempted to hide the defect from consumers.[63] There has been no wide awareness in the market about the defect. Therefore, Dr. Strombom's analysis has no capacity of identifying a tire wear related effect by simply looking at the depreciation of vehicles and is a mere speculation.

### 2. The Analysis Assumes the Benchmark Vehicles Represent the Ford Focus with a Retrofitted Rear Suspension

73. The second critical error Dr. Strombom commits is that he assumes that differences between the deprecation rates of Benchmark Vehicles and depreciation rates of the Ford Focus are attributable to Ford Focus excess tire wear, as if the benchmark vehicles were Ford Focus vehicles with retrofitted suspensions.

74. If the Benchmark vehicles are full of defects, they might naturally have accelerated depreciation and might not be like a Ford Focus with a retrofitted suspension. Dr. Strombom's benchmark vehicles had numerous defects

---

[60] See e.g. Akerlof, G.A., "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism." *The Quarterly Journal of Economics*, Vol. 84, No. 3 (Aug., 1970), pp. 488-500.

[61] Hartman, R.S., "Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation," *The Review of Economics and Statistics*, Vol. 69, No. 2 (1987), pp. 367-372.

[62] Ibid. at p. 367 (emphasis added).

[63] Plaintiff's Motion for Class Certification, April 22, 2012, pp. 4-5.

publicly recorded during the relevant period. These defects might have influenced the depreciation rates. Table 2 lists 50 examples of the benchmark vehicles that were reported to have recalls for 2005 - 2011 models. The technical problems listed in these recalls are more serious than premature tire wear.

75. A particularly noteworthy observation of Dr. Strombom is that "for 2008, 2010, and 2011, the Ford Focus prices appear to be toward the upper end of the range."[64] Most of the recalls listed in the table below relate to the 2008-2011 models. In light of the technical problems documented for the benchmark vehicles, it is inconceivable that Dr. Strombom's observation can have any meaningful implications about Ford Focus's tire wear defect.

76. I also note that one of the benchmark vehicles is Honda Civic. As mentioned earlier in my review of Dr. Taylor's analysis, Honda Civic has been reported to have premature tire wear problems similar to Ford Focus.[65]

77. In sum, this analysis is incapable of generating any meaningful conclusions regarding Focus's tread wear defect.

---

[64] Strombom Report, p. 14.

[65] See e.g., See e.g., Honda Problems, "Honda Civic Premature Tire Wear: Rapidly Worn Tires Caused by Short Rear Upper Control Arms," http://www.hondaproblems.com/Civic/tire-wear.shtml or Honda, "Honda Service Bulletin: 08-001," January 22, 2008, http://ww2.justanswer.com/uploads/thebesthonda/2010-11-28_180103_uneven_tire_wear.pdf.

## Table 2: Dr. Strombom's Benchmark Vehicles Had Many Recalls

### Examples of Recalls for Benchmark Vehicles in the Depreciation Analysis

| | Model | Model Year | Recall Description | Recall ID | Recall Date |
|---|---|---|---|---|---|
| 1. | Chevy Cobalt | 2009 | Power Train: Automatic Transmission: Lever and Linkage: Column Shift | # 09V073000 | 6-Mar-09 |
| 2. | Chevy Cobalt | 2009 | Steering: Electric Power Assist System | # 10V073000 | 3-Mar-10 |
| 3. | Chevy Cobalt | 2009 | Fuel System, Gasoline: Delivery: Fuel Pump | # 12V459000 | 19-Sep-12 |
| 4. | Chevy HHR | 2008 | Latches/Locks/Linages:Doors:Latch | # 08V444000 | 3-Sep-08 |
| 5. | Chevy HHR | 2008 | Air Bags | # 08V046000 | 30-Jan-08 |
| 6. | Dodge Caliber | 2007 | Vehicle Speed Control: Accelerator Pedal | # 10V234000 | 3-Jun-10 |
| 7. | Dodge Caliber | 2007 | Wheels: Cap/Cover/Hub | # 07V196000 | 7-May-07 |
| 8. | Dodge Caliber | 2007 | Service Brakes, Hydraulic: Antilock: Control Unit/ Module | # 06V493000 | 29-Dec-06 |
| 9. | Dodge Caliber | 2009 | Power Train: Automatic Transmission: Control Module (TCM, PCM) | # 08V528000 | 9-Oct-08 |
| 10. | Dodge Caliber | 2010 | Latches/Locks/Linages:Doors:Latch | # 10V197000 | 11-May-10 |
| 11. | Dodge Caliber | 2011 | Steering: Column | # 11V315000 | 8-Jun-11 |
| 12. | Ford Focus | 2008 | Air Bags: Frontal: Driver Side Inflator Module | # 07V541000 | 21-Nov-07 |
| 13. | Ford Focus | 2008 | Exterior Lighting: Headlights | # 08E050000 | 11-Aug-08 |
| 14. | Honda Civic | 2011 | Fuel System, Gasoline: Delivery: Fuel Pump | # 11V176000 | 15-Mar-11 |
| 15. | Honda Civic | 2009 | Fuel System, Gasoline: Delivery: Hoses, Line/Piping, and Fittings | # 08V535000 | 14-Oct-08 |
| 16. | Hyundai Elantra | 2010 | Exterior Lighting: Brake Lights: Switch | # 13V113000 | 1-Apr-13 |
| 17. | Hyundai Elantra | 2010 | Service Brakes, Hydraulic: Switches: Brake Light | # 13V113000 | 1-Apr-13 |
| 18. | Hyundai Elantra | 2011 | Air Bags: Side/Window | # 13V115000 | 1-Apr-13 |
| 19. | Hyundai Elantra | 2011 | Structure | # 13V115000 | 1-Apr-13 |
| 20. | Nissan Sentra | 2005 | Engine and Engine Cooling | # 07V527000 | 14-Nov-07 |
| 21. | Nissan Sentra | 2005 | Fuel System, Gasoline: Storage | # 05V269000 | 7-Jun-05 |
| 22. | Nissan Sentra | 2007 | Service Brakes, Hydraulic: Foundation Components: Master Cylinder | # 08V311000 | 11-Jul-08 |
| 23. | Nissan Sentra | 2009 | Equipment: Electrical: Navigational System (Global Positioning System) | # 10V401000 | 10-Sep-10 |
| 24. | Mazada Mazda 3 | 2010 | Electrical System | # 09V126000 | 16-Apr-09 |
| 25. | Misibishi Lancer | 2006 | Exterior Lighting : Headlights | # 06E023000 | 13-Mar-06 |
| 26. | Misibishi Lancer | 2006 | Exterior Lighting : Headlights | # 09E025000 | 11-May-09 |
| 27. | Misibishi Lancer | 2006 | Exterior Lighting | # 06E064000 | 17-Jul-06 |
| 28. | Pontiac G5 | 2009 | Steering: Electric Power Assist System | # 10V073000 | 3-Mar-10 |
| 29. | Pontiac G5 | 2009 | Fuel System, Gasoline: Delivery: Fuel Pump | # 12V459000 | 19-Sep-12 |
| 30. | Pontiac G5 | 2009 | Power Train: Automatic Transmission: Lever and Linkage: Column Shift | # 09V073000 | 6-Mar-09 |
| 31. | Saturn Aura | 2008 | Power Train: Automatic Transmission: Gear Position Indication (PRNDL) | # 12V460000 | 18-Sep-12 |
| 32. | Saturn Aura | 2009 | Power Train: Automatic Transmission: Gear Position Indication (PRNDL) | # 12V460000 | 18-Sep-12 |
| 33. | Saturn Aura | 2009 | Power Train: Automatic Transmission: Lever and Linkage: Column Shift | # 09V073000 | 6-Mar-09 |
| 34. | Subaru Impreza | 2005 | Suspension: Front: Control Arm: Lower Arm | # 11V464000 | 6-Sep-11 |
| 35. | Subaru Impreza | 2006 | Suspension: Front: Control Arm: Lower Arm | # 11V464000 | 6-Sep-11 |
| 36. | Subaru Impreza | 2006 | Air Bags: Frontal | # 07V043000 | 12-Feb-07 |
| 37. | Toyota Corolla | 2011 | Seats | # 13V014000 | 16-Jan-13 |
| 38. | Toyota Corolla | 2011 | Structure: Body: Roof and Pillars | # 11V566000 | 22-Nov-11 |
| 39. | Toyota Corolla | 2011 | Air Bags: Frontal: Sensor/ Control Module | # 13V014000 | 16-Jan-13 |
| 40. | Toyota Prius | 2008 | Hybrid Propulsion System: Inverter | # 12V536000 | 14-Nov-12 |
| 41. | Toyota Prius | 2008 | Engine and Engine Cooling | # 12V536000 | 14-Nov-12 |
| 42. | Toyota Prius | 2008 | Vehicle Speed Control: Accelerator Pedal | # 09V388000 | 5-Oct-09 |
| 43. | Toyota Prius | 2008 | Steering | # 12V537000 | 14-Nov-12 |
| 44. | Toyota Prius | 2008 | Steering: Gear Box: Shaft Sector | # 12V537000 | 14-Nov-12 |
| 45. | Toyota Prius | 2008 | Equipment: Other: Labels | # 10V036000 | 3-Feb-10 |
| 46. | Volkswagen Golf | 2010 | Fuel System, Diesel | # 11V490000 | 3-Oct-11 |
| 47. | Volkswagen Golf | 2011 | Fuel System, Diesel | # 11V490000 | 3-Oct-11 |
| 48. | Volkswagen Jetta | 2010 | Fuel System, Diesel | # 11V490000 | 3-Oct-11 |
| 49. | Volkswagen Jetta | 2010 | Power Train: Automatic Transmission | # 09V333000 | 20-Aug-09 |
| 50. | Volkswagen Jetta | 2010 | Fuel System, Gasoline: Delivery: Hoses, Line/Piping, and Fittings | # 10V621000 | 10-Dec-10 |

Source: Public sources.

### 3. *The Analysis Does Not Control for Relevant Factors*

78. Dr. Strombom provides no coherent basis for selecting his set of benchmark vehicles other than that they are in the same class of "Intermediate Compact Vehicles."[66] In fact these vehicles are differentiated by many characteristics that may affect the depreciation rate. There are far more significant components of vehicle value than tire condition or tread wear--for example engine condition, steering, or brakes. Variations in these other vehicle characteristics can be expected to swamp the variations in value due to accelerated tread wear. Dr. Strombom makes no effort to control for any differences in the vehicles.

## C. Named Plaintiffs Are Not, and Need Not Be, a Random Sample

79. Dr. Strombom complains that the tire repair experience of the Named Plaintiffs is more troubled than the experience of the fleet owners.[67] But this is immaterial. The Named Plaintiffs are not presented as a statistically representative sample, nor used as such. It is to be expected that among those who step forward to participate in a case may be those who have had particularly notable wear repair experiences. This does not indicate that other vehicles' tire repair and replacement data must match the Named Plaintiffs to have had a defect that accelerated tire wear.

## D. Repeat Customers' Experience is Uninformative

80. Dr. Strombom opines that repeat purchasers of Ford Focus vehicles could not have been harmed because they would have been aware of the defect.[68] With regards to fleets this opinion is irrelevant because the Class consists of individually owned or leased vehicles.[69] With regards to individual owners, this opinion is speculative and suspect. Vehicle owners would have a difficult time

---

[66] Dr. Strombom provides no reasonable basis for selecting these benchmarks other than they are in the same class of "Intermediate Compact Vehicles." Strombom Report, p. 12. See Deposition of Bruce Strombom, April 18, 2013 at 151:6-152:4.

[67] Strombom Report, pp. 18-19.

[68] Strombom Report, pp. 24-25.

[69] Complaint, p. 26 ¶ 76.

conducting the tests to determine that there was a suspension defect, and to confirm that the same defect was present when another Ford Focus was purchased.  A Focus repeat buyer may have been generally satisfied with other aspects of his or her car and purchased another without realizing that the tires might have worn less rapidly absent the suspension defect.

### E. Summary

81.     In his Fleet Data Analysis, Dr. Strombom relies on a small sample of vehicles that are not representative of the Class Vehicles to draw unreliable conclusions regarding tire wear.

82.     Dr. Strombom's Depreciation Analysis relies on wrong assumptions and faulty benchmarks.  The analysis erroneously assumes that market participants would be fully aware of the tire wear defect.  Dr. Strombom fails to control for any factors that affect relative depreciation rates. In addition, Dr. Strombom utilizes faulty benchmarks that had many different defects and is unable to draw adequate inferences regarding premature tire wear.

83.     Dr. Strombom is incorrect to suggest that Named Plaintiff's need to be a statistically representative sample of the Class.

## V.    Conclusion

84.    I therefore conclude that there is nothing in the expert reports of Dr. Taylor and Dr. Strombom that shed light on the extent to which Ford Focus vehicles experienced accelerated tread wear due to a rear suspension problem.


Edward E. Leamer, Ph.D.
May 2, 2013

5/2/2013

# APPENDIX A. Tread Wear on Vehicles with Less Than 1,000 Miles

**Figure 8**

Focus compared to Civic
Left Front
Right Front
Left Rear
Right Rear
Percent of Vehicles
Minimum Tread Depth, 32nd Inch
Focus
Civic

Note: Model Year = 2005-2011, 1<Mileage<1000.

Source: Auction Records backup.xlsx.

Page 37

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

5/2/2013

**Figure 9**

Focus compared to Corolla
Left Front
Right Front
Left Rear
Right Rear
Percent of Vehicles
Minimum Tread Depth, 32nd Inch
Focus
Corolla

Note: Model Year = 2005-2011, 1<Mileage<1000.

Source: Auction Records backup.xlsx.

Page 38

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

5/2/2013

**Figure 10**

Focus compared to Fusion
Left Front
Right Front
Left Rear
Right Rear
Percent of Vehicles
Minimum Tread Depth, 32nd Inch
0
.1
.2
.3
0 1 2 3 4 5 6 7 8 9 10 11 12
Focus
Fusion

Note: Model Year = 2005-2011, 1<Mileage<1000.

Source: Auction Records backup.xlsx.

Page 39

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

5/2/2013

**Figure 11**

Focus compared to Mazda3
Left Front
Right Front
Left Rear
Right Rear
Percent of Vehicles
0
.1
.2
.3
0 1 2 3 4 5 6 7 8 9 10 11 12
Minimum Tread Depth, 32nd Inch
Focus
Mazda3

Note: Model Year = 2005-2011, 1<Mileage<1000.

Source: Auction Records backup.xlsx.

Page 40

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

5/2/2013

## APPENDIX B. Tread Wear Distributions for Average Sedans Less Than 20,000 Miles

**Figure 12**

Focus compared to Civic
Left Front
Right Front
Left Rear
Right Rear
Percent of Vehicles
Minimum Tread Depth, 32nd Inch
Focus
Civic

Note: Model Year = 2005-2011, Mileage<20K, Condition = Average, Body Type = Sedan.

Source: Auction Records backup.xlsx.

Page 41

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

5/2/2013

**Figure 13**

Focus compared to Corolla
Left Front
Right Front
Left Rear
Right Rear
Percent of Vehicles
Minimum Tread Depth, 32nd Inch
Focus
Corolla

Note: Model Year = 2005-2011, Mileage<20K, Condition = Average, Body Type = Sedan.

Source: Auction Records backup.xlsx.

Page 42

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

5/2/2013

**Figure 14**

Focus compared to Mazda3
Left Front
Right Front
Left Rear
Right Rear
Percent of Vehicles
Minimum Tread Depth, 32nd Inch
Focus
Mazda3

Note: Model Year = 2005-2011, Mileage<20K, Condition = Average, Body Type = Sedan.

Source: Auction Records backup.xlsx.

Page 43

Rebuttal Expert Report of Edward E. Leamer, Ph.D.

EXHIBIT 1
May 1, 2013

CURRICULUM VITAE

# Edward E. Leamer

**Position:** Chauncey J. Medberry Chair in Management
Professor of Statistics
Professor of Economics
Director, Business Forecast Project

**Address:** Anderson Graduate School of Management
University of California
110 Westwood Plaza
Los Angeles, California 90095-1481

**Phone:** (310) 206-1452

**FAX:** (310) 825-4011

**E-Mail:** edward.leamer@anderson.ucla.edu

**Birth:** May 24, 1944

**Education:** B.A., Princeton, 1966, mathematics
M.A., University of Michigan, mathematics (statistics)
Ph.D., University of Michigan, 1970, economics

**Honors:** Society of Sigma Xi
Fellow, Econometric Society
Fellow, American Academy of Arts and Sciences
**New Horizons in Economic Thought, Appraisals of Leading Economists**, ed. by Warren J. Samuels, chapter by Herman Leonard and Keith Maskus, 1992
Graham Lecture, Princeton University, March 1994
Christie Lecture, Millersville University, October 1998
**Who's Who in Economics**, edited by Mark Blaug, Edward Elgar
Citibank Teaching Award, 2001
EMBA Teaching Award: 2001, 2002

**Academic Appointments:**

Assistant Professor:
- Wayne State University, January-June, 1970
- Harvard University, July, 1970-June, 1973

Associate Professor:
- Harvard University, July, 1973-June, 1975

Professor of Economics:
- University of California at Los Angeles, July 1975-

Chauncey J. Medberry Chair in Management:
- Anderson Graduate School of Management, July 1990-

Professor of Statistics
- University of California at Los Angeles, July 1997-

**Administrative Positions:**

Chairman, Department of Economics:
University of California, Los Angeles, 1983-87
Area Head, Business Economics:
Anderson Graduate School of Management, 1990-92, 1993 -
Director, UCLA/Anderson Business Forecast, July 2000 -

**Visiting Positions:**

Visiting Professor:
University of Southern California, 1979-80
University of Basel, June 1990.
Central European University, April 1993
Graduate School of Business, University of Chicago, Fall 1994
Yale University, 1995
Universidad de San Andreas, Argentina, 1997
University of Oregon, 2001
Gastprofessor:
Institute for Advanced Studies, Vienna, October 1987, June 1991, July 1992, April 1993, June 1995
Visiting Scholar:
Federal Reserve Board, March 1988, September 1989, September 1991, September 1993, May 1996
International Monetary Fund, 1992, 1993
Lecturer, National Science Council, Republic of China, Dec. 1991
United States Study Center, University of Sydney, 2009
Visiting Fellowship:
Department of Statistics (Econometrics), The Australian National University, August - September, 1988
Research Fellow:
National Bureau of Economic Research, 1989 -
Lecturer:
Dutch Network for Quantitative Economics, May 1990.

**Fellowships, Grants:**

NSF graduate traineeship, 1966-67
NDEA Fellowship, 1967-70
National Science Foundation Grant GS31929, Bayesian Inference with Economic Data,
U.S. State Department, 1970-71, "Tariffs and the Commodity Composition of Trade," with R.M. Stern, University of Michigan
Federal Reserve, Board of Governors, 1971-72, "Controlling Monetary Aggregates"
Department of Labor, 1974-75, "Tariffs and the Allocation of Labor"
National Science Foundation Grant, SOC 76-08863, 1976-78
Ford Foundation Grant, "The Commodity Composition of Trade," 1977-79
National Science Foundation, SOC 78-09477, 1978- 80, "Bayesian Statistical Search and Estimation Procedures"
Department of Labor, "Trade and Employment," 1978-79
National Science Foundation, renewal, 1980-82, 1982-84, 1984-86, 1986-7
World Bank, "Effects of Non-tariff Barriers," 1986-87
National Science Foundation, "Determinants of the Real Exchange Rate", with Sebastian Edwards, 1986-7

Sloan Foundation, "Empirical Studies of the Effect of U.S. International Economic Policy on the Distribution of Income", 1987-93
National Science Foundation, "Bayesian Elicitation Diagnostics," 1989-91.
Labor Department, "Estimates of the Effects of Non-tariff Barriers", 1989-90
National Science Foundation, "Economic Integration of High-wage and Low-wage Economies," 1992-4, 1994-96
Chiang Ching-Kuo Foundation for International Scholarly Exchange, "Economic Integration of Taiwan with Mainland China," with Ivan Pn'g, 1993-4
Price Waterhouse, "Does U.S. Foreign Direct Investment Reduce Domestic Investment?" 1993-4
Sage Foundation, "Trade and US Wages," 1997-2000

**Professional Activities:**

Global Fellow, UCLA, 2004-7

Associate Editor.

Review of Economics and Statistics, 1970-1996
Quarterly Journal of Economics, 1970-1975
Journal of the American Statistical Association, 1975-1979
Econometrica, 1975-1979
Journal of International Economics, 1988-1994
Econometric Theory, 1985-1988.
Journal of Applied Econometrics, 1985-1992

Editorial Board

The Journal of International Trade and Economic Development, 1995-
Asia Pacific Management Review, 2000-
The North American Journal of Economics and Finance, 2005-
*e*conomics, 2007-

Co-editor

Journal of International Economics, 1989-1993

Editor

Data Point, Harvard Business Review, 2004-2005

Advisory Committee

Handbook of Applied Econometrics

Advisory Board for International Trade Abstracts, 1996-

Referee

Various Journals

Outsider Reviewer

Department of Economics, University of Oregon, May 1995

National Science Foundation Panel for Evaluation of Proposals, 1976-1978

Chair, L.J. Savage Memorial Prize Committee, 1979-1981

National Research Council, Committee on Basic Research in the Behavioral and Social Sciences, Working Group on Measurement and Scaling

Frontiers of Economics, Speaker, World Bank, 1985

National Science Foundation Panel on Empirical Studies in Economics, December 1987

Sloan Foundation Fellowship Committee, 1988-1993

Australian Economics Congress, Invited Speaker, August 1988

Commission on Graduate Education in Economics, American Economic Association

Panel on Foreign Trade Statistics, National Research Council, National Academy of Sciences

9th World Congress of the International Economics Association, Invited Speaker

National Academy of Sciences, Speaker: "Public Policy to Maintain America's Technological Leadership," annual meeting, April 1994

Nominating Committee, American Economic Association, 1992-3

Contingent Valuation Panel, National Oceanographic and Atmospheric Administration, 1992

Council of Economic Advisors, State of California, 1995-1998, 2009-

Council of Economic Advisors, State Comptroller, 2007-2008

Faculty Executive Board, Clausen Center, Haas School of Business, 1996-

NBER
ITI summer conference organizer, 1999-2000

Bureau of Economic Analysis, Advisory Committee, 2002-2007

Queenscare
Investment Committee, 2005-
Board of Directors, 2007-

National Academy Panel on Outsourcing, Chair, 2004-2006

Los Angeles Economy and Jobs Commission, 2006-2007

UCLA Extension, Board Member, 2006-

Public Outreach
Testimony at US Trade Deficit Commission of Congress, January 2000
MacArthur Working Group on Networks and Inequality, April 2000

**Teaching Experience:**

Econometrics - Statistics
Bayesian Inference - Statistics
International Trade
Economic Theory
Principles of Economics

Forecasting

**Dissertation:** Inference with Non-Experimental Data: A Bayesian View

**Publications:**

**Books:**

**Quantitative International Economics**, with R.M. Stern, Boston: Allyn and Bacon, 1970.

**Specification Searches: Ad Hoc Inference with Non Experimental Data**, John Wiley and Sons, Inc., 1978. Translated into Spanish and Russian.

**Sources of International Comparative Advantage: Theory and Evidence**, Boston: MIT Press, 1984.

**Behind the Numbers: U.S. Trade in the World Economy**, with Robert Baldwin and the Panel on Foreign Trade Statistics, National Research Council, Washington, D.C.: National Academy Press, 1992.

**Sturdy Econometrics: Selected Essays of Edward E. Leamer**, Economists of the 20th Century, Hants:Edward Elgar, 1994.

**Quiet Pioneering: Robert M. Stern and His International Legacy**, edited by Keith E. Maskus, Peter M. Hooper, Edward E. Leamer and J. David Richardson, Ann Arbor: The University of Michigan Press, 1997.

**International Economics**, Worth Series in Outstanding Contributions, edited by Edward E. Leamer, New York: Worth Publishers, 2001.

**Handbook of Econometrics,** Vol. 5, edited by James Heckman and Edward Leamer, 2004.

**Handbook of Econometrics,** Vol. 6A, edited by James Heckman and Edward Leamer, 2007.

**Handbook of Econometrics,** Vol. 6B, edited by James Heckman and Edward Leamer, 2007.

**Macroeconomic Patterns and Stories,** Springer-Verlag, 2009.

**The Craft of Economics: Lessons from the Heckscher-Ohlin Framework**, Ohlin Lecture, M.I.T. Press, 2012.

**Tariff and Nontariff Barriers to International Trade**, in process.

**The Analysis of Data**, in process.

**NAFTA and Central America**, World Bank Monograph, in process.

**Who's Afraid of Global Trade?**, in process.

**Op-Ed Pieces:**

"Privatize Social Security? Here's Why," **LA Times,** October 2000
"Cyclically, We're Back to the Past," **LA Times**, December 4, 2000
"Is there a Real Estate Bubble?" **LA Business Journal**, June 27, 2005
"What Happens When the Housing Market Cools?" **LA Business Journal**, Jan 15, 2006
"A Dose of Urgency for Home Buyers," **New York Times**, April 2008
"Let's Stop Paying Wall Street's Gambling Debts," with Larry Kotlikoff, **Forbes**, April 2008
"Running a National Sale," with Larry Kotlikoff, **Financial Times**, October 2008
"An Undergraduate Error," **National Journal**, December 2008
"What might tell us when this mess will start getting better?" **National Journal**, March 2009
"The US is NOT experiencing a second Great Depression," **National Journal**, June 2009
"What We Need is an AAWP," **National Journal**, August 2009
"Dust-up" With Brad DeLong, **Los Angeles Times**, September 2009

**Articles:**

"Location Equilibria," **Journal of Regional Science**, Vol, 8 (No. 2, 1968), 229-242, reprinted in A.J. Scott, ed., Location Allocation Systems: A reader (San Francisco: Holden-Day, Inc.), forthcoming.

"Problems in the Theory and Empirical Estimation of International Capital Movements," with R.M. Stern, in F. Machlup, S. Salant and L. Tarshis, eds., **International Mobility and Movement of Capital** (National Bureau of Economic Research, New York), 1972.

"A Class of Informative Priors and Distributed Lag Analysis," **Econometrica**, 40 (November 1972), 1059-81.

"Criteria for Evaluation of Econometric Models," with Phoebus Dhrymes and others, **Annals of Economic and Social Measurement** (July 1972), 259-290.

"False Models and Post-Data Model Construction," **Journal of the American Statistical Association**, 69 (March 1974), 122-131; abstracted in **Zentralblatt fur Mathematik,** reprinted in Omar F. Hamouda and J.C.R. Rowley, **Foundations of Probability, Econometrics and Economic Games,** Edward Elgar Publishing Limited, 1995.

"Empirically-weighted Price and Income Indexes for Import Demand Functions," **Review of Economics and Statistics**, LV (November 1973), 441-450.

"Multicollinearity: A Bayesian Interpretation," **Review of Economics and Statistics**, LV (August 1973), 371-380.

"Nominal Tariff Averages with Estimated Weights," **Southern Economic Journal** (July 1974), 34-46.

"The Commodity Composition of International Trade: An Empirical Analysis," **Oxford Economic Papers**, 26 (November 1974), 350-374.

"A Bayesian Interpretation of Pretesting," with G. Chamberlain, **Journal of the Royal Statistical Society**, Series B, 38 (No. 1, 1976), 85-94.

"'Explaining Your Results' as Access-Biased Memory," **Journal of the American Statistical Association** (March 1975), 88-83.

"Tariffs in a Trade-Dependence Model," in H. Glejser, ed., **Quantitative Studies of International Economic Relations** (North-Holland Publishing Co., Amsterdam), 1976.

"A Result on the Sign of Restricted Least Squares Estimates," **Journal of Econometrics**, 3 (1975), 387-390.

"Matrix Weighted Averages and Posterior Bounds," with G. Chamberlain, **Journal of the Royal Statistical Society**, Series B, 38 (No. 1 1976), 73-84.

"An Empirical Analysis of the Composition of Manufacturing Employment in the Industrialized Countries," with R.M. Stern and C.F. Baum, **European Economic Review**, 9 (1977), 1-19.

"Regression Selection Strategies and Revealed Priors," **Journal of the American Statistical Association** (September 1978), 580-587.

"Least Squares Versus Instrumental Variables Estimation in a Simple Errors in Variables Model," **Econometrica** (July 1978), 961-968.

"The Information Criterion for the Choice of Regression Models, A Comment," **Econometrica** (March 1979), 507-510.

"Difficulties with Testing for Causation," with R. Jacobs and M. Ward, **Economic Inquiry** (July 1979), 401-13.

"The Leontief Paradox, Reconsidered," **Journal of Political Economy** (June 1980), 495-503; reprinted in J. Bhagwati, ed., **International Trade: Selected Readings**, Cambridge:  MIT Press, 1986; reprinted in J. Peter Neary, ed., International Trade: The International Library of Critical Writings in Economics, Edward Elgar, forthcoming, 1994; reprinted in Heinz D. Kruz and Christian Lager, **Input-Output Analysis**, Edward Elgar Publishing Limited, 1997; reprinted in Edward E. Leamer, **International Economics**, Worth Publishers, 2001.

"Sets of Estimates of Location," **Econometrica**, Vol. 49, No. 1 (January 1981), 193-204.

"Welfare Computations and the Optimal Staging of Tariff Reductions in Models with Adjustment Costs," **Journal of International Economics**, 10 (1980), 21-36.

"Cross-Section Tests of the Heckscher-Ohlin Theorem:  A Methodological Comment," with Harry P. Bowen, **American Economic Review**, 71 (December 1981), 1040-1043; reprinted in Bertil Ohlin, **Critical Assessments of Leading Economists**, Routledge, 1996.

"Is It a Supply Curve, or Is It a Demand Curve:  Partial Identification through Inequality Constraints," **Review of Economics and Statistics**, Vol. LXIII, No. 3 (August 1981), 319-327.

"Parameterization-free Ridge Regression Bounds," **Journal of the American Statistical Association**, 76 (December 1981), 842-849.

"The Hit Parade of Economics Articles," in E. Tower, editor, **Economics Reading Lists, Course Outlines, Exams, Puzzles and Problems**, Volume 14, July 1981.

"Sets of Posterior Means with Bounded Variance Priors," **Econometrica**, 50 (May 1982), 725-736.

"Comment on `Specification Analysis with Discriminating Priors'," by Thomas F. Cooley, **Econometric Reviews**, First Issue, 1982.

"Techniques for Estimation with Incomplete Assumptions," **Proceedings of IEEE Meeting on Decision and Control**, San Diego, December 1981.

"Robust Sets of Estimates for Regression," with C.Z. Gilstein, **Econometrica**, LXV (May 1983), 306-317.

"Let's Take the Con Out of Econometrics," **American Economics Review**, 73 (March 1983), 31-43; reprinted in Bruce J. Caldwell, Criticism and Appraisal in Economics: A Book of Readings (Allen and Unwin, 1985); reprinted in Thomas J. Coyne, **Readings in Managerial Economics**, 1985; excerpted in Caroline P. Clotfelter, **Economic Satire: Wit and Humor in the Dismal Science**, Armonk, New York: M.E. Sharpe; summarized in **Journal of Forecasting**, reprinted in C.W.J. Granger,ed., **Modeling Economic Series**, Oxford: Oxford University Press, 1990; reprinted in Dale J. Poirier, **The Methodology of Econometrics II**, Hants: U.K.: Edward Elgar, 1994; reprinted in Omar F. Hamouda and J.C.R. Rowley, **Foundations of Probability, Econometrics and Economic Games**, 1996; reprinted in Guy Peters**, The International Library of Comparative Public Policy - Series B.**, 1996; reprinted in Andrew Lo, **Financial Econometrics**, 2006.

"Reporting the Fragility of Regression Estimates," with H. Leonard, **Review of Economics and Statistics**, LXV (May 1983), 306-3417.

"Model Choice and Specification Analysis," in Z. Griliches and M. Intriligator, eds., **Handbook of Econometrics, Volume 1**, Amsterdam: North Holland, 1983.

"Sets of Weighted Regressions" (with C.Z. Gilstein), **Journal of the American Statistical Association**, 78 (December 1983), 942-948.

"Consistent Sets of Estimates for Regression with All Variables Measured with Error" (with S. Klepper), **Econometrica**, 52 (January 1984), 163-183.

"Vector Autoregressions for Causal Inference?", in Karl Brunner and Allan H. Meltzer, eds., **Carnegie-Rochester Conference Series On Public Policy: Understanding Monetary Regimes**, Volume 22, 1985, 255-304; reprinted in Kevin D. Hoover, ed., **The New Classical Macroeconomics**, The University of California Press at Davis, 1992; reprinted in Dale J. Poirier, **The Methodology of Econometrics II**, Hants, England: Edward Elgar, 1994.

"Global Sensitivity Analysis for Generalized Least-Squares Estimates, **Journal of the American Statistical Association**, 79 (December 1984), 867-870.

"Bayesian Regression and Sensitivity Analysis," **Multiple Regression Analysis: Applications in the Health Sciences**," ed. by Donald E. Herbert and Raymond H. Myers, New York: American Institute of Physics, 1986.

"Bid-Ask Spreads for Subjective Probabilities," in P. Goel and A. Zellner, eds., **Bayesian Inference and Decision Techniques**, New York: Elsevier, 1985.

"Estimation of Time-of-Use Pricing Response In the Absence of Experimental Data: An Application of the Methodology of Data Transfer," with D. Aigner, **Journal of Econometrics**, (Sept/Oct. 1984), 26(1/2), 205-27.

"Sensitivity Analyses Would Help," **American Economic Review**, Vol. 75, No. 3, June 1985, reprinted in C.W.J. Granger,ed., **Modelling Economic Series**, Oxford: Oxford University Press, 1990.

"A Bayesian Analysis of the Inflation/Unemployment Tradeoff," in David A. Belsley and Edwin Kuh, eds., **Model Reliability**, Cambridge: MIT Press, 1986, 62-89, reprinted in C.W.J. Granger,ed., **Modelling Economic Series**, Oxford: Oxford University Press, 1990.

"Nonexperimental Inference," in S. Kotz and N.L. Johnson, eds., **Encyclopedia of Statistical Sciences**, vol. 6, New York: John Wiley and Sons, 1985.

"Leontief Paradox," in **The New Palgrave: A Dictionary of Economics**, edited by John Eatwell, Murray Migate and Peter Newman, London: The Macmillan Press, 1987.

"Specification Problems in Econometrics," in **The New Palgrave: A Dictionary of Economics**, edited by John Eatwell, Murray Migate and Peter Newman, London: The Macmillan Press, 1987.

"Self Interpretation," **Economics and Philosophy**, (1, 1985), 295-302; abstracted in The Philosopher's Index.

"Econometric Metaphors," in T. Bewley, ed., **Advances in Econometrics, Fifth World Congress**, Cambridge: Cambridge U. Press, 1987.

"Cross Section Estimation of the Effects of Trade Barriers," in R. Feenstra, ed., **Empirical Methods for International Trade**, Cambridge: MIT Press, 1987, 52-82.

"Multi-country Multi-factor Tests of the Factor Abundance Theory," with H.P. Bowen and L. Sveikauskus, **American Economic Review**, 77, no. 5, December 1987, 791 - 809; reprinted in Peter Neary, ed., **International Trade: The International Library of Critical Writings in Economics**, London: Edward Elgar Publishing, Ltd.; reprinted in Edward E. Leamer, **International Economics**, Worth Publishers, 2001; reprinted in Danel M. Bernhofen**, Empirical International Trade**, 2009.

"Empirical Tests of Alternative Models of International Growth," with L. Kotlikoff, in Colin I. Bradford and William H. Branson, eds., **Trade and Structural Change in Pacific Asia**, Chicago: University of Chicago Press, 1987, 227 - 269.

"Paths of Development in the Three-Good n-Factor General Equilibrium Model," **Journal of Political Economy**, Vol. 95, No. 5, October, 1987, 961-999.

"Errors-in-Variables in Linear Systems," **Econometrica**, Vol. 55, No. 4, July, 1987, 893-909.

"The Sensitivity of International Comparisons of Capital Stock Measures to Different 'Real Exchange Rates", **American Economic Review, Papers and Proceedings,** May 1988, 78, No. 2, 479 - 483.

"Measures of Openness" in R. Baldwin, ed., **Trade Policy Issues and Empirical Analysis**, University of Chicago Press, 1989, 147-200.

"Causality", discussion papers by Paul W. Holland, in Clifford C.Clogg, ed., **Sociological Methodology**, 1988, 485- 493.

"Things That Bother Me," **Proceedings from the 1988 Australian Economics Congress,** Michael McAleer and Ric Simes, eds., **Economic Record**, 64, (December 1989), 331-335.

"Optimal Aggregation of Linear Net Export Systems," in Terry Barker and M. Hashem Pesaran, eds., **Disaggregation in Econometric Modelling**, London: Routledge, 1990, 150-170.

"Planning, Criticism and Revision," in Michael McAleer, ed., **Topics in Applied Econometrics, Journal of Applied Econometrics**, Vol. 4S, (December 1989), S5-S28.

"The Structure and Effects of Tariff and Nontariff Barriers in 1983," in Anne P. Krueger and Ronald Jones, eds. **Festschrift** for Robert Baldwin, Basil Blackwell, 1990, 224-260.

"Latin America as a Target of Trade Barriers Erected by the Major Developed Countries in 1983," **Journal of Development Economics**, 32 (1990), 337-368.

> Reprinted as "La America Latina como un objectivo de las barreras comerciales erigidas por los principales paises desarrollados en 1983," **El Trimestre Economico**, Vol LVII (Diciembre 1990), 103-140.

"The Interplay of Theory and Data in the Study of International Trade," in M. Nerlove, ed., **Issues in Contemporary Economics**, **Proceedings of the Ninth World Congress of the International Economics Association, Volume 2, Macroeconomics and Econometrics,** Macmillan, 1991.

"A Conversation on Econometric Methodology," with Dale Poirier and David Hendry, **Journal of Econometric Theory**, 6, No. 2, June 1990, pp. 171-261; reprinted in Dale J. Poirier, ed., **The Methodology of Econometrics**, forthcoming, 1994.

"Comment" on Keith Maskus, "Comparing International Trade Data and Product and National Characteristics Data for the Analysis of Trade Models," in Peter Hooper and J. David Richardson, eds., **International Economic Transactions: Issues in Measurement and Empirical Research**, Chicago: University of Chicago Press, 1991, pp.56-60.

"A Bayesian Perspective on Inference from Macro-Economic Data," **Scandanavian Journal of Economics: New Approaches to Empirical Research in Macroeconomics**, Vol. 93, No. 2, 1991, pp. 225-248; reprinted in Omar F. Hamouda and J.C.R. Rowley, **Foundations of Probability, Econometrics and Economic Games**, 1996.

Comment on "Has Formalisation in Economics Gone Too Far?", **Methodus**, Vol. 3, No.1, (June 1991), 25-26; reprinted in Craig Freedman, ed., forthcoming.

"Report of the Commission on Graduate Education in Economics" with Anne Krueger et. al., **Journal of Economic Literature**, XXIX, (September 1991), 1035-1053.

"Comment on 'To Criticize the Critics'", **Journal of Applied Econometrics**, 1991, Vol. 6, 371-373.

"Can More Information Make You Worse Off?", **Econometric Theory**,
Vol 8, No. 1, March 1992, Solution, Vol.9, No.1, March 1993.

"Bayesian Elicitation Diagnostics", **Econometrica**, Vol. 60, No. 4 (July, 1992), pp. 919-942.

"Measurement Errors and the Convergence Hypothesis," in Helmut Frisch and Andreas Wörgötter, eds., **Open-Economy Macroeconomics**, London: MacMillan Press, Ltd., 1993, pp. 241-256.

"U.S. Wages and the Mexican-U.S. Free Trade Agreement", in Peter Garber, ed., **The Mexico-U.S. Free Trade Agreement**, Cambridge: M.I.T. Press, 1994, pp. 57-128.

"Testing Trade Theory," **Surveys in International Trade**, ed. by David Greenaway and L. Alan Winters, Basil Blackwell, 1994, pp. 66-106.

"Taste in Economics and Econometrics," in **Educating Economists**, ed. by David Collander and Reuven Brenner, Ann Arbor: U. of Michigan Press, 1992, pp. 91-94.

"Report of the NOAA Panel on Contingent Valuation," with Kenneth Arrow, Paul Portney, Roy Radner, Howard Schumann and Robert Solow, **Federal Register**, Friday, January 15, 1993, 4602-4614.

"U.S. Manufacturing and an Emerging Mexico," **The North American Journal of Economics and Finance**, Vol. 4, No. 1, Spring 1993, 51-89.

"The Neglect of Measurement Errors in the Social Sciences," Marschak Colloquium, abstract in **Mathematical Social Sciences** 25 (1993), p.308.

"Factor Proportions as a Source of International Comparative Advantage," **Papers and Proceedings**, **American Economic Review**, May 1993.

"Commentary on 'The Market for (Ir)reproducible Econometrics'" by Susan Feigenbaum and David M. Levy, **Social Epistemology**, (July-September, 1993), Vol. 7, No. 3, p.268.

"Two-ness and the Stolper-Samuelson Theorem", in Alan V. Deardorff and Robert M. Stern, eds**., The Stolper-Samuleson Theorem: A Golden Jubilee**, Ann Arbor: The University of Michigan Press, 1994, pp. 290-307.

"Commemorating the 50th Anniversary of the Stolper-Samuelson Theorem," in Alan V. Deardorff and Robert M. Stern, eds**., The Stolper-Samuleson Theorem: A Golden Jubilee**, Ann Arbor: The University of Michigan Press, 1994, pp. 289-290.

"Heteroscedasticity Sensitivity Diagnostics" **in Sturdy Econometrics**, Hants, England: Edward Elgar, 1994.

"Pooling Noisy Data Sets,"in Thomas Url and Andreas Wörgötter, eds., **The Econometrics of Short and Unreliable Time Series**, Physica-Verlag, Heidelberg, 1995, 41-60.

"The Heckscher-Ohlin Model in Theory and Practice," Graham Lecture, **Princeton Studies in International Finance**, No. 77, February 1995

"International Trade Theory: The Evidence", with James Levinsohn,in G. Grossman and K. Rogoff, eds., **Handbook of International Economics**, Vol III, 1995, pp. 1339-1394.

"In Search of Stolper-Samuelson Linkages between International Trade and Lower Wages," in Susan Collins, ed., **Imports, Exports and the American Worker**, Brookings, 1997, 141-214; reprinted in Edward E. Leamer, **International Economics**, Worth Publishers, 2001.

"A Year of NAFTA and a Peso Earthquake", with Christopher F. Thornberg, UCLA Business Forecast Project, April 1995.

"U.S. Wages, Technological Change and 'Globalization'", **Jobs and Capital**, Milken Institute for Job and Capital Formation, Vol. IV. Summer 1995, pp. 4-10.

"A Heckscher-Ohlin View of Sweden Competing in the Global Market," with Per Lundborg, in Richard B. Freeman, Robert Topel and Birgitta Swedenborg, eds. **The Welfare State in Transition**, The University of Chicago Press, 1997.

"A Combined Ricardian and Heckscher-Ohlin Model of Comparative Advantage," in. **Quiet Pioneering: Robert M. Stern and His International Legacy**, edited by Keith E. Maskus, Peter M. Hooper, Edward E. Leamer and J. David Richardson, Ann Arbor: The University of Michigan Press, 1997, 11-34.

"Questions, Theory and Data," in Steven G. Medema and Warren J. Samuels**, Foundations of Research in Economics: How do Economists Do Economics?,** Edward Elgar Publishing Co., 1996, pp. 175-190.

"Wage Inequality from International Competition and Technological Change: Theory and Country Experience, **American Economic Review**, **Papers and Proceedings**, May 1996, 309-314.

"The Effects of Trade in Services, Technology Transfer and Delocalisation on Local and Global Income Inequality," **Asia-Pacific Economic Review**, April 1996, Vol. 2, No. 1, 44-60.

"What Do We Know About the Impact of Offshore Investment on the U.S. Economy?" In Joel Slemrod, ed., **The Taxation of Multinational Corporations**, Kluwer Academic Publishers, 1996, pp. 103-132.

"Access to Western Markets and Eastern Effort," in Salvatore Zecchini, ed., **Lessons from the Economic Transition, Central and Eastern Europe in the 1990s**, Dordrecht: Kluwer Academic Publishers, 1997, pp. 503-526.

"Revisiting Tobin's 1950 Study of Food Expenditure," in Jan Magnus and Mary Morgan, ed., Special issue of **Journal of Applied Econometrics**, V 12, No3, Sept./Oct. 1997, 533-562. (with comments by McAleer, Barten and Schmidt, and reply), reprinted in **Methodology and Tacit Knowledge: Two Experiments in Econometrics** edited by Jan R. Magnus and Mary S. Morgan, Wiley, 1999, 123-152.

"Labor Markets in Developing Countries: An Agenda for Research," with Ann Harrison, **Journal of Labor Economics,** 1997, vol. 15, no.3, S1 - S18.

"Comment on Spilimbergo and Stein - Trading Blocs among Countries with Different Endowments," in Jeffrey Frankel, Ed. **The Regionalization of the World Economy**, Chicago: U. of Chicago Press, 1997, pp. 149-151.

"What's the Use of Factor Contents?" **Journal of International Economics**, Volume 50, No. 1, February 2000, pp. 17-50.

"Effort, Wages and the International Division of Labor," **Journal of Political Economy**, Vol. 107, Number 6, Part1, Dec 1999, 1127-1163, reprinted in Singer, Hans et.al. New World Order Series, Vol. 20, 2001.

"Competition in Tradables as a Driving Force of Rising Income Inequality," in **Globalization and Labor**, edited by Horst Siebert, Mohr Siebeck: Institut für Welterwirtschaft an der Universität Kiel, 1999.

"Effort and Wages: A New Look at the Inter-Industry Wage Differentials", with Christopher Thornberg, in Robert Feenstra, **The Impact of International Trade on Wages**, NBER: The University of Chicago Press, 2000, pp. 37-84.

"Does natural resource abundance increase Latin American income inequality?" with Hugo Maul, Sergio Rodriquez and Peter Schott, **Journal of Development Economics**, Vol. 59, No. 1, June 1999, pp. 3-42.

"Is this what I look like?" in **Methodology and Tacit Knowledge: Two Experiments in Econometrics** by Jan R. Magnus and Mary S. Morgan, Wiley, 1999, ISBN: 0-471-98297-0, pp. 363-368.

"Estimating Growth Equations for Previously Centrally Planned Economies: Dealing with Dubious Data and Disparate Information," with Mark P. Taylor, **Journal of Macroeconomics**, Fall 1999, Vol. 21, No. 4, pp. 639-672.

"Natural Resources as a Source of Latin American Income Inequality", with Peter Schott, **2000 World Development Report** Memorandum, 2000.

"Foreigners and Robots: Assistants of Some, Competitors of Others," in Alan V. Deardorff and Robert. M. Stern, eds., **Social Dimensions of U.S. Trade Policy**, Ann Arbor: University of Michigan Press, 2000, pp. 19-52.

"The Economic Geography of the Internet Age," with Michael Storper, **Journal of International Business Studies**, 32,4 (Fourth Quarter 2001): 641-655; reprinted in Ron Martin, ed., **Contemporary Foundations of Space and Place – Economics: Critical Essays in Human Geography**, Ashgate Publishing, 2008.

"Can the FTAA Suspend the Law of Gravity and Give the Americas Higher Growth and Better Income Distributions?" with Bernardo Blum, in Antoni Estevadeordal, Dani Rodrik, Alan M. Taylor and Andres Velasco, eds, **Integrating the Americas, FTAA and Beyond**, Harvard University Press, 2004, pp. 539-572.

"Are the roads red? Comments on 'Size Matters'", **Journal of Socio-Economics**, Volume 33, Issue 5, November 2004, pp. 555-557.

"The Truth About GDP Growth," **Harvard Business Review**, October 2004, p. 24.

"The Rich (and Poor) Keep Getting Richer", with Peter Schott, **Harvard Business Review**, April 2005, p. 20.

"Extreme Bounds Analysis," **The New Palgrave**, 2006

"Specification Searches," **The New Palgrave**, 2006

"The Leontief Paradox," **The New Palgrave**, 2006

"Globalizeringen och Europaintegrationen – effeckter på produktion och löner I Sverige," with Rikcard Forslid in Rihcard B. Freeman, Birgitta Swedenborg and Robert Topel, eds. **Att reformera välfärdsstaten**, NBER Rapporten II, 2006.

"Ports, Trade and Terrorism: Balancing the Catastrophic and the Chronic," with Christopher Thornberg, in Jon D. Haveman and Howard J. Shatz, Protecting the Nation's Seaports: Balancing Security and Cost, 2006.

"A Flat World, A Level Playing Field, a Small World After All, or None of the Above?" review of **The World is Flat**, by Thomas J. Friedman, *Journal of Economic Literature*, March (2007).

"Analyzing the U.S. Content of Imports and the Foreign Content of Exports," National Research Council, National Academy of Sciences, committee chaired by Edward Leamer, 2006.

"Is a Recession Ahead? The Models Say Yes, but the Mind Says No" The Economists' Voice. Berkeley Electronic Press, Volume 4 / Issue 1 (January 2007) http://www.bepress.com/ev/vol4/iss1/art1

"Housing IS the Business Cycle," in **Housing, Housing Finance and Monetary Policy, A Symposium** Sponsored by the Federal Reserve of Kansas City, 2008. Revised and updated for the **Enclyclopedia of Finance.**

"Please Think This Over," **The Economists' Voice**: Vol. 5 : Iss. 5, Article 7, 2008.

"Homes and Cars: Why are the Cycles in Homes and Consumer Durables so Similar?," **The B.E. Journal of Economic Analysis & Policy: Vol. 9** : Iss. 3 (Symposium), Article 5, 2009.

"What have changes in the Global Markets for Goods and Services Done to the Viability of the Swedish Welfare State?" in Richard Freeman, Birgitta Swedenborg and Robert Topel, eds, **Reforming the Welfare State: Recovery and Beyond in Sweden**, 2009.

"Tantalus on the Road to Asymptopia" **Journal of Economic Perspectives**, 2010

"Deflation Dread Disorder "The CPI is Falling!" **Berkeley Electronic Press,** Vol. 8 (2011) / Issue 1 / Columns

"Globalization and U.S. Wages: Modifying Classic Theory to Explain Recent Facts," with Jonathan Haskel, Robert Z. Lawrence, and Mathew J. Slaughter, **The Journal of Economic Perspectives,** Spring 2012, V. 26, No 2, 119-140.

"The Context Matters: Comment on Jerome H. Friedman, ''Fast sparse regression and classification''" **International Journal of Forecasting** 28 (2012) 741–748.

"Housing Is the Business Cycle. In: Gerard Caprio (ed.), **The Evidence and Impact of Financial Globalization**, Vol. 3, pp. 589-643. Oxford: Elsevier Inc, (2013)

**Business Forecast Reports**

"B2B and B2C in 2001, Back 2 Bankruptcies and Back 2 Cycles," December 2000.

"Too Many Predators and Not Enough Prey: The When and the Why of the Demise of the Bush/Clinton Expansion," April 2001.

"It Takes a Locomotive, but the fuel of optimism and ambition is running low," June 2001.

"If it isn't a Recession, what is IT?" September 2001.

"Not Long, Not Deep, but Not Much of a Recovery, Either," December 2001.

"This is Our First Business Cycle," March 2002.

"Should that 5.8% let the Bulls Out?" April, 2002.

"Bubble Trouble: Your Home Has a P/E Ratio Too." June 2002.

"Waiting Patiently for that 1999 Tech Equipment to Become Obsolete. Struggling between then and now," September 2002

"No news is no news," December 2002.

"The Fourth Imbalance," March 2003.

"The Bush/Clinton Expansion of the 21st Century. Overspent Consumers, Cautious Businesses and Broke Governments," June 2003.

"Looking for the Signs of Spring That Wouldn't Come," September 2003.

"The Twilight Zone Economy," December 2003.

"Normal Again," June 2004.

"A 2005 Rematch: The Housing Bubble and the Productivity Miracle vs. Reality and Reason," December 2004.

"Red Skies at Night, Sailors' Delight; Red Skies in the Morning, Sailors Take Warning," March 2005.

"Housing in the US Business Cycle," June 2005.

"Conference Board's Index of Leading Indicators," June 2005.

"No Recession Any Time Soon, But Troubles Ahead, Nonetheless," December 2005.

"Homes, Jobs and Bonds," June 2006.

"2005: The Year the Tortoise Won the Race.  Whither California Home Prices?" September 2006.

"Models or Minds?" December 2006.

"Why This Time Really IS Different, and Why We Will Survive a Near Recession Experience", December 2007.

"Recession Depression," March 2008

"Muddied Waters," June 2008

"You Haven't Seen That Before," December 2008

"Edging Backward Into the Future," March 2009

**Book Reviews:**

**An Introduction to Bayesian Inferences in Econometrics**, by A. Zellner, **Journal of Economic Literature**, X (December 1972), pp. 1232-1234.

**Bayesian Analysis in Econometrics and Statistics**, ed. by A. Zellner in **Journal of Economic Literature**.

**Research in Human Capital and Development**, Vol, 2. ed., by A. Khan and I. Sirageldin, **Journal of American Statistical Association**, 78 (December 1983), pp. 997-998.

**The Limits of Econometrics,** by Adrian C. Darnell and J. Lynne Evans, in **The Manchester School**, LIX, Number 1, (March 1991), pp. 93-96.

**North American Free Trade**, by Gary Clyde Hufbauer and Jeffrey J. Schott, in **Journal of Economic Literature**, forthcoming, 1993.

**Other Completed Manuscripts:**

"Ridge Regression Metrics and Distributed Lag Analysis"

"Valley Regression: Biased Estimation for Orthogonal Problems"

"On Controlling a Monetary Aggregate Under Uncertainty"

"The Welfare Impact of Uncertain Tariff Policy"

"Asymptotic Bayes Estimates of the Simultaneous Equations Model"

"The Determinants of Reading Scores: An Analysis Built on Explicit Prior Information"

"Destructive Diagnostics for the Errors-in-Variables Problem"

"SEARCH, A Bayesian Regression Package"

"Theory and Evidence of Immigrant Enclaves"

"Measurements of Capital Stocks"

"We Need Standard Errors of the Standard Errors of the Measurement Errors"

"Partial Economic Integration"

"Talent in a General Equilibrium Model"

"Will Regional Integration Weaken Trans-Pacific Exchanges," presented at the Trans-Pacific Conference, UCLA, May 19-21, 1993.

"Trade, Wages and Revolving Door Ideas," NBER Working Paper 4716, April 1994.

"The Life Cycle of US Expansions"

"Hydrocarbon Dewpoint Determination of Lean Natural Gases," with H.R. Warner Jr., A.P. Spence, R.L.Bone, R.A. Hubbard, J. Bernos, and W. A. Kriel.

"What's a Recession Anyway?" 2008, NBER Discussion Paper w14221.

"Workday, Holiday and Calendar Adjustment of Monthly Aggregates of Daily Diesel Fuel Purchases," NBER Working paper, 2011.

**Consulting:**

ABT associates, Cambridge, Massachusetts; 1973
Statistical tests for effectiveness of educational programs

State Department, 1971-1973

Econometric estimation of the effects of tariffs on imports

U.S. Treasury, 1972
Multi-period control under uncertainty of the monetary aggregates

U.S. Department of Labor, 1975-79
Econometric estimation of the effects of trade restrictions on U.S. workers

Pacific Gas and Electric, 1979-80
Bayesian Choice of Optimal Sample Size for Load Control Experiments

System Development Corporation, 1979
Bayesian estimation of multiple regression

System Development Corporation, 1983 -85
Review panel, analysis of school lunch and breakfast programs

Electric Power Research Institute, 1983-85
Forecasting electricity demand

D.J. Aigner Assoc., 1982-83
Data transferability

Legal Consulting

JurEcon, 1981-1983
Econometrics of Business Evaluations 1991-
Wrongful death and the valuation of human life, 1980 -
DES /Lilly 1985-86
Contingent Valuation Panel of NOAA, 1992
Contingent Valuation of Environmental Accidents, 1993-
Honeywell v. Litton Systems (Navigational system reliability), 1997-1998
Alaska North Slope Quality Bank proceeding (Effect of quality on price of crude oil) 1998-1999
Baker v. Motorola, (Contingent valuation surveys for assessing the effect of ground-water contamination on property values) 1998-2000
Roll International v. U.S. Fire, business interruption claim (Effect of supply disruption on pistachio prices), 1999
Vitamin price fixing, LECG: assorted European clients, (Vitamin demand analysis) 1999-2001
DA of Los Angeles v. H.J. Heinz (Fair weights of catsup bottles), 1999
ARCO China v. Exxon (Hydrocarbon dewpoint measurements), 2000
ALJ Reed, Public Utilities Commission deliberation (Comparability of performance data for ILEC and CLEC), 2000
US Commerce Department countervailing duty determination (British Columbia forest management practices). 2001-2002
Demand systems and mergers, (LECG) 2002
BP China,(recoverable natural gas reserves), 2001
Unova v. Dell, patent infringement, (Economic value of lithium ion battery), 2002
Federal Trade Commission v. IBC (Wonder Bread false advertising allegation), 2002
National Metals, Inc. v. Sumotomo et. al., effect of price fixing on copper prices, 2002
International Paper Co. v. Affiliated FM Inc. Co., (Hardwood siding insurance claims), 2002-2003, 2005-
Alaska Air, 2002-2003 (Reliability of jackscrew endplay test.)

Specialized Devices (Insurance claim for damaged equipment with technological
        obsolescence), 2003-2006
Unova v. Apple, patent infringement, (Economic value of lithium ion battery), 2003-2004
Unova v. Dell, patent infringement, (Economic value of lithium ion battery), 2003-2004
Unova v. Hewlett Packard Company (Economic value of lithium ion battery), 2005
MagTek v. Compaq, (valuation of business at time of transfer), 2004
Cedars-Sinai v. MSK (efficacy of laser eye surgery), 2004-2006
Jeld-Wen v. flat glass manufacturers (Damages from illegal price fixing), 2004- 2006
Class v. Pizza Hut (Statistics of compensation of delivery personnel), 2005
I.R.S. v. Friedman Jewelry (Sampling methods for estimating bad debt fraction), 2005
Brunskill Associates v. Rapid Payroll, Inc. (Modeling of sales by startups), 2005-2006
Copper Antitrust Litigation (Effect on copper prices), 2006
Federal Government v. SDI Future Health, Inc. (Sampling methods), 2006
Nokia adv. Qualcomm (FRAND royalty rates), 2006-2008
Honda v. Toyota, durability dispute, 2009
Pulse v. Mascon, Patent infringement, 2009
Ceridian: Business Records and Forecasting, 2008 -
Chevron: Ecuador Texpet litigation, 2010 –
TFT-LCD (Flat Panel) Antitrust Litigation 2011 – 2012
Juan Moreyra v. Fresenius Medical Care Holdings, Inc., et. al. 2011
High-Tech Employee Antitrust Litigation, 2012 – 2013

World Bank
        Estimates of the effects of nontariff barriers, 1985 - 1988
        NAFTA and Central America 1994

Department of Energy, 1987-
        Reviews: OECD energy forecasting, Nuclear Power Generating Costs. Oil and Gas Annual
        Outlook
        Energy forecasting documents

U.S. Department of Labor, 1988-1990
        Econometric estimation of the effects of trade restrictions on U.S. workers

New Zealand Treasury, 1996-1997

Inter-American Development Bank
        Latin American Income Inequality, 1997-1999

Motion Picture Association (LEK), 2005-2006, 2007-2008
        Effect of piracy on revenues from films

Ceridian, 2008-2011
        Leading Indicators Based on Business Records

**Past Legal/Consulting Cases**
**Edward E. Leamer**
**March 2013**

**2012**

      High-Tech Employee Antitrust Litigation
           Damages from anti-cold-calling agreements
           Deposition, October 2012

**2011**

      Juan Moreyra v. Fresenius Medical Care Holdings, Inc., et. al.
           Wages and hours: rounding and meal breaks
           Expert Report, April 2011
           Deposition, April 2011
      TFT-LCD (Flat Panel) Antitrust Litigation
           Damages from illegal price-fixing
           Expert Report, May 2011
           Deposition, July 2011
           Reply Report, Sept 2011
           Testimony, June 2012

**2010-2013**

      María Aguinda et al. v. Chevron Corporation
           Damages from alleged oil contamination in Ecuador
           Expert Report, Sept. 2010
           Expert Report, August 2011
           Expert Report, May 2012
           Expert Report, February 2013

**2009**

      Honda v. Toyota
           Longevity of Camry and Accord
           Report
           Settlement
      Pulse v. Mascon
           Damages from Patent Infringement
           Deposition:  Aug 11, 2009
           Settlement

**2008**

      Ceridian
           Business Records and Forecasting

**2007**

      Nokia adv. Qualcomm, 2006-2007
           FRAND royalty rates
           Consultation
      Tobacco Master Settlement Agreement
           Consultation with States Attorneys General
      New Motor Vehicles Canadian Export Antitrust Litigation
           Effects of Imports from Canada on US new car prices
           Consultation

**2006**

    Copper Antitrust Litigation
        Effect on copper prices
        Consultation
    Federal Government v. SDI Future Health, Inc.
        Sampling methods

**2005**

    Class v. Pizza Hut
        Statistics of compensation of delivery personnel
    Brunskill Associates v. Rapid Payroll, Inc.
        Modeling of sales by startup companies
        Deposition, February 2005
    I.R.S. v. Friedman Jewelry
        Sampling methods for estimating bad debt fraction
        Settlement, November 2005
    International Paper , et.al. v. Affiliated FM Insurance Company, et. al.
        Hardwood Siding: Characteristics of damaged homes based on surveys
        Deposition, Aug. 9, 2005
        Settlement, October 2005
    Moeller v. Taco Bell
        Wheelchair access at Taco Bell Stores
    US Canada Lumber Dispute, 2005
        BC Government
        Expert reports regarding cross-border log price comparisons
    LEK and the Motion Picture Association
        Effect of piracy on revenues from films
    Unova v. Hewlett Packard Company
        Patent Infringement, Lithium Ion Battery
        Economic Value of Lithium Ion Battery in Dell notebooks
        Expert Report re patent data
        Settlement, January 2006

**2004**

    Cedars-Sinai v. MSK
        Efficacy of fluorescence-guided feedback rules for laser eye surgery
        Deposition, December 14, 2004
        Settlement, December 2005
    Flat Glass Antitrust Litigation, on behalf of Jeld-Wen
        Effect of alleged price-fixing conspiracy on flat glass prices
        Expert Report, May 12, 2004
        Reply Report, August 12, 2004
        Deposed, October 25-26, 2004
        Settlement, March 2006
    Olympic Pipeline Company v. Equilon Pipeline Company
        Effect of pipeline outage on West Coast gasoline prices
        Expert Report, November, 2004
        Declaration in support of motion to limit testimony, December 2004
        Settlement
    Archdiocese of Los Angeles
        Child abuse settlements

**2003**

National Union Fire Insurance Company v. Special Devices, Inc., et.al.
   Business Interruption/Property Damage Insurance Claim
   Expert Report, Sept. 2003
   Deposition, July 21, 2005
   Deposition, January 11, 2006

Unova v. Apple
   Patent Infringement, Lithium Ion Battery
   Economic Value of Lithium Ion Battery in Dell notebooks
   Expert Report

Compaq Computer v. Mag-Tek
   Damages from unreliable product
   Expert Report, October 2003
   Deposed, November 17, 2003

International Paper , et.al. v. Affiliated FM Insurance Company, et. al.
   Hardwood Siding: Characteristics of damaged homes based on surveys
   Expert Report
   Deposition, March 5-6, 2003
   Trial, no trial testimony

**2002**

Plaintiffs vs. Boeing and Alaska Airlines
   Alaska Air 361
   Reliability of End Play Checks
   Expert Report
   Deposed, April 18, 2003
   Settlement

Unova vs. Dell
   Patent Infringement, Lithium Ion Battery
   Economic Value of Lithium Ion Battery in Dell notebooks
   Expert Report
   Settlement

International Trade Commission vs. IBC
   Effect of allegedly illegal advertising on Wonderbread sales
   Settlement

LECG: Copper Price Fixing Allegation
   Abnormality of copper prices.
   Consultation.

Atlas Textile
   Plaintiffs: Ernest Schatz and Benjamin Kaye
   Evolution of Textile Industry
   Expert Report
   Settlement

**2001**

US Canada Lumber Dispute
   BC Government
   Expert report regarding the effect of log export restrictions
   Expert report regarding estimation of but-for Canadian stumpage values
   Testimony at Commerce Department hearing, March 5, 2002

**2000**

    Uncitral Arbitration, Claimant: Castle Peak Power Company, Ltd.
        Respondents:
        China National Offshore Oil Corporation
        ARCO China Incorporated
        KUFPEC (China) Incorporated
        Gas Dewpoints by Dewscopes and Gas Chromotography
        Expert Report January 28, 2000
        Settled prior to arbitration
    American Ad Management/O'Connor Agency v. GTE Directories Corporation, et.al.
        But-for revenue streams from ad placements
        Expert advice

**1999**

    L.A. District Attorney v. H.J. Heinz
        Catsup bottle underweighting
        Expert Report
        Settlement conference
        Settlement
    Baker v. Motorola, No. CV 92-02603
        Surveys for the valuation of private property after underground chemical contamination
        Expert Report, May 1999
        Deposition Nov. 3, 1999
        Settled before trial
    Roll International Corporation. v. United States Fire Insurance Company
        Business Interruption Claim
        Deposition taken May 13, 1999
        Mediated Settlement, October 1999
    LECG
        RE: Effect of collusion on vitamin prices
        Consultation

**1998**

    Pacific Bell (U 1001 C) and Pacific Bell Communications Notice of Intent to File
        Section 271 Application For InterLATA Authority In California
        Effect of increased competition in telephone services on California competitiveness
        Affidavit Filed, April 1998
    Exxon Company, USA. V. Amerada Hess Pipeline Corporation, et.al.  Docket No. OR96-14-000
        State of Alaska Before the Alaska Public Utilities Commission
        RE: Pricing of Alaskan North Slope Oil
        Prepared Answering Testimony of ARCO Alaska, Inc. before the Federal Energy
            Regulatory Commission
        Expert report April 1998
        Case dismissed
    Litton Systems, Inc. vs. Honeywell, Inc.
        Antitrust and Patent Infringement Cases
        RE: Product reliability
        Expert report, September 1998
        Deposition taken October 8, 1998
        Jury award in antitrust case for Litton, November 1998

**Previous Work:**

    JurEcon, 1981-1983
    Wrongful death and the valuation of human life, 1981
    DES /Lilly 1985-86

**Exhibit 3**
**List of Additional Materials Relied Upon**

| **Pleadings and Orders** | **Date** |
|---|---|
| Complaint | 11/2/2011 |
| Brief in Support of Ford Motor Company's Motion For Summary Judgement | 03/15/13 |
| Plaintiffs' Motion For Class Certification | 01/11/13 |

| **Depositions and Exhibits** | **Date** |
|---|---|
| Strombom, Bruce | 04/18/12 |
| Taylor, Paul M. | 04/17/13 |

| **Expert Reports** | **Date** |
|---|---|
| Expert Report of Bruce A. Strombom, PhD | 03/15/13 |
| Supplemental Expert Report of Bruce A. Strombom, PhD | 04/15/13 |
| Declaration of Janet L. Conigliaro | 03/15/13 |
| Expert Declaration of Paul M. Taylor, Ph.D., P.E. | 03/15/13 |
| Expert Report of Robert J. Pascarella | 03/15/13 |

**Publicly Available Materials**

Akerlof, G.A., "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism." *The Quarterly Journal of Economics* , Vol. 84, No. 3 (Aug., 1970), pp. 488-500.

Greene, W.H., *Econometric Analysis: Fifth Edition* , New Jersey: Pearson Education, Inc., 2003, pp. 457-459.

Hartman, R.S., "Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation," The Review of Economics and Statistics, Vol. 69, No. 2 (1987), pp. 367-372.

**Exhibit 3**
**List of Additional Materials Relied Upon**

AA Membership, “Tyre life and age,” http://www.aaireland.ie/AA/Motoring-advice/Driving-advice/Tyres/Tyre-life-and-age.aspx.

Auto Remarketing, “Manheim’s Analysis of Repossession Remarketing Challenges,” February 12, 2013, http://www.autoremarketing.com/print/wholesale/manheim%E2%80%99s-analysis-repossession-remarketing-challenges.

Comparing The Durability of Tires,” http://www.stat.ualberta.ca/statslabs/casestudies/files/tires2.pdf.

Honda Problems, “Honda Civic Premature Tire Wear: Rapidly Worn Tires Caused by Short Rear Upper Control Arms,” http://www.hondaproblems.com/Civic/tire-wear.shtml.

Honda, “Honda Service Bulletin: 08-001,” January 22, 2008, http://ww2.justanswer.com/uploads/thebesthonda/2010-11-28_180103_uneven_tire_wear.pdf.

Illinois Department of Transportation, Division of Traffic Safety, “Illinois Traffic Crash Report SR 1050 (2009), Instruction Manual for Law Enforcement Agencies,” 2009, http://www.ce.siue.edu/faculty/hzhou/ww/paper/Illinois%20Traffic%20Crash%20Report%20SR%201050.pdf.

JK Tyres, “Factors affecting tyre performance,” http://www.jktyre.com/Customer_Service/Tyre_Care.aspx.

Manheim, “A Guide to Wholesale Vehicle Remarketing Auction Handbook: Second Edition 2007,” http://www.manheim.com/content_pdfs/help/Auction_Handook.pdf.

Manheim, “About Manheim,” http://www.manheim.com/about/?WT.svl=m_footer_about.

NHTSA, “Manuals & Documentation - FARS,” http://www-nrd.nhtsa.dot.gov/CATS/listpublications.aspx?Id=J&ShowBy=DocType.

Office of Regulatory Analysis and Evaluation Planning, Evaluation and Budget, “NPRM on Tire Pressure Monitoring System FMVSS No. 138,” U.S. Department of Transportation, September 2004.

SaferCar.gov, “Tire Rating Lookup,” http://www.safercar.gov/Vehicle+Shoppers/Tires/Tires+Rating.

Tire Rack, “Tire Specs Explained,” http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=194.

Tire Rack, “Tire Specs Explained: Tread Depth,” http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=197.

Tire Rack, “Uniform Tire Quality Grade (UTQG) Standards,” http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=48.

Tire Rack, "How to Read Speed Rating, Load Index & Service Descriptions," http://www.tirerack.com/tires/tiretech/techpage.jsp?techid=35.

Tyre Damage, “Tyre Wear,” http://www.tyredamage.com/content/view/3/4/.

U.S. Department of Transportation National Highway Traffic Safety Administration, “An Evaluation of Existing Tire Pressure Monitoring Systems,” July 2001.

U.S. Department of Transportation National Highway Traffic Safety Administration, “NHTSA Tire Aging Test Development Project: Phase 1,” October 2009.

U.S. Department of Transportation, National Highway Traffic Safety Administration,"Consumer Guide to Uniform Tire Quality Grading," August 2012.

Veith, A.G., “Tire Treadwear: The Joint Influence of Tg, Tread Composition and Environmental Factors. A Proposed ‘Two-Mechanism’ Theory of Treadwear,” *Polymer Testing*, Vol. 7, Issue: 3 (1987), pp. 177-202.

**Exhibit 3**
**List of Additional Materials Relied Upon**

**Documents**

Auction Information Email
Auction Record Field Decodes
DNL2 00001329
DNL2 00005326
DNL2 00006364-65
DNL2 00006366