1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10                           ----oo0oo----

11

12  MARGIE DANIEL, ROBERT MCCABE,      CIV. NO. 2:11-02890 WBS EFB
    MARY HAUSER, DONNA GLASS, and
13  ANDREA DUARTE, individually        MEMORANDUM AND ORDER RE: RENEWED
    and on behalf of a class of        MOTION FOR SUMMARY JUDGMENT
14  similarly situated
    individuals,
15
                Plaintiffs,
16
         v.
17
    FORD MOTOR COMPANY, a
18  Delaware corporation,

19
                Defendant.
20
                             ----oo0oo----
21

22          Plaintiffs Margie Daniel, Robert McCabe, Mary Hauser,

23  Donna Glass, and Andrea Duarte brought this action against

24  defendant Ford Motor Company ("Ford") on behalf of themselves and

25  a class of similarly situated individuals in connection with an

26  alleged rear suspension defect in the 2005-2011 Ford Focus.

27  Defendant now moves for summary judgment pursuant to Federal Rule

28  of Civil Procedure 56.

                                    1

1    I.    Factual and Procedural Background

2              Plaintiffs are individuals who purchased new Ford Focus

3    vehicles in California between 2005 and 2011.  Plaintiffs allege

4    that those vehicles have a rear suspension "alignment/geometry

5    defect" that leads to premature tire wear, which in turn leads to

6    safety hazards such as decreased control in handling, steering,

7    and stability, as well as the threat of catastrophic tire

8    failure.  Plaintiffs bring claims for: (1) violation of the

9    California Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750-

10   1784; (2) violation of California's Unfair Competition Law

11   ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210; (3) breach of

12   implied warranty under the Song-Beverly Consumer Warranty Act,

13   Cal. Civ. Code §§ 1790-1795.8; (4) breach of warranty under the

14   Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312; and (5)

15   breach of express warranty under California Commercial Code

16   section 2313.

17             In an Order dated June 7, 2013, this court granted

18   Ford's motion for summary judgment on all claims and entered

19   final judgment in its favor.  (Docket No. 84.)  Plaintiffs

20   successfully appealed that Order and the Ninth Circuit reversed

21   this court's decision on all claims.  Daniel v. Ford Motor Co.,

22   806 F.3d 1217 (9th Cir. 2015).  Because this court's prior order

23   and the Ninth Circuit's decision discuss the facts in this case

24   in detail, the court will refrain from reciting them here.

25             Having unsuccessfully defended judgment in its favor on

26   appeal, Ford now moves for summary judgment on the grounds the

27   Ninth Circuit declined to address on appeal.  Specifically, the

28   Ninth Circuit did not examine the "duty to disclose, actual

                                  2

1  damages, statutorily-required notice, statute of limitations,

2  equitable restitution, and sufficiency of the evidence of tire

3  wear."  Id. at 1227.  Plaintiffs Hauser, Glass, and Duarte do not

4  oppose entry of judgment in favor of Ford on all of their claims,

5  (Pls.' Opp'n at 1:4-5), and the court will thus grant Ford's

6  motion for summary judgment on all claims by those plaintiffs.

7  Plaintiff Daniel opposes Ford's motion for summary judgment and

8  this Order is thus limited to the grounds upon which Ford moves

9  for summary judgment against Daniel.  (Id. at 1:5-6.)

10  II.  Analysis

11       Summary judgment is proper "if the movant shows that

12  there is no genuine dispute as to any material fact and the

13  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

14  P. 56(a).  A material fact is one that could affect the outcome

15  of the suit, and a genuine issue is one that could permit a

16  reasonable jury to enter a verdict in the non-moving party's

17  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

18  (1986).  The party moving for summary judgment bears the initial

19  burden of establishing the absence of a genuine issue of material

20  fact and can satisfy this burden by presenting evidence that

21  negates an essential element of the non-moving party's case.

22  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

23  Alternatively, the moving party can demonstrate that the non-

24  moving party cannot produce evidence to support an essential

25  element upon which it will bear the burden of proof at trial.

26  Id.

27       Once the moving party meets its initial burden, the

28  burden shifts to the non-moving party to "designate 'specific

3

1   facts showing that there is a genuine issue for trial.'"  Id. at

2   324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

3   the non-moving party must "do more than simply show that there is

4   some metaphysical doubt as to the material facts."  Matsushita

5   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

6   "The mere existence of a scintilla of evidence . . . will be

7   insufficient; there must be evidence on which the jury could

8   reasonably find for the [non-moving party]."  Anderson, 477 U.S.

9   at 252.

10      In deciding a summary judgment motion, the court must

11  view the evidence in the light most favorable to the non-moving

12  party and draw all justifiable inferences in its favor.  Id. at

13  255.  "Credibility determinations, the weighing of the evidence,

14  and the drawing of legitimate inferences from the facts are jury

15  functions, not those of a judge . . . ruling on a motion for

16  summary judgment . . . ."  Id.

17      A.   CLRA and UCL Claims

18      The CLRA prohibits certain "unfair methods of

19  competition and unfair or deceptive acts or practices undertaken

20  by any person in a transaction intended to result or which

21  results in the sale or lease of goods or services."  Cal. Civ.

22  Code § 1770(a).  The CLRA's list of proscribed practices include

23  "[r]epresenting that goods or services have . . . characteristics

24  . . . uses, benefits, or qualities which they do not have," id. §

25  1770(a)(5), and "[r]epresenting that goods or services are of a

26  particular standard, quality, or grade," id. § 1770(a)(7).  The

27  UCL proscribes as unfair competition "any unlawful, unfair or

28  fraudulent business act or practice and unfair, deceptive, untrue

4

1  or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

2         1.    Duty to Disclose

3             "[A] manufacturer cannot be found liable under the

4  CLRA for failure to disclose a defect that manifests itself after

5  expiration of the warranty period unless such omission (1) is

6  'contrary to a representation actually made by the defendant' or

7  (2) pertains to a 'fact the defendant was obligated to

8  disclose.'"  Smith v. Ford Motor Co., 749 F. Supp. 2d 980, 987

9  (N.D. Cal. 2010), aff'd, 462 F. App'x 660 (9th Cir. 2011)

10  (quoting Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824,

11  835-36 (2006)).  Here, plaintiffs do not allege Ford made

12  misrepresentations and contend only that Ford had a duty to

13  disclose the alleged rear suspension defect and failed to do so.

14         There is a duty to disclose under the CLRA and UCL in

15  four different circumstances:

16       (1) when the defendant is the plaintiff's fiduciary;

17
       (2) when the defendant has exclusive knowledge of
18  material facts not known or reasonably accessible to
    the plaintiff;
19
       (3) when the defendant actively conceals a material
20  fact from the plaintiff; and

21
       (4) when the defendant makes partial representations
22  that are misleading because some other material fact
    has not been disclosed.
23

24  Collins v. eMachines, Inc., 202 Cal. App. 4th 249, 255 (3d Dist.

25  2011).  "[F]or the omission to be material, the failure must pose

26  'safety concerns.'"  Smith, 749 F. Supp. 2d at 987 (quoting

27  Oestreicher v. Alienware Corp., 322 F. App'x 489, 493 (9th Cir.

28  2009)); accord Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1141

1   (9th Cir. 2012) ("California federal courts have generally

2   interpreted Daugherty as holding that [a] manufacturer's duty to

3   consumers is limited to its warranty obligations absent either an

4   affirmative misrepresentation or a safety issue." (internal

5   citations and quotations omitted)).[1]

6                    a.   Materiality

7           Although the Ninth Circuit did not address whether Ford

8   had a duty to disclose, when concluding plaintiffs had

9   established a triable issue of fact as to reliance on their CLRA

10  and UCL claims, it found that "[a] reasonable fact finder could

11  infer that a vehicle that experiences premature and more frequent

12  tire wear would pose an unreasonable safety risk." Daniel, 806

13  F.3d at 1226.  The Ninth Circuit specifically found that

14  plaintiffs had established a genuine issue of material fact on

15  the two "sub-element[s]" of reliance: (1) that plaintiffs "would

16  have been aware of a disclosure by Ford"; and (2) that plaintiffs

17  "would have behaved differently if Ford had disclosed the alleged

18  defect."  Id.  Whether the alleged defect posed an unreasonable

19  safety risk was relevant to the Ninth Circuit's analysis because,

20  as the court explained, "[t]hat one would have behaved

21  differently can be presumed, or at least inferred, when the

22  omission is material" and "[a]lleged defects that create

23  'unreasonable safety risks' are considered material."  Id. at

24  ─────────────────

25          [1]   Citing Rutledge v. Hewlett-Packard Co., 238 Cal. App.
    4th 1164 (6th Dist. 2015), Daniel contends in a footnote that a
26  fraudulent omission claim may no longer require that the defect
    be related to a safety concern.  Because the court finds that
27  Daniel has established a triable issue of material fact with
    respect to whether the defect in this case involved a safety
28  concern, it need not address this argument.

                                    6

1    1225 (citations omitted).

2         Although the Ninth Circuit made this finding in the

3    context of reliance, Ford has not cited a single case

4    articulating a distinction between materiality under the CLRA and

5    UCL for purposes of a duty to disclose versus reliance.  In fact,

6    when defining "materiality" for purposes of reliance, the Ninth

7    Circuit expressly relied on the definition of "materiality" from

8    a case discussing the duty to disclose.  See id. at 1126 (citing

9    Wilson, 668 F.3d at 1141-43 as "holding in the duty-to-disclose

10   context that an omission must pose safety concerns to be

11   material").  The court would be at a loss to articulate how the

12   Ninth Circuit's finding that a reasonable jury could infer that

13   the alleged defect posed an unreasonable safety risk and was thus

14   material for purposes of reliance does not apply equally to the

15   safety risk necessary to establish materiality in the context of

16   a duty to disclose.

17        Ford nonetheless argues that this finding was merely

18   dicta and therefore not the law of the case.  (See Def.'s Reply

19   at 4:12-5:2 (citing cases).)  While Ford argues that the parties

20   did not dispute this "sub-element" of reliance and the Ninth

21   Circuit "had no need to address this issue," the Ninth Circuit

22   obviously considered the issue necessary and did not believe it

23   was "undisputed" as Ford now claims.[2]

24   _____

25        [2]   Ford points out that it never raised this aspect of
     reliance in its motion for summary judgment and plaintiff
26   informed the Ninth Circuit that there was "'no dispute that each
     Plaintiff satisfied the second [sub-element of reliance] by
27   declaring that she would not have purchased a Ford Focus had she
     been informed of the suspension defect.'"  (Def.'s Reply at 4:6-8
28   (quoting Appellant's Opening Br. at 10).)  It is not surprising

                                    7

1    Nonetheless, even assuming that this conclusion is not

2  the law of the case, this court denies Ford's invitation to

3  reexamine the evidence that the Ninth Circuit considered.

4  Although Ford argues the Ninth Circuit "had no reason to (and did

5  not) consider in detail the evidence relevant to whether the

6  alleged defect poses an unreasonable safety risk," (id. at 5:3-

7  4), Ford does not deny that the very evidence it now relies on

8  was before the Ninth Circuit.  While the Ninth Circuit may not

9  have cited the record or discussed the intricacies of the expert

10  evidence in its decision, there is little question that it

11  considered the evidence in reaching its decision:

> A reasonable fact finder could infer that a vehicle
> that experiences premature and more frequent tire wear
> would pose an unreasonable safety risk, such that it
> can be presumed that the nondisclosure of the safety
> risk impacted Plaintiffs' purchasing decision.
> Plaintiffs have put forth sufficient evidence, when
> viewed in a light most favorable to them, that the
> Focus experienced premature and more frequent tire
> wear, and that Ford circulated special service
> messages to its authorized dealerships informing them
> that "some 2005–2011 Focus vehicles may exhibit
> premature front/rear tire wear and/or a vehicle drift
> condition when driving on wet or snow packed roads."
> Plaintiffs' experts opined that worn tires can pose a
> safety hazard in terms of road and weather conditions
> and potential blowouts. Even Ford acknowledges that
> "it can be dangerous to let the tires on any vehicle
> become excessively worn before replacing them."

23  Daniel, 806 F.3d at 1226.

24    Accordingly, because "[a] reasonable fact finder could

_____

25  that plaintiffs would argue that an issue on which they have the

26  burden is "undisputed."  Ford does not indicate that it stated in
   its appellate brief that it did not dispute this sub-element.

27  Without such an express admission on a necessary sub-element, the
   court can see why the Ninth Circuit felt it necessary to address

28  it.

1   infer that a vehicle that experiences premature and more frequent
2   tire wear would pose an unreasonable safety risk," id. at 1226,
3   Daniel has established a triable issue of fact with respect to
4   whether the alleged defect was material for purposes of
5   establishing Ford's duty to disclose.

                    b.   Exclusive Knowledge

7        A plaintiff can prevail on a CLRA or UCL claim based on
8   a material omission if the defendant had exclusive knowledge of
9   the defect.  Ford does not dispute that it "was aware of a tire
10  wear problem" at the time Daniel purchased her vehicle in January
11  2011.  It argues that it nonetheless did not have exclusive or
12  superior knowledge of the "tire wear issues."

13       Generally, courts have not defined "exclusive"
14  literally, but have found such claims cognizable if the defendant
15  had "superior" knowledge of a defect that was not readily
16  apparent and there is no or only a limited publicly available
17  information about the defect.  See, e.g., Falk v. Gen. Motors
18  Corp., 496 F. Supp. 2d 1088, 1096-97 (N.D. Cal. 2007) ("[Because]
19  GM 'was in a superior position to know' that its speedometers
20  might fail, plaintiffs successfully state a CLRA claim for
21  omission of a material fact which lay within GM's exclusive
22  knowledge.") (emphasis added); In re Toyota Motor Corp.
23  Unintended Acceleration Mktg., Sales Practices, & Prods. Liab.
24  Litig., 754 F. Supp. 2d 1145, 1174, 1192 (C.D. Cal. 2010)
25  ("Plaintiffs establish a duty to disclose because they allege
26  that Toyota has superior knowledge of the SUA defects. . . .
27  Plaintiffs have sufficiently alleged that Toyota knew
28  significantly more about the alleged SUA defect than the limited

                                9

1   information that was eventually shared with the public.")

2   (emphasis added).

3        In _Falk_, plaintiffs brought CLRA and UCL claims against

4   General Motors based on an alleged defect in its speedometers

5   that caused the speedometers to stop working properly after

6   45,000 miles or more.  496 F. Supp. 2d at 1092.  The plaintiffs

7   had alleged that consumers had raised "many complaints" about the

8   speedometers on the Internet and that the plaintiffs could and

9   even may have read those complaints.  The court nonetheless found

10   that General Motors had "exclusive" knowledge for purposes of the

11   duty to disclose because plaintiffs alleged that General Motors

12   had "_known_ a lot more about the defective speedometers, including

13   information unavailable to the public."  _Id._ at 1097.  The court

14   further reasoned that "[m]any customers would not have performed

15   an Internet search before beginning a car search" and they were

16   not required to do so under the CLRA.  _Id._  The court ultimately

17   found that plaintiffs had sufficiently alleged exclusivity based

18   on General Motors' "superior position" to know that its

19   speedometers might fail.  _Id._ at 1096-97.

20        Here, Ford argues it lacked exclusive knowledge because

21   former plaintiff Robert McCabe testified that in September 2009,

22   technicians at Les Schwab Tires told him that "Focuses were known

23   for wearing out tires early."  (McCabe Dep. at 147:21-148:15

24   (Docket No. 47-8).)  Ford also relies on allegations in

25   plaintiffs' motion for class certification that, by 2010, some

26   Ford technicians were informing consumers that "rapid rear tire

27   wear is a _normal characteristic_" of the Focus and there was

28   "widespread acknowledgement among Ford dealers that the C170

1  Focus was indeed a tire eater."  (Pls.' Mot. for Class Cert. at

2  5:8, 6:1-2 (Docket No. 33).)[3]

3         Compared to Falk, in which complaints were made

4  publicly about the defect, comments by technicians about the

5  rapid tire wear on the Focus does not even suggest that the

6  technicians were aware that a rear suspension defect was

7  allegedly causing the tire wear.  Moreover, the court in Falk

8  found that complaints on the Internet about the defective

9  component did not defeat plaintiffs' claim that the manufacturer

10  had exclusive knowledge.  Those complaints were readily

11  accessible to any prospective purchaser who performed an online

12  search.  Here, a prospective purchaser might have learned about

13  the tire problem only if he happened to talk to a technician or

14  Ford dealer who happened to mention it.  If the CLRA and UCL do

15  not require prospective customers to search the internet for

16  complaints, they surely do not require them to contact numerous

17  technicians to find out if any of them happen to know of any tire

18  issues or, more importantly, an undisclosed rear suspension

19  defect.

20         Similarly, Ford claims it did not have exclusive

21  knowledge of the rear suspension defect because, according to the

22  allegations in plaintiffs' Complaint, consumers had filed

23  complaints about the "defective condition" of the Focus with the

24  National Highway Traffic Safety Association ("NHTSA") and those

25         [3]    Allegations in the opposing party's motion for class

26  certification is hardly the type of "evidence" the court would
expect to see in support of a motion for summary judgment.

27  Nonetheless, plaintiffs cite excerpts from various reports in
support of these statements and the court could consider that

28  evidence at summary judgment.

1   consumer complaints were available on the internet.  (See Compl.

2   ¶ 37 (Docket No. 1).)  Even assuming the court could consider

3   such allegations from plaintiffs' Complaint at summary judgment,

4   the ability of a prospective purchaser to find complaints made to

5   the NHTSA on the Internet does not preclude a finding of

6   exclusivity.  See In re Toyota Motor Corp. Unintended

7   Acceleration Mktg., Sales Practices, & Prods. Liab. Litig., 754

8   F. Supp. 2d at 1192 ("While prospective customers could have been

9   tipped off to the possibility of SUA by researching past

10  complaints filed with NHTSA, many customers would not have

11  performed such a search, nor would they be expected to.").

12       Ford also relies heavily on Gray v. Toyota Motor Sales,

13  U.S.A., Civ. No. 08-1690 PSG JCX, 2012 WL 313703 (C.D. Cal. Jan.

14  23, 2012), aff'd, 554 F. App'x 608 (9th Cir. 2014).  In Gray, the

15  plaintiffs brought CLRA, UCL, and fraudulent concealment claims

16  based on the failure of the Toyota Prius Hybrid to meet the EPA's

17  estimated 55 miles per gallon ("MPG") under real world driving

18  conditions.  The court dismissed plaintiffs' claims premised on a

19  fraudulent omission theory because the claims did not involve a

20  warranty or safety-related defect.  Id. at *3-5.  On plaintiffs'

21  fraudulent concealment claim, which requires the same duty to

22  disclose as the CLRA and UCL, the court assumed that a claim for

23  fraudulent concealment was cognizable in the absence of a safety

24  defect and, on that assumption, assessed whether the plaintiffs

25  had sufficiently alleged that Toyota had exclusive knowledge.

26  Id. at *8.

27       The Gray court ultimately found that the plaintiffs

28  could not show Toyota possessed exclusive knowledge of the

1   underperformance of the Prius Hybrid.  Id. at *8-9.  It did so,

2   however, only after finding that the "newsworthiness" about the

3   Prius Hybrid's underperformance had received "mainstream-media

4   attention" and was "public information."  Id. at *8.  Two years

5   prior to the plaintiffs having purchased their vehicles, Consumer

6   Reports had "publically revealed" that the discrepancy between

7   the EPA estimates and real-world figures was "much, much bigger"

8   than for other vehicles and USA Today had reported that a real-

9   world driving test revealed an MPG of only 38.  Id.  Unlike in

10  Gray, Ford contends only that some technicians and dealers were

11  aware of the Focus's poor tire wear.  Ford does not suggest or

12  provide any evidence suggesting that the Focus's rear suspension

13  defect was reported in mainstream media and had become public

14  information prior to Daniel having purchased her vehicle.

15          Ignoring the Gray court's finding that the

16  underperformance of the Prius Hybrid was "public information" two

17  years prior to the plaintiffs' purchases of their vehicles, Ford

18  attributes undue weight to the Gray court's statement that "[t]he

19  Prius's real-world MPG can be readily and immediately observed by

20  a layman."  Id. at *9.  The Gray court emphasized the obviousness

21  of the Prius Hybrid's real-world fuel performance not as the sole

22  ground upon which it found that the plaintiffs could not allege

23  exclusivity, but as a means to distinguish the case from Falk.

24  The Gray court explained that the speedometers at issue in Falk

25  "function[ed] as anticipated for 45,000-plus miles, before

26  breaking unexpectedly after a consumer has exceeded their

27  warranty coverage," whereas the Prius Hybrid's underperformance

28  was immediately apparent upon first driving the Prius.  Id.

1    Here, any rear suspension defect and consequent tire

2    wear would not have been immediately apparent upon driving a

3    Focus, but would have required thousands of miles of use before a

4    problem might be suspected.  Even then, when tire wear might have

5    been noticeable, a reasonable consumer would be unlikely to

6    realize that the premature tire wear was the result of a rear

7    suspension defect.  Moreover, even if Gray was not so readily

8    distinguishable, the language Ford relies on was not necessary to

9    the decision and, while the Ninth Circuit affirmed the decision,

10   it neither discussed nor approved of the district court's

11   analysis of exclusivity.  See Gray v. Toyota Motor Sales, U.S.A.,

12   Inc., 554 F. App'x 608, 609 (9th Cir. 2014) (affirming the

13   district court because, "under the statutes pled, California law

14   does not recognize a cause of action for publicizing EPA fuel

15   economy estimates and omitting further explanation").

16   Similar to Gray, the district court in Herron v. Best

17   Buy Co. also found that the plaintiff could not allege exclusive

18   knowledge of the test conditions under which a laptop battery was

19   tested.  924 F. Supp. 2d 1161, 1175 (E.D. Cal. 2013).  In his

20   complaint, however, the plaintiff had alleged that the defendant

21   had disclosed the testing that was used and, nine months before

22   the plaintiff purchased his laptop, "Newsweek [had] published an

23   article publicly criticizing the [] test [defendant used] for the

24   same reasons raised [] by Plaintiff."  Id.  The Herron court also

25   found that because the defect was underperformance of the

26   estimated battery life under real-world use, the "Plaintiff could

27   have readily recognized any deficiencies in his Laptop's battery

28   life."  Id.  Not only was the testing method used in Herron

1   disclosed on the defendant's website, <u>Herron</u> was similar to <u>Gray</u>

2   in that it involved a readily apparent defect that had been

3   reported in mainstream media prior to the plaintiff's purchase.

4          Daniel has therefore established a triable issue of

5   fact with respect to Ford's duty to disclose a material defect of

6   which it had exclusive knowledge for purposes of her CLRA and UCL

7   claims.[4]

8          2.   <u>Damages</u>

9             a.   <u>CLRA Damages</u>

10         Relying on the measure of damages provided for in

11  California Civil Code section 3343 when a person is "defrauded in

12  the purchase, sale or exchange of property," Ford argues that

13  Daniel's CLRA claim fails because she cannot prove loss as

14  calculated under section 3343.  The CLRA provides, however, that

15  "[a]ny consumer who suffers <u>any</u> damage as a result of the use or

16  employment by any person of a method, act, or practice declared

17  to be unlawful by Section 1770 may bring an action" to recover

18  "(1) Actual damages, . . . [;] (2) An order enjoining the

19  methods, acts, or practices[;] (3) Restitution of property[;] (4)

20  Punitive damages[; or] (5) [a]ny other relief that the court

21  deems proper."  Cal. Civ. Code § 1780(a) (emphasis added).

22         As California courts have repeatedly explained, "[t]he

23  damage that a plaintiff in a CLRA action must show under Civil

24  Code section 1780, subdivision (a) is any damage, which is not

25

26         [4]   Because the court concludes that Daniel's CLRA and UCL
    claims withstand summary judgment on the theory that Ford failed
27  to disclose a material fact of which it had exclusive knowledge,
    the court need not address Daniel's alternative theory that Ford
28  actively concealed a material fact.

15

synonymous with actual damages and may encompass harms other than

pecuniary damages." <u>Id.</u> (internal quotation marks omitted);

<u>accord</u> <u>Meyer v. Sprint Spectrum L.P.</u>, 45 Cal. 4th 634, 640

(2009).  The showing of damage or actual injury under the CLRA is

therefore not "governed by Civil Code section 3343, i.e., the

measure of actual damages for persons defrauded in the purchase

of property."  <u>In re Steroid Hormone Prod. Cases</u>, 181 Cal. App.

4th 145, 155 (2d Dist. 2010).[5]  Thus, even assuming Daniel could

not prove damages under section 3343--which Daniel strongly

disputes--she has submitted sufficient evidence to create a

triable issue of fact as to whether she incurred "any damage"

necessary to sustain a CLRA claim.  (<u>See, e.g.</u>, Webb Expert

Report at 3 (Docket No. 33-6) (estimating that the alternative

design replacement retrofit costs to address the alleged defect

---

[5]     In <u>Paz v. Playtex Products, Inc.</u>, the court rejected the plaintiffs' use of gross sales revenue to calculate potential damages for purposes of the statutory minimum under the Class Action Fairness Act of 2005.  Civ. No. 07-2133 JM BLM, 2008 WL 111046, at *3 (S.D. Cal. Jan. 10, 2008).  Although the <u>Paz</u> court relied on section 3343(a) as the means to calculate potential damages, it did not hold that damages under the CLRA are limited to those provided in section 3343(a) or analyze that issue in any detail.  <u>See id.</u>
       Moreover, while section 3343 provides the "exclusive measure of damages for fraud cases," <u>Cent. Mut. Ins. Co. v. Schmidt</u>, 152 Cal. App. 2d 671, 676 (1st Dist. 1957) (quoting <u>Bagdasarian v. Gragnon</u>, 31 Cal. 2d 744, 762 (1948)), Ford has not cited a single decision from the California Supreme Court or California appellate courts holding that section 3343 also provides the exclusive measure of damages for CLRA claims.  The Ninth Circuit has also noted that even though CLRA and UCL claims may "said to be 'grounded in fraud' or to 'sound in fraud, . . . [f]raud is not an essential element of a claim under these statutes."  <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1103, 1105 (9th Cir. 2003).  The court will therefore not interpret "any damage" in the CLRA as measurable only under the calculation provided for fraud claims in section 3343.

1  range from $845 to $1167).)

2                    b.    Restitution Under the UCL

3          Under the UCL, "restitution is the only monetary remedy

4  expressly authorized" and "[a] court cannot, under the equitable

5  powers of section 17203, award whatever form of monetary relief

6  it believes might deter unfair practices."  Korea Supply Co. v.

7  Lockheed Martin Corp., 29 Cal. 4th 1134, 1146, 1148 (2003)

8  (internal quotation marks and citation omitted).  "[A]n order for

9  restitution is one 'compelling a UCL defendant to return money

10 obtained through an unfair business practice to those persons in

11 interest from whom the property was taken, that is, to persons

12 who had an ownership interest in the property or those claiming

13 through that person.'"  Id. at 1149 (quoting Kraus v. Trinity

14 Mgmt. Servs., Inc., 23 Cal. 4th 116, 126-27 (2000)).  "The object

15 of restitution is to restore the status quo by returning to the

16 plaintiff funds in which he or she has an ownership interest."

17 Id.

18         An award of restitution under the UCL "must be of a

19 measurable amount to restore to the plaintiff what has been

20 acquired by violations of the statutes, and that measurable

21 amount must be supported by evidence."  Colgan v. Leatherman Tool

22 Grp., Inc., 135 Cal. App. 4th 663, 698 (2d Dist. 2006).  In

23 calculating restitution, "California law requires only that some

24 reasonable basis of computation of damages be used, and the

25 damages may be computed even if the result reached is an

26 approximation."  Pulaski & Middleman, LLC v. Google, Inc., 802

27 F.3d 979, 989 (9th Cir. 2015) (internal quotation marks and

28 citation omitted).  "[T]he fact that the amount of damage may not

                                  17

1   be susceptible of exact proof or may be uncertain, contingent or

2   difficult of ascertainment does not bar recovery." Id. (internal

3   quotation marks and citation omitted).

4          With a UCL claim based on a fraudulent omission, the

5   Ninth Circuit has recently explained that "restitution is based

6   on what a purchaser would have paid at the time of purchase had

7   the purchaser received all the information." Id.; see also

8   Chowning v. Kohl's Dep't Stores, Inc., Civ. No. 15-08673 RGK SPX,

9   2016 WL 1072129, at *10 (C.D. Cal. Mar. 15, 2016) ("To determine

10  Plaintiff's loss for purposes of restitution, the focus should be

11  on what Plaintiff actually received given the price she paid, not

12  on the bargain Plaintiff thought she was receiving.").

13         Here, Daniel estimates that the alternative design

14  replacement retrofit cost to address the alleged defect ranges

15  from $845 to $1167.  (Webb Expert Report at 3.)  While this might

16  not be the most probative evidence of what a consumer would have

17  paid for a Focus if Ford had disclosed the alleged defect, a

18  reasonable jury could conclude that a consumer would demand that

19  the purchase price of a vehicle with a defect be reduced by the

20  cost of remedying that defect.  Moreover, while Ford's expert

21  opines that the defect did not affect the depreciation of the

22  Focus, (Strombom Expert Report at 16-17 (Docket No. 48-3)),

23  Daniel's expert criticizes this opinion, (Leamer Rebuttal Expert

24  Report at 30 (Docket No. 58-2)), and depreciation value is not

25  determinative of the purchase value.  The court cannot weigh this

26  conflicting and circumstantial evidence at summary judgment and

27  thus the jury must ultimately determine the value of the Focus at

28  the time of purchase.

1     Ford also contends restitution is not possible because

2  Daniel paid the authorized Ford dealership for her Focus, not

3  Ford.  It is undisputed, however, that Ford sells and leases its

4  vehicles to authorized dealerships and that Daniel purchased her

5  Focus from an authorized Ford dealership.  Taking all inferences

6  in favor of Daniel, she has made the minimum showing necessary to

7  establish a triable issue that funds she paid to the Ford

8  dealership are traceable to Ford.  Cf. Colgan, 135 Cal. App. 4th

9  at 699 ("[W]hen in equity, the plaintiff can seek [restitution]

10  'in the form of a constructive trust or an equitable lien, where

11  money or property identified as belonging in good conscience to

12  the plaintiff could clearly be traced to particular funds or

13  property in the defendant's possession.'" (quoting Great-W. Life

14  & Annuity Ins. v. Knudson, 534 U.S. 204, 213 (2002))).

15     While Daniel's theory of restitution may ultimately

16  reveal itself to be a square peg unable to fit in the round hole,

17  the court will not foreclose the claim at this stage and will

18  deny Ford's motion for summary judgment with respect to

19  plaintiff's request for restitution under the UCL.

20          3.   Statutory Notice under the CLRA

21     The CLRA requires that a consumer notify the defendant

22  in writing of the consumer's alleged CLRA claims thirty days

23  prior to bringing a claim.  Cal. Civ. Code § 1782.  The notice

24  "requirement exists in order to allow a defendant to avoid

25  liability for damages if the defendant corrects the alleged

26  wrongs within 30 days after notice, or indicates within that 30-

27  day period that it will correct those wrongs within a reasonable

28  time."  Morgan v. AT&T Wireless Servs., Inc., 177 Cal. App. 4th

1   1235, 1261 (2d Dist. 2009).  When a plaintiff fails to comply

2   with CLRA's notice requirement, courts generally dismiss the

3   plaintiff's complaint without prejudice to plaintiff refiling

4   thirty days after giving notice.  See, e.g., Reed v. Dynamic Pet

5   Prods., Civ. No. 15-0987 WQH DHB, 2015 WL 4742202, at *8 (S.D.

6   Cal. July 30, 2015); Morgan, 177 Cal. App. 4th at 1261; Doe 1 v.

7   AOL LLC, 719 F. Supp. 2d 1102, 1110-11 (N.D. Cal. 2010).

8          Although Daniel alleged that she had provided the

9   requisite notice under section 1782 in her Complaint, (see Compl.

10  ¶ 98), the parties do not dispute that this allegation was false

11  when the Complaint was filed on November 2, 2011.  It is also

12  undisputed that Daniel provided the requisite notice on December

13  10, 2012.  Although Ford does not contend it suffered any

14  prejudice as a result of Daniel's late notice, it nonetheless

15  argues that her Complaint is subject to dismissal for failure to

16  have satisfied the notice requirement prior to filing.  While

17  Ford recognizes the dismissal would ordinarily be without

18  prejudice, it nonetheless suggests that Daniel cannot show the

19  requisite good cause to justify amending her Complaint four-and-

20  a-half years after filing it.

21         Ford's suggestion that Daniel's CLRA claims are

22  defeated because of such a technicality hardly passes the

23  straight face test.  While Daniel failed to provide the requisite

24  notice prior to filing the action, it is undisputed that Ford was

25  aware of this failure by no later than January 19, 2012.  (See

26  Answer ¶ 98 (denying the allegation that Daniel provided

27  notice).)  Despite this knowledge, Ford did not raise the lack of

28  pre-commencement notice until March 15, 2013 when it filed its

20

1    first motion for summary judgment.  Because the court granted

2    Ford's motion for summary judgment on other grounds, it did not

3    address the notice issue at that time.  Ford should not be

4    rewarded for sitting on its right to seek dismissal for over a

5    year and then utilizing its own delay to claim that Daniel cannot

6    show good cause to amend her Complaint.  A defendant can waive

7    notice under the CLRA, Outboard Marine Corp. v. Superior Court,

8    52 Cal. App. 3d 30, 41 (3d Dist. 1975), and, under the

9    circumstances of this case, the court finds that Ford waived its

10   right to pre-commencement notice.

11        Even if Ford did not waive its right to pre-

12   commencement notice, dismissal of this Complaint would achieve

13   nothing.  Any dismissal would be without prejudice and the court

14   would find good cause for plaintiff to file an amended complaint

15   in light of Ford's delay in seeking dismissal and the even

16   lengthier delay resulting from the appeal.  Because Daniel has

17   already provided notice and the Complaint alleges notice was

18   provided, an amended complaint that is identical to the operative

19   Complaint would be legally sufficient and Daniel could thus

20   refile the operative Complaint as her First Amended Complaint.

21   The court will not require such a meaningless and empty gesture.

22   Accordingly, the court will deny Ford's motion for summary

23   judgment with respect to the requisite CLRA notice.

24        B.   Express Warranty Claim

25        Lastly, and with a rather cursory analysis, Ford seeks

26   summary judgment on Daniel's express warranty claim because the

27   warranty excludes coverage for "worn out tires."  Ford made this

28   same argument to the Ninth Circuit, which the Ninth Circuit

                                   21

1  apparently determined did not even merit discussion.  (See Grant

2  Decl. Ex. HH (Appellee's Br. on Appeal) ("On appeal, as below,

3  Plaintiffs simply ignore that portion of the warranty that

4  expressly provides that it 'does not cover . . . worn out

5  tires.'").  Although Ford suggests the Ninth Circuit left this

6  issue for resolution on remand like the numerous other issues it

7  did not address on appeal, the Ninth Circuit held that the

8  express warranty covered the design defect at issue in this case,

9  Daniel, 806 F.3d at 1225, and did not include Ford's "worn out

10 tire" argument in the express list of issues it declined to

11 address, see id. at 1227 ("Because the district court did not

12 address duty to disclose, actual damages, statutorily-required

13 notice, statute of limitations, equitable restitution, and

14 sufficiency of the evidence of tire wear, we decline to do so on

15 appeal.").  Accordingly, because the Ninth Circuit has held that

16 the express warranty extends to the rear suspension design defect

17 alleged in this case, the court will deny Ford's motion for

18 summary judgment on Daniel's breach of express warranty claim.

19        IT IS THEREFORE ORDERED that defendant's motion for

20 summary judgment be, and the same hereby is, DENIED as to

21 plaintiff Margie Daniel and GRANTED as to all remaining

22 plaintiffs.  Plaintiff shall file a renewed motion for class

23 certification within thirty days of the date this Order is

24 signed.

25 Dated:  May 17, 2016

26 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

27

28

22