John B. Thomas (Bar No. 269538)
jthomas@hicks-thomas.com
Hicks Thomas LLP
8801 Folsom Boulevard, Suite 172
Sacramento, California 95826
Telephone: (916) 388-0833
Facsimile: (916) 691-3261

J. Allen Carney (*pro hac vice*)
acarney@cbplaw.com
Hank Bates (Bar No. 167688)
hbates@cbplaw.com
Carney Bates & Pulliam, PLLC
2800 Cantrell Road, Suite 510
Little Rock, Arkansas 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Counsel for Plaintiff MARGIE DANIEL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| MARGIE DANIEL, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiff,<br><br>    v.<br><br>FORD MOTOR COMPANY, a Delaware corporation,<br><br>    Defendant. | No. 2:11-cv-02890-WBS-EFB<br><br>**PLAINTIFF'S TRIAL BRIEF PURSUANT TO LOCAL RULE 285**<br><br>Judge: Hon. William B. Shubb |

{00197794.DOCX}　　　　　　　　　　1

COMES NOW, Plaintiff Margie Daniel ("Plaintiff"), individually and on behalf of the certified Class of similarly situated individuals, and submits this Trial Brief, as required by this Court's order of September 5, 2017 (ECF No. 180) and Local Rule 285.

Pursuant to Local Rule 285, Plaintiff submits this Trial Brief to set forth (1) a short statement of facts; (2) all admissions and stipulations not recited in the pretrial order; and (3) a summary of points of law, including reasonably anticipated disputes concerning admissibility of evidence, legal arguments, and citations of authority in support thereof.

## I. STATEMENT OF FACTS

Plaintiff Margie Daniel purchased a 2011 Ford Focus from Big Valley Ford (an "authorized" Ford dealer) in Stockton, California, on or about January 2, 2011. After making her purchase, she routinely maintained the vehicle with regular oil changes and tire rotations.

On August 30, 2011, and with 20,723 miles on the odometer, Ms. Daniel took her car to the same dealership and was informed she needed to purchase new tires because they were worn out. Ms. Daniel was surprised and upset that her tires would wear out so quickly. In response, Ms. Daniel was informed that the tires were not under warranty and that it was normal wear and tear for the tires to wear out at 20,000 miles. On October 16, 2011, Ms. Daniel looked at the tires and confirmed that the tires have inner edge tire wear. On November 4, 2011, with approximately 25,220 miles on her car, she bought four new tires at Big Valley Ford to replace the worn out tires on her vehicle. Since this time, Ms. Daniel has purchased additional sets of tires due to accelerated tire wear:

- On February 7, 2013, Ms. Daniel was told her tires were worn. The mileage on her vehicle was 54,565. She bought four new tires at Big Valley Ford to replace the worn out tires.

- On December 27, 2014, Ms. Daniel purchased an additional set of 4 tires from Jackson Tire to replace the old set. The mileage on her vehicle at this time is estimated to be approximately 98,000 miles.

{00197794.DOCX}  2

- On February 18, 2017, with approximately 136,790 miles on the vehicle, Ms. Daniel's tires were replaced.

Ms. Daniel, individually and on behalf of a class of similarly situated individuals, alleges that the Ford Focus vehicles, model years 2005 through 2011 ("Class Vehicles") are defective. Ms. Daniel alleges that the Class Vehicles have a defective suspension (the "Suspension Defect") that causes premature tire wear. Further, Ms. Daniel alleges that the Suspension Defect can cause serious handling, steering, stability, and braking problems on the Class Vehicles while in operation. As a result, Ms. Daniel and the Class Members have been damaged because they were sold a vehicle that contains a defect that wears out tires prematurely.

Beginning in 2005, if not before, Ford was aware that the suspension of the Class Vehicles was defective. In fact, the European division of Ford, who was also experiencing a tire wear problem on Focus vehicles, fixed the problem by implementing a change to the suspension. However, Ford decided not to implement the change to correct the problem in the United States until the 2012 model year.

Although this defect manifested itself during the warranty period, Ford has failed to repair or replace the defective components or the damaged tires under warranty as promised. Ford was aware that the Class Vehicles are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, Ford has actively concealed this defect from, and failed to disclose this defect to, Ms. Daniel and other Class Members at the time of purchase or lease and thereafter. Despite the notice of the Suspension Defect from numerous consumer complaints and dealership repair orders, Ford has not recalled the Class Vehicles to repair the defect, has not offered its customers a suitable repair or replacement free of charge, and has not offered to reimburse the Class Vehicles' owners and leaseholders the costs they incurred related to diagnosing and repairing the Suspension Defect and the related damage that it causes.

Ms. Daniel and the other Class Members have been harmed and have suffered actual damages. As a result of the Suspension Defect, the tires on the Class Vehicles must frequently

be replaced well before the expected service life of the tires. In properly functioning vehicles without the Suspension Defect, the expected tread wear of the original factory tires installed in the vehicles is estimated at 75,000 miles or more in U.S. Department of Transportation (DOT) National Highway Traffic Safety Administration's (NHTSA) Uniform Tire Quality Grade Standards (UTQG) wear tests. Ms. Daniel wants Ford to pay the repair cost to fix the Suspension Defect in the Class Vehicles, which Plaintiff's experts estimate to be $1,000 per vehicle.

## II. ADMISSIONS AND STIPULATIONS

Plaintiff set forth undisputed facts in her Pretrial Statement, to which Ford responded in its Pretrial Statement. Based on those filings, Plaintiff proposes the following admissions and stipulations and does not believe there is any dispute about the following facts:

1. Defendant Ford Motor Company ("Ford") designed, distributed, and marketed model year 2005 through 2011 Ford Focus vehicles.

2. The Ford Focus, model years 2000 through 2011, is also known as the C170 platform or program.

3. Margie Daniel purchased a 2011 Ford Focus from Big Valley Ford in Stockton, California on or about January 2, 2011.

4. Big Valley Ford is an authorized Ford dealership.

5. During the purchase process of her Focus, Margie Daniel spoke with Ford dealership sales representatives at Big Valley Ford.

6. Margie Daniel's Focus vehicle was manufactured by Ford Motor Company.

7. At the time of Margie Daniel's purchase, Ford was in the business of manufacturing automobiles.

8. Ford gave Margie Daniel a written New Vehicle Limited Warranty at the time she purchased her Ford Focus.

9. After purchase, Margie Daniel replaced her tires for the first time at 25,220 miles.

{00197794.DOCX} 4

HICKS THOMAS LLP
8801 Folsom Boulevard, Suite 172
Sacramento, California 95826
Telephone: (916) 388-0833

10. In 2008, Ford issued a Special Service Message ("SSM") to its dealers, which stated as follows:

> SOME 2008-2009 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT AND/OR REAR TIRE WEAR. TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIOR TO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT AND REAR TOE SETTINGS.

11. In 2009, Ford issued a SSM to its dealers, which stated as follows:

> SOME 2005-2009 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR A VEHICLE DRIFT CONDITION WHEN DRIVING ON WET OR SNOW PACKED ROADS. TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIOR TO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT AND REAR TOE SETTINGS.

12. In 2010, Ford issued an additional SSM to its dealers, which stated as follows:

> SOME 2005-2010 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR A VEHICLE DRIFT CONDITION WHEN DRIVING ON WET OR SNOW PACKED ROADS. TO SERVICE, REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIOR TO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT AND REAR TOE SETTINGS.

13. This special service bulletin was followed by yet another SSM, which stated as follows:

> SOME 2005-2011 FOCUS VEHICLES MAY EXHIBIT PREMATURE FRONT/REAR TIRE WEAR AND/OR A VEHICLE DRIFT CONDITION WHEN DRIVING ON WET OR SNOW PACKED ROADS. TO SERVICE,

REFER TO THE SYMPTOM CHART IN WORKSHOP MANUAL, SECTION 204-04 AND CORRECT ANY IDENTIFIED ISSUES. IF PERFORMING AN ALIGNMENT, RECORD ALL ALIGNMENT ANGLES PRIOR TO ANY ADJUSTMENTS, AND ENTER IN WARRANTY CLAIM IF APPLICABLE. TO MINIMIZE TIRE WEAR CONCERNS, POSITION ALL ALIGNMENT SETTINGS AS CLOSE TO THE MIDDLE OF THE SPECIFIED RANGE AS POSSIBLE. PAY PARTICULAR ATTENTION TO FRONT AND REAR TOE SETTINGS.

14. . TSB 03-13-5, issued by Ford in 2003, provides that "[i]f a vehicle exhibits rear inner edge tire wear, and the rear camber reading is beyond the negative end of the specification . . . then install revised +1.0 degree rear Upper Control Arm(s)." The "Service Procedure" section of the TSB refers technicians to "Workshop Manual Section 204-04" for additional information.

15. Ford has not recalled the Class Vehicles to repair the alleged defect.

16. Ford has not offered to its consumers repair or replacement parts to repair the alleged defect.

17. The National Highway Traffic Safety Administration (NHTSA) is a federal agency that describes its mission as follows: "to save lives, prevent injuries, and reduce economic costs due to road traffic, crashes, through education, research, safety standards, and enforcement." The NHTSA permits consumers to file complaints against automobile manufacturers online. The NHTSA also publishes those consumer complaints online.

18. The NHTSA has recorded and published for viewing online complaints from customers against Ford related to Focus vehicles.

19. Ford has a system referred to as CQIS that records communications between Ford and its dealers concerning vehicle-related issues, including a description of the problem, what was done to attempt to resolve the problem, and Ford's recommendations.

20. Ford's CQIS system has recorded complaints from Ford dealers to Ford about premature tire wear on the 2005-2011 Focus vehicles.

21. Ford has a system referred to as MORS that records complaints directly from customers.

{00197794.DOCX}  6

22. Ford's MORS system has recorded complaints from Ford customers to Ford about excessive tire wear on Focus vehicles.

23. Authorized Ford employees have daily access to Ford's CQIS and MORS systems.

24. In 2002, Ford engineers evaluated possible changes to the C170's rear suspension. The evaluation was characterized by these engineers as an "attempt to resolve excessive tire wear customer concerns on current production Focus vehicles."

25. By January 2003, Ford had received reports of potentially excessive tire wear from Canadian owners of Focus station wagons.

26. In 2003, Ford formed a C170 Tire Improvement Team to investigate several potential ways to improve tire wear on the Focus, which included the design of the suspension system and its alignment parameters.

27. In 2003, Ford engineers in Michigan stated in written correspondence that in Europe, the Focus platform "had a tire wear problem," which was addressed by making certain modifications to the vehicle's rear alignment settings.

28. These Ford engineers further reported in written correspondence that this "change was rejected in the US by the previous management in OPD. The reason was that there was some tooling expense to make the small kinematic changes required."

29. In 2004, a Ford Suspension/Chassis Technical Specialist, noted in written correspondence that it was "known for some time that we have quality issues regarding the suspension geo[me]try". He also wrote "tests in Europe showed a 20% increase in tire life without any shoulder wear when they changed the geometry and alignment specs. This is huge!"

30. In 2005, one Ford engineer stated in written correspondence that "the vehicle has a known rear tire wear issue."

31. In 2005, a director in vehicle engineering at Ford stated in written correspondence that "[t]ire wear has been a significant problem for the Focus."

32. In 2006, a management-level engineer stated in written correspondence that the "C170 is out of the box for nominal total rear toe at curb and further out of the box at 25 mm into jounce. The plant total rear toe spec is 0.36 deg +/- 0.20 degrees. The total rear toe on a 3 sigma vehicle can be as high as 0.56 degrees at curb and will be at approx. 0.86 degrees when loaded. The tire experts report that anything past 0.50 degree will result in excessive tire wear."

33. In 2007, it was reported by Ford engineer Paul Roberts that "We are getting quite a number of calls from FCSD [Ford Customer Service Division] about customer complaints/tires returned to the warranty center involving rear tire wear."

34. Ford engineers created an Alignment Health Chart in 2009, wherein it was recorded: "Pre-mature tire wear is an ongoing issue for C170 program."

35. In 2010, Paul Roberts, an engineer who worked at the plant that manufactured the Focus, stated in written correspondence "This car is a tire eater."

36. In 2012, the C170 platform was replaced by the C346 platform.

37. Ford's warranty database is referred to as AWS (Analytical Warranty System). In order to be included in Ford's AWS database, Ford has to pay for part or all of the repair claim.

38. Ford utilizes a system referred to as WERS (Worldwide Engineering Release System) to manage and communicate engineering information about for Ford vehicles.

### III. SUMMARY OF POINTS OF LAW

There are five claims for relief remaining for trial: (1) violation of California's Consumers Legal Remedies Act, (2) violation of California's Unfair Competition Law, (3) breach of implied warranty under California's Song-Beverly Consumer Warranty Act, (4) breach of warranty under the Magnuson-Moss Warranty Act, and (5) breach of express warranty under Cal. Com. Code § 2313. During the course of the trial, Plaintiff intends to show that Ford, in violation or breach of the foregoing laws, sold or leased Class Vehicles to consumers with an alignment/geometry defect in the Class Vehicles' rear suspensions that leads to premature, *i.e.* accelerated, tire wear, which in turn leads to safety hazards such as decreased control in handling, steering, stability, and braking, the threat of catastrophic tire failure, and drifting while

driving on wet or snow-covered roads. Based on Ford's violations and/or breaches of law, Plaintiff seeks, among other available remedies, damages in an amount equivalent to the cost to repair or replace the defect, and punitive damages.

### A. Key Points of Law

California's Consumers Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices" in the sale of goods or services to consumers. Cal. Civ. Code § 1770(a). This prohibition includes "[r]epresenting that goods or services have . . . characteristics, . . . uses, [or] benefits . . . which they do not have," and "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another." § 1770(a)(5) & (7). In a similar vein, California's Unfair Competition Law ("UCL") broadly prohibits "any unlawful, unfair or fraudulent business or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Notably, the "statute is phrased in the 'disjunctive,' and, as a result, is violated where a defendant's act or practice is unlawful, unfair, or fraudulent." *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 481 (C.D. Cal. 2012) (citing *Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1137 (2001)). "Fraudulent omissions are actionable under both consumer statutes." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

A duty to disclose exists under the CLRA and UCL in the following circumstances: (1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed. *See* ECF No. 107 (Order Denying Defendant's Motion for Summary Judgment) at 5.

Plaintiff's claims under the CLRA and the UCL are grounded on Ford (1) knowingly selling or leasing Class Vehicles with a known Suspension Defect that results in premature, or accelerated, tire wear; (2) failing to disclose the defective nature of the Class Vehicles; (3) concealing or omitting material facts; and (4) engaging in unfair and deceptive acts or practices.

{00197794.DOCX}  9

California's Song-Beverly Act imposes an implied warranty of merchantability for certain consumer goods, including the Class Vehicles at issue here. Liability for a breach of implied warranty under the Song-Beverly Act arises upon a showing of the following: (1) the plaintiff purchased or leased a consumer good manufactured by the defendant, (2) at the time of purchase, the defendant was in the business of manufacturing consumer goods, and (3) the consumer goods were not (i) of merchantable quality, or (ii) fit for their ordinary or intended purpose. *Mexia v. Rinker Boat Co., Inc.*, 174 Cal. App. 4th 1297, 1303 (Cal. App. 4th Dist. 2009); *see also* California Civil Jury Instruction 3210. In the present case, the first two prongs are not in dispute. *See* ECF No. 182 at 4 ("Ford does not dispute that Ford is in the business of manufacturing automobiles, or that the members of the class purchased or leased a 2005-2011 Ford Focus. Accordingly, there is no need to instruct the jury on these elements of the claim.").

With regard to Plaintiff's breach of express warranty claim under Cal. Comm. Code § 2313, Plaintiff must establish that Ford (1) made an affirmation of fact or a promise, or otherwise described its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) Plaintiff and the Class were harmed. *Parenteau v. GM, LLC*, 2015 U.S. Dist. LEXIS 31184, at *21 (C.D. Cal. Mar. 5, 2015); *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012). On this claim, the Ninth Circuit concluded that "Ford's express warranty is ambiguous," and "[t]he ambiguity, which is without question within a contract of adhesion, must be resolved against the draftsman, Ford." *Daniel*, 806 F.3d at 1225. As such, the Ninth Circuit held that Ford's New Vehicle Limited Warranty "must be construed to guarantee against both manufacturing and design defects." *Id.*; *see also* ECF No. 107 at 22 (noting "the Ninth Circuit held that the express warranty covered the design defect at issue in this case.").

The Magnuson-Moss Act is a federal statute that provides for a federal cause of action for state law warranty claims. *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 n. 2 (9th Cir. 2009) (noting that the substantive elements under the Magnuson-Moss Act are the same as under state warranty laws). As such, Plaintiff's claims under the Magnuson-Moss Act "stand or fall" with

the state express and implied warranty claims. *Daniel*, 806 F. 3d at 1227; *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

**B. Reasonably Anticipated Disputes Concerning Substantive Law**

1. <u>Ford Will Likely Argue that It Had No Duty to Disclose the Alleged Suspension Defect Because It Did Not Have "Exclusive" Knowledge and the Alleged Suspension Defect Was Not "Material".</u>

Plaintiff maintains, and intends to prove at trial, that Ford owed Plaintiff and the Class a duty to disclose because it had exclusive knowledge and/or actively concealed a material fact.[1] Notwithstanding the fact that Ford does not dispute that it was aware of a tire wear problem (*see* ECF No. 101-1 at 13 and ECF No. 107 at 9), Plaintiff anticipates that Ford will argue, as it did in its Renewed Motion for Summary Judgment (ECF No. 101-1), that Ford did not have "exclusive" knowledge and that the alleged Suspension Defect was not "material".

First, on the issue of materiality, the Ninth Circuit previously ruled that "[a]lleged defects that create 'unreasonable safety risks' are considered material." *Daniel*, 806 F.3d at 1226; *see also* ECF No. 107 at 6. The Ninth Circuit further opined that "a vehicle that experiences premature and more frequent tire wear would pose an unreasonable safety risk." *Daniel*, 806 F. 3d at 1226; *see also* ECF No. 107 at 8. Ford's own experts agree. *See Daniel*, 806 F. 3d at 1226 (observing "[e]ven Ford acknowledges that 'it can be dangerous to let the tires on any vehicle become excessively worn before replacing them.'"); ECF No. 107 at 8 (same).

Second, on the issue of exclusive knowledge, this Court previously stated that "courts have not defined 'exclusive' literally, but have found such claims cognizable if the defendant had 'superior' knowledge of a defect that was not readily apparent and there is no or only a limited publicly available information about the defect." ECF No. 107 at 9. This Court also rejected

---

[1] As previously noted, under the CLRA, a duty to disclose exists in the following circumstances: (1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed. ECF No. 107 (Order Denying Defendant's Motion for Summary Judgment) at 5.

{00197794.DOCX} 11

Ford's arguments that the CLRA and UCL require prospective consumers to "contact numerous technicians to find out if any of them happen to know of any tire issues or, more importantly, an undisclosed rear suspension defect" (*see* i*d*. at 11) or perform an internet search to research past complaints filed with the National Highway Traffic Safety Association (*id*. at 11-12). Against this backdrop, the Court observed "any rear suspension defect and consequent tire wear would not have been immediately apparent upon driving a Focus, but would have required thousands of miles of use before a problem might be suspected. Even then, when tire wear might have been noticeable, a reasonable consumer would be unlikely to realize that the premature tire wear was the result of a rear suspension defect." *Id*. at 14. Thus, Ford's position fails because as the evidence will show, Ford had exclusive, internal knowledge and/or actively concealed that the Class Vehicles had a Suspension Defect causing premature tire wear.

2. <u>Ford Will Likely Argue that Plaintiff's Claim for Breach of Implied Warranty Under the Song-Beverly Consumer Warranty Act Is Subject to a One-Year Durational Limitation</u>.

Plaintiff anticipates that Ford will argue that Plaintiff's claim for breach of implied warranty under the Song-Beverly Act is subject to the Act's one-year durational limitation. However, the Ninth Circuit specifically rejected this very argument and held that the Act's durational limitation was inapplicable in this case, specifically holding that it "does not create a deadline for discovering latent defects or for giving notice to the seller." *Daniel*, 806 F.3d at 1223.

3. <u>Ford Will Likely Argue that Plaintiff's Measure of Damages for Her CLRA Claim Is Improper.</u>

Plaintiff further anticipates that Ford will argue that the proper measure of damages for Plaintiff's CLRA claim is "'the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction . . .'" (ECF No. 101-1, at 17 (quoting Cal. Civ. Code § 3343(a)). However, Ford's narrow interpretation of what is recoverable pursuant to the CLRA is without merit.

The CLRA permits a consumer who suffers "***any*** damage" to recover ***any*** of the following:

    (1) Actual damages (with a $1,000 minimum in class actions),

    (2) An order enjoining the methods, acts, or practices,

    (3) Restitution,

    (4) Punitive damages, or

    (5) Any other relief that the court deems proper.

Cal. Civil Code § 1780(a). "[T]he CLRA's 'any damage' requirement is a capacious one that includes any pecuniary damage as well as opportunity costs and transaction costs that result when a consumer is misled by deceptive marketing practices." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013); *Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 88 Cal. Rptr. 3d 859, 200 P.3d 295, 299, 302-03 (Cal. 2009) (concluding the phrase "any damages" includes transaction and opportunity costs, such as attorneys' fees in connection with the challenged practice or loss of an opportunity to do business elsewhere); *see also* Cal. Civ. Code § 1782(d).

Recognizing the flawed reasoning in Ford's argument, this Court previously held that "[t]he showing of damage or actual injury under the CLRA is therefore not 'governed by Civil Code section 3343, i.e., the measure of actual damages for persons defrauded in the purchase of property.'" ECF No. 107 at 16. Based upon this conclusion, the Court opined that "Plaintiff has submitted sufficient evidence to create a triable issue of fact as to whether she incurred "any damage" necessary to sustain a CLRA claim." *Id*.

    4. <u>Ford Will Likely Argue that Plaintiff's UCL Claim Fails Because Plaintiff Cannot Prove a Measurable Amount of Restitution.</u>

In a similar vein, Plaintiff anticipates that Ford will argue that Plaintiff's UCL claim fails because Plaintiff cannot prove a measurable amount of restitution. However, on this issue, this Court previously determined that "[i]n calculating restitution, 'California law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result is an approximation.'" ECF No. 107 at 17 (quoting *Pulaski & Middleman, LLC*

*v. Google, Inc*., 802 F. 3d 979, 989 (9th Cir. 2015)). Thus, the Court held that the evidence proffered by Plaintiff's expert, i.e. a range of $845 to $1167 per Class Vehicle as an estimate to address the alleged Suspension Defect, was sufficiently probative, and any conflicting expert testimony offered by Ford must be weighed by the trier of fact. ECF No. 107 at 18.

**C. Reasonably Anticipated Disputes Concerning Admissibility of Evidence**

1. Admissibility of any opinions and related testimony of Ford's expert Thomas R. Giapponi that relate to "paper trails," as set out in Paragraph 5 on Page 16 of Mr. Giapponi's expert report dated March 15, 2013 because these opinions are not based on sufficient facts or data per Federal Rule of Evidence 702(b).

2. Admissibility of any opinions and related testimony of Ford's expert Robert J. Pascarella regarding whether the characteristics and specifications of the rear suspension of the Focus are "within the range of other mainstream vehicles," as set out on Page 12 of Mr. Pascarella's expert report dated March 15, 2013 because these opinions are not based on sufficient facts or data within the meaning of Federal Rule of Evidence 702(b).

3. Admissibility of any opinions and related testimony of Ford's expert Dr. Paul M. Taylor that analyze or otherwise concern "crash data," as laid out in Paragraphs 22-34 and 41 of Dr. Taylor's expert report dated March 15, 2013 because the underlying data was not produced in violation of Federal Rule of Civil Procedure 26(a)(2)(B)(ii) and any opinions relying on such un-produced data are inconsistent with Federal Rule of Evidence 702(b).

4. Admissibility of any opinions and related testimony of Dr. Taylor regarding statistical analysis, as Dr. Taylor is a mechanical engineer and not a statistician and does not have the requisite qualifications to provide these types of opinions per Federal Rule of Evidence 702.

5. Admissibility of CQIS reports, NHTSA ODI reports, AWS reports, TSBs or SSMs, and other records from Ford dealerships. Ford argues that the preceding evidence is hearsay under the Federal Rules of Evidence. Plaintiff maintains that the evidence is admissible because the evidence is relevant to prove that Ford had notice of the alleged defect, the evidence

falls within the hearsay exceptions in Federal Rule of Evidence 803, and the evidence is admissible to impeach the proffered testimony of Ford's witnesses expected at trial.

6. Admissibility of evidence pertaining to testing and modifications made to the Ford Focus in Europe. Ford argues that this evidence is not relevant and any probative value is outweighed by a danger of unfair prejudice. Plaintiff maintains that the evidence is admissible as it is relevant to prove that Ford had notice and knowledge of the alleged defect, the feasibility of the alternative design offered by Plaintiff, and to impeach the proffered testimony of Ford's witnesses expected at trial. Plaintiff further maintains that Ford cannot make a showing of unfair prejudice because the ***probative*** value of the evidence is substantially outweighed by any potential prejudice to Ford. *See United States v. Hankey,* 203 F. 3d 1160, 1172 (9th Cir. 2000) ("Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant cumulative probative force, dragged in by the heels for the sake of prejudicial effect."); *United States v. Newsome*, 452 F. 3d 593, 603 (6th Cir. 2006) (explaining the difference between undue prejudice and mere prejudice, stating "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis.") (quotations and citation omitted).

7. Admissibility of evidence relating to the suspension design of the Ford Focus model year 2012. Ford argues that the evidence should be not be allowed as it may be considered evidence of subsequent remedial measures. Plaintiff maintains that the evidence is admissible as it is relevant to prove that Ford had notice and knowledge of the alleged defect, the feasibility of the alternative design offered by Plaintiff, and to impeach the proffered testimony of Ford's witnesses expected at trial.

8. Admissibility of evidence pertaining to the two sets of tires that were not preserved. Ford argues that Plaintiff should be sanctioned for not preserving the two sets of tires. Plaintiff maintains that the two sets of tires were replaced as a result of Plaintiff's practice of routine maintenance on her vehicle in accord with her efforts to preserve the underlying vehicle at issue in this litigation, and her failure to retain the tires was innocent and/or accidental, and, therefore, does not justify the harsh sanctions sought by Ford. Plaintiff further maintains that Ford has failed to demonstrate any resulting prejudice, making sanctions unwarranted.

Dated: December 29, 2017.

    Respectfully submitted,

    /s/ John Thomas
    John B. Thomas
    Hicks Thomas LLP

    J. Allen Carney
    Hank Bates
    Carney Bates & Pulliam PLLC

    Counsel for Plaintiff MARGIE DANIEL